Nos. 23-35440 & 23-35450

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO,
*Defendant-Appellant*.

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.
THE STATE OF IDAHO
*Defendant*,
v.
MIKE MOYLE, Speaker of the Idaho House of Representatives; et al.,
*Intervenors-Appellants*.

Appeal from the United States District Court
for the District of Idaho
Honorable B. Lynn Winmill
(1:22-cv-00329-BLW)

## INTERVENORS-APPELLANTS' OPPOSED MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

# INTRODUCTION

At issue here is whether the United States can lawfully prevent the State of Idaho from regulating abortion by contriving a mandate contrary to federal law. Idaho Code § 18-622 (section 622) prohibits abortion unless authorized. Before it could come into force, the United States sued Idaho, claiming that section 622 is preempted by the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA). The district court issued a preliminary injunction and reaffirmed that order when denying motions for reconsideration. This appeal followed.

The motion seeks a stay pending appeal. Intervenors-Appellants, the Speaker of the Idaho House of Representatives Mike Moyle, Idaho Senate President Pro Tempore Chuck Winder, and the Sixty-Seventh Legislature (Legislature) respect-fully move this Court for a stay of the district court's orders dated May 4, 2023 (Dkt. 135) (May Order or Exh. 1) and August 24, 2022 (Dkt. 95) (August Order or Exh. 2), until a final disposition of the pending appeal before this Court and proceedings before the Supreme Court of the United States.[1]

The Legislature satisfies the standard for issuing a stay pending appeal. Every day that the preliminary injunction prevents the operation of Idaho law inflicts

---

[1] The Legislature satisfied FRAP 8 by filing a motion for a stay with the district court. *See* Mot. to Stay Pending Appeal (Dkt. 140) (Exh. 3). That motion was fully briefed on August 4, 2023, but the district court has not acted on it. As for Circuit Rule 27-1, opposing counsel has confirmed that the United States opposes the motion.

irreparable harm on the State. The Legislature has a strong likelihood of success on the merits since the preliminary injunction rests on a conflict between federal and state law that does not exist. Congress expressly limited the preemptive reach of EMTALA, and it cannot preempt state laws like section 622. EMTALA does not impliedly require a hospital to perform abortions; rather, it expressly requires emergency medical care for *both* a pregnant woman *and* her unborn child. Giving EMTALA the gloss preferred by the government will violate the major questions doctrine, as well as the Tenth Amendment and the Spending Clause. Finally, the public interest and balance of the equities point toward a stay.

## ARGUMENT

A familiar four-part standard governs when to issue a stay pending appeal:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted). Irreparable injury and the likelihood of success "are the most critical." *Id.* at 434. When those are satisfied, a court will consider "the harm to the opposing party and weighing the public interest"—factors that "merge when the Government is the opposing party." *Id.* at 435.

This Circuit uses a "sliding scale" approach, under which "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rock-*

*ies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam) (applying the sliding scale approach to a stay pending appeal). Analysis may begin with irreparable harm. *See Leiva-Perez*, 640 F.3d at 965; *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020).

## I. THE IDAHO LEGISLATURE WILL SUFFER IRREPARABLE INJURY WITHOUT A STAY.

The Legislature can readily show that "a stay is necessary to avoid likely irreparable injury to the [Legislature] while the appeal is pending." *Wolf*, 952 F.3d at 1007. The Supreme Court has held that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). That holding reflects the broader principle that a State suffers "ongoing irreparable harm" whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Other circuits have applied that principle when considering whether an injunction inflicts irreparable injury. *See, e.g.*, *Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) (quoting *King*, 567 U.S. at 1303); *District 4 Lodge of the Int'l Ass. Of Machinists v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (same); *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (same).

3

Last August, the district court issued a preliminary injunction blocking the operation of section 622. *See* Exh. 2, at 38–39. That interference with "a duly enacted statute" constitutes irreparable harm by itself. *King*, 567 U.S. at 1303. Every day that passes with that injunction in place obstructs the State from carrying out a duly adopted law reflecting Idaho's historic policy of disfavoring abortion. *See Planned Parenthood Great N.W. v. State*, 522 P.3d 1132, 1148 (Idaho 2023) (describing Idaho's "history and traditions" prohibiting abortion unless authorized by law).

Beyond the intrinsic harm of impeding Idaho law, the preliminary injunction prevents the exercise of Idaho's constitutional authority to regulate abortion, which the Supreme Court has directly recognized. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The preliminary injunction thwarts Idaho's exercise of democratic self-government as *Dobbs* promised states were free to do.

A stay will not cause irreparable injury to the United States. Allowing section 622 to operate as intended does not impose "irreparable" harm since the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam), *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017).[2]

---

[2] Third-party harm does not count as irreparable injury to the government. *See Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020).

4

## II.    THE IDAHO LEGISLATURE HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

*Nken* requires "a strong showing" that the party requesting a stay is likely to succeed. 556 U.S. at 434. "[S]atisfaction of this factor is the irreducible minimum requirement to granting any equitable and extraordinary relief." *City and Cnty. of San Francisco v. U.S. Citizenship and Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019). But "the minimum quantum of likely success necessary to justify a stay" consists of demonstrating that "serious legal questions are raised." *Leiva-Perez*, 640 F.3d at 967-68 (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)). That is certainly so here.

### A.    The Preliminary Injunction Rests on an Asserted Conflict Between Federal and Idaho Law.

The May Order appealed from here reaffirmed the preliminary injunction issued in August 2022. *See* Exh. 1, at 11. That injunction "restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by [EMTALA], 42 U.S.C. § 1395dd." Exh. 2, at 38. In the district court's view, "the Supremacy Clause says state law must yield to federal law when it's impossible to comply with both," and section 622 "conflicts with" EMTALA. *Id.* at 3. Section 622 is enjoined "to the extent that statute conflicts with EMTALA-mandated care." *Id.* That injunction and its rationale harbor multiple errors.

5

### B. EMTALA Cannot Preempt Section 622.

The preliminary injunction rests on the district court's ruling that "there will always be a conflict between EMTALA and Idaho Code § 18-622" because "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." *Id*. at 18, 19. While acknowledging that EMTALA contains "an express preemption provision," the court concluded that section 622 fails both impossibility and obstacle preemption. *Id.* at 19 (citing *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993)). But that approach to preemption fails to account for this Court's instruction to "construe [EMTALA's] preemptive effect as narrowly as possible." *Draper*, 9 F.3d at 1393. It also disregards an express preemption provision in the Medicare Act.

EMTALA says that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement ***directly*** conflicts with a requirement of this section." 42 U.S.C. § 1359dd(f) (emphasis added). The baseline is non-preemption. *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) (referring to EMTALA's "non-preemption provision"). EMTALA preempts only when state law "directly conflicts." 42 U.S.C. § 1359dd(f). Given the adverb "directly," an implied duty under EMTALA does not pose a *direct* conflict with state law. Yet the government's purported mandate to provide an abortion arises by implication—from EMTALA's general duty for a physician to "provide

6

stabilizing treatment" for a patient with an emergency medical condition." Exh. 2, at 19. Such an implied duty cannot "directly" conflict with Idaho law.

Further limiting EMTALA's preemptive force is the Medicare Act. It directs that "[n]othing in this subchapter [the Medicare Act] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. This provision governs EMTALA since it is part of the Medicare Act. So EMTALA cannot confer federal "supervision or control over the practice of medicine or the manner in which medical services are provided." *Id.*; *see also Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995) ("Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay."). The preliminary injunction thus offends section 1395 by seizing control of "the practice of medicine" regarding abortion. 42 U.S.C. § 1395.

Because the preliminary injunction exceeds these limits on EMTALA's preemptive reach, it is void and should be vacated.

### C. EMTALA Does Not Mandate Abortion.

Even without sharp limits on EMTALA's preemptive authority, the preliminary injunction has no foundation. It rests on the conclusion that "EMTALA

obligates the treating physician to provide stabilizing treatment, including abortion care." Exh. 2, at 19. But EMTALA's text repudiates such an obligation.

EMTALA says nothing about abortion. The statute can be said to require abortions as emergency care, if at all, only by implication. Indeed, the statutory text shows that Congress intended for hospitals to provide medical care to a pregnant woman *and* her unborn child—not to force hospitals to perform abortions.

EMTALA's express duties are simple and few. A Medicare-participating hospital must (1) perform "an appropriate medical screening examination" to see whether the patient has an emergency medical condition, 42 U.S.C. § 1395dd(a); conduct a further medical exam along with "such treatment as may be required to stabilize the medical condition" or send the patient "to another medical facility," *id.* § 1395dd(b)(1); transfer a patient with an emergency medical condition that has not been stabilized only as provided and where "appropriate," *id.* § 1395dd(c)(1), (2).

These duties arise when a patient has an "emergency medical condition," as the statute defines it. *Id.* § 1395dd(e)(1). A pregnant woman suffers from an "emergency medical condition" triggering the hospital's duty of care if "the absence of immediate medical attention" could put "the health of the woman or her unborn child in serious jeopardy." *Id.* § 1395dd(e)(1)(A) (punctuation altered). That definition also details when "a pregnant woman who is having contractions" is suffering from an emergency medical condition. *Id.* § 1395dd(e)(1)(B). This occurs if a physician

determines that "(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child." *Id.* Transferring her to another facility is forbidden unless there is time enough for "a safe transfer … *before* delivery." *Id.* § 1395dd(e)(1)(B)(i) (emphasis added). Then there is a catchall prohibition on any transfer that "may pose a threat to the health or safety of the woman or the unborn child." *Id.* § 1395dd(e)(1)(B)(ii). Even the prospect of such a threat bars a transfer. The hospital is thus obliged to consider not only the unborn child's life, but his or her "health or safety." *Id.*; *accord* 42 C.F.R. § 489.24 (same).

Repeatedly, then, EMTALA expresses Congress's commitment to protect *both* a pregnant woman *and* her unborn child. At no point does the statute suggest that the mother's health should take priority over the child's life. Only the United States (and the preliminary injunction) does that.

### D. The District Court's Orders Misconstrue EMTALA.

*First*, the decision below goes awry by discarding subsection (B) of EMTALA's definition of *emergency medical condition*, 42 U.S.C. § 1395dd(e)(1). *See* Exh. 2, at 4 n.1. Statutory provisions describing when "a pregnant woman who is having contractions" suffers an emergency medical condition are plainly relevant to the government's claim that EMTALA requires abortion. 42 U.S.C. § 1395dd(e)(1).

*Second*, the preliminary injunction unaccountably removes the phrase "or her unborn child" when describing how EMTALA and Idaho law conflict. *Id.* at § 1395dd(e)(1)(A)(i). The August order enjoins section 622 insofar as it interferes with an abortion deemed "necessary to avoid (i) 'placing the health of' a pregnant patient 'in serious jeopardy'; (ii) a 'serious impairment to bodily functions' of the pregnant patient; or (iii) a 'serious dysfunction of any bodily organ or part' of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii)." Exh. 2, at 38–39. Omitting "or her unborn child" from the statute wrongly reduces EMTALA's text to "mere surplusage." *Am. Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002) (cleaned up). Excising the statute's reference to unborn children in a case that tests how far Idaho law can protect them is profoundly troubling.

*Third*, the district court is likewise mistaken to say that EMTALA "calls for stabilizing treatment, which of course may include abortion care." Exh. 2, at 21. Stabilizing treatment is required only when a patient with an emergency medical condition cannot be transferred to another facility, consistent with statutory criteria. *See* 42 U.S.C. §§ 1395dd(b)(1); 1395dd(c). Even then, the definition of *stabilized* undermines the notion of requiring a hospital to perform an abortion for that purpose. After all, EMTALA's only approved form of stabilizing care is to ensure that "the [pregnant] woman has delivered (including the placenta)." *Id* § 1395(e)(3)(B).

In short, Congress's repeated command to deliver emergency medical care to both a pregnant woman and her unborn child refutes the government's contention that EMTALA requires hospitals to perform abortions.

### E. Construing EMTALA as an Abortion Mandate Violates the Major Questions Doctrine.

The district court's reading of EMTALA collides with the major questions doctrine. Under that doctrine, courts presume that Congress will "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). In that instance, "something more than a merely plausible textual basis" is necessary, *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022): only "clear congressional authorization" will do. *Util. Air*, 573 U.S. at 324. Indeed, "exceedingly clear language" is necessary if Congress "wishes to significantly alter the balance between federal and state power." *U.S Forest Serv. v. Cowpasture River Preserv. Assn.*, 140 S. Ct. 1837, 1849–50 (2020). Requiring "a clear statement," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023), of congressional authority to justify the consequential exercise of executive power rests on "both separation of powers principles and a practical understanding of legislative intent." *W. Va.*, 142 S. Ct. at 2609.

This is a quintessential major questions doctrine case.

*First*, the United States "claims to discover in a long-extant statute an unheralded power" to control national abortion policy. *Util. Air*, 573 U.S. at 324.

11

Accepting the government's gloss on EMTALA "would bring about an enormous and transformative expansion in [the Executive Branch's] regulatory authority without clear congressional authorization." *Id.* By the government's logic, all sorts of medical mandates can be inferred from the versatile phrase "necessary stabilizing treatment." 42 U.S.C. § 1395dd. But the idea that Congress hid such consequential power in a remote corner of the Medicare Act is wholly implausible.

*Second*, the government's reading of EMTALA is unprecedented. *See Texas v. Becerra*, 623 F. Supp. 3d 696, 735 (N.D. Tex. 2022). That novelty is another powerful strike against construing EMTALA as an abortion mandate.

*Third*, the government's claim that federal law requires hospitals to perform abortions even when prohibited by state law is a matter of "vast … political significance," *Util. Air*, 573 U.S. at 324 (quotation omitted). The Supreme Court's decision in *Roe v. Wade* to constitutionalize abortion "sparked a national controversy" for the past half-century. *Dobbs*, 142 S. Ct. at 2241. Controversy will inflame national politics no less if the Executive Branch is allowed to exercise "highly consequential power [over abortion] beyond what Congress could reasonably be understood to have granted," *W. Va.*, 142 S. Ct. at 2609, and to "significantly alter the balance between federal and state power," without "exceedingly clear language" from Congress. *Cowpasture River*, 140 S. Ct. at 1849–50.

These signs of executive overreach oblige the United States to identify "more than a merely plausible textual basis" to justify the assault on Idaho law. *W. Va.*, 142 S. Ct. at 2609. The government must pinpoint "'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air*, 573 U.S. at 324). And that it cannot do. The only statutory text propping up the government's claim is broad language requiring a hospital to deliver "such treatment as may be required to stabilize the medical condition" of a patient with an emergency medical condition. 42 U.S.C. § 1395dd(b)(1)(A). This "wafer-thin reed" is all the United States has to support its claim to "sweeping power" over abortion. *Ala. Assoc. of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Without clear congressional authority, the government's interpretation should be rejected.

*Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), poses no obstacle to applying the major questions doctrine. Even if the doctrine does not apply to actions of the President, *see id.* at 933, EMTALA is unlike the Procurement Act since it does not grant discretionary authority to the President. And unlike *Mayes*, political accountability remains a concern because the suit is brought under the direction of the Attorney General, an appointed official—not an elected one. *See* 28 U.S.C. § 503. The leeway owing to a President acting under an express grant of congressional authority, *see Mayes*, 67 F.4th at 933, is misplaced when considering the lawfulness of asserted executive authority without a presidential overlay.

**F.     The District Court Mischaracterized Section 622 as a Risk to the Life and Health of Women in Crisis.**

The federal-state conflict at the root of the preliminary injunction appears no better from the perspective of state law.

In the district court's telling, section 622 is unduly harsh. "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care. But regardless of the pregnant patient's condition, Idaho statutory law makes that treatment a crime." Exh. 2, at 19. Pressing further, the court asks the reader to imagine "the pregnant patient, laying on a gurney in an emergency room facing the terrifying prospect of a pregnancy complication that may claim her life" but where "her doctors feel hobbled by an Idaho law that does not allow them to provide the medical care necessary to save her health and life." Exh. 2, at 36–37. Framing section 622 in these emotional terms is highly misleading. Far from posing an arbitrary obstacle to decent medical care, section 622 simply restores Idaho law to its pre-*Roe* condition under which performing an elective "abortion was viewed as an immoral act and treated as a crime." *Planned Parenthood*, 522 P.3d at 1148.

To start, Idaho law does not treat all medical procedures to terminate a pregnancy as an abortion. By statute, *abortion* is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood,

14

cause the death of the unborn child." IDAHO CODE § 18-604(1). The Idaho Supreme Court ruled that pregnancy complications like preeclampsia, as well as ectopic pregnancy and other non-viable pregnancies are outside the scope of section 622. *See Planned Parenthood*, 522 P.3d at 1202–03. A doctor faces no liability if giving a pregnant mother needed medical treatment accidentally results in the death of an unborn child. *See* IDAHO CODE §§ 18-622(4) (statutory exemption); *id.* § 18-604(1) (defining *abortion* as using some means "to intentionally terminate" a pregnancy).

Besides defining abortion narrowly, section 622 contains straightforward exceptions authorizing abortion to save a woman's life or (during the first trimester) to terminate a pregnancy from rape or incest. IDAHO CODE §§ 18-622(2), 18-622(2)(b). A physician does not risk prosecution because he performed an abortion believing that a woman's life was at risk. Statutory exceptions protect a physician who acts "in his good faith medical judgment and based on the facts known to the physician at the time." *Id.* §§ 18-622(2)(a)(i), (ii). Given that safe harbor, section 622 should no longer "deter physicians from providing abortions in some emergency situations." Exh. 1, at 6; *accord* Exh. 2, at 26. Yet the May Order neglects to acknowledge these important amendments.

Hence, the federal-state conflict conceived by the district court is false at both ends. Reading EMTALA as an abortion mandate defeats Congress's evident intent to secure emergency medical care for both a pregnant woman and her unborn child,

and Idaho's section 622 is not the draconian measure portrayed by the lower court. Because EMTALA and section 622 do not conflict, the preliminary injunction has no basis. It should be vacated and the decision below reversed.

### G. Construing EMTALA as an Abortion Mandate Raises Significant Constitutional Objections.

#### 1. *The preliminary injunction violates the Tenth Amendment.*

The decision below contradicts the Tenth Amendment in two ways.

Enjoining section 622 unlawfully deprives the State of Idaho of its sovereign authority to regulate abortion. *Dobbs* holds that the Constitution reserves that power to the states. *Dobbs*, 142 S. Ct. at 2279 (holding that "the authority to regulate abortion must be returned to the people and their elected representatives"). The decision below thwarts Idaho from charting its own course on abortion. Courts require "exceedingly clear language" if federal law is to "alter the balance between federal and state power," *Cowpasture River*, 140 S. Ct. at 1849-50, and EMTALA is "exceedingly clear," *id.*—but in the opposite direction. The district court evidently missed the federalism implications of reading EMTALA as an abortion mandate.

#### 2. *The decision below violates the Spending Clause.*

The construction of EMTALA adopted by the district court transgresses the Spending Clause. *See* U.S. Const. art. I, § 8.

