No. 23-35440, 23-35450

---

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

STATE OF IDAHO,

*Defendant-Appellant,*

*v.*

MIKE MOYLE, ET AL.

*Movants-Appellants.*

---

On Appeal from the United States District Court
for the District of Idaho

No. 1:22-cv-00329-BLW
The Honorable B. Lynn Winmill

---

## STATE OF IDAHO'S RESPONSE TO APPELLEE'S EMERGENCY MOTION FOR RECONSIDERATION EN BANC

---

RAÚL R. LABRADOR
  *Attorney General*

Idaho Office of the Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
josh.turner@ag.idaho.gov
brian.church@ag.idaho.gov

THEODORE J. WOLD
  *Solicitor General*
JOSHUA N. TURNER
  *Deputy Solicitor General*

LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense
BRIAN V. CHURCH
AARON M. GREEN
  *Deputy Attorneys General*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................ii

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 2

I. EMTALA Likely Does Not Preempt Idaho Law ............................... 2

    A. EMTALA does not conflict with Idaho law because it does not require
        any specific treatments, especially not abortions ................................ 3

    B. EMTALA protects unborn children—it doesn't require their termination ........... 7

    C. EMTALA does not displace States' traditional role in regulating medicine .......... 8

    D. Idaho law is not an obstacle to EMTALA's purposes—both protect
        indigent patients and both require equal treatment ............................. 10

II. The Panel's Decision Does Not Create a Circuit Split ............................. 12

III. The Equities Do Not Warrant Emergency En Banc Consideration ..................... 13

IV. En Banc Review Is Improvident And Perhaps Even Unavailable ........................ 15

CONCLUSION ........................................................................................ 16

## TABLE OF AUTHORITIES

**CASES**

*Am. Med. Ass'n v. Weinberger,*
  522 F.2d 921 (7th Cir. 1975) ............................................................. 8

*Baker v. Adventist Health, Inc.,*
  260 F.3d 987 (9th Cir. 2001) .......................................................... 5, 9

*Beaty v. Brewer,*
  649 F.3d 1071 (9th Cir. 2011) ........................................................ 16

*Bristol Reg'l Women's Ctr., P.C. v. Slatery,*
  988 F.3d 329 (6th Cir. 2021) .......................................................... 16

*Brodersen v. Sioux Valley Mem. Hosp.,*
  902 F.Supp. 931 (N.D. Iowa 1995) ............................................... 9, 11

*California by & through Becerra v. Azar,*
  *950 F.3d 1067 (9th Cir. 2020)* ...................................................... 16

*Chamber of Comm. of U.S. v. Whiting,*
  563 U.S. 582 (2011) ...................................................................... 10

*Collins v. Texas,*
  223 U.S. 288 (1912) ........................................................................ 8

*Dobbs v. Jackson Women's Health Org.,*
  142 S.Ct. 2228 (2022) ..........................................................1, 8, 9, 12

*Eberhardt v. City of Los Angeles,*
  62 F.3d 1253 (9th Cir. 1995) .......................................................... 12

*EEOC v. Ind. Bell Tel. Co.,*
  256 F.3d 516 (7th Cir. 2001) .......................................................... 15

*Feighery v. York Hosp.,*
  59 F.Supp.2d 96 (D. Me. 1999) ........................................................ 5

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ................................................................................. 10

*Hart v. Massanari,*
  266 F.3d 1155 (9th Cir. 2001) ............................................................... 15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. and Prods. Liab. Litig.,*
  959 F.3d 1201 (9th Cir. 2020) ............................................................... 10

*James v. Sunrise Hosp.,*
  86 F.3d 885 (9th Cir. 1990) ..................................................................... 6

*Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food and Drug Admin.,*
  3 F.4th 390 (D.C. Cir. 2021) ................................................................... 8

*Lambert v. Yellowley,*
  272 U.S. 581 (1926) ............................................................................ 4, 8

*Martindale v. Ind. Univ. Health Bloomington, Inc.,*
  39 F.4th 416 (7th Cir. 2022) ............................................................... 5, 7