*First*, that Clause forbids the United States from coercing an unwilling state into complying with a regulatory command. But that is what the government does

16

by threatening the State of Idaho with the loss of all Medicare funding (of which EMTALA-related funding is a small part) unless Idaho hospitals obey the government's baseless reading of EMTALA. *See NFIB v. Sebelius*, 567 U.S. 519, 582 (2012) (holding that a provision of the ACA amounted to "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion"). Here, the United States says that section 622 denies it "the benefit of its bargain … by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA." Complaint, Dkt. 1, at 13 (Exh. 4). The government adds that section 622 "undermines the overall Medicare program and the funds that the United States provides in connection with that program …." *Id.* at 13–14. This suggests that Idaho hospitals must perform abortions when the United States says that EMTALA requires it or risk the loss of billions in Medicare funding. The scale of that risk is eye-popping. Idaho received "approximately ***$3.4 billion*** in federal Medicare funds" between 2018-2020. USA Memo ISO Motion for Prelim. Inj., Dkt. 17-1, at 6 (emphasis added) (Exh. 5). HHS Secretary Becerra made the threat crystal clear by warning that any Medicare-funded hospitals that adheres to state law rather than to the government's conception of EMTALA risks "termination of its Medicare provider agreement." Letter from Secretary Becerra to Health Care Providers, July 11, 2022, at 2, *available at* https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf.

17

*Second*, the requirement pressed by the United States is retroactive. It comes long after Idaho agreed to the conditions of participating in Medicare. Imposing a novel mandate retroactively is another way that the government violates the Spending Clause. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981).

## III.   GRANTING A STAY SERVES THE PUBLIC INTEREST AND APTLY BALANCES THE EQUITIES.

*Nken* holds that the remaining factors—harm to the opposing party and the public interest—"merge when the Government is the opposing party." 556 U.S. at 435. These factors too weigh in favor of a stay.

The public interest is served by confining the government within its lawful bounds and "maintaining our constitutional structure" of powers divided among the three branches of the national government and between the federal government and the states. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). *See also Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (the public interest would be served by "respecting the Constitution's assignment of the power of the purse to Congress, and by deferring to Congress's understanding of the public interest"). *Dobbs* recognizes that the State of Idaho is free to strike its own balance between safeguarding the health and safety of its women and the lives of its unborn children. That same interest is reflected in EMTALA's requirement to furnish emergency medical care for both a pregnant woman and her unborn child. *See* 42 U.S.C. §

18

1395dd(e)(1). And it is consistent with non-preemption provisions in EMTALA, 42 U.S.C. § 1395dd(f), and the Medicare Act. 42 U.S.C. § 1395.

The district court thought otherwise. To it, a "key consideration" is "what impact an injunction would have on non-parties and the public at large." Exh. 2, at 36 (citing *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003)). The public at large would be best served, the court said, by vindicating the Supremacy Clause. *See id.* In addition, the court discerned that "allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho." *Id.* And hospital capacity in neighboring states "would be pressured as patients may choose to cross state lines to get the emergency care they are entitled to receive under federal law." Exh. 2, at 37-38. Compared to these interests, the district court said that "the State of Idaho will not suffer any real harm if the Court issues the modest preliminary injunction the United States is requesting." Exh. 2, at 38. Accordingly, the court ruled that "the public interest lies in favor of enjoining the challenged Idaho law to the extent it conflicts with EMTALA." *Id.*

Yet section 622 expressly authorizes necessary medical care for pregnant women in distress. *See* IDAHO CODE §§ 18-622(2), (4), (5). There is no reasonable prospect that a woman suffering from preeclampsia or the side-effects of an ectopic pregnancy will be denied medical care because of section 622. Preeclampsia is a dangerous condition that poses a genuine threat to a woman's life, and section 622

19

expressly authorizes an abortion where a physician judges it in good faith to be necessary. *See id.* § 18-622(2). An ectopic pregnancy can also be life-threatening and even when not, its removal is not an abortion under Idaho law. *See Planned Parenthood*, 522 P.3d at 1203. Since EMTALA does not dictate any particular form of medical treatment—including abortion—an Idaho doctor complies with EMTALA by giving a pregnant woman with an emergency medical condition the same care provided to any similarly situated patient, regardless of the patient's ability to pay. That may include treatments other than abortion.

The lower court's focus on "non-parties and the public at large," Exh. 2, at 36, is mistaken when the likelihood of success on the merits "is the most important" factor in evaluating an injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Also, what matters under the "balance of equities" prong are "the burdens or hardships to [the plaintiff] compared with the burden on [the State of Idaho and the Legislature] if an injunction is ordered." *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Properly focused, the balance tips in the Legislature's favor. For the Legislature, the preliminary injunction interposes federal judicial power on an issue of profound importance to Idaho. Elected state officials acted in good faith by adopting section 622 in harmony with Supreme Court precedent. Enjoining Idaho law is an affront to the State that only searching judicial review can justify.

By comparison, the United States has no legitimate interest in forcing compliance with an implied mandate contrary to EMTALA's text and context. Surely, there is no public interest in replacing Idaho's conception of abortion policy with the federal government's. Reasonable minds differ about when the law should authorize an abortion. But Idaho's elected officials have duly adopted laws restoring the State's historic commitment to protecting unborn life. *See Planned Parenthood Great N.W.*, 522 P.3d at 1148 (describing Idaho's "history and traditions" respecting the regulation of abortion). And nothing in EMTALA bars that choice.

## CONCLUSION

For these reasons, the Legislature respectfully requests a stay of the district court orders dated August 24, 2022 and May 4, 2023, pending final disposition of the appeal before this Court and proceedings before the Supreme Court of the United States.

Respectfully submitted,

*/s/ Daniel W. Bower*
Daniel W. Bower
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

*Counsel for Intervenors-Appellants*

August 22, 2023

21

**CERTIFICATE OF COMPLIANCE PURSUANT TO
CIRCUIT RULE 32-1 FOR CASE NOS. 23-35440 & 23-35450**

I hereby certify that this brief complies with the word limits permitted by

FRAP 27(d)(2)(A). The motion is 4,984 words, excluding the cover and documents

exempted by FRAP 27(a)(2)(B). The brief's type size and typeface comply with

FRAP 32(a)(5) and (6).

Dated: August 22, 2023        */s/ Daniel W. Bower*
                              Daniel W. Bower

                              *Counsel for Intervenors-Appellants*

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:22-cv-00329-BLW |
| v. | |
| THE STATE OF IDAHO, | **MEMORANDUM DECISION AND ORDER** |
| Defendant, | |
| SCOTT BEDKE, in his official capacity as Speaker of the House of Representatives of the State of Idaho; CHUCK WINDER, in his capacity as President Pro Tempore of the Idaho State Senate; and the SIXTY-SIXTH IDAHO LEGISLATURE, | |
| Intervenor-Defendants | |

**INTRODUCTION**

Idaho Code § 18-622 makes it a felony for anyone to perform or attempt to perform or assist with an abortion. Idaho Code § 18-622(2). The law, which the Idaho Supreme Court refers to as the "Total Abortion Ban," criminalizes *all* abortions, without exception – offering only the "cold comfort" of two narrow affirmative defenses. *Memorandum Decision and Order dated August 24, 2022*, p. 1, Dkt. 95. As relevant here,

an accused physician may avoid *conviction* when the physician determines in her good faith medical judgment that the abortion is necessary to prevent the death of a pregnant woman. *Id.* § 18- 622(3). The affirmative defense does not protect a physician who performs an abortion "merely" to prevent serious harm to the patient, rather than to save her life. Nor does the affirmative defense insulate the physician from criminal *prosecution* under any circumstances. Instead, it shifts the burden of proof from the prosecution to the criminal defendant to prove at trial that the abortion was necessary to prevent the death of the mother – in a sense, presuming the defendant guilty until she proves herself innocent.

The Total Abortion Ban, even before it went into effect, has engendered various legal challenges in both federal and state court. In this Court, the United States sued to enjoin the ban to the extent it conflicted with the federal Emergency Medical Treatment and Labor Act ("EMTALA"), which requires hospitals that accept Medicare funds to offer stabilizing treatment—including, in some cases, treatment that would be considered an abortion—to patients who present at emergency departments with emergency medical conditions. Because the Total Abortion Ban criminalizes medical care that federal law requires hospitals to offer, this Court enjoined Idaho Code § 18-622 to the extent it conflicts with EMTALA. *See Memorandum Decision and Order, dated August 24, 2022* ("*August 24, 2022 Injunction*"). Rather than appealing this decision the State of Idaho and the Idaho Legislature have filed motions for reconsideration, which are now pending before the Court. (Dkt. 97 & 101).

MEMORANDUM DECISION AND ORDER - 2

Parallel to this litigation, a challenge to the constitutionality of the ban under the Idaho Constitution proceeded separately before the Idaho Supreme Court. *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. State ("Planned Parenthood")*, Idaho Supreme Court Docket No. 49817-2022 (Idaho June 27, 2022) (Petition for Writ of Prohibition). On January 5, 2023, while the motions for reconsideration remained pending, the Idaho Supreme Court issued its decision in *Planned Parenthood*, upholding the constitutionality of the Total Abortion Ban under the Idaho Constitution. *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (2023). The Idaho Supreme Court also construed the scope of Idaho's Total Abortion Ban in rendering its decision.

After the Idaho Supreme Court issued its decision in *Planned Parenthood*, both the State and the Legislature requested to file supplemental briefing in support of their motions for reconsideration. This Court granted their request. Now, in addition to their arguments raised in their initial round of briefing, both the State and the Legislature argue that the *Planned Parenthood* decision eliminated any conflict between EMTALA and the Total Abortion Ban, obviating any need for the preliminary injunction entered in this case. *See* Dkts. 126, 127. As explained below, the Court will deny the motions for reconsideration.

## ANALYSIS

### 1.  Motion to Reconsider Standard

"Reconsideration is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 540 F. Supp. 2d 1176, 1179 (D. Or. 2008) (quoting *Kona Enterprises,*

*Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)) (internal quotation marks omitted); *see also Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). A motion to reconsider should therefore be granted only if the moving party can show an intervening change in controlling law, new evidence has become available, or the district court committed clear error, or the initial decision was manifestly unjust. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. California*, 649 F.Supp.2d 1063, 1069-70 (E.D. Cal. 2009) (citing *Sch. Dist. No. 1J Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)).

"Motions for reconsideration are generally disfavored, and, in the absence of new evidence or change in the law, a party may not use a motion to reconsider to present new arguments or evidence that could have been raised earlier." *Adidas*, 540 F. Supp. 2d at 1180 (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991)). "Motions to reconsider are also not vehicles permitting the unsuccessful party to 'rehash' arguments previously presented." *Cachil Dehe Band*, 649 F. Supp. 2d at 1069–70 (quoting *United States v. Navarro*, 972 F.Supp. 1296, 1299 (E.D.Cal.1997), *rev'd on other grounds*, 160 F.3d 1254 (9th Cir. 1998) (internal quotation marks omitted)). "Ultimately, a party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." *Id.* (quoting *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 (E.D.Cal. 2001). (internal quotation marks omitted)).

**2.  The Legislature and State Fail to Meet the Demanding Standard for Reconsideration in their Initial Briefing.**

The Legislature and the State's motions fail to meet the demanding standard the Ninth Circuit has set for succeeding on reconsideration. In their original round of briefing on their motions to reconsider, the Legislature and the State do not identify an intervening change in controlling law or newly discovered evidence. Instead, they argue that this Court "committed clear error or made a decision that was manifestly unjust" when it granted the United States' motion for preliminary injunction. But then the Legislature and the State simply proceed in rehashing arguments previously presented or in making additional arguments that they could have raised earlier.

To the extent the Legislature and the State merely express their disagreement with the Court's decision and recapitulate the cases and arguments considered by the Court before rendering its initial decision, they have failed to carry their heavy burden on reconsideration. The Court will therefore deny their motions to reconsider on any of the grounds raised in their initial round of briefing. To the extent, however, the Idaho Supreme Court decision in *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (2023), somewhat altered the legal landscape since the Court issued its preliminary injunction, it merits some discussion.

**3.  The *Planned Parenthood* Decision Did Not Negate the Fundamental Principles Underpinning the Court's Preliminary Injunction.**

In their supplemental briefing, the Legislature and the State suggests the Idaho Supreme Court's decision in *Planned Parenthood* amounts to an intervening change of controlling law, warranting reconsideration of the Court's preliminary injunction order.

They argue the Idaho Supreme Court "defined the scope of Idaho Code § 18-622 in at least two ways that conflict with this Court's interpretation of that law," upending this Court's analysis finding a conflict between the Total Abortion Ban and EMTALA. *See Id's Supp. Br.*, Dkt. 127. The Court disagrees.

In its preliminary injunction decision, the Court concluded that the Total Abortion Ban conflicts with EMTALA under principles of both impossibility and obstacle preemption. *August 24, 2022 Injunction*, pp. 19-34, Dkt. 95. First, the Court determined that, by virtue of the Total Abortion Ban's affirmative defense structure, "it is impossible to comply with both laws" because "federal law requires the provision of care and state law criminalizes that very care." *Id.* at 19. Second, this Court found that "the plain language of the statutes demonstrates that EMTALA requires abortions that the affirmative defense would not cover." *Id*. at 20. And third, this Court concluded that "Idaho's criminal abortion law will undoubtedly deter physicians from providing abortions in some emergency situations," which "would obviously frustrate Congress's intent to ensure adequate emergency care for all patients who turn up in Medicare-funded hospitals." *Id.* at 26.

In the *Planned Parenthood* decision, the Idaho Supreme Court confirmed that: (1) Idaho Code § 18-622 criminalizes *all* abortions, 522 P.3d at 1152 ("Unlike Idaho's historical abortion laws, which provided an exception to 'save' or 'preserve' the life of the woman, the Total Abortion Ban makes all 'abortions' a crime."); (2) the affirmative defense covers a narrower set of circumstances than those in which EMTALA requires a

MEMORANDUM DECISION AND ORDER - 6

hospital to offer stabilizing treatment, *id.* at 1196 (noting Idaho Code § 18-622 "does *not* include the broader 'medical emergency' exception for abortions" contained in Idaho Code § 18-8804(1)); and (3) a provider's invocation of the affirmative defense may still be challenged at trial, after the provider has been charged, arrested, and potentially detained, and thus will continue to deter the provision of medically necessary abortions, *id.* (noting "a physician who performed an "abortion' …could be charged, arrested, and confined until trial *even if* the physician initially claims they did it to preserve the life of the mother….[and] "[o]nly later, at trial, would the physician be able to raise the affirmative defenses available in the Total Abortion Ban").

In other words, the Idaho Supreme Court's decision in *Planned Parenthood* confirms each of the fundamental principles that underpinned this Court's decision enjoining Idaho Code § 18-622 to the extent it conflicts with EMTALA; it therefore does not provide a basis for this Court to reconsider its decision. By contrast, the aspects of the Idaho Supreme Court's decision on which the State and Legislature focus—i.e., that the affirmative defense is subjective rather than objective, and that the Total Abortion Ban does not apply to ectopic or other nonviable pregnancies—do not fundamentally alter this Court's preemption analysis.

The Idaho Supreme Court held that the necessary-to-prevent-death affirmative defense "does not require *objective* certainty" nor "a particular level of immediacy" before the abortion can be "necessary" to prevent a pregnant woman's death. *Planned Parenthood*, 522 P.3d at 1203. Thus, according to the State, because the affirmative

MEMORANDUM DECISION AND ORDER - 7

defense is "subjective" rather than objective, "there is no conflict" between the Total

Abortion Ban and EMTALA because the ban "does not require a 'medically impossible'

determination that a pregnant woman is certain to die without an abortion," and neither

does it promote delays or worsened patient outcomes by encouraging physicians to wait

to provide care until a pregnant woman is nearer to death. *Id. Supp. Br*., pp. 1-2, Dkt. 127.

First, this argument ignores – as the Idaho Supreme Court decision makes clear –

that "the Total Abortion Ban makes all 'abortions' a crime," and "a physician who

perform[s] an 'abortion'… [can] be charged, arrested, and confined until trial *even if* the

physician initially claims they did it to preserve the life of the mother." *Planned*

*Parenthood*, 522 P.3d at 78 (emphasis in original). "Only later, at trial, would the

physician be able to raise the affirmative defenses available under the Total Abortion

Ban…to argue it was a *justifiable* abortion that warrants acquittal and release." *Id.*  This

is true regardless of whether the affirmative defense is "subjective" or "objective." It also

remains true that EMTALA requires physicians to offer medical care that state law

criminalizes. Thus, the Idaho Supreme Court's decision, as consistent with this Court's

holding, confirmed – rather than eliminated – the conflict between EMTALA and the

Total Abortion Ban: Because "federal law requires the provision of care and state law

criminalizes that very care, it is impossible to comply with both laws" and the state law is

preempted. *August 24, 2022 Injunction*, p. 19, Dkt. 95.

Second, this argument ignores a second key rationale undergirding this Court's

preliminary injunction decision: the affirmative defense applies to a narrower scope of

conduct than EMTALA covers. *August 24, 2022 Injunction*, p. 20, Dkt. 95. A physician

may only assert the affirmative defense at trial when "the abortion was necessary to

prevent the death of the pregnant woman." I.C. § 18-622(3)(a)(ii). But EMTALA requires

providing stabilizing care not just when the patient faces death, but also when a patient

faces serious health risks that may stop short of death, including permanent and

irreversible health risks and impairment of bodily functions. 42 U.S.C. §

1395dd(e)(1)(A). As the Court explained in its decision, the pregnant patient may face

grave risks to her health, "such as severe sepsis requiring limb amputation, uncontrollable

uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, or

hypoxic brain injury" – but if the pregnant patient does not face death, the ban's

affirmative defense offers no protection to a physician who performs an abortion. *August

24, 2022 Injunction*, pp. 2-3, 20, Dkt. 95. The Idaho Supreme Court confirmed as much

when it noted that the Total Abortion Ban "does not include the broader 'medical

emergency' exception for abortions present in [another Idaho abortion statute]." *Planned

Parenthood*, 522 P.3d at 1196. The lack of such an exception, or even affirmative

defense, is yet another reason that a conflict exists between EMTALA and § 18-622.

*August 24, 2022 Injunction*, p. 20, Dkt. 95. Again, the subjective nature of the affirmative

defense does not change this result, given that the *Planned Parenthood* decision did not

expand the scope of the defense to include health-threatening conditions.

      Likewise, the Idaho Supreme Court's narrowing the scope of the Total Abortion

Ban to exclude ectopic and other "non-viable pregnancies" did not eliminate the conflict

between Idaho law and EMTALA. In *Planned Parenthood*, contrary to this Court's interpretation, the Idaho Supreme Court applied a "limiting judicial construction, consistent with apparent legislative intent" to conclude that § 18-622 does not "contemplate ectopic pregnancies" or other "non-viable pregnancies." *Id.* at 1202-1203. Both the State and the Legislature argue that this limiting construction eliminates any conflict between EMTALA and the Total Abortion Ban by pointing to the United States' examples involving ectopic pregnancies. *Leg.'s Supp. Br.*, p. 2, Dkt. 126, *Id. Supp. Br.*, pp. 7-8, Dkt. 127. But this Court's decision finding a conflict between § 18-622 and EMTALA did not rest on its conclusion that the ban encompasses ectopic pregnancies.