*Matter of Baby K,*
  16 F.3d 590 (4th Cir. 1994) ................................................................... 12

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) ....................................................................... 2, 8, 11

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................ 1, 2

*Ramos-Cruz v. Centro Medico del Turabo,*
  642 F.3d 17 (1st Cir. 2011) ..................................................................... 6

*Texas v. Becerra,*
  623 F.Supp.3d 696 (N.D. Tex. 2022) ....................................................... 3

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ................................................................. 8

*Wyeth v. Levine,*
  555 U.S. 555 (2009) .......................................................................... 2, 14

**STATUTES**

42 U.S.C. § 1395 ............................................................................... 8

42 U.S.C. § 1395dd ..................................................................... 6, 9, 11

Idaho Code § 18-606 (1973) ............................................................ 14

Idaho Code § 18-608 (1973) ............................................................ 14

Idaho Code § 18-622 .................................................................... 2, 11

**OTHER AUTHORITIES**

J. Woodford Howard, Jr., *Courts of Appeals in the Federal Judicial System: A Study of the Second, Fifth, and District of Columbia Circuits* (1981) ...................... 15

Richard S. Arnold, *Why Judges Don't Like Petitions for Rehearing*, 3 J. App. Prac. & Process (2001) ........................................................ 15

## INTRODUCTION

The district court's injunction was the first of its kind. It held that EMTALA requires covered hospitals to provide abortions as stabilizing treatment, without regard to a hospital's legal and actual capabilities, state standards of care, or state laws regulating the practice of medicine. Even though the Supreme Court had just "return[ed] the issue of abortion to the people's elected representatives," *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2243 (2022), the district court's injunction overrode the will of Idaho's elected representatives on this issue. To get there, the district court disregarded preemption's focused scope and high regard for traditional areas of state law. It overlooked EMTALA's text and structure and what this Court has said about EMTALA's purpose. And it ignores the serious negative consequences of its unprecedented holding, including for the traditionally state duty to regulate the medical profession. Because the injunction should have never been entered, the panel got it right when it stayed enforcement of the district court's errant overreach.

The United States' emergency petition for en banc review again seeks judicial overreach—this time at the hand of this Court. A stay is part of an appellate court's "inherent" judicial powers and allows "appellate courts [to] responsibly fulfill their role in the judicial process." *Nken v. Holder*, 556 U.S. 418, 426-27 (2009). Its use includes a measure of discretion and reflects judicial temperance. *Id.* at 428-29. The district court's injunction intruded on Idaho's sovereign prerogative; the panel's stay makes sure that the judicial intrusion only strikes its blow when, and if, necessary. The panel's stay is

modest and temporary. This Court need not—and should not—step in to review it en banc. To do so would be exceedingly wasteful.

## ARGUMENT

The panel properly weighed the *Nken* factors and granted a stay. EMTALA does not preempt Idaho Code § 18-622; the State and Legislature will be irreparably injured absent a stay; the district court's unlawful injunction injures all Idahoans, and the United States suffers no injury by EMTALA remaining a focused patient-protection statute; and the public interest favors keeping the United States' powers trained on federal matters and out of traditional State functions. *Nken*, 556 U.S. at 425-26. Here's why.

## I. EMTALA Likely Does Not Preempt Idaho Law.

Preemption "is a demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). It is an even harder showing when, as here, it targets the historic police powers of states. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Because Idaho's sovereign right to regulate the practice of medicine and the health and safety of its people is at stake, the "assumption" is that EMTALA does not supersede Idaho law. *Id.* And even if EMTALA has *some* preemptive effect, its preemptive scope is "narrow." *Id.* "That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Id.*

The United States ignores these basic principles and pins its preemption argument on irrelevant and warped arguments—ones that would have absurd consequences if accepted. According to the United States, EMTALA preempts Idaho law because

"EMTALA requires *whatever* treatment a provider concludes is medically necessary to stabilize whatever emergency condition is present." Dkt. #35 at 31 (emphasis added). In the United States' view, that is true regardless of a hospital's capabilities or any state law to the contrary. That radical position would allow EMTALA to dictate state standards of care, emergency department resources, staffing, and offerings, and the practice of medicine more broadly—all matters of state regulation. Nothing in the statute or Congress's intent shows such broad preemption.