In its decision enjoining the Total Abortion Ban, this Court pointed to "many other complications," in addition to ectopic pregnancy, that "may place the patient's health in serious jeopardy or threaten bodily functions." *August 24, 2022 Injunction*, p. 8, Dkt. 95. As noted by the Court in its decision, "[s]ome examples include the following scenarios":

- A patient arrives at an emergency room with nausea and shortness of breath, leading to a diagnosis of preeclampsia. Preeclampsia can quickly progress to eclampsia, with the onset of seizures.

- A woman arrives at an emergency room with an infection after the amniotic sac surrounding the fetus has ruptured. That condition can progress into sepsis, at which point the patient's organs may fail.

- A patient arrives at the hospital with chest pain or shortness of breath, which leads the physician to discover elevated blood pressure or a blood clot.

- A patient arrives at the emergency room with vaginal bleeding caused by a placental abruption. Placental abruption is when the placenta partly or completely separates from the inner wall of the uterus. It can lead to catastrophic or uncontrollable bleeding. If the bleeding is uncontrollable, the patient may go into shock, which

MEMORANDUM DECISION AND ORDER - 10

> could result in organ disfunction such as kidney failure, and even
> cardiac arrest

*Id.* at 8-9 (citing *Fleisher Dec.* ¶¶ 15-22, Dkt. 17-3). In each of these scenarios, the stabilizing care EMTALA requires a physician to offer may include terminating a-still developing pregnancy covered under the Idaho Supreme Court's more limited definition of "abortion." Thus, the exclusion of ectopic and other nonviable pregnancies from the Total Abortion Ban does not negate the continuing need to enjoin the ban to the extent it still clearly conflicts with EMTALA.

In short, the Court finds no reason to reconsider its decision granting the United States' motion for a preliminary injunction, and the injunction stands. To contest the preliminary injunction, the State and the Legislature may appeal and seek remedy with the Ninth Circuit. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) ("So I'm going to deny your motion and let's let the law lords of the Ninth Circuit reach a judgment.").

## ORDER

**IT IS ORDERED that:**

1. The Idaho Legislature's Motion for Reconsideration of Order Granting
   Preliminary Injunction (Dkt. 97) is **DENIED**.

2. The State of Idaho's Motion to Reconsider Preliminary Injunction (Dkt.
   101) is **DENIED.**

DATED: May 4, 2023

B. Lynn Winmill
U.S. District Court Judge

# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>Defendant. | Case No. 1:22-cv-00329-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Pregnant women in Idaho routinely arrive at emergency rooms experiencing severe complications. The patient might be spiking a fever, experiencing uterine cramping and chills, contractions, shortness of breath, or significant vaginal bleeding. The ER physician may diagnose her with, among other possibilities, traumatic placental abruption, preeclampsia, or a preterm premature rupture of the membranes. In those situations, the physician may be called upon to make complex, difficult decisions in a fast-moving, chaotic environment. She may conclude that the only way to prevent serious harm to the patient or save her life is to terminate the pregnancy—a devastating result for the doctor and the patient.

So the job is difficult enough as it is. But once Idaho Code § 18-622 goes into effect, the physician may well find herself facing the impossible task of

attempting to simultaneously comply with both federal and state law. A decades-old federal law known as the Emergency Medical Treatment and Labor Act (EMTALA) requires that ER physicians at hospitals receiving Medicare funds offer stabilizing treatment to patients who arrive with emergency medical conditions. But when the stabilizing treatment is an abortion, offering that care is a crime under Idaho Code § 18-622—which bans *all* abortions. If the physician provides the abortion, she faces indictment, arrest, pretrial detention, loss of her medical license, a trial on felony charges, and at least two years in prison. Yet if the physician does not perform the abortion, the pregnant patient faces grave risks to her health—such as severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury, or even death. And this woman, if she lives, potentially may have to live the remainder of her life with significant disabilities and chronic medical conditions as a result of her pregnancy complication. All because Idaho law prohibited the physician from performing the abortion.

Granted, the Idaho statute offers the physician the cold comfort of a narrow affirmative defense to avoid conviction. But only if she convinces a jury that, in her good faith medical judgment, performing the abortion was "necessary to prevent the death of the pregnant woman" can she possibly avoid conviction. Even then, there is no certainty a jury will acquit. And the physician cannot enjoy the

benefit of this affirmative defense if she performed the abortion merely to prevent serious harm to the patient, rather than to save her life.

Back to the pregnant patient in the emergency department. The doctor believes her EMTALA obligations require her to offer that abortion right now. But she also knows that all abortions are banned in Idaho. She thus finds herself on the horns of a dilemma. Which law should she violate?

Fortunately, the drafters of our Constitution had the wisdom to provide a clear answer in Article VI, Paragraph 2 of the Constitution—the Supremacy Clause. At its core, the Supremacy Clause says state law must yield to federal law when it's impossible to comply with both. And that's all this case is about. It's not about the bygone constitutional right to an abortion. This Court is not grappling with that larger, more profound question. Rather, the Court is called upon to address a far more modest issue—whether Idaho's criminal abortion statute conflicts with a small but important corner of federal legislation. It does.

As such, the United States has shown it will likely succeed on the merits. Given that—and for the reasons discussed in more detail below—the Court has determined it should preserve the status quo while the parties litigate this matter. The Court will therefore grant the United States' motion. During the pendency of this lawsuit, the State of Idaho will be enjoined from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care.

MEMORANDUM DECISION AND ORDER - 3

# BACKGROUND

## A.    The Emergency Medical Treatment and Labor Act

Congress enacted EMTALA in 1986 with the overarching purpose of ensuring that all patients receive adequate emergency medical care—regardless of the patient's ability to pay and regardless of whether the patient qualifies for Medicare. *See Arrington v. Wong,* 237 F.3d 1066, 1073-74 (9th Cir. 2001) (citation omitted). Under that Act, when a patient arrives at an emergency department and requests treatment, the hospital must provide an appropriate screening examination "to determine whether or not an emergency condition" exists. 42 U.S.C. § 1395dd(a). An "emergency medical condition" is defined to include:

> (A)    a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> > (i)    placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> >
> > (ii)    serious impairment to bodily functions, or
> >
> > (iii)    serious dysfunction of any bodily organ or part; . . .

42 U.S.C. § 1395dd(e)(1).[1]  If a hospital determines that a patient has an

---

[1] Sub-part (B) defines an emergency medical condition as it relates to "a pregnant woman having contractions," but that subsection is not relevant to the issues before the Court.

emergency medical condition, it must examine the patient and provide stabilizing treatment at the hospital, although a transfer is permitted under certain circumstances. 42 U.S.C. § 1395dd(b)(1). Under EMTALA, stabilizing an emergency medical condition generally means providing medical treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" a discharge or transfer to another facility. 42 U.S.C. § 1395dd(e).

EMTALA applies to every hospital that has an emergency department and participates in Medicare. *See* 42 U.S.C. § 1395cc(a)(1)(I). And a participating hospital that fails to comply with EMTALA's screening requirement, stabilizing treatment, or transfer provisions may be subject to civil monetary penalties up to $119,942 per violation. 42 U.S.C. § 1395dd(d)(1)-(2); 42 C.F.R. §1003.500 (2017). Likewise, treating physicians who violate EMTALA face civil monetary penalties of up to $119,942 per violation and exclusion from Medicare and state health care programs. 42 U.S.C. § 1395dd(d)(1); 42 C.F.R. §1003.500.

## B.    Idaho's Criminal Abortion Law[2]

Idaho Code § 18-622 is set to take effect on August 25, 2022. It provides

---

[2] Idaho has enacted a series of statutes criminalizing abortion. The statute at issue here—and referred to at times as the "criminal abortion law" or the "Total Abortion Ban"—is codified (Continued)

that "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion." Idaho Code § 18-622(2). Abortion is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." § 18-604(1). Pregnancy, in turn, is defined as "the reproductive condition of having a developing fetus in the body and commences at fertilization." § 18-604(11).

Criminal abortion is a felony punishable by at least two, and up to five, years' imprisonment. § 18-622(2). In addition, "any health care professional who performs or attempts to perform or who assists in performing or attempting to perform an abortion" faces professional licensure suspension for a minimum of six months upon a first offense and permanent revocation for subsequent offenses. *Id.*

The statute provides two affirmative defenses. As relevant here, an accused physician may avoid conviction by proving, by a preponderance of the evidence, that:

(1)  The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman; and

---

at Idaho Code § 18-622. Not at issue is the later-enacted *Fetal Heartbeat Preborn Child Protection Act,* codified at Idaho Code § 18-8801 to 18-8808. According to Idaho Code § 18-8805, if Idaho Code § 18-622 becomes enforceable, the penalties specified in the Heartbeat Act will be superseded by §18-622. *See* Idaho Code § 18-8805(4).

(2) The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman.

Idaho Code § 18-622(3)(a)(ii) and (iii).

## C.   Facts

Idaho has roughly 22,000 births per year. Not surprisingly then, some patients will experience serious, pregnancy-related complications that qualify as an "emergency medical condition" under EMTALA. *See generally Fleisher Dec.* ¶ 12, Dkt. 17-3; *Corrigan Dec.* ¶¶ 9-30, Dkt. 17-6; *Cooper Dec.* ¶¶ 6-12, Dkt. 17-7; *Seyb Dec.* ¶¶ 4-13, Dkt. 17-8.

One relatively straightforward example is a patient who presents at an emergency department with an ectopic pregnancy. *Id.* ¶ 13. Accounting for about 2% of all reported pregnancies, ectopic pregnancies occur when an embryo or fetus grows outside of the uterus, most frequently in a fallopian tube. *Ex. B. to Fleisher Dec.*, Dkt. 17-4, at 91. It is undisputed that an ectopic pregnancy in a fallopian tube is an emergency medical condition that places the patient's life in jeopardy. Left untreated it will cause the fallopian tube to rupture and, in the majority of cases, cause significant and potentially fatal internal bleeding. *See, e.g., White Dec.* ¶ 3, Dkt. 66-1. Likewise, the parties do not dispute that the appropriate treatment for an

ectopic pregnancy is either "emergency surgery and removal of the involved fallopian tube, including the embryo or fetus, or administration of a drug to cause embryonic or fetal demise." *Fleisher Dec.* ¶ 13, Dkt. 17-3. Still, though, during oral argument, the State conceded that the procedure necessary to terminate an ectopic pregnancy is a criminal act, given the broad definitions used in Idaho's criminal abortion statute.

In addition to ectopic pregnancies, there are many other complications that may arise during pregnancy—all of which may place the patient's health in serious jeopardy or threaten bodily functions. Despite the risks such conditions present, it is not always possible for a physician to know whether treatment for any particular condition, at any particular moment in time, is "necessary to prevent the death" of the pregnant patient, which is the prerequisite to their relying on the affirmative defense offered by the criminal abortion statute. *See Fleisher Dec.* ¶¶ 13-21, Dkt. 17-3. Some examples include the following scenarios:

- A patient arrives at an emergency room with nausea and shortness of breath, leading to a diagnosis of preeclampsia. Preeclampsia can quickly progress to eclampsia, with the onset of seizures.

- A woman arrives at an emergency room with an infection after the amniotic sac surrounding the fetus has ruptured. That condition can progress into sepsis, at which point the patient's organs may fail.

- A patient arrives at the hospital with chest pain or shortness of breath, which leads the physician to discover elevated blood

pressure or a blood clot.

- A patient arrives at the emergency room with vaginal bleeding caused by a placental abruption. Placental abruption is when the placenta partly or completely separates from the inner wall of the uterus. It can lead to catastrophic or uncontrollable bleeding. If the bleeding is uncontrollable, the patient may go into shock, which could result in organ disfunction such as kidney failure, and even cardiac arrest.

*Id.* ¶¶ 15-22.

Idaho physicians have submitted declarations describing specific patients who have presented with these types of complications and have required abortions.[3] Each of these conditions unquestionably qualifies as an "emergency medical condition" under EMTALA. Accordingly, if future patients with similar conditions presented at Medicare-funded hospitals, they would be entitled to the emergency care required by EMTALA—which will often include an emergency abortion.

The impact of Idaho's criminal abortion statute on the emergency care

---

[3] *See Corrigan Dec.* ¶¶ 9-30, Dkt. 17-6 (describing three patients who required abortions after experiencing, respectively, (1) severe infection due to premature rupture of the membranes; (2) placental abruption which other medications and blood products failed to mitigate; and (3) preeclampsia with pleural effusions and high blood pressure); *Cooper Dec.* ¶¶ 6-11, Dkt. 17-7 (describing three patients who required abortions after experiencing, respectively, (1) preeclampsia with severe features, (2) HELLP syndrome, and (3) lab abnormalities consistent with a diagnosis of HELLP syndrome); *Seyb Dec.* ¶¶ 7-13, Dkt. 17-8 (describing three patients who required abortions after experiencing, respectively, (1) a septic abortion, (2) preeclampsia with severe features, and (3) heavy vaginal bleeding).

dictated by EMTALA is substantial. The United States has submitted declarations from four physicians practicing in Idaho who say that if Idaho Code § 18-622 goes into effect, they believe "there will be serious and negative consequences for patients and healthcare workers alike." *Corrigan Supp. Dec.* ¶ 13, Dkt. 86-3. Dr. Emily Corrigan, a board-certified Obstetrician-Gynecologist practicing at a Boise hospital, explains why this is so. First, she speaks specifically as to three recent patients—all of whom presented with emergency medical conditions and required an abortion. She says that for each of these patients, it was "medically impossible to say that death was the guaranteed outcome." *Id.* ¶ 8. Regarding Jane Doe 1, for example, she says that this patient "could have developed severe sepsis potentially resulting in catastrophic injuries such as septic emboli necessitating limb amputations or uncontrollable uterine hemorrhage ultimately requiring hysterectomy but [she] could still be alive." *Id.* Jane Does 2 and 3 were in similar situations—they could have survived, but each "potentially would have had to live the remainder of their lives with significant disabilities and chronic medical conditions as a result of their pregnancy complication." *Id.*.

More broadly, Dr. Corrigan says that "while the State's physician declarations speak in terms of absolutes," in her view, "medicine does not work that way in most cases. Death may be a possible or even probable outcome, but different outcomes or conditions may also be probable. That is why doctors

frequently refuse to answer the question, 'What are my chances?'" *Id.* ¶ 9.

Dr. Corrigan also points out that if Idaho Code § 18-622 goes into effect, patient care will be delayed. *Id.* ¶ 11. She says that, under Idaho's law, physicians must "wait until death is near-certain and in the meantime, the patient will experience pain and complications that may have lifelong disabling consequences." *Id.* Ultimately then, from her perspective, "[a] physician administering an emergency abortion in Idaho would be risking their professional license, livelihood, personal security, and freedom." *Id.*

Compliance with the EMTALA standards is significant to this state's health care system. In Idaho, there are thirty-nine hospitals that receive Medicare funding and provide emergency services. *Wright Dec.* ¶ 8, Dkt. 17-9. Between 2018 and 2020, these hospitals' emergency departments received approximately $74 million in federal Medicare funding, which was conditioned on compliance with EMTALA. *Shadle Dec.* ¶ 6, Dkt. 17-10.

## LEGAL STANDARD

The United States asks for a preliminary injunction to enjoin Idaho from enforcing its criminal abortion law to the extent it conflicts with EMTALA-mandated care. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Fraihat v. United States Immigration & Customs Enf't*, 16

F.4th 613, 635 (9th Cir. 2021) (citation omitted).

To obtain relief, the United States must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). As to the last two factors, "[w]here the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

"A district court has considerable discretion in granting injunctive relief and in tailoring its injunctive relief." *United States v. AMC Entm't, Inc*., 549 F.3d 760, 768 (9th Cir. 2008). Generally, a court must ensure that the relief is "tailored to eliminate only the specific harm alleged" and not "overbroad." *E.&J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1297 (9th Cir. 1992). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And in the context of enjoining a state statute subjected to an as-applied challenge, the Supreme Court has said, "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We . . . enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S.

320, 328-29 (2006).

## ANALYSIS

The key substantive question this Court must address is whether Idaho Code § 18-622 conflicts with certain requirements of the federal Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. But before turning to that question, the Court will resolve three threshold issues: (1) whether the United States has a cause of action; (2) whether the United States has standing; and (3) whether the United States has mounted a facial or an as-applied attack to the challenged statute.

## A.   Cause of Action

The United States has the unquestioned authority to sue. It has asked this Court, sitting in equity, to partially enjoin the enforcement of Idaho Code § 18-622 because of its direct conflict with a federal statute. Such a Supremacy Clause claim fits squarely within causes of action the Supreme Court has recognized. As the Supreme Court explained in *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983), "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question." *Id.* at 96 n.14; *see also Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 326 (2015) ("[W]e have long recognized, if an individual claims federal law immunizes him

from state regulation, the court may issue an injunction upon finding the state

regulatory actions preempted."). Here, the United States has a cause of action

because it seeks to halt Idaho's allegedly unconstitutional encroachment on

EMTALA; it is not seeking to enforce federal law against would-be violators. This

case is therefore distinct from the line of cases where plaintiffs challenge state

administrative action taken under a particular statute, as opposed to challenging the

validity of the state statute itself. *See*, *e.g.*, *Armstrong*, 575 U.S. at 324.

     In a somewhat related argument, the State, in its briefing, attempted to

raise[] serious concerns that EMTALA's required stabilizing treatment, as

interpreted by the United States and expressed in this litigation, is invalid as

coercive spending clause legislation." *State Br.*, Dkt. 66, at 19 n.10 (citing *Nat'l*

*Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575-87 (2012)). To the extent this

"concern" is an argument, it is not sufficiently developed here. *Cf. Indep.*

*Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) ("We

require contentions to be accompanied by reasons."). The State cannot

challenge the constitutionality of a 35-year-old federal statute in a passing

footnote. More importantly, deciding that question would "run contrary to the

fundamental principle of judicial restraint that courts should neither 'anticipate

a question of constitutional law in advance of the necessity of deciding it' nor

'formulate a rule of constitutional law broader than is required by the precise

facts to which it is to be applied.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)).

**B.     Standing**

To establish standing, the United States must demonstrate that it has suffered an injury in fact that is fairly traceable to Idaho's actions and that will likely be redressed by a favorable decision from the Court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

Here, United States alleges at least three types of harm. First, the United States' sovereign interests are harmed when its laws are violated. *See Vt. Agency of Nat. Res. v. United States ex rel Stevens,* 529 U.S. 765, 771 (2000); *United States v. Arizona,* 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds,* 567 U.S. 387 (2012). Second, if Idaho Code § 18-622 goes fully into effect, pregnant patients throughout Idaho will be denied EMTALA-mandated care. As a general principle, the United States may sue to redress widespread injuries to the general welfare. *In re Debs*, 158 U.S. 564, 584 (1895). Third, the United States has alleged that Idaho's law deprives it of the benefits of its bargain in that it has provided Medicare funding to hospitals within Idaho, and that funding was conditioned on those hospitals' compliance with EMTALA.