### A. EMTALA does not conflict with Idaho law because it does not require any specific treatments, especially not abortions.

After *Dobbs*, the United States has tried various ways to repurpose EMTALA to impose its abortion regime on states. For instance, the Department of Health and Human Resources issued "[g]uidance" to providers that threatened enforcement action if they did not provide abortions as stabilizing care. That "[g]uidance" went "well beyond EMTALA's text." *Texas v. Becerra*, 623 F.Supp.3d 696, 704 (N.D. Tex. 2022), *appeal dismissed*, 2023 WL 2366605 (5th Cir. Jan. 26, 2023). This case is another attempt by the United States to circumvent *Dobbs* by turning EMTALA—a 1980s statute to prevent hospitals from dumping patients—into an abortion mandate. Its theory is meritless.

Nothing in EMTALA requires abortions. In fact, nothing in EMTALA requires emergency departments to provide all manner of specific care: clival chordoma resection surgeries, pediatric and prenatal cardiovascular surgeries, lifesaving burn therapies, or any number of other "specific methods of 'stabilizing treatment.'" Add.8. EMTALA

requires equality of treatments offered regardless of ability to pay. It does not force emergency rooms to calibrate their offerings to whatever roster of treatments the current administration or physicians deem necessary.

The United States says that "EMTALA requires *any* form of stabilizing treatment," so long as "the relevant professional deems it necessary." Dkt. #53 at 12 (emphasis in original). That is just plain wrong. For example, just because a provider concludes that bloodletting, lobotomies, or radium are medically necessary treatments does not mean EMTALA requires them. Or to take more modern examples, just because a provider believes cannabis, ivermectin, or euthanasia are stabilizing treatments likewise does not mean EMTALA requires them. States have long regulated the practice of medicine within their borders, and their regulation includes the power to determine what is and is not appropriate medical care. "[T]here is no right to practice medicine which is not subordinate to the police power of the states." *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926). It is absurd for the United States to claim that EMTALA requires "any" treatment a provider deems necessary without regard to what state law permits.

The United States tries to limit the consequences of its position by saying that the treatment must be consistent with "reasonable medical judgment" or the "canons of medical ethics." Dkt. #53 at 12; Dkt. #35 at 51. But that just shows why there is no preemption here. EMTALA does not codify any "canon of medical ethics" and it does not set standards for "reasonable medical judgment." *Id.* Again, that is the responsibility of states. And Idaho protects both pregnant mothers and unborn children by

forbidding certain abortions regardless of "reasonable medical judgment." *Id.* The United States does not get to second-guess that policy determination about the practice of medicine. EMTALA certainly isn't a tool for doing so.

The United States' novel preemption argument would also necessarily require emergency departments to offer otherwise unavailable treatments. But as other courts have recognized, that is far beyond EMTALA's scope. *See Martindale v. Ind. Univ. Health Bloomington, Inc.*, 39 F.4th 416, 424 (7th Cir. 2022) (rejecting claim that if stabilizing treatment was "possible," then EMTALA required emergency department to provide it); *Feighery v. York Hosp.*, 59 F.Supp.2d 96, 102 (D. Me. 1999) ("[T]he Act does not require a covered hospital to provide a uniform minimum level of care to each patient seeking emergency care."). Not all emergency departments have the same capabilities, and EMTALA does not require them to provide care they are unable or unauthorized to give.

Undeterred, the United States claims this reasoning amounts to a "canon of donut holes." Dkt. #53 at 14. But the problem is that the United States has not established the critical premise of its argument: that EMTALA contains a general rule requiring any treatment other than equal treatment. That common-sense point is why this Court rejected a similar argument in *Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001), where the plaintiff argued that EMTALA required a 40-bed rural hospital to offer psychiatric treatment. *Id.* at 991. The hospital operated an emergency room but had no psychiatrists, psychologists, or any other mental health professionals on staff. *Id.* This Court held that forcing a hospital to provide treatment beyond its capability was "not a

tenable position under the statute." *Id.* at 993. That is exactly what the United States demands here. Abortions for non-life-threatening conditions are just as unavailable in Idaho emergency rooms as the psychiatric treatment in *Baker*.