From there, the standing analysis is simple. The harms the United States

alleges are traceable to Idaho's actions in enacting and, soon, enforcing Idaho

Code § 18-622. And the remedies sought here would redress the injury. The United

States thus has established standing.

## C.    Facial versus As-Applied

"As a general matter, a facial challenge is a challenge to an entire legislative

enactment or provision," *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir.

2011), and a successful facial challenge "invalidates the law itself." *Italian Colors*

*Restaurant v. Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018). An as-applied

challenge, on the other hand, "challenges only one of the rules in a statute, a subset

of the statute's applications, or the application of the statute to a specific

circumstance." *Hoye*, 653 F.3d at 857. Thus, "a successful as-applied challenge

invalidates only the particular application of the law." *Italian Colors*, 878 F.3d at

1175 (internal quotation and citation omitted).

Ultimately, though, "[t]he label is not what matters." *Doe v. Reed*, 561 U.S.

186, 194 (2010) (acknowledging that plaintiffs' claim had characteristics of both

an as-applied and facial challenge). Rather, the "important" inquiry is whether the

"claim and the relief that would follow . . . reach beyond the particular

circumstances of the[ ] plaintiffs." *Id.* In other words, the distinction between the

two types of challenges mainly goes to the breadth of the remedy.

Here, a quick skim of the United States' complaint reveals an as-applied

challenge. In its prayer for relief, the United States asks the Court to issue a declaratory judgment stating that "Idaho Code § 18-622 violates the Supremacy Clause and is preempted and therefore invalid *to the extent that it conflicts with EMTALA.*" *Compl.* ¶ 16, Dkt. 1 (emphasis added). The complaint repeats that limiting language in the prayer for injunctive relief. *Id.* And in moving for a preliminary junction, the United States once again—and repeatedly—clarified that it is seeking a limited form or relief. *See, e.g.*, *Mtn.*, Dkt. 17-1, at 8.

The State acknowledges this limiting language but nevertheless argues that the United States is bringing a facial challenge, based on the United States' argument that there is a conflict in *all* instances in which both EMTALA and Idaho Code § 18-622 apply. The State says this isn't so because, at times, the two statutes can operate harmoniously.

The Court does not find the State's argument persuasive because it has failed to properly account for the staggeringly broad scope of its law, which has been accurately characterized by this Court and the Idaho Supreme Court as a "Total Abortion Ban." *See Planned Parenthood Great Nw. v. Idaho*, --- P.3d ---, 2022 WL 3335696, at *1 (Idaho Aug. 12, 2022). As will be discussed more fully below, Idaho Code § 18-622 doesn't just criminalize EMTALA-mandated abortions; it criminalizes all abortions. So, in that sense, the United States has mounted a textbook, as-applied challenge focusing only on a particular application of the

MEMORANDUM DECISION AND ORDER - 17

statute in a particular context. After all, Idaho Code § 18-622 will take effect on August 25, 2022, regardless. The United States is not trying to stop that. The only question this Court is addressing is whether the statute must include a carve-out for EMTALA-mandated care. The United States has mounted an as-applied challenge.

Moreover, even if the Court were to construe the challenge as a facial one—focusing only on the subset of abortions EMTALA requires—the United States is still likely to succeed on the merits of its claim. As explained below, even within that subset there will always be a conflict between EMTALA and Idaho Code § 18-622.

**D.    Likelihood of Success on the Merits**

With these threshold questions resolved, the Court turns to whether the United States is entitled to a preliminary injunction. The first question—whether the United States is likely to succeed on the merits—is the most important. *California v. Azar*, 950 F.3d 1067, 1083 (9th Cir. 2020). To resolve that question, the Court is guided by the Supremacy Clause and basic preemption principles.

**1.   The Supremacy Clause & Preemption**

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

In EMTALA, Congress indicated its intent to displace state law through an express preemption provision, which says EMTALA preempts state law only "to the extent that the [state law] requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). The Ninth Circuit has construed EMTALA's "directly conflicts" language as referring to two types of preemption—impossibility preemption and obstacle preemption. *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993). Impossibility preemption occurs, straightforwardly, "where it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). And obstacle preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373.

### 2. Impossibility Preemption

Here, it is impossible to comply with both statutes. As already discussed, when pregnant women come to a Medicare-funded hospital with an emergency medical condition, EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care. But regardless of the pregnant patient's condition, Idaho statutory law makes that treatment a crime. Idaho Code § 18-622(2). And where federal law requires the provision of care and state law criminalizes that very care, it is impossible to comply with both laws. Full stop.

The statute's affirmative defense does not cure the impossibility. An affirmative defense is an excuse, not an exception. The difference is not academic. The affirmative defense admits that the physician committed a crime but asserts that the crime was justified and is therefore legally blameless. And it can only be raised after the physician has already faced indictment, arrest, pretrial detention, and trial for every abortion they perform. *See generally United States v. Sisson*, 399 U.S. 267, 288 (1970) (indictments need not anticipate affirmative defenses). So even though accused healthcare workers might avoid a conviction, the statute still makes it impossible to provide an abortion without also committing a crime.

Moreover, even taking the affirmative defense into account, the plain language of the statutes demonstrates that EMTALA requires abortions that the affirmative defense would not cover. When an abortion is the necessary stabilizing treatment, EMTALA directs physicians to provide that care if they reasonably expect the patient's condition will result in serious impairment to bodily functions, serious dysfunction of any bodily organ or part, or serious jeopardy to the patient's health. 42 U.S.C. § 1395dd(3)(1). In contrast, the criminal abortion statute admits to no such exception. It only justifies abortions that the treating physician determines are *necessary* to prevent the patient's death. Idaho Code § 18-622(a)(ii) (emphasis added). According to the dictionary, the word "necessary" means something is "needed" or "essential." *See Necessary*, Black's Law Dictionary

(11th ed. 2019). And the Idaho Supreme Court has said that "[w]hen engaging in statutory interpretation," it "begins with the dictionary definitions of disputed words or phrases contained in the statute." *Idaho v. Clark*, 484 P.3d 187, 192 (Idaho 2021). Thus, an abortion is only justified under the statute if the treating physician can persuade the jury that she made a good faith determination that the patient would have died if the abortion had not been performed.

EMTALA is thus broader than the affirmative defense on two levels. First, it demands abortion care to prevent injuries that are more wide-ranging than death. Second, and more significantly, it calls for stabilizing treatment, which of course may include abortion care—when harm is probable, when the patient could "reasonably be expected" to suffer injury. In contrast, to qualify for the affirmative defense, the patient's death must be imminent or certain absent an abortion. It is not enough, as the Legislature has argued, for a condition to be life-threatening, which suggests only the *possibility* of death. *See Life-Threatening*, Black's Law Dictionary (11th ed. 2019) ("illness, injury, or danger that *could* cause a person to die") (emphasis added).

Finally, as the Court discusses further below, when the defense is put up against the realities of medical judgments, its scope is tremendously ambiguous. Although this makes it difficult to determine whether some abortions would qualify for both the affirmative defense and be mandated by EMTALA, that

question is ultimately immaterial to the Court's determination that it is impossible for physicians to comply with both statutes.

Seeking to skirt the conflict between federal and state law, the Legislature advances three main points. First, the Legislature submits declarations from two physicians who offer up opinions as to what Idaho Code § 18-622 means. They say that terminating a pregnancy to save the life of the pregnant woman is *never* considered an abortion under Idaho law. *French Dec.* ¶¶ 14, 17, Dkt. 71-5; *Reynolds Dec.* ¶ 12, Dkt. 71-1. But as already discussed, on its face, the Idaho law criminalizes *all* procedures *intended* to terminate a pregnancy, even if necessary to save the patient's life or to preserve her health. *See* Idaho Code § 18-604(1). And it should go without saying that Idaho law controls the inquiry on this point—not the medical community. Indeed, if anything, this argument crystallizes the conflict between Idaho law and EMTALA: Idaho law criminalizes as an "abortion" what physicians in emergency medicine have long understood as both life- and health-preserving care.

The Legislature's primary example of ectopic pregnancies as falling outside the statutory prohibition further reveals the fallacy of their argument: Idaho law expressly defines "pregnancy" as "having a developing fetus in the body" and commencing at fertilization. Idaho Code § 18-604(11). This plain language, which refers to "the body," rather than the uterus, and "fertilization" rather than

implantation, evinces the Legislature's intent to include ectopic pregnancies within the statutory definition of "pregnancy." *See Worley Highway Dist. v. Kootenai Cnty.*, 576 P.2d 206, 209 (Idaho 1978). As such, termination of an ectopic pregnancy falls within the definition of an "abortion." The Legislature cannot avoid the effect of its chosen statutory language by relying on the medical community's definition of what is (and what is not) an abortion.

The Legislature next says that terminations of ectopic pregnancies—or any other, similar lifesaving procedures—do not fall within the scope of the statute because such terminations are "covered" by the exemption of Idaho Code § 18-622(4). *See French Dec.* ¶ 15, Dkt. 71-5. This sub-section exempts from the statute's prohibitions medical treatment provided to pregnant women that results in the "*accidental* death" or "*unintentional* injury" to the fetus. Idaho Code § 18-622(4). But certain pregnancy-related conditions, such as ectopic pregnancy, require pregnancy termination to preserve a patient's health or save her life—and the "death" or "injury" to the "unborn child" in that situation will be neither accidental nor unintentional. *See Cooper Dec.* ¶ 3, Dkt. 17-6; *Fleisher Dec.* ¶ 13, Dkt. 17-3; *Seyb Dec.* ¶ 6, Dkt. 17-8. It is therefore nonsensical to classify it as such, simply because the pregnancy was terminated to save the life or health of the mother.

Second, during oral argument, the Legislature acknowledged the

"conceptual textual conflicts" between § 18-622 and EMTALA but entreated the Court to ignore the Idaho statute's text and focus instead on "what happens in the real world." Even if the Court accepted this invitation to ignore what the law says, the Legislature's speculations about how the law will work in practice are belied by the actual, "real-life" experience of medical professionals in Idaho who regularly treat women in these situations.  They conclude that emergency care normally provided to pregnant patients will be made criminal by the plain language of § 18-622, which will, in turn, hinder their ability to provide that care if the law goes into effect. *See Corrigan Dec.* ¶¶ 31-35, Dkt. 17-6; *Cooper Dec.* ¶ 12, Dkt. 17-7; *Seyb Dec.* ¶ 13, Dkt. 17-8. As one Idaho physician testified, OB/GYN physicians in Idaho have been "bracing for the impact of this law, as if it is a large meteor headed towards Idaho." *Supp. Cooper Dec.* ¶ 13, Dkt. 86-3. More fundamentally, if the law does not mean what it says, why have it at all?

In short, given the extraordinarily broad scope of Idaho Code § 18-622, neither the State nor the Legislature have convinced the Court that it is possible for healthcare workers to simultaneously comply with their obligations under EMTALA and Idaho statutory law. The state law must therefore yield to federal law to the extent of that conflict.

### 3.  Obstacle Preemption

Moreover, even if it were theoretically possible to simultaneously comply

with both laws, Idaho law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373. To be sure, the Supreme Court has cautioned that "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 607 (2011) (citation and quotation omitted). Nevertheless, that threshold is met when it is plain that "Congress made 'a considered judgment' or 'a deliberate choice' to preclude state regulation" because "a federal enactment clearly struck a particular balance of interests that would be disturbed or impeded by state regulation." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (*quoting Arizona*, 567 U.S. at 405).

"The first step in the obstacle preemption analysis is to establish what precisely were the purposes and objectives of Congress in enacting" the statute at issue. *Chamber of Commerce v. Bonta*, 13 F.4th 766, 778 (9th Cir. 2021). For nearly four decades, EMTALA has served as the bedrock for the emergency-care safety net. Congress enacted EMTALA primarily because it was "concerned that medically unstable patients are not being treated appropriately" including in "situations where treatment was simply not provided." H.R. Rep. No. 99-241, Pt. I, at 27 (1985). Congress's clear purpose was to establish a bare minimum of emergency care that would be available to all people in Medicare-funded hospitals.

*See Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001).

Congress chose to use "federal sanctions" to ensure that emergency screening and treatment was available for "all individuals for whom care is sought." H.R. Rep. No. 99-241, Pt. III, at 4-5 (1985). But Congress was mindful that overly severe sanctions might lead "some hospitals, particularly those located in rural or poor areas, [to] decide to close their emergency rooms entirely rather than risk the . . . penalties that might ensue." *Id.* at 6. Notably, Congress took care to avoid sanctions that would "result in a decrease in available emergency care, rather than an increase in such care, which appears to have been the major goal of [EMTALA]." *Id.*

Here, Idaho's criminal abortion statute, as currently drafted, stands as a clear obstacle to what Congress was attempting to accomplish with EMTALA. As discussed below, Idaho's criminal abortion law will undoubtedly deter physicians from providing abortions in some emergency situations. That, in turn, would obviously frustrate Congress's intent to ensure adequate emergency care for all patients who turn up in Medicare-funded hospitals.

### a.  Idaho Code § 18-622 Deters Abortions

It goes without saying that all criminal laws have some deterrent effect. But the structure of Idaho's criminal abortion law—specifically that it provides for an affirmative defense rather than an exception—compounds the deterrent effect and

increases the obstacle it poses to achieving the goals of EMTALA.

For one, the process of enduring criminal prosecution and licensing authority sanctions has a deterrent effect, regardless of the outcome. As Dr. Corrigan aptly explained, "[h]aving to defend against such a case would be incredibly burdensome, stressful, costly." *Corrigan Dec.* ¶ 10, Dkt. 17-6. By criminalizing all abortions, Idaho guarantees that physicians will have to accept this hardship every time they perform an abortion. The result is reluctance to perform abortions in any circumstances.

The uncertain scope of the affirmative defense intensifies that result. Providers who might be willing to depend on the affirmative defense do not have the clarity to do so because of the statute's ambiguous language and the complex realities of medical judgments.

Consider what a defendant-physician needs to prove to avail herself of the affirmative defense. The core of the affirmative defense at issue requires the defendant-physician to show she determined "the abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2). In that sense, the defense is objective—either the defendant-physician made the determination, or she did not. Yet the nature of that determination—how imminent a patient's death must before an abortion is necessary—is inscrutable.

Applying the standard to another medical context shows its ambiguity. Say a

sovereign adopted a law that allowed oncologists to provide cancer treatment "only when necessary to prevent death." Under that standard, oncologists would likely feel comfortable providing care to a patient with a stage four terminal cancer diagnosis. But what about a patient with stage one cancer? On the one hand, treatment may be lawful because the patient has a condition that, left untreated, will eventually, almost certainly cause death. On the other hand, the patient is not in danger of dying soon, so perhaps the oncologist needs to withhold treatment until the cancer progresses to the point where treatment is more obviously necessary to prevent death.

Idaho physicians treating pregnant women face this precise dilemma. As Dr. Cooper puts it, "For those patients who are clearly suffering from a severe pregnancy related illness and for which there is a clear indicated treatment, but death is not imminent, it is unclear whether I should provide the appropriate treatment because the circumstances may not justify the affirmative defense." *See Cooper Supp. Dec.* ¶ 2, Dkt. 86-5. In other words, when, precisely, does the "necessary-to-prevent-death" language apply? Healthcare providers can seldom know the imminency of death because medicine rarely works in absolutes. *Corrigan Supp. Dec.* ¶ 9, Dkt. 86-3. Instead, physicians treat patients whose medical risks "exist along a continuum" without bright lines to specify "when exactly a condition becomes 'life-threatening' or 'necessary to prevent the death'

of the pregnant patient." *Fleisher Supp. Dec.* ¶ 7, Dkt. 86-2; *see also Seyb Dec.*

¶ 13, Dkt. 17-8 (explaining that "'prevent the death of the pregnant woman'"

standard is not useful because "this is not a dichotomous variable"). Faced with

these limitations, physicians provide care by making "educated guess[es] . . . .

[b]ut we can only rarely predict with certainty a particular outcome." *Corrigan*

*Supp. Dec.* ¶ 9, Dkt. 86-3. Because medical needs present on a spectrum, in a given

moment of decision, "[d]eath may be a possible or even probable outcome, but

different outcomes may also be possible or probable." *Id.*

But the affirmative defense is only available to physicians once they make

that often "medically impossible" determination that "death [i]s the guaranteed

outcome." *Corrigan Supp. Dec.* ¶ 8; *see also ACEP et al Amicus Br.*, Dkt. 62 at 6

(describing the affirmative defense as "a legislatively imagined but medically

nonexistent line"); *Fleisher Dec.* ¶ 12, Dkt. 17-3 ("[I]n some cases where the

patient's health is unambiguously threatened, it may be less clear whether there is

also a certainty of death without stabilizing treatment—and a physician may not

ever be able to confirm whether death would result absent immediate treatment.").

In short, against the backdrop of these uncertain, medically complex

situations, the affirmative defense is an empty promise—it does not provide any

clarity. The upshot of this uncertainty is that even those providers willing to risk

prosecution if they were confident in the availability of the affirmative defense will

be deterred from providing emergency abortion care under EMTALA, where the availability of the defense is so uncertain.

And the Legislature cannot step in and say there is no obstacle to providing EMTALA-mandated care—that these Idaho healthcare workers may comfortably forge ahead and provided emergency abortions—based on its assertion that Idaho prosecutors would not enforce the law as written.[4] The Legislature supports this argument with a single declaration from a single county prosecutor, who said he "would not prosecute any health care professional based on facts like those set forth in [the United States'] declarations, and that he "believe[s] no Idaho prosecuting attorney would do so." *Loebs Dec.* ¶ 7, Dkt. 71-6. But Idaho prosecutors have a statutory duty "to prosecute *all* felony criminal actions." Idaho Code § 31-2604(2) (emphasis added). And this one prosecutor lacks the authority to bind the other forty-three elected county prosecutors, let alone grand juries or citizens who might independently seek to initiate criminal proceedings, or any of the disciplinary boards that might pursue license revocation proceedings. *Cf.* Idaho

─────────────────

[4] The Legislature also submitted a declaration from a Nevada doctor who opines that the standard laid out in Idaho Code § 18-622 "provides a clear and workable standard" and that "physicians may proceed without the kinds of subjective 'fears' and 'chillings' suggested in the declarations of the three Idaho doctors.'" *Reynolds Dec.* ¶¶ 9-10, Dkt. 71-1. The Court does not find this assertion persuasive. At best, it's a difference of opinion—some doctors will be chilled; some won't. On balance, and based on the factual record before it, the Court finds that if Idaho Code §18-622 goes into effect, physicians practicing in Idaho are likely to be deterred from providing EMTALA-mandated care, including emergency abortions.

Code § 19-1108 (grand juries); *Idaho v. Murphy*, 584 P.2d 1236, 1241 (Idaho 1978) (citizen complaints); § 18-622(2).