The United States' view that EMTALA requires "any" and "whatever" treatments a provider concludes is medically necessary also conflicts with EMTALA's transfer provisions, which allow a hospital to meet patient obligations either by providing stabilizing treatment or a "transfer of the individual in accordance with subsection (c)." 42 U.S.C. § 1395dd(b)(1)(A)-(B); *see also James v. Sunrise Hosp.*, 86 F.3d 885, 889 (9th Cir. 1990). EMTALA permits transfers based on informed consent or a physician's certification that the benefits of transfer "outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer." 42 U.S.C. § 1395dd(c)(1)(A).

EMTALA thus recognizes that one hospital may not have the resources, capacity, capabilities, or staff to stabilize every medical condition presented. That was the case in *Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17 (1st Cir. 2011). "Because the Hospital did not have gastroenterologic services available," the treating physician arranged to have the boy transferred. *Id.* at 18. And even though the plaintiffs' son died following his transfer, the Court of Appeals held that EMTALA did not require the hospital to have treated the boy's gastrointestinal bleeding. *Id.* at 19-20. It was also the case in the Seventh Circuit's recent *Martindale* decision, where a physician determined "he could not safely operate" and the benefits of transfer for a certain type of surgery

6

outweighed the risks. *Martindale*, 39 F.4th at 421. The court rejected the plaintiff's argument that "when the evidence shows the hospital could have stabilized the patient, pre-stabilization transfer could never be deemed 'appropriate.'" *Id.* at 422. That reading was inconsistent with the text of the statute and "incompatible" with EMTALA's "narrow purpose as an anti-dumping law rather than a federal cause of action for medical malpractice." *Id.* at 423.

The United States does not even address these provisions—indeed, it cannot, since they show that EMTALA contemplates that emergency departments will not all offer the treatments a physician believes are necessary stabilizing care.

### B. EMTALA protects unborn children—it doesn't require their termination.

The United States' reading of EMTALA is particularly jarring given that the Act expressly requires care of unborn children in four places and nowhere mentions abortion. 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(A)(i), (e)(1)(B)(ii). Yet the United States' interpretation eliminates a physician's statutory duty to stabilize the health of the "unborn child" when in serious jeopardy. *Id.* § 1395dd(e)(1)(A)(i). And EMTALA's silence on medical emergencies that create a conflict between the health of the pregnant woman and her unborn child is a far cry from a direct conflict with state law that sets the standard of medical care. Preemption is not a statutory gap filler.

7

**C. EMTALA does not displace States' traditional role in regulating medicine.**

The panel correctly recognized that EMTALA does not usurp or intrude on Idaho's historic police powers in determining standards of medical care. Dkt. #59 at 9. States have a well-recognized—and longstanding—right to regulate the practice of medicine. *E.g., Collins v. Texas*, 223 U.S. 288, 297–98 (1912); *Lambert*, 272 U.S. at 596; *Medtronic*, 518 U.S. at 485. States get to "[c]hoos[e] what treatments are or are not appropriate for a particular condition." *Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food and Drug Admin.*, 3 F.4th 390, 400 (D.C. Cir. 2021) (collecting cases). That determination "is at the heart" of state regulatory authority over the practice of medicine. *Id.* And that's why this Court has upheld "the right of the state to adopt a policy even upon medical matters concerning which there is difference of opinion and dispute." *Tingley v. Ferguson*, 47 F.4th 1055, 1080 (9th Cir. 2022). Idaho's abortion regulations fall squarely within its right to regulate the practice of medicine. *Dobbs*, 142 S.Ct. at 2284