One prosecutor's promise to refrain from enforcing the law as written, therefore, offers little solace to physicians attempting to navigate their way around both EMTALA and Idaho's criminal abortion laws—and whose "professional license, livelihood, personal security, and freedom" are on the line. *Corrigan Supp. Dec.* ¶ 11, Dkt. 86-3 ("Our malpractice insurance may not cover us for performing an act that some may view as a crime."). Indeed, the Ninth Circuit has expressly rejected the argument that courts may uphold a law merely because the enacting authority promises to enforce it only to the extent it is consistent with federal law. *United States v. City of Arcata*, 629 F.3d 986, 992 (9th Cir. 2010) (holding officials' "promise of self-restraint does not affect our consideration of the ordinances' validity" under preemption doctrine). Physicians performing health- or life-saving abortions should not be left to "the mercy of *noblesse oblige*." *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010) (citation omitted) ("We may not uphold the statutes merely because the state promises to treat them as properly limited.").

*b.* **Deterring Abortions is an Obstacle to EMTALA**

The clear and intended effect of Idaho's criminal abortion law is to curb abortion as a form of medical care. This extends to emergency situations,

obstructing EMTALA's purpose. Idaho's choice to impose severe and sweeping

sanctions that decrease the overall availability of emergency abortion care flies in

the face of Congress's deliberate decision to do the opposite.

The primary obstacle is delayed care. Under the status quo, physicians "rely

upon their medical judgement or best practices for handling pregnancy

complications." *Seyb Dec.* ¶ 13, Dkt. 17-8. But because of the criminal abortion

statute, "providers will likely delay care for fear of criminal prosecution and loss of

licensure." *Id.; see also Cooper Supp. Dec.* ¶ 7, Dkt. 86-5 ("provider fear and

unease is real and widespread"). The incentive to do so is obvious—delaying care

so that the patient gets nearer to death and thus closer to the blurry line of the

affirmative defense. Providers may also delay care to allow extra time to consult

with legal experts. *See, e.g.*, *Corrigan Dec.* ¶¶ 25, Dkt. 17-6.

Delayed care is worse care. "The goal in medicine is to effectively identify

problems and treat them promptly so patients are stabilized *before* they develop a

life-threatening emergency. The Idaho law requires doctors to do the opposite—to

wait until abortion is necessary to prevent the patient's death. *See Huntsberger*

*Dec.* ¶ 12, Dkt. 86-4. Rather than providing the stabilizing treatment that

EMTALA calls for, Idaho subjects women in medical crisis to periods of "serious

physical and emotional trauma" as they wait to get nearer and nearer to death.

*Corrigan Supp. Dec.* ¶ 13, Dkt. 86-3.

The wait for care is troubling enough on its own. Even worse, delayed care worsens patient outcomes. As a result of delay, "[p]atients may experience serious complications, have negative impacts on future fertility, require additional hospital resources including blood products, and some patients may die." *Huntsberger Dec.* ¶ 15, Dkt. 86-4. A recent study of maternal morbidity in Texas confirms this. When a pregnant woman with specific pregnancy complications was treated with "the standard protocol of terminating the pregnancy to preserve the pregnant patient's life or health," the rate of serious maternal morbidity was 33 percent. *California et al Amicus Br.*, Dkt. 59 at 21.[5] That rate reached 57 percent, nearly doubling, when providers used "an expectant-management approach," meaning the physician provided "observation-only care until serious infection develops or the fetus no longer has cardiac activity." *Id*.

These delays in providing care frustrate EMTALA in two ways. First, delays frustrate Congress's intent to eliminate situations where treatment was simply not provided by providing for basic emergency treatment. Second, the worsened patient outcomes offend EMTALA's core purpose of ensuring that the most vulnerable people were not left to suffer catastrophic outcomes because of

---

[5] Citing Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, Am. J. Obstetrics & Gynecology (forthcoming 2022) (internet).

indifference from physicians—or, in this case, obstacles created by the State.

Another effect of Idaho's criminal abortion law is that it will likely make it more difficult to recruit OB/GYNs, who are on the front lines of providing abortion care in emergency situations. Because Idaho does not have in-state training for the specialty, all OB/GYNs must be recruited to come here. *Seyb Dec.* ¶ 14, Dkt. 17-8. But if these newly trained physicians "can practice in a state without these conflicts and risks, it is only natural that they would be deterred from practicing here." *Id.* By extension, OB/GYNs who are already practicing here may choose to leave or to change the nature of their practice. *See, e.g.*, *Corrigan Dec.* ¶ 32, Dkt. 17-6. In both cases, the end result is fewer providers performing health and life-saving abortions. This, again, is an obstacle to EMTALA because it disrupts Congress's careful balance to avoid overly severe sanctions that could lead to providers deciding not to provide emergency care.

In sum, cutting back on emergency abortion care quantitatively and qualitatively is a plain obstacle to EMTALA, which Congress enacted to ensure that all individuals—including pregnant women—have access to a minimum level of emergency care.

**E. Likelihood of Irreparable Harm**

Having concluded that that the United State is likely to succeed on the merits of its claims, the Court turns to whether the United States has shown it is likely to

suffer irreparable harm in the absence of an injunction.

The United States has met that burden, as Supremacy Clause violations trigger a presumption of irreparable harm when the United States is a plaintiff. *See generally United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm.") (citation omitted). As one court has explained, "The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

And so it is here. If Idaho's criminal abortion statute is allowed to go fully into effect, federal law will be significantly frustrated—as discussed in detail above. Most significantly, allowing the criminal abortion ban to take effect, without a cutout for EMTALA-required care, would inject tremendous uncertainty into precisely what care is required (and permitted) for pregnant patients who present in Medicare-funded emergency rooms with emergency medical conditions. *See generally United States v. South Carolina*, 840 F. Supp. 2d 898, 925 (D.S.C. 2011) (finding irreparable harm where state immigration law "could create a chaotic situation in immigration enforcement"). The net result—discussed further in the next section—is that these patients could suffer irreparable injury in the absence of an injunction.

MEMORANDUM DECISION AND ORDER - 35

## F.     The Balance of Equities and the Public Interest

The next question is whether the balance of equities tips in the United

States' favor and whether an injunction is in the public interest. As noted above,

because the United States is a party, these two factors merge. The key

consideration here is what impact an injunction would have on non-parties and the

public at large. *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003).

Looking first to the public at large, in the most general sense, "preventing a

violation of the Supremacy Clause serves the public interest." *United States v.*

*California*, 921 F.3d 865, 893-94 (9th Cir. 2019) (citing *Arizona*, 641 F.3d at 366).

As the Ninth Circuit has explained, "it is clear that it would not be equitable or in

the public's interest to allow the state to violate the requirements of federal law,

especially when there are no adequate remedies available. In such circumstances,

the interest of preserving the Supremacy Clause is paramount." *Arizona*, 641 F.3d

at 366 (cleaned up, citations omitted).

Next, based on the various declarations submitted by the parties, the Court

finds that allowing the Idaho law to go into effect would threaten severe,

irreparable harm to pregnant patients in Idaho. Speaking of patients, although the

parties and the Court have often focused mainly on the actions and competing

interests of doctors, prosecutors, legislators, and governors, we should not forget

the one person with the greatest stake in the outcome of this case—the pregnant

patient, laying on a gurney in an emergency room facing the terrifying prospect of a pregnancy complication that may claim her life. One cannot imagine the anxiety and fear she will experience if her doctors feel hobbled by an Idaho law that does not allow them to provide the medical care necessary to preserve her health and life. From that vantage point, the public interest clearly favors the issuance of a preliminary injunction.

In that regard—and as discussed at some length above—the United States has submitted declarations from physicians explaining that there are any number of pregnancy-related complications that require emergency care mandated by EMTALA but that are forbidden by Idaho's criminal abortion law. Idaho physicians have treated such complications in the past, and it is inevitable that they will be called upon to do so in the future. Not only would Idaho Code § 18-622 prevent emergency care mandated by EMTALA, it would also discourage healthcare professionals from providing *any* abortions—even those that might ultimately be deemed to have been necessary to save the patient's life—given the affirmative-defense structure already discussed. Finally, if the abortion ban laid out in the Idaho statute goes into effect, the capacity of hospitals in neighboring states that do not prohibit physicians from providing EMTALA-mandated care (Washington and Oregon, for example)—would be pressured as patients may choose to cross state lines to get the emergency care they are entitled to receive

under federal law. *See* Dkt. 45-1, at 16-17.

Turning to the other side of the equitable balance sheet, the State of Idaho will not suffer any real harm if the Court issues the modest preliminary injunction the United States is requesting. In fact, as a practical matter, the State (and, to a much greater extent, the Legislature) argue that physicians who perform the types of emergency abortions at issue here won't violate Idaho law anyway; therefore, by their own reasoning, they will suffer no harm if enforcement of § 18-622 is enjoined on this limited basis. And although the State has argued that in the wake of *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), the public interest lies in allowing states to regulate abortions, *Dobbs* did not overrule the Supremacy Clause. Thus, even when it comes to regulating abortion, state law must yield to conflicting federal law. As such, the public interest lies in favor of enjoining the challenged Idaho law to the extent it conflicts with EMTALA.

## ORDER

**IT IS ORDERED that:**

1. Plaintiff's motion for a preliminary injunction (Dkt. 17) is **GRANTED**.

2. The Court hereby restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. Specifically, the State of

Idaho, including all of its officers, employees, and agents, are prohibited from initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, any medical provider or hospital based on their performance of conduct that (1) is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to avoid (i) "placing the health of" a pregnant patient "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii).

3. This preliminary injunction is effective immediately and shall remain in full force and effect through the date on which judgment is entered in this case.

DATED: August 24, 2022

_____
B. Lynn Winmill
United States District Judge

MEMORANDUM DECISION AND ORDER - 39

# EXHIBIT 3

Daniel W. Bower, ISB #7204
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, Idaho 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

Monte Neil Stewart, ISB #8129
11000 Cherwell Court
Las Vegas, Nevada 89144
monteneilstewart@gmail.com

*Attorneys for Defendant-Intervenor Idaho Legislature*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:22-cv-00329-BLW |
| Plaintiff, | **IDAHO LEGISLATURE'S MOTION TO STAY PRELIMINARY INJUNCTION [Dkt. 95] PENDING APPEAL** |
| v. | |
| THE STATE OF IDAHO, | |
| Defendant. | |

The Speaker of the Idaho House of Representatives Mike Moyle, Idaho Senate

President Pro Tempore Chuck Winder, and the Sixty-Seventh Legislature respectfully

move this Court for a stay of its orders dated August 24, 2022 (Dkt. 95) and May 4, 2023,

pending disposition of an appeal to the United States Court of Appeals for the Ninth Circuit

and proceedings, if any, before the Supreme Court of the United States.  This motion is

supported by a supporting memorandum filed contemporaneously herewith.

Dated this 3rd day of July, 2023.

MORRIS BOWER & HAWS PLLC

By:   */s/ Daniel W. Bower*
          Daniel W. Bower


*/s/ Monte Neil Stewart*
Monte Neil Stewart

*Attorneys for Intervenors-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of July, 2023, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Brian David Netter
DOJ-Civ
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530

☐ U.S. Mail
☐ Hand Delivered
☐ Facsimile:
☒ ECF Email: brian.netter@usdoj.gov

*Attorneys for Plaintiff*

Daniel Schwei
DOJ-Civ
Federal Programs Branch
1100 L Street, N.W., Ste. 11532
Washington, D.C. 20530

☐ U.S. Mail
☐ Hand Delivered
☐ Facsimile:
☒ ECF Email: daniel.s.schwei@usdoj.gov

*Attorneys for Plaintiff*

Julie Straus Harris
DOJ-Civ
Civil Division, Federal Programs
Branch
1100 L Street, N.W.
Washington, D.C. 20530

☐ U.S. Mail
☐ Hand Delivered
☐ Facsimile:
☒ ECF Email:
julie.strausharris@usdoj.gov

*Attorneys for Plaintiff*

Lisa Newman
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street, N.W.
Washington, D.C. 20005

☐ U.S. Mail
☐ Hand Delivered
☐ Facsimile:
☒ ECF Email: lisa.n.newman@usdoj.gov

*Attorneys for Plaintiff*

Anna Lynn Deffebach

☐ U.S. Mail

DOJ-Civ                              ☐   Hand Delivered
Civil Division, Federal Programs     ☐   Facsimile:
Branch                               ☒   ECF Email:
1100 L Street, N.W., Ste. 12104          anna.l.deffebach@usdoj.gov
Washington, D.C. 20005

*Attorneys for Plaintiff*


Christopher A. Eiswerth               ☐   U.S. Mail
DOJ-Civ                               ☐   Hand Delivered
Federal Programs Branch               ☐   Facsimile:
1100 L Street, N.W., Ste. 12310       ☒   ECF Email:
Washington, D.C. 20005                    christopher.a.eiswerth@usdoj.gov

*Attorneys for Plaintiff*

Emily Nestler                         ☐   U.S. Mail
DOJ-Civ                               ☐   Hand Delivered
1100 L Street                         ☐   Facsimile:
Washington, D.C. 20005                ☒   ECF Email: emily.b.nestler@usdoj.gov

*Attorneys for Plaintiff*

Lawrence G. Wasden                    ☐   U.S. Mail
Attorney General                      ☐   Hand Delivered
                                      ☐   Facsimile: (208) 334-2400
Steven L. Olsen                       ☒   ECF Email: steven.olsen@ag.idaho.gov
Chief of Civil Litigation
Megan A. Larrondo                         megan.larrondo@ag.idaho.gov
Dayton P. Reed                            dayton.reed@ag.idaho.gov
Ingrid C. Batey                           ingrid.batey@ag.idaho.gov
Deputy Attorneys General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID 83720-0010

*Attorneys for Defendant*

*/s/ Daniel W. Bower*

Daniel W. Bower

# EXHIBIT 4

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
JOSHUA REVESZ
Counsel, Office of the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
**LISA NEWMAN (TX Bar No. 24107878)**
ANNA DEFFEBACH
EMILY NESTLER
Trial Attorneys
JULIE STRAUS HARRIS
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*
United States of America

[Additional counsel listed below]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:22-cv-329 |
| v. | **COMPLAINT** |
| THE STATE OF IDAHO, | |
| Defendant. | |

The United States of America, by and through its undersigned counsel, brings this civil action

for declaratory and injunctive relief, and alleges as follows:

**PRELIMINARY STATEMENT**

1.      Under federal law, hospitals that receive federal Medicare funds are required to provide necessary stabilizing treatment to patients who arrive at their emergency departments while experiencing a medical emergency.  Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, if a person with an "emergency medical condition" seeks treatment at an emergency department at a hospital that accepts Medicare funds, the hospital must provide medical treatment necessary to stabilize that condition before transferring or discharging the patient. Crucially, "emergency medical conditions" under the statute include not just conditions that present risks to life but also those that place a patient's "health" in "serious jeopardy" or risk "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part."

2.      In some circumstances, medical care that a state may characterize as an "abortion" is necessary emergency stabilizing care that hospitals are required to provide under EMTALA.  Such circumstances may include, but are not limited to, ectopic pregnancy, severe preeclampsia, or a pregnancy complication threatening septic infection or hemorrhage.

3.      The State of Idaho, however, has passed a near-absolute ban on abortion.  Once the Idaho law takes effect on August 25, 2022, Idaho Code § 18-622 will make it a felony to perform an abortion in all but extremely narrow circumstances.  The Idaho law would make it a criminal offense for doctors to comply with EMTALA's requirement to provide stabilizing treatment, even where a doctor determines that abortion is the medical treatment necessary to prevent a patient from suffering severe health risks or even death.

4.      Under the Idaho law, once effective, any state or local prosecutor can subject a physician to indictment, arrest, and prosecution merely by showing that an abortion has been performed, without regard to the circumstances.  The law then puts the burden on the physician to prove an "affirmative defense" at trial.  Idaho Code § 18-622(3) (2022).  Nothing protects a physician

2

from arrest or criminal prosecution under Idaho's law, and a physician who provides an abortion in Idaho can avoid criminal liability only by establishing that "the abortion was necessary to prevent the death of the pregnant woman" or that, before performing the abortion, the pregnant patient (or, in some circumstances, their parent or guardian) reported an "act of rape or incest" against the patient to a specified agency and provided a copy of the report to the physician. *Id.* Beyond care necessary to prevent death, the law provides no defense whatsoever when the health of the pregnant patient is at stake. And, even in dire situations that might qualify for the Idaho law's limited "necessary to prevent the death of the pregnant woman" affirmative defense, some providers could withhold care based on a well-founded fear of criminal prosecution.

5.      Idaho's abortion law will therefore prevent doctors from performing abortions even when a doctor determines that abortion is the medically necessary treatment to prevent severe risk to the patient's health and even in cases where denial of care will likely result in death for the pregnant patient. To the extent Idaho's law prohibits doctors from providing medically necessary treatment, including abortions, that EMTALA requires as emergency medical care, Idaho's new abortion law directly conflicts with EMTALA. *See* 42 U.S.C. § 1395dd(f) (EMTALA preempts State laws "to the extent that the requirement directly conflicts with a requirement of this section"). To the extent Idaho's law renders compliance with EMTALA impossible or stands as an obstacle to the accomplishment of federal statutes and objectives, EMTALA preempts the Idaho law under the Supremacy Clause of the United States Constitution.

6.      In this action, the United States seeks a declaratory judgment that Idaho's law is invalid under the Supremacy Clause and is preempted by federal law to the extent that it conflicts with EMTALA. The United States also seeks an order preliminarily and permanently enjoining Idaho's restrictive abortion law to the extent it conflicts with EMTALA.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

8.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant resides within this judicial district and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

9.      Pursuant to D. Idaho Civ. R. 3.1, venue is proper in the Southern Division because Defendant legally resides in Ada County, Idaho, and because that is where the claim for relief arose.

**PARTIES**

10.     Plaintiff is the United States of America.

11.     Defendant, the State of Idaho, is a State of the United States.  The State of Idaho includes all of its officers, employees, and agents.

**SUPREMACY OF FEDERAL LAW**

**I.      The Supremacy Clause and Preemption**

12.     The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

13.     "[S]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the Constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government."  *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819).  "There is no doubt Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision," and a State law is invalid if it conflicts with such a provision.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  Likewise, a State law is invalid if compliance with the state

and federal law is impossible or if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

## II.   The Emergency Medical Treatment and Labor Act (EMTALA)

14.     Medicare, enacted in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is a federally funded program, administered by the Secretary of the Department of Health and Human Services (HHS), that pays health care providers or insurers for health care services under certain circumstances.

15.     Medical providers' participation in Medicare is voluntary.  When providers agree to participate in Medicare, they submit provider agreements to the Secretary of HHS.  *See* 42 U.S.C. § 1395cc.  Hospitals submitting such agreements agree that they will "adopt and enforce a policy to ensure compliance with the requirements of [EMTALA] and to meet the requirements of [EMTALA]." *Id.* § 1395cc(a)(1)(I)(i).

16.     Under EMTALA, hospitals participating in Medicare are generally required to provide stabilizing health care to all patients who arrive at an emergency department suffering from an emergency medical condition.  *See* 42 U.S.C. § 1395dd.

17.     Specifically, EMTALA requires these hospitals to "screen" patients who request treatment at the hospital's emergency department and provide "necessary stabilizing treatment," including an appropriate transfer to another facility that is able to provide stabilizing care not available at the originating hospital, for any "emergency medical condition" the hospital identifies.  42 U.S.C. § 1395dd.