Congress did not purport to disturb that right in enacting EMTALA. Instead, it stated expressly that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395; *see also Am. Med. Ass'n v. Weinberger*, 522 F.2d 921, 925 n.6 (7th Cir. 1975). And again, Congress emphasized that EMTALA's provisions "do not preempt any State or local law

requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

Nevertheless, the United States asks this Court to hold that EMTALA requires hospitals to offer treatments unavailable under state law—something no court other than the district court has ever held. The panel, thus, correctly concluded that EMTALA "certainly doesn't require that a hospital provide whatever treatment an individual medical professional may desire." Add.8. That conclusion fits with EMTALA's purpose, which was not to dictate a federal standard of care, but to prevent hospitals from denying care to indigent patients that they would otherwise provide. Add.6, 13-14; *Brodersen v. Sioux Valley Mem. Hosp.*, 902 F.Supp. 931, 946 (N.D. Iowa 1995). And it is consistent with this Court's decision in *Baker,* 260 F.3d at 992. There is no reason to revisit that conclusion.

The United States says that EMTALA "did not preserve police powers that no State possessed when Congress enacted the statute," and thereby "limited states' authority to ban abortion." Dkt. #53 at 18. This ignores the states' longstanding right to regulate the practice of medicine within their respective borders, which is not superseded without a clear and manifest purpose from Congress. EMTALA does not provide that clear statement. Instead, the United States' argument from silence is, in effect, a plea to codify *Roe* within a penumbra of statutory law that the Supreme Court expressly rejected in the Constitution. *Dobbs*, 142 S.Ct. at 2242-43. The panel correctly rejected it.

### D. Idaho law is not an obstacle to EMTALA's purposes—both protect indigent patients and both require equal treatment.

Impossibility preemption is rare, and obstacle preemption is rarer yet. It applies "in only a small number of cases," namely "where the federal legislation at issue involved a 'uniquely federal area[] of regulation,'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. and Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quoting *Chamber of Comm. of U.S. v. Whiting*, 563 U.S. 582, (2011)). Such areas do not include medicine, which is traditionally regulated by the several states. *See Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

Here, the statutory text protects unborn children, rather than providing for their termination. Moreover, as the panel rightly held, even if the United States were correct "that EMTALA requires abortions as 'stabilizing treatment' in limited circumstances, EMTALA still would not conflict with Idaho's law." Add.9. That is because section 622 authorizes care for pregnant women that the EMTALA seeks to promote—it permits abortions where the physician determines abortion is necessary to prevent a pregnant woman's death in his good faith medical judgment and based on the facts known at the time. *Id.* And since the Idaho Supreme Court has made clear that the "text of the exception means what it says," the district court erred in relying on physician declarations claiming the law would undermine their medical judgment. Add.10. As the Idaho Supreme Court explained, that exception contains no "certainty" requirement. *Id.* Likewise, the district court's heavy reliance on ectopic pregnancies shows no conflict of

purpose, since both the Idaho Supreme Court and subsequent statutory changes have made clear that removal of an ectopic pregnancy is not an abortion. Add.11.

The panel also concluded that Congress, through the statute's language, "left it to state healthcare standards to determine which course of treatment 'may be necessary' to prevent 'material deterioration.'" Add.13 (citing 42 U.S.C. § 1395dd(e)(3)(A)). The panel correctly remarked that "[i]t is not the purpose of EMTALA to force hospitals to treat medical conditions using certain procedures." Rather, "EMTALA seeks to prevent hospitals from neglecting poor or uninsured patients with the goal of protecting 'the health of the woman' and 'her unborn child.'" Add.13-14 (citing 42 U.S.C. § 1395dd(e)(1)(A)). Nothing in Idaho Code § 18-622 impedes that purpose; it simply regulates when medical professionals may perform abortions and when they may not, regardless of indigency or insurance. There is no "deviation from normal procedure" required by the act because "normal procedure" in Idaho cannot include abortion unless it is necessary to save the life of the mother. *See Brodersen,* 902 F.Supp. at 947. There is no obstacle preemption and no reason for rehearing en banc.