18.     The screening requirement necessitates that hospitals act "to determine whether or not an emergency medical condition" exists.  *Id.* § 1395dd(a); *see also* 42 C.F.R. § 489.24(a) (noting that EMTALA requires "an appropriate medical screening examination within the capability of the hospital's emergency department").

5

19.     Congress defined an "emergency medical condition" in EMTALA as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part …

(B) with respect to a pregnant woman who is having contractions-

(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or

(ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).

20.     If the hospital determines an individual has an emergency medical condition, "the hospital must provide either" (1) "further medical examination and such treatment as may be required to stabilize the medical condition," or (2) "transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1); *see also* 42 C.F.R. § 489.24(a)(1)(i)-(ii). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).

21.     EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). The term "transfer" is defined to include "discharge" of a patient. *Id.* § 1395dd(e)(4).

22.     A hospital may not transfer (including by discharging) an individual with an emergency medical condition who has not been stabilized, unless, *inter alia*, the individual requests a transfer or a

6

physician certifies that the benefits of a transfer to another medical facility outweigh the increased risks to the patient.  *Id.* § 1395dd(c).

23.    In short, when an emergency medical condition exists, EMTALA requires participating hospitals to provide "stabilizing" treatment, as determined by the particular hospital's facilities and the treating physician's professional medical judgment.

24.    As relevant here, there are some pregnancy-related emergency medical conditions—including, but not limited to, ectopic pregnancy, severe preeclampsia, or a pregnancy complication threatening septic infections or hemorrhage—for which a physician could determine that the necessary stabilizing treatment is care that could be deemed an "abortion" under Idaho law.[1]  In that scenario, EMTALA requires the hospital to provide that stabilizing treatment.  *See* Dep't of Health and Human Servs., *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf; *see also Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf.

25.    EMTALA contains an express preemption provision, which preempts State laws "to the extent that the requirement directly conflicts with a requirement of this section."  42 U.S.C. § 1395dd(f).

---

[1] Termination of an ectopic pregnancy—which can never lead to a live birth and poses inherent danger to pregnant patients—is not considered an abortion by medical experts.  However, the termination of an ectopic pregnancy appears to fall within Idaho's broad definition of abortion.  *See* Idaho Code § 18-604(1).

**IDAHO'S ABORTION LAW**

26.     In 2020, Idaho enacted a law that severely restricts abortions and threatens criminal prosecution against anyone who performs an abortion.  The law, codified at Idaho Code § 18-622, is currently set to take effect on August 25, 2022, which is 30 days after issuance of the judgment in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).  *See* Idaho Code § 18-622(1)(a).

27.     Under Idaho's abortion law, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion."  *Id.* § 18-622(2).  The crime of "criminal abortion" is a felony, punishable by two to five years imprisonment.  *Id.*

28.     Idaho's law also requires that "[t]he professional license of *any* health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense."  *Id.* (emphasis added).

29.     The Idaho law defines "[a]bortion" to mean "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child."  *Id.* § 18-604(1).

30.     The *prima facie* criminal prohibition in Idaho's law does not contain any exceptions for when the pregnant patient's health or life is endangered.  Thus, the mere performance of an abortion—even in an emergency, life-saving scenario—would subject a provider to criminal prosecution and require the provider to raise one of the law's narrow affirmative defenses at trial.

31.     Idaho's abortion law provides for only two affirmative defenses, either of which the provider must prove by a preponderance of the evidence.  In other words, once a prosecutor or licensing authority proves the *prima facie* case of an abortion having been performed, an accused physician may try to avoid conviction, incarceration, and loss of license by raising one of two

affirmative defenses, but bears the burden of proving the defense to a jury, along with the expense and uncertainty that flow from that burden.

32.     Specifically, the accused physician would have to prove to a jury: (1) that "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman," or (2) in cases of rape or incest, that the woman, or, if a minor, the woman or her parent or guardian, "has reported the act of rape or incest to a law enforcement agency" and the physician, prior to performing the abortion, received a copy of a police report (or, in the case of a minor, a police report or report to child protective services) regarding "the act of rape or incest."   Idaho Code § 18-622(3)(a)(ii), (b)(ii)-(iii).

33.     There is no affirmative defense applicable in circumstances where an abortion is necessary to ensure the health of the pregnant patient—even where the patient faces serious medical jeopardy or impairment—if the care is not "necessary to prevent the death" of the patient.

34.     In addition, it is a requirement for both affirmative defenses, and thus the physician would have to prove, that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman."   *Id.* § 18-622(3)(a)(iii), (b)(iv).

## IDAHO'S ABORTION LAW CONFLICTS WITH EMTALA

35.     Within the State of Idaho, there are approximately 43 hospitals that voluntarily participate in Medicare.  Approximately 39 of those hospitals have emergency departments that are required to comply with EMTALA.

36.     Idaho's criminal prohibition of all abortions, subject only to the statute's two limited affirmative defenses, conflicts with EMTALA. Idaho's criminal prohibition extends even to abortions that a physician determines are necessary stabilizing treatment that must be provided under EMTALA.

37.     In particular, EMTALA's definition of an emergency medical condition—for which the hospital would be required to facilitate stabilizing treatment—is broader than just those circumstances where treatment is "necessary to prevent . . . death" under Idaho law. For example, EMTALA requires stabilizing treatment where "the health" of the patient is "in serious jeopardy," or where continuing a pregnancy could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii). Idaho has criminalized performing abortions in those circumstances, even when a physician has determined that an abortion is the necessary stabilizing treatment for a patient's emergency medical condition. The Idaho law therefore conflicts with federal law and is, in this respect, preempted.

38.     The Idaho law also conflicts with EMTALA because the only limited protection it affords for even life-saving abortions is in the form of an affirmative defense where the provider bears the burden of proof at trial. Idaho's law subjects every provider who performs an abortion to the threat of indictment, arrest, and criminal prosecution. The law likewise subjects every provider and employee who performs or assists in performing an abortion to potential loss of their medical license. By threatening providers with criminal prosecution and license revocation proceedings for *every* abortion, regardless of whether it was "necessary to prevent . . . death," the Idaho law will deter physicians from performing abortions they have determined are medically necessary and thus must be provided under federal law. This is true even in the limited situations in which the abortions could be deemed defensible at a physician's criminal trial. "Where a prosecution is a likely possibility, yet only an affirmative defense is available," there "is a potential for extraordinary harm and a serious chill" upon protected conduct. *Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004). Here, the law's obvious

chilling effect on providers' willingness to perform abortions, even when abortions are determined to be necessary medical treatments, is itself an impediment to the accomplishment of EMTALA's goal of ensuring that patients receive emergency care.  The Idaho law is therefore preempted.

## **IDAHO'S ABORTION LAW CAUSES INJURY TO FEDERAL INTERESTS**

39.     The Idaho abortion law will become effective on August 25, 2022.

40.     Following the Supreme Court's decision in *Dobbs*, the Governor of Idaho issued a press release stating that "Idaho has been at the forefront of enacting new laws" to restrict abortion, and specifically referencing § 18-622 as a bill that the Governor "signed into law" and "will go into effect later this summer."[2]

41.     Before filing this lawsuit, on July 29, 2022, the United States sent a letter to the State of Idaho, expressing the United States' view that § 18-622 was contrary to federal law.  The United States did not receive a substantive response.

42.     Once the law goes into effect on August 25, 2022, providers will immediately be subject to the threat of arrest, imprisonment, criminal liability, and loss of license for providing federally required care.

43.     Severe harm will result from Idaho's law, which violates the Supremacy Clause.  *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (assuming that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)).

## I.     Idaho's Abortion Law Threatens Severe Public Health Consequences

44.     If Idaho's abortion law is allowed to take effect, physicians in Idaho will be threatened with prosecution under a state law that prohibits them from providing necessary stabilizing medical

---

[2] https://gov.idaho.gov/pressrelease/gov-little-comments-on-scotus-overrule-of-roe-v-wade/

treatment required by EMTALA. Physicians will be faced with an untenable choice—either to withhold critical stabilizing treatment required under EMTALA or to risk criminal prosecution and potential loss of their professional licenses. As a result of Idaho's physicians being placed in this position, patients will suffer—including by having their care delayed or losing access to necessary health care that is guaranteed under federal law. Particularly in emergency circumstances, or when dealing with considerations of risk to an individual's life or health, delayed health care can pose serious harms and is exactly what EMTALA's requirements are designed to prevent. In short, the Idaho law threatens severe public health consequences.

45. For example, pregnant patients sometimes arrive at a hospital's emergency department with an emergency medical condition for which physicians reasonably determine that the appropriate stabilizing treatment is an emergency abortion. Physicians facing a threat of criminal prosecution for performing an emergency abortion may be reluctant to perform the procedure—even when their medical judgment leads them to conclude that the procedure is necessary. The loss of that necessary treatment will result in irreversible damage to the health of a pregnant patient in some instances, and in other cases could lead to death.

46. The Idaho law will deprive pregnant patients of necessary treatment required by EMTALA notwithstanding the Idaho law's affirmative defense for abortions "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(ii). Because that defense is available only during criminal prosecution or licensing proceedings, the law still subjects providers to the threat of criminal prosecution and potential loss of license for performing a life-saving abortion. And even the law's affirmative defense does not allow for abortions in emergency situations where pregnancy can reasonably be expected to place the health of the pregnant patient in serious jeopardy, seriously impair the pregnant patient's bodily functions, or cause serious dysfunction of any bodily part or organ.

II.     **Idaho's Law Interferes with EMTALA Obligations under the Federal Medicare Program**

47.     As discussed above, Idaho's abortion law directly conflicts with the important federal policy reflected in EMTALA, 42 U.S.C. § 1395dd, through which Congress codified a guarantee of necessary stabilizing medical treatment for patients with emergency medical conditions, including pregnant patients, who seek care at emergency departments. *See id.* § 1395dd(a), (b), (e)(1), (g).

48.     Congress intended EMTALA to govern nationwide in every hospital that accepts Medicare funds, as confirmed by its express preemption of conflicting State laws. *Id.* § 1395dd(f). Idaho's law frustrates Congress's objective of guaranteeing nationwide emergency medical care at Medicare hospitals, because Idaho law prohibits a particular form of medical treatment—even when that treatment is necessary to stabilize a patient experiencing an emergency medical condition. The United States has a strong sovereign interest in ensuring that States may not disrupt the federal objectives embodied in EMTALA, particularly when States seek to hold physicians criminally liable for providing stabilizing emergency treatment required under federal law.

49.     The United States has an interest in protecting the integrity of the funding it provides under Medicare and ensuring that hospitals who are receiving Medicare funding will not refuse to provide stabilizing treatment to patients experiencing medical emergencies. From 2019 to 2020, HHS paid approximately 74 million dollars for emergency department care in Idaho hospitals enrolled in Medicare. A condition of hospitals' enrollment in Medicare is that they agree to comply with EMTALA. *See id.* § 1395cc(a)(1)(I)(i). Thus, part of the United States' bargain when it agrees to provide Medicare reimbursement to hospitals is that those hospitals will, in return, provide all forms of stabilizing treatment to emergency department patients, consistent with EMTALA.

50.     Idaho's law prevents the United States from receiving the benefit of its bargain, however, by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA. Thus, Idaho's law undermines the overall Medicare program and the funds that the United

States provides in connection with that program, by precluding the United States from receiving one of the benefits to which it is entitled under the Medicare program.

51.     Idaho's law also improperly interferes with the United States' pre-existing agreements with hospitals under Medicare.  Under these agreements, each hospital (including those in Idaho) must certify that it "agrees to conform to the provisions of section 1866 of the Social Security Act and applicable provisions in 42 CFR," CMS Form 1561, and those referenced provisions likewise include obligations to comply with EMTALA.[3]

52.     Approximately 43 hospitals in Idaho have signed Medicare agreements, and approximately 39 of those hospitals have emergency departments that must comply with EMTALA. Compliance with Idaho's law would force these hospitals to violate their agreements with the United States because Idaho criminalizes the provision of stabilizing medical services required by EMTALA, and thus Idaho's law likewise interferes with the United States' interests.

53.     Waiting to initiate federal enforcement actions directly against physicians or hospitals would likely have significant negative consequences on public health, including because such actions could be pursued only after physicians or hospitals had first denied emergency care to an individual in need.  Unless the action is filed against a state-run hospital, the State would not be a party to a federal enforcement action, and the State's absence would further delay the resolution of this issue. Meanwhile, patients would be denied important life-saving and stabilizing medical care, resulting in needless suffering and even loss of life.  Physicians and hospitals should not be placed in the untenable position of risking criminal prosecution under state law or subjecting themselves to enforcement actions under federal law.  Pregnant patients who arrive at an emergency department are entitled to the stabilizing emergency care ensured under federal law when experiencing life- or health-threatening conditions.

---

[3] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1561.pdf

54.     The law likewise stands as an obstacle to Congress's goal of ensuring that patients receive effective emergency care by threatening the professional license of *any* health care professional who "assists" in performing or attempting to perform an abortion.  Idaho Code § 18-622(2).  In particular, the law threatens a six-month suspension of the license of any health care professional who assists in an abortion or, on a second offense, threatens to permanently bar these providers from their professional practice.  A pregnant patient who arrives in the emergency department with an emergency condition is likely to encounter not just emergency department physicians but also triage nurses, scrub nurses, lab techs, radiologists, anesthesiologists, and others whose role in any procedure could constitute "assisting" in the performance of an abortion.  By threatening the license of other hospital employees whose care is critical to providing emergency department care, Idaho's law impedes EMTALA's goal of ensuring that patients receive effective emergency care.

## CLAIM FOR RELIEF

### Preemption Under the Supremacy Clause and EMTALA

55.     Plaintiff hereby incorporates paragraphs 1 through 54 as if fully set forth herein.

56.     The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

57.     EMTALA expressly preempts State laws "to the extent that the requirement directly conflicts with a requirement of this section."  42 U.S.C. § 1395dd(f).  Idaho Code § 18-622 violates the Supremacy Clause and is preempted to the extent it is contrary to EMTALA.

58.     The law imposes requirements that are contrary to EMTALA and impedes the accomplishment and execution of the full purposes and objectives of federal law and is therefore preempted.

15

59.     The Idaho law therefore violates the Supremacy Clause and is preempted under federal law to the extent that it conflicts with EMTALA.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

a.  A declaratory judgment stating that Idaho Code § 18-622 violates the Supremacy Clause and is preempted and therefore invalid to the extent that it conflicts with EMTALA;

b.  A declaratory judgment stating that Idaho may not initiate a prosecution against, seek to impose any form of liability on, or attempt to revoke the professional license of any medical provider based on that provider's performance of an abortion that is authorized under EMTALA;

c.  A preliminary and permanent injunction against the State of Idaho—including all of its officers, employees, and agents—prohibiting enforcement of Idaho Code § 18-622(2)-(3) to the extent that it conflicts with EMTALA;

d.  Any and all other relief necessary to fully effectuate the injunction against Idaho Code § 18-622's enforcement to the extent it conflicts with EMTALA;

e.  The United States' costs in this action; and

f.  Any other relief that the Court deems just and proper.

16

Dated: August 2, 2022

SAMUEL BAGENSTOS
General Counsel

PAUL R. RODRÍGUEZ
Deputy General Counsel

DAVID HOSKINS
Supervisory Litigation Attorney

JESSICA BOWMAN
MELISSA HART
Attorneys
Department of Health and Human Services
200 Independence Ave., SW
Washington, DC  20201

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

JOSHUA REVESZ
Counsel, Office of the Assistant Attorney
General

ALEXANDER K. HAAS
Director, Federal Programs Branch

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
LISA NEWMAN (TX Bar No. 24107878)
ANNA DEFFEBACH
EMILY NESTLER
Trial Attorneys

JULIE STRAUS HARRIS
Senior Trial Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*

# EXHIBIT 5

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
JOSHUA REVESZ
Counsel, Office of the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
**LISA NEWMAN (TX Bar No. 24107878)**
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys
JULIE STRAUS HARRIS
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*
United States of America

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF IDAHO, <br><br> Defendant. | Case No. 1:22-cv-329-BLW <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |

**Table of Contents**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I.    Federal Law ....................................................................................................2

      A.    Supremacy of Federal Law ....................................................................2

      B.    The Emergency Medical Treatment and Labor Act (EMTALA)..................3

      C.    Idaho Hospitals' Participation in Medicare and Their Agreements to Comply
            with EMTALA Obligations ......................................................................5

II.   Idaho's Abortion Law ....................................................................................6

STANDARD OF REVIEW ....................................................................................7

ARGUMENT ....................................................................................................8

I.    The United States is Likely to Succeed in Demonstrating that EMTALA Preempts
      Idaho's Abortion Law ....................................................................................8

      A.    EMTALA Requires Participating Hospitals to Provide Stabilizing Treatment,
            Which Includes Abortions for Some Medical Conditions ..........................8

      B.    Idaho's Near-Absolute Abortion Ban Conflicts with EMTALA ................14

II.   The Equitable Balance Supports Entry of a Preliminary Injunction ....................17

CONCLUSION ....................................................................................................20

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*AK Futures LLC v. Boyd St. Distro, LLC,*
  35 F.4th 682 (9th Cir. 2022) ................................................................. 8

*All. For Wild Rockies v. Pierson,*
  550 F. Supp. 3d 894 (D. Idaho 2021) .................................................. 20

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................ 16

*Arrington v. Wong,*
  237 F.3d 1066 (9th Cir. 2001) ........................................................ 3, 11

*Beltran v. Myers,*
  677 F.2d 1317 (9th Cir. 1982) ............................................................ 18

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ........................................................................... 3

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) ........................................................................ 11

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ............................................................................ 16

*Burditt v. HHS,*
  934 F.2d 1362 (5th Cir. 1991) ............................................................ 14

*California v. United States,*
  No. 05-cv-328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ............. 13

*Chamber of Com. Of U.S. v. Bonta,*
  13 F.4th 766 (9th Cir. 2021) ............................................................... 15

*Cox v. Cabell Huntington Hosp., Inc.,*
  863 F. Supp. 2d 568 (S.D. W. Va. 2012) ............................................ 15

*Cummings v. Premier Rehab Keller, PLLC,*
  142 S. Ct. 1562 (2022) ......................................................................... 3

*Cyan, Inc. v. Beaver Cnty. Employees Ret. Fund,*
  138 S. Ct. 1061 (2018) ........................................................................ 13

*Draper v. Chiapuzio,*
  9 F.3d 1391 (9th Cir. 1993) ....................................................... 5, 14, 15

*Hardy v. N.Y.C. Health & Hosp. Corp.*,
   164 F.3d 789 (2d Cir. 1999) ................................................................5

*Harris v. McRae*,
   448 U.S. 297 (1980) ..........................................................................12

*Harry v. Marchant*,
   291 F.3d 767 (11th Cir. 2002) .............................................................5

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
   469 U.S. 256 (1985) ..........................................................................20

*Matter of Baby K*,
   16 F.3d 590 (4th Cir. 1994) .......................................................... 11, 14

*M'Culloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ...........................................................2