*        *        *        *        *

All of this underscores the inappropriateness of preemption here. Preemption principles require close calls to go to state law and in such cases to leave it intact. This is not a close call. States are "independent sovereigns" and responsible for regulating the practice of medicine. *Medtronic*, 518 U.S. at 485. The Supreme Court recently made

clear that abortion is no exception by returning the "authority" to regulate it "to the people and their elected representatives." *Dobbs,* 142 S.Ct. at 2284. And "Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). The United States' position directly conflicts with this Court's understanding of EMTALA's statutory language and legislative history. The panel's stay was appropriate.

## II.   The Panel's Decision Does Not Create a Circuit Split.

The panel did not split with the Fourth Circuit's *Baby K* decision. Dkt. #53 at 21. That case concerned a child who was born with anencephaly and needed mechanical breathing assistance. *Matter of Baby K*, 16 F.3d 590, 592 (4th Cir. 1994). Although the hospital had previously provided the child with the breathing treatment at issue, the hospital denied the care later when the child returned because it believed the treatment was futile. *Id.* at 593.

The Fourth Circuit held that, under EMTALA, the hospital could not withhold the breathing treatment just because the hospital considered it futile. *Id.* at 598. Crucial to the court's analysis was the fact that the hospital had previously provided the needed treatment to Baby K and to other patients with similar emergency conditions symptoms. *Id.* at 594 n.6. Since the hospital provided mechanical breathing assistance to "comatose patients, those with lung cancer," and "infants experiencing bradypnea or

apnea who do not have anencephaly," the hospital also had to offer the same treatment to Baby K. *Id.* at 596.

There is no conflict between the panel's decision and *Baby K.* First, *Baby K* is inapposite because Idaho is not withholding abortion unequally. The issue in *Baby K* was that the hospital was not offering stabilizing care to Baby K that it offered other patients with the *same* emergency medical condition. That is not the issue here. Second, *Baby K* confirms that EMTALA does not turn on subjective medical judgment. The physicians' personal belief that treatment for Baby K was "unethical" was irrelevant. But the United States tries to make subjective physician judgment coextensive with EMTALA's reach. And third, *Baby K* only addressed preemption in the alternative. The court did not believe there was any conflict between EMTALA and Virginia law—it is hardly a standard bearer for expanding EMTALA's preemptive scope. *Id.* at 597 n.10

## III.    The Equities Do Not Warrant Emergency En Banc Consideration.

The United States fails to show that the equities warrant en banc rehearing, much less relief on an emergency basis. To the contrary, the panel correctly determined that the other *Nken* factors favor a stay of the district court's preliminary injunction.

*First*, while the United States incorrectly charges the Legislature with a purported delay in seeking a stay, *cf.* Add.15-16, it fails to offer any account for its own 36-year delay in asserting the preemption theory that it now says demands urgent relief. If the United States is correct on the merits, then EMTALA has been on a collision course with state abortion laws ever since it was enacted in 1986. At that time, the United

States' theory that EMTALA requires abortion care in emergency settings would conflict with state bans on first- and second-trimester abortions, including Idaho's. *See* Idaho Code § 18-606 (1973); Idaho Code § 18-608(2)-(3) (1973). Yet through seven consecutive Administrations, the United States never pressed that argument. Instead, it discovered it in mid-2022, in the wake of *Dobbs*.

*Second*, as the panel observed, the United States' assertion of irreparable harm from a stay depends primarily on its likelihood of success argument and thus fails for the same reasons. Add.17; *see also* Dkt. #53 at 22. There is no preemption here, and so no injury to the federal government's sovereignty. And without preemption, the United States cannot invoke the interests of pregnant women, since, as the panel noted, Idaho law specifically considers those interests, as well as the interests of unborn children—just as EMTALA does. Add.17. "[E]ven assuming abortions were required to 'stabilize' emergency conditions presented by some pregnant women, and that EMTALA required such treatment, *Idaho's law would not prevent abortions in those circumstances*." *Id.* (emphasis added). Idaho law does not prevent transfer or life-saving abortions.