*Merce v. Greenwood*,
   348 F. Supp. 2d 1271 (D. Utah 2004) ...............................................15

*Morin v. E. Maine Med. Ctr.*,
   780 F. Supp. 2d 84 (D. Me. 2010) ................................................ 12, 13

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) .......................................................................3

*New York v. U.S. Dep't of Health & Hum. Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................12

*Nken v. Holder*,
   556 U.S. 418 (2009) ..........................................................................17

*Puerto Rico v. Franklin Calif. Tax-Free Tr.*,
   579 U.S. 115 (2016) ............................................................................3

*Rodde v. Bonta*,
   357 F.3d 988 (9th Cir. 2004) .............................................................18

*Root v. New Liberty Hosp. Dist.*,
   209 F.3d 1068 (8th Cir. 2000) ...........................................................14

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018) ........................................................................12

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) .........................................................19

*United States v. Mackby,*
    339 F.3d 1013 (9th Cir. 2003) ................................................................. 19

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ..................................................... 15, 17, 18

*Vargas By & Through Gallardo v. Del Puerto Hosp.,*
    98 F.3d 1202 (9th Cir. 1996) ............................................................ 16, 17

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
    529 U.S. 765 (2000) ............................................................................... 19

## **Constitutions**

U.S. Const. art. VI, cl. 2 ............................................................................ 2

## **Statutes**

10 U.S.C. § 1093 ..................................................................................... 12

20 U.S.C. § 1688 ..................................................................................... 12

22 U.S.C. § 5453 ..................................................................................... 12

22 U.S.C. § 7704 ..................................................................................... 12

25 U.S.C. § 1676 ..................................................................................... 12

42 U.S.C. § 238n ..................................................................................... 12

42 U.S.C. § 280h-5 ................................................................................. 12

42 U.S.C. § 300a-6 ................................................................................. 12

42 U.S.C. § 300a-7 ................................................................................. 12

42 U.S.C. § 300a-8 ................................................................................. 12

42 U.S.C. § 300z-10 ............................................................................... 12

42 U.S.C. § 1395 *et seq.* .......................................................................... 3

42 U.S.C. § 1395cc ........................................................................ *passim*

42 U.S.C. § 1395dd ....................................................................... *passim*

42 U.S.C. § 1397ee ................................................................................. 12

42 U.S.C. § 2996f ................................................................................... 12

42 U.S.C. § 12584a ................................................................................................12

42 U.S.C. § 18023 .................................................................................................11

Consolidated Appropriations Act, 2022,
   Pub. L. No. 117-103, 136 Stat. 49 (2022) .....................................................12

Idaho Code § 18-604 (2021) ............................................................................. 7, 16

Idaho Code § 18-622 (2020) ..........................................................................*passim*

Idaho Code § 54-1401 (2014) ...............................................................................16

Idaho Code § 54-1718 (2021) ...............................................................................16

Idaho Code § 54-1810 (2019) ...............................................................................16

Idaho Code § 54-1810A (2019) ............................................................................16

**Legislative Materials**

131 Cong. Rec. S13892 .........................................................................................14

151 Cong. Rec. H177 (Jan. 25, 2005) ...................................................................12

Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (1985) ..................12

H.R. Rep. No. 99-241 (1985) ........................................................................... 3, 5

**Regulations**

42 C.F.R. § 489.24(a)(1)(i) .............................................................................. 4, 9, 11

**Other Authorities**

CMS, Form 855
   https://perma.cc/84T6-S2DP ...........................................................................6

CMS, Form 1561
   https://perma.cc/5EPE-YLRE ...........................................................................6

HHS, Medicare Enrollment Application; CMS Form 855,
   https://perma.cc/84T6-S2DP ...........................................................................6

Idaho Dep't of Health & Welfare, 2010-2020 Idaho Resident Births, VS Natality –
   Data Results, 2010-2020,
   https://www.gethealthy.dhw.idaho.gov/idaho-births-vital-statistics ....................................18

**INTRODUCTION**

Federal law requires certain hospitals receiving federal Medicare funds to offer treatment to individuals experiencing medical emergencies. Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, individual patients must be provided "stabilizing care" when they seek treatment at a covered hospital for an "emergency medical condition." An emergency medical condition exists when a patient's "health" is in "serious jeopardy" or the patient risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). Some patients who experience these medical emergencies are pregnant, and in some situations the necessary stabilizing treatment for such a pregnant patient involves termination of the pregnancy. In those circumstances, EMTALA requires that hospitals offer that stabilizing treatment to the patient, who can then decide whether to proceed.

In direct conflict with this federal requirement, the State of Idaho has enacted a near-absolute ban on abortion that is scheduled to go into effect on August 25, 2022. *See* Idaho Code § 18-622 (2020). Under Idaho's law, any physician who terminates a pregnancy can be indicted, arrested, and prosecuted on felony charges, regardless of the medical need for the procedure. A physician may avoid criminal liability only by proving a narrow "affirmative defense"—as relevant here, that the abortion was "necessary to prevent the death of the pregnant woman." *Id.* § 18-622(3)(a)(ii). That defense is far narrower than the circumstances in which EMTALA requires providing stabilizing treatment. Where EMTALA's standard is met but the treatment is not strictly "necessary to prevent the death" of the patient, it is impossible for a physician to comply both with the obligations of EMTALA and § 18-622. And even in cases where termination of the pregnancy is necessary to prevent the patient's death, the Idaho law requires a physician to risk arrest and prosecution for each abortion performed because the law affords only an "affirmative defense" that the physician must prove at trial. By threatening physicians with criminal prosecution—even when they provide treatment in emergency, life-

threatening situations as federal law requires—Idaho's law penalizes and discourages such treatment, and thereby conflicts directly with federal law. In these respects, federal law preempts § 18-622.

If allowed to go into effect, the Idaho law will cause significant irreparable harm, including to the public health of patients across Idaho. As the declaration of Dr. Lee A. Fleisher (attached as Ex. A) demonstrates, there are emergency conditions affecting pregnant individuals for which the medically necessary treatment involves termination of the pregnancy. But § 18-622 criminalizes providing such treatment, despite the extremely serious risk that, for example, a patient with an ectopic pregnancy might bleed to death, an infection could turn into sepsis and cause organ failure, or seizures caused by eclampsia might prove uncontrollable. Physicians practicing within Idaho likewise confirm that, if § 18-622 takes effect, pregnant patients experiencing emergency conditions will suffer. *See* Decls. of Dr. Emily Corrigan, Dr. Kylie Cooper, and Dr. Stacy T. Seyb (attached hereto as Exs. B-D). These facts establish clear irreparable harm and a strong public interest in enjoining § 18-622 from going into effect as applied to EMTALA-mandated care. The Court should grant the United States' motion for a preliminary injunction.

## BACKGROUND

### I.   Federal Law

#### A.      Supremacy of Federal Law

The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to that principle, "states have no power . . . to retard, impede, burden, or in any manner control the operations of the Constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819).

When "Congress enacts a law that imposes restrictions or confers rights on private actors," and "a state law confers rights or imposes restrictions that conflict with the federal law," the "federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). If a "statute contains an express pre-emption clause, we do not invoke any presumption against preemption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Calif. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation omitted).

### B.     The Emergency Medical Treatment and Labor Act (EMTALA)

Medicare is a federally funded program, administered by the Secretary of Health and Human Services (HHS), that generally pays health care providers for health care services under certain circumstances. *See* 42 U.S.C. § 1395 *et seq*. Participation in Medicare is voluntary, and each provider must submit an agreement to the Secretary promising to comply with certain conditions in return for receipt of Medicare funding. *See id.* § 1395cc. Although Medicare generally does not contemplate Federal employees "exercis[ing] any supervision or control over the practice of medicine or the manner in which medical services are provided," 42 U.S.C. § 1395, that does not prevent the Federal Government from establishing and enforcing conditions of participation in Medicare, *see Biden v. Missouri*, 142 S. Ct. 647, 654 (2022), nor does it eliminate Congress's "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022).

Congress enacted EMTALA in 1986, based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, Part 3, at 5 (1985); *see also Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) ("The overarching purpose of EMTALA is to ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." (alterations and citations

omitted)). EMTALA applies to every hospital that has an emergency department and participates in Medicare, *see* 42 U.S.C. § 1395dd(e)(2), regardless of whether any particular patient qualifies for Medicare. Congress has statutorily required that hospitals participating in Medicare agree to comply with EMTALA as a condition of receiving federal funding. *See id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, when a patient arrives at an emergency department and requests treatment, the hospital must provide an appropriate medical screening examination "to determine whether or not an emergency medical condition" exists. *Id.* § 1395dd(a); *see also* 42 C.F.R. § 489.24(a)(1)(i). Congress defined an "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>> (ii) serious impairment to bodily functions, or
>> (iii) serious dysfunction of any bodily organ or part …
>
> (B) with respect to a pregnant woman who is having contractions-
>> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1). If a hospital determines that an individual has an emergency medical condition, "the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1); *see also* 42 C.F.R. § 489.24(a)(1)(ii). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i). Under EMTALA, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual

from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "[T]ransfer" is defined to include discharge of a patient. *Id.* § 1395dd(e)(4). A hospital satisfies its obligations under EMTALA if, after being informed of the risks and benefits of treatment, the patient (or the patient's representative) does not consent to the treatment. *Id.* § 1395dd(b)(2).

In short, EMTALA requires that hospitals offer stabilizing treatment where "the health" of the patient is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A)(i)-(iii). The hospital may also "transfer" such an individual, but only if the transfer meets certain requirements, *e.g.*, that the medical benefits of the transfer outweigh the risks. *Id.* § 1395dd(c)(1)(A)(ii).

EMTALA contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section." *Id.* § 1395dd(f). The intent of this provision was to preserve "stricter state laws," *i.e.*, state laws requiring emergency care *beyond* what EMTALA mandates. H.R. Rep. No. 99-241, Part 1, at 4 (1985); *see also* H.R. Rep. No. 99-241, Part 3, at 5 (1985) (expressing a desire to add "federal sanctions" as a supplement to state law duties "to provide necessary emergency care"); *Harry v. Marchant*, 291 F.3d 767, 773-74 (11th Cir. 2002). For purposes of EMTALA, "[a] state statute 'directly conflicts' with federal law in either of two cases: first, if 'compliance with both federal and state regulations is a physical impossibility,' or second, if the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted) (per curiam); *accord Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999).

## C.   Idaho Hospitals' Participation in Medicare and Their Agreements to Comply with EMTALA Obligations

As noted, a hospital participating in Medicare must comply with EMTALA as a condition of receiving federal funds. *See* 42 U.S.C. § 1395cc(a)(1)(I)(i). Additionally, hospitals enter into written agreements with the Secretary confirming they will comply with EMTALA.

Hospitals apply to become certified under Medicare by submitting a Centers for Medicare & Medicaid Services (CMS) Form 855, *see* Decl. of David R. Wright (attached hereto as Ex. E) ¶ 2, in which the provider "agree[s] to abide by the Medicare laws, regulations and program instructions that apply." CMS Form 855, § 15, ¶ A.3 (pg. 48), https://perma.cc/84T6-S2DP. If approved for Medicare certification, the hospital must then sign CMS Form 1561, Wright Decl. ¶ 4, in which the provider likewise "agrees to conform to the provisions of section of 1866 of the Social Security Act [42 U.S.C. § 1395cc] and applicable provisions in 42 CFR." https://perma.cc/5EPE-YLRE. Finally, each fiscal year, a Medicare-participating hospital must submit a cost report, pursuant to which "the Chief Financial Officer or hospital Administrator must certify that he or she is 'familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations,' which include EMTALA." Wright Decl. ¶ 6; *see also* Decl. of Barbara Shadle (attached hereto as Ex. F) ¶¶ 2-5.

Within Idaho, there are 52 Medicare-certified hospitals, at least 39 of which provide emergency services. Wright Decl. ¶ 8. Of the 52 hospitals, 16 are government-owned, and at least 15 of those provide emergency services. *Id.* ¶ 9. These 52 hospitals in Idaho received approximately $3.4 billion in federal Medicare funds during fiscal years 2018-2020; by rough estimate, approximately $74 million was attributable to these hospitals' emergency departments. Shadle Decl. ¶ 6. That funding was conditioned on compliance with EMTALA. Wright Decl. ¶ 14.

## II.    Idaho's Abortion Law

In 2020, Idaho enacted a law that severely restricts abortion and threatens criminal prosecution against anyone who performs the procedure. The law, codified at Idaho Code § 18-622, is set to take effect August 25, 2022. *See* Idaho Code § 18-622(1)(a).

Under § 18-622, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion," a felony punishable by two to five years imprisonment. *Id.*

§ 18-622(2). The law also requires that "[t]he professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* Idaho law defines "[a]bortion" to mean "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1).[1]

The *prima facie* criminal prohibition and license suspension provisions in Idaho's law do not contain any exceptions, including for when the pregnant patient's health or life is endangered. *See id.* § 18-622(2). Thus, the performance of an abortion—even in an emergency, life-saving scenario— would subject a provider to criminal prosecution and require the provider to assert one of the law's "affirmative defense[s]" at trial. *Id.* § 18-622(3). As relevant here, the accused physician would have to prove to a jury, by a preponderance of the evidence, that "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman," and that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." *Id.* § 18-622(3)(a)(ii)-(iii).

## STANDARD OF REVIEW

The United States seeks a preliminary injunction against § 18-622's enforcement as applied to

---

[1] This definition of "abortion" in the Idaho Code is broad and covers some procedures that may not be characterized as an abortion in the medical community, including some circumstances in which a pregnancy is nonviable or termination of pregnancy is necessary to treat a pregnant patient's medical condition. *See* Fleisher Decl. ¶ 32, Ex. A-B. For purposes of this case, the United States uses the term "abortion" as it is defined under the Idaho Code.

EMTALA-mandated care. To obtain such preliminary relief, "a party must show: (1) it will likely succeed on the merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) the public interest favors an injunction." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022) (citation omitted).

## ARGUMENT

### I. The United States is Likely to Succeed in Demonstrating that EMTALA Preempts Idaho's Abortion Law

The United States has a clear likelihood of success on its claim. EMTALA requires hospitals with emergency departments to provide stabilizing treatment for emergency conditions. Physicians treating emergency conditions will sometimes determine that the medically necessary treatment involves or will result in the termination of a pregnancy. Idaho's law conflicts with EMTALA by subjecting physicians to criminal prosecution for terminating *any* pregnancy, irrespective of the medical circumstances. The law also imposes felony criminal liability on physicians who provide abortions, unless the physician is able to prove through an affirmative defense that (as relevant here) the abortion was "necessary to prevent the death of the pregnant woman"—which is far narrower than the standard EMTALA requires for the provision of medically necessary care. Thus, Idaho's abortion law conflicts directly with EMTALA, and is preempted in the context of EMTALA-mandated care.

### A. EMTALA Requires Participating Hospitals to Provide Stabilizing Treatment, Which Includes Abortions for Some Medical Conditions

Under EMTALA, hospitals that receive Medicare funds are generally required (barring an appropriate transfer to another medical facility) to offer and provide "stabilizing treatment" to all patients who arrive at their emergency departments while experiencing an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). For such patients, hospitals are required to provide "further medical examination and such treatment as may be required to stabilize the medical condition." *Id.*

§ 1395dd(b)(1)(A); *see also* 42 C.F.R. § 489.24(a)(1)(i)-(ii).

Congress explicitly contemplated that pregnant patients would be among those arriving at an emergency department experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B). A number of conditions can arise during, or can be exacerbated by, pregnancy that may constitute "emergency medical conditions." For some patients, a physician will determine that the stabilizing treatment for the patient's emergency condition is termination of the pregnancy. Fleisher Decl. ¶¶ 12-27; Corrigan Decl. ¶¶ 8-30; Cooper Decl. ¶¶ 5-11; Seyb Decl. ¶¶ 6-12. For example, a pregnant patient may arrive at an emergency department with bleeding, pelvic pain, or severe abdominal pain that is being caused by an ectopic pregnancy, a condition in which a nonviable embryo implants outside the uterus, often in a fallopian tube, which can never lead to a live birth. Fleisher Decl. ¶ 13. This is an "emergency medical condition" because it could cause the fallopian tube to rupture, and the patient could bleed to death. *Id.* In most cases, the physician cannot reasonably know when that rupture will occur—rupture can occur within minutes, hours, or days of an ectopic-pregnancy diagnosis—but without immediate treatment it is reasonably probable that the patient's condition will continue to deteriorate. *Id.* Given the "serious risk of unknown imminence," and the inevitability that the patient's condition will deteriorate, the "appropriate stabilizing treatment is nearly always" termination of the pregnancy through surgery or medication. *Id.*

To take another example, a patient may arrive at an emergency room with nausea and shortness of breath, leading to a diagnosis of pre-eclampsia. Fleisher Decl. ¶ 17. Pre-eclampsia can "quickly progress to eclampsia, with the onset of seizures," that can result in a coma, pneumonia, kidney failure, stroke, or cardiac arrest. *Id.* In many cases, pre-eclampsia and eclampsia can be managed with medications that allow the fetus to mature. But in other cases (*e.g.*, situations in which the seizures cannot be controlled), a physician exercising her medical judgment will conclude that termination of the pregnancy is the necessary stabilizing treatment. *Id.* As Dr. Corrigan described, pre-eclampsia for

one patient caused "water on the lungs," which required an immediate termination of the pregnancy. Corrigan Decl. ¶¶ 27-29; Cooper Decl. ¶¶ 6-7 (pre-eclampsia placed patient at risk for stroke, seizure, and pulmonary edema); Seyb Decl. ¶¶ 9-10. A woman may also arrive at the emergency department with an infection after the amniotic sac surrounding the fetus ruptures. Fleisher Decl. ¶ 19. This condition can progress quickly into sepsis, at which point a patient's organs may begin to fail; like the other conditions discussed above, there are some circumstances in which termination of the pregnancy is the medically necessary treatment. *Id.*; Corrigan Decl. ¶¶ 11-17; Seyb Decl ¶¶ 7-8.

As a further example, a patient may arrive at the hospital with chest pain or shortness of breath, at which point a doctor discovers longstanding elevated blood pressure or a blood clot. Fleisher Decl. ¶ 15. Pregnancy can substantially exacerbate these conditions, and for some patients with severe symptoms, termination is the necessary treatment under EMTALA because there is a high probability of severe impairment of the lungs, heart, and kidneys without treatment. *Id.* Similarly, a patient may arrive at the hospital with vaginal bleeding caused by a placental abruption. *Id.* ¶ 20; Corrigan Decl. ¶¶ 21-25; Seyb Decl. ¶¶ 11-12. If the bleeding is uncontrollable, a physician may conclude that the stabilizing treatment includes termination of the pregnancy, in order to prevent the patient from going into shock which can result in organ dysfunction such as kidney failure. Fleisher Decl. ¶¶ 20-21.