*Third*, because there is no preemption, the only irreparable injury is to Idaho's sovereignty, not the United States', under an injunction that forbade the enforcement of valid state law for nearly a year. Add.14. And given the well-settled presumption against preemption, "particularly . . . in which Congress has 'legislated . . . in a field which the States have traditionally occupied,'" *Wyeth*, 555 U.S. at 565, that injury to Idaho's sovereignty weighs even more heavily in the balance. And together with the

significant policies that Idaho's law protects—the public interest in preserving unborn life—there is no need to revisit the panel's ruling that this irreparable harm to Idaho's sovereignty is decisive.

## IV. En Banc Review Is Improvident And Perhaps Even Unavailable.

A final word on this emergency petition. It warrants a cautious approach. En banc review should be a rare occurrence. The more it is used, the less effective it becomes. Many circuit judges already consider it a "damned nuisance." J. Woodford Howard, Jr., *Courts of Appeals in the Federal Judicial System: A Study of the Second, Fifth, and District of Columbia Circuits* 217 (1981); see also Richard S. Arnold, *Why Judges Don't Like Petitions for Rehearing*, 3 J. App. Prac. & Process 29, 37 (2001) ("[O]n many days, I confess, I find myself wishing that there were no such thing [as en banc rehearing]."). En banc review's expensive, time-consuming, and cumbersome process means it should be "seldom used." *Hart v. Massanari*, 266 F.3d 1155, 1172 n.29 (9th Cir. 2001). And the United States' petition exemplifies the type of case unfit for en banc review. *EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516, 529 (7th Cir. 2001) (en banc) (Posner, J., concurring) ("We take cases en banc to answer questions of general importance likely to recur, or to resolve intracircuit conflicts, or to address issues of transcendent public significance, . . . but not just to review a panel opinion for error, even in cases that particularly agitate judges."). This splintered-off issue makes en banc review especially improper.

The United States will have an opportunity to press its preemption argument before a merits panel. And should it be unhappy with the outcome, it will be able to

petition for en banc review—of the entire case. But mobilizing this Court en banc in the midst of an appeal to review a panel's weighing of the *Nken* factors derails that process and invites piecemeal appeals. As Federal Rule of Appellate Procedure 35 instructs, en banc review "is not favored" and should not "ordinarily . . . be ordered." That is why even in matters of life and death, this Court rarely grants en banc review. *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011). To the extent en banc review is even available under these circumstances—and there is good reason to doubt that it is[1]—emergency en banc review is a gross misuse of judicial resources.

## CONCLUSION

This Court should deny Appellee's emergency petition.

---

[1] The State has not found a single instance of this Court granting an en banc petition to review nothing more than a panel's stay order. *California by & through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020), is not to the contrary, as the Court took the entire case en banc, but left the stay in place, which became moot upon the en banc court's merit's determination. *Id.* at 1082 n.10. The lack of precedent is unsurprising, as Judge Gibbons of the Sixth Circuit questioned whether en banc review of a stay order is "even available" in this context where it would be "exceedingly wasteful" before the panel has resolved the appeal itself. *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 988 F.3d 329, 331 n.3 (6th Cir. 2021), vacated on other grounds, 994 F.3d 774 (6th Cir.).

Respectfully submitted,

HON. RAÚL R. LABRADOR          THEODORE J. WOLD
Attorney General              Solicitor General

October 4, 2023.             /s/ *Joshua N. Turner*
                             Joshua N. Turner
                             Deputy Solicitor General
                             Lincoln Davis Wilson
                             Chief, Civil Litigation and
                             Constitutional Defense Division
                             Brian V. Church
                             Aaron M. Green
                             Deputy Attorneys General

                             *Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Circuit Case No.:        23-35440 (consolidated with 23-35450)

I am the attorney representing Appellant.

**This brief contains 4,181 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.


/s/ *Joshua N. Turner*                                    October 4, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing/attached documents on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

Description of Documents: Response To Appellee's Emergency Motion For Reconsideration En Banc.


/s/ *Joshua N. Turner*                                    October 4, 2023