These are just some of the emergency conditions that can place a pregnant patient's health in serious jeopardy or threaten bodily functions or organs. *Id.* ¶ 22. Despite these conditions' serious risks, it may not be possible for a physician to know whether treatment for any particular condition is "necessary to prevent the death" of the pregnant patient. *Id.* ¶¶ 13-21. Absent the stabilizing treatment EMTALA requires, however, the risk is extremely serious that, for example, a patient with an ectopic pregnancy might bleed to death, an infection could turn into sepsis and cause organ failure, seizures from eclampsia might prove uncontrollable, or a blood clot could lead to kidney failure. *Id.*

For each of these emergency medical conditions, where a physician determines that abortion

is the stabilizing treatment, EMTALA's plain text requires that treatment be offered and provided upon informed consent. Once a physician identifies that a pregnant individual suffers from an emergency medical condition, that individual must be offered "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A); *see also* 42 C.F.R. § 489.24(a)(1)(ii) ("If an emergency medical condition is determined to exist," the hospital must "provide any necessary stabilizing treatment[.]"). The only reasonable interpretation of EMTALA's text is that it requires hospitals to offer stabilizing treatment when medically necessary.

Nothing in EMTALA creates a different rule for circumstances in which the treatment results in termination of a pregnancy. The statute's text does not exempt any particular treatment (abortion or otherwise) from the ambit of stabilizing treatment. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *In the Matter of Baby K*, 16 F.3d 590, 596 (4th Cir. 1994) (finding no "statutory language or legislative history [in EMTALA] evincing a Congressional intent to create an exception to the duty to provide stabilizing treatment"). And any contrary interpretation—*i.e.*, that a hospital need not perform an abortion even when medically necessary to stabilize an emergency medical condition— would undermine EMTALA's overall purpose of ensuring "that patients . . . receive adequate medical emergency care." *Arrington*, 237 F.3d at 1073-74 (citation omitted).

Any argument that EMTALA does not encompass abortions is foreclosed by the specific Affordable Care Act (ACA) provision addressing abortion. *See* 42 U.S.C. § 18023. The ACA allows States to prohibit abortion coverage in certain health plans, *id.* § 18023(a)(1), but the same provision contains a cross-reference to EMTALA and makes explicit that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA.')" *Id.* § 18023(d). Congress therefore left no doubt that EMTALA encompasses abortion services and

that a State may not override that requirement.

The Weldon Amendment, which is a frequently enacted appropriations provision that prohibits discrimination against certain entities that do not perform abortions, reflects the same understanding. The Weldon Amendment's sponsor, when confronted with a concern that "women will die because they will not have access to an abortion needed to save the life of the mother," expressly referenced EMTALA as addressing that concern: "Hyde-Weldon does nothing of the sort. It ensures that in situations where a mother's life is in danger a health provider must act to save the mother's life. In fact, Congress passed [EMTALA] forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize the medical condition of such patients—particularly pregnant women." 151 Cong. Rec. H177 (Jan. 25, 2005) (statement of Rep. Weldon).

More generally, when Congress creates special rules for abortion—or excludes abortion care from otherwise-applicable rules—it does so expressly.[2] "Had Congress likewise intended" to exempt abortions from EMTALA, "it knew how to say so." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018). Indeed, the very same legislation through which Congress considered EMTALA included a separate program that *did* expressly carve out abortion. *Compare* Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong., 1st Sess., § 124 (language that became EMTALA), *with id.* § 302(b)(2)(B) (expressly excluding abortion from a different program's authorized activities). Courts have also previously understood EMTALA to require abortion-related services. *See, e.g., New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019); *Morin v. E. Maine Med.*

---

[2] Examples of these abortion-specific provisions include 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(e)(4); 25 U.S.C. § 1676; 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10, 1397ee(c)(7), 2996f(b)(8), and 12584a(a)(9). Congress has also routinely enacted a similar provision in appropriations laws, commonly referred to as the "Hyde Amendment." *See, e.g.,* Consolidated Appropriations Act, 2022, Div. H, Tit. V, §§ 506, 507, Pub. L. No. 117-103, 136 Stat. 49, 496 (2022); *cf. Harris v. McRae*, 448 U.S. 297, 302 (1980).

*Ctr.*, 780 F. Supp. 2d 84, 96 (D. Me. 2010); *California v. United States*, No. 05-cv-328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008). Thus, both EMTALA's text and the surrounding statutory scheme confirm that EMTALA includes termination of the pregnancy as a potential stabilizing treatment.

To be sure, EMTALA separately provides that a pregnant person may have an "emergency medical condition" in circumstances in which "the health of [the] . . . unborn child . . . [is] in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i). That provision ensures that a hospital's EMTALA obligations extend to a scenario where the "unborn child's" health (and not the pregnant patient's health) is threatened. But nothing in the statutory text indicates that Congress intended to limit the EMTALA-mandated care to pregnant patients, or to require a provider to prioritize the fetus's health over the life or health of the pregnant patient. Instead, when a pregnant patient has an emergency medical condition and a physician concludes that stabilizing treatment would require termination of the pregnancy, EMTALA's text leaves that balancing to the pregnant patient—who may decide, after weighing the risks and benefits, whether to accept or refuse the treatment. *See id.* § 1395dd(b)(2) (acknowledging that "the individual" with an emergency medical condition, after being informed "of the risks and benefits" of treatment, may "refuse[] to consent to the . . . treatment"). There is therefore no conflict between EMTALA's provision respecting a pregnant patient and an "unborn child."

The statutory context further refutes any alternative interpretation that EMTALA's reference to "unborn child" *forecloses* abortion as a stabilizing treatment. That interpretation would mean that every time a hospital emergency room terminated a pregnancy to save a pregnant patient's life, the hospital committed an EMTALA violation—contrary to the consistent Congressional understanding reflected above. Moreover, that interpretation would mean that Congress, when enacting EMTALA in 1986, intended to prohibit hospitals from performing abortions, but only those abortions involving a threat to the pregnant patient's life or health. "Congress does not hide elephants in mouseholes," *Cyan, Inc. v. Beaver County Employees Ret. Fund*, 138 S. Ct. 1061, 1071-72 (2018), and the notion that

Congress intended EMTALA to forbid necessary medical care is fundamentally at odds with the statute's aim of guaranteeing—not prohibiting—emergency medical care. *See, e.g.*, 131 Cong. Rec. S13892 ("We cannot stand idly by and watch those Americans who lack the resources be shunted away from immediate and appropriate emergency care whenever and wherever it is needed.") (statement of Sen. Durenberger). In sum, Idaho cannot meaningfully dispute that EMTALA's requirement to offer stabilizing treatment includes abortion when a provider determines that treatment is medically necessary.

**B.      Idaho's Near-Absolute Abortion Ban Conflicts with EMTALA**

Because Idaho's law makes it a crime to perform an abortion even when a physician concludes that such a procedure is the necessary stabilizing treatment under EMTALA, Idaho's law is preempted.

As EMTALA provides, "any State or local law requirement" is preempted "to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). This preemption provision encompasses both impossibility and obstacle preemption. *Draper*, 9 F.3d at 1393. Applying these principles to a state law that entitled physicians to forgo medical treatment that EMTALA would otherwise require, the Fourth Circuit found the analysis to be straightforward: "[T]o the extent that [the state law] exempts treating physicians in participating hospitals from providing care [under specified circumstances], it is preempted—it does not allow the physicians . . . to refuse to provide her with [stabilizing treatment]." *Matter of Baby K*, 16 F.3d at 597. Numerous courts have likewise found state laws preempted when they stood as obstacles to EMTALA's civil liability provisions. *See Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000) (Missouri state law preempted to the extent it sought to shield its state-operated hospitals from EMTALA liability); *Burditt v. HHS*, 934 F.2d 1362, 1373-74 (5th Cir. 1991) (physician could not avoid EMTALA liability by relying on state law contract principles, because "[w]e recognize no reason for conditioning the applicability of EMTALA's civil penalty provision on the vagaries of the several state laws"); *see also,*

*e.g.*, *Cox v. Cabell Huntington Hosp., Inc.*, 863 F. Supp. 2d 568, 572 (S.D. W. Va. 2012); *Merce v. Greenwood*, 348 F. Supp. 2d 1271, 1277 (D. Utah 2004). Consistent with these decisions, Idaho's abortion law conflicts with EMTALA, and therefore is preempted, for three independent reasons.

First, Idaho law flatly prohibits—and attaches criminal penalties and loss of license to— medical care that EMTALA requires. It is thus impossible for Idaho medical providers to comply with both Idaho and federal law. The Idaho law establishes an affirmative defense for abortions "necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(3)(a)(ii), but EMTALA requires necessary stabilizing treatment for any "emergency medical condition," which is broader than just those treatments necessary to prevent death. *See* 42 U.S.C. § 1395dd(e)(1)(A) (defining "emergency medical condition" to include conditions that "plac[e] the health of the individual . . . in serious jeopardy," threaten "serious impairment to bodily functions," or risk "serious dysfunction of any bodily organ or part"). Serious medical conditions exist that meet EMTALA's criteria but for which an abortion might not be necessary to prevent death. *See* Part I.A, *supra*; Fleisher Decl. ¶¶ 12-27. Because Idaho law criminalizes terminating a pregnancy in these circumstances, but federal law requires physicians to offer and provide such stabilizing treatment when medically necessary, it is impossible for physicians to comply with both laws; the Idaho law is therefore preempted. *See, e.g.*, *Chamber of Com. of U.S. v. Bonta*, 13 F.4th 766, 781 (9th Cir. 2021) ("An arbitration agreement cannot simultaneously be 'valid' under federal law and grounds for a criminal conviction under state law"); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (state law was preempted because it allowed "individuals [to] be prosecuted for conduct that Congress specifically sought to protect").

Second, even in circumstances for which Idaho offers an affirmative defense—where the procedure is "necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(3)(a)(ii)— the affirmative defense structure *itself* "is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper*, 9 F.3d at 1394. The Idaho law allows physicians to be

prosecuted for performing *any* abortion, regardless of circumstances. Even where the affirmative defense would be satisfied, the Idaho law would still allow for indictment, arrest, and criminal prosecution of physicians each and every time a pregnancy is terminated—including when the physician determined that the procedure was necessary stabilizing treatment under EMTALA. Relegating any exception from criminal liability to an affirmative defense itself poses an obstacle to EMTALA's "overarching purpose of ensuring that patients . . . receive adequate emergency medical care," *Vargas By & Through Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir. 1996), because exposure to criminal prosecution will render physicians less inclined or entirely unwilling to risk providing treatment. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350-51 (2001) (holding that fear of being "expose[d] . . . to unpredictable civil liability" under state law, for conduct condoned by federal law, was sufficient for preemption); *Arizona v. United States*, 567 U.S. 387, 408 (2012) (preempting a state law authorizing the arrest of aliens, because "[t]he result could be unnecessary harassment of some aliens . . . who federal officials determine should not be removed").

Third, the Idaho law conflicts with EMTALA by threatening the licenses of medical professionals who perform or assist in providing an abortion. Fleisher Decl. ¶ 27; Corrigan Decl. ¶¶ 32-34; Cooper Decl. ¶ 12; Seyb Decl. ¶¶ 13-14. Specifically, beyond the physician who performs the abortion, *see* Idaho Code § 18-604(12), the Idaho law mandates that any "health care professional . . . who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* § 18-622(2). This provision could apply to a number of personnel involved in emergency care, including nurses, pharmacists, physicians' assistants, and anesthesiologists. *Cf. id.* §§ 54-1401 (nursing licensure), 54-1718 (pharmacists), 54-1810 (physicians), 54-1810A (physicians' assistants).

Notably, these professionals' licenses can be revoked even for someone else's conduct,

because in any "disciplinary action by an applicable licensing authority," they must likewise prove the elements of the affirmative defense: that the physician appropriately determined the necessity of the abortion and the appropriate manner to perform it. *See* Idaho Code § 18-622(3)(a)(ii)-(iii). The obvious effect will be to discourage medical professionals from participating in *any* abortions. Even if a doctor *tells* a nurse, for example, that an abortion is necessary to prevent death or serious bodily harm, the nurse could still be subject to disciplinary action for assisting in the abortion, and potentially have their license revoked based on the disciplinary board's determination that the *doctor* erred in making a "good faith medical judgment" about how to treat the pregnant patient. *Id.* Thus, the Idaho law penalizes and deters medical professionals from participating in medically necessary abortions, contrary to EMTALA's "overarching purpose of ensuring that patients . . . receive adequate emergency medical care," *Vargas*, 98 F.3d at 1205.

For each of these reasons, § 18-622 conflicts directly with EMTALA, and the United States has demonstrated a likelihood of success on its preemption claim. Section 18-622 is therefore preempted to the extent it allows Idaho to initiate criminal prosecutions against, attempt to revoke the license of, or seek to impose any other form of liability on, medical providers with respect to EMTALA-covered care.

## II. The Equitable Balance Supports Entry of a Preliminary Injunction

The remaining factors all support entry of a preliminary injunction, because allowing the Idaho law to take effect would result in irreparable harm to the public and to the United States' sovereign interests. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, in suits involving the United States, the balance of equities and "public interest . . . factors merge").

First and most fundamentally, allowing the Idaho law to go into effect would threaten severe harm to pregnant patients in Idaho, who would no longer be guaranteed the critical emergency care to which they are entitled under federal law. *See Valle del Sol*, 732 F.3d at 1029 ("It is clear that it would

not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." (modifications omitted)). As discussed above, numerous pregnancy-related conditions could require emergency care including abortion, and these conditions have occurred and will inevitably occur again within Idaho. Corrigan Decl. ¶¶ 8, 15, 23, 29; Cooper Decl. ¶¶ 5, 6, 8, 10, 12; Seyb Decl. ¶¶ 6, 7, 9, 11, 13. To take just one example, in Idaho, Medicaid has covered treatment for approximately 100 ectopic pregnancies each year. Fleisher Decl. ¶ 36. Medical literature also confirms that other diagnoses qualifying as "emergency medical conditions" for pregnant individuals also occur frequently. *Id.* ¶¶ 28-38. And Idaho-based physicians have personally treated patients with these types of conditions. Corrigan Decl. ¶ 8 (anticipating that "the number will increase"); Seyb Decl. ¶ 6 (treating "a dozen" per year); Cooper Decl. ¶ 5.

Given that Idaho has approximately 22,000 births per year,[3] and a large number of high-risk pregnancies due to surrogacy, it is virtually guaranteed that these emergency medical conditions will occur for a sizeable number of pregnant patients within Idaho. Corrigan Decl. ¶¶ 8, 19; Fleisher Decl. ¶¶ 36-38. Allowing the law to go fully into effect would discourage physicians from providing necessary care in emergency circumstances, resulting in significant and irreparable harm to numerous pregnant patients within Idaho. Every day that the law is in effect, there is a likelihood that some pregnant persons suffering medical emergencies will face irreversible health consequences, such as strokes and organ failure, and some are likely to die. *See* Fleisher Decl. ¶¶ 36-38; Corrigan Decl. ¶¶ 8, 17, 23-24, 29; Cooper Decl. ¶ 6, 8, 10, 12; Seyb Decl. ¶ 7, 9, 11, 13; *see also Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm "includes delayed and/or complete lack of necessary treatment, and increased pain and medical complications"); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) ("Plaintiffs have shown a risk of irreparable injury, since enforcement of the California rule may deny

---

[3] Idaho Dep't of Health & Welfare, *2010-2020 Idaho Resident Births*, *VS Natality – Data Results, 2010-2020*, https://www.gethealthy.dhw.idaho.gov/idaho-births-vital-statistics (attached as Ex. G-C).

them needed medical care.").

Indeed, patients in Idaho are already facing dire situations. Dr. Corrigan treated a patient who, after initially being denied care, arrived at the hospital two weeks later with an infection in her uterus, at risk of sepsis, and termination was necessary to preserve her life. Corrigan Decl. ¶¶ 12-15. And Dr. Seyb recently received a call from a physician whose patient was "clear[ly]" "in danger" due to severe bleeding, but the physician feared the ramifications of providing medically necessary care. Seyb. Decl. ¶ 13. Had § 18-622 been in effect, the life-saving treatment these patients received could have been further delayed or denied. Corrigan Decl. ¶¶ 31-35; Cooper Decl. ¶ 12; Seyb Decl. ¶¶ 13-14.

Moreover, Idaho's law also interferes with the United States' sovereign interest in ensuring the proper administration of federal law and the Medicare program. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). The United States has agreed to provide federal Medicare funds to hospitals in Idaho, in return for those hospitals promising (among other things) to comply with EMTALA for all patients, not just for Medicare beneficiaries. *See* 42 U.S.C. § 1395cc(a)(1)(I). But the Idaho law seeks to disrupt the program and deprive the United States of the benefit of its bargain by prohibiting Idaho hospitals from performing EMTALA-mandated services, notwithstanding that hospitals' receipt of Medicare funds is conditioned on them doing so. Thus, the Idaho law threatens "harm to the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), because payments to hospitals will no longer guarantee the availability of services that Congress mandated. Wright Decl. ¶¶ 14, 16. This harm is substantial: the United States provided over $3 billion in Medicare funding to hospitals within Idaho over fiscal years 2018-2020, with approximately $74 million attributable to emergency departments. Shadle Decl. ¶¶ 6-8.

The Idaho law also interferes with the written agreements that the United States has entered

into with hospitals pursuant to Medicare. These Spending Clause agreements likewise require hospitals to comply with EMTALA. *See* Background, Part I.C, *supra*. It is well-settled that third parties may not interfere with the terms of Spending Clause legislation, *see Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 270 (1985), but here, the State of Idaho is directly interfering with the agreements between the United States and the 52 hospitals within Idaho that are receiving Medicare funds. Thus, irreparable harm exists on this basis as well.

Finally, on the other side of the ledger, the State of Idaho will suffer no cognizable harm as a result of the requested preliminary relief. Idaho's abortion law is not currently in effect, has never been in effect, and therefore enjoining it from going into effect, as applied to EMTALA-mandated care, would simply preserve the status quo during the short period necessary for further litigation. *See All. for Wild Rockies v. Pierson*, 550 F. Supp. 3d 894, 898 (D. Idaho 2021) ("The purpose of a preliminary injunction is to preserve the status quo and prevent the 'irreparable loss of rights' before a final judgment on the merits[.]"). Given the significant harms that would result if the Idaho law were to go into effect to prohibit EMTALA-mandated care—both for pregnant individuals as well as the United States' sovereign interests—and the corresponding lack of harm to the State of Idaho from a temporary injunction against certain applications of its law, the equitable factors plainly favor entry of preliminary relief against the Idaho law's enforcement.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction prohibiting the State of Idaho—including all of its officers, employees, and agents—from enforcing Idaho Code § 18-622(2)-(3) as applied to EMTALA-mandated care.

Dated: August 8, 2022

SAMUEL BAGENSTOS
General Counsel

PAUL R. RODRÍGUEZ
Deputy General Counsel

DAVID HOSKINS
Supervisory Litigation Attorney

JESSICA BOWMAN
MELISSA HART
Attorneys
U.S. Department of Health & Human Servs.
200 Independence Ave., SW
Washington, DC  20201

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

JOSHUA REVESZ
Counsel, Office of the Assistant Attorney
General

ALEXANDER K. HAAS
Director, Federal Programs Branch

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
LISA NEWMAN (TX Bar No. 24107878)
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys

JULIE STRAUS HARRIS
Senior Trial Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*