**No. 23-35450 (w/ No. 23-35440)**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

STATE OF IDAHO,
*Defendant-Appellant,*

v.

MIKE MOYLE, Speaker of the Idaho
House of Representatives, et al.,
Proposed Intervenor-Defendants,
*Movants-Appellants,*

On Appeal from the United States District Court for the District of Idaho
Hon. B. Lynn Winmill, No. 1:22-cv-00329-BLW

**BRIEF OF APPELLANTS MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE
OF REPRESENTATIVES, CHUCK WINDER, PRESIDENT PRO TEMPORE
OF THE IDAHO SENATE & THE SIXTY-SEVENTH IDAHO LEGISLATURE**

Daniel W. Bower
HILTY, BOWER,
HAWS & SEABLE PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
(208) 345-3333
dbower@hbhslaw.com

Taylor A.R. Meehan
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*\* Supervised by principals of the firm
licensed to practice in Virginia*

## CORPORATE DISCLOSURE STATEMENT

The Idaho Legislature, Speaker of the Idaho House of Representatives, and President Pro Tempore of the Idaho Senate are not subsidiaries or affiliates of any publicly owned corporations. No publicly owned corporation is a party to this case or has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................ i

Table of Authorities ......................................................................... iv

Introduction ................................................................................. 1

Jurisdictional Statement .................................................................... 3

Statement of the Issues Presented for Review ................................................ 3

Statement of the Case ....................................................................... 4

    I.    Statutory History ................................................................... 4

        A.  EMTALA ...................................................................... 4

        B.  Idaho's Defense of Life Act ................................................... 8

    II.   Procedural History ................................................................. 12

        A.  After *Dobbs*, the government rewrites EMTALA to require "abortion care." ...................................................... 12

        B.  The government obtains a preliminary injunction. ................................ 14

        C.  The Legislature seeks a stay and appeals. ..................................... 19

Standard of Review .......................................................................... 23

Summary of the Argument ..................................................................... 24

Argument .................................................................................... 26

    I.    EMTALA Does Not Preempt Idaho's Defense of Life Act. .............................. 26

        A.  EMTALA's default rule is one of non-preemption. ................................ 28

        B.  No EMTALA requirement directly conflicts with Idaho law ......................................................................... 33

            1.  EMTALA's stabilization provisions are about patient dumping and do not override state laws regulating medical procedures. .......................................................... 35

2. The district court's contrary interpretation would read EMTALA to command hospitals to violate state laws. ......... 41

3. EMTALA's stabilization provisions protect the "unborn child" too. .................................................................. 44

C. Even if EMTALA required abortions, Idaho's Defense of Life Act does not directly conflict. ........................................... 46

1. There is no evidence that medical emergencies require abortions in circumstances that Idaho prohibits. .................. 47

2. Idaho law draws the same lines Congress has drawn when restricting abortions or abortion funding. .................... 53

D. Reading the federal and state requirements to directly conflict offends the major questions doctrine. ............................ 58

E. Even if there were a direct conflict, the government has no cause of action for this pre-enforcement suit. ........................ 61

II. EMTALA Could Not Constitutionally Preempt Idaho's Defense of Life Act. ................................................................. 63

A. EMTALA is Spending Clause legislation that must abide by the Spending Clause's limits. .................................................. 64

B. Construing EMTALA to require abortion invades Idaho's sovereignty contrary to the Tenth Amendment. ......................... 74

Conclusion ............................................................................................ 78

Certificate of Compliance ................................................................... 79

Certificate of Service ........................................................................... 79

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States,*
  567 U.S. 387 (2012) .................................................. 62

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ............................................... 65-66

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .............................................. 62, 65

*Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt.,*
  793 F.3d 313 (3d Cir. 2015) ........................................ 48

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ...................................... 23

*Baker v. Adventist Health, Inc.,*
  260 F.3d 987 (9th Cir. 2001) ..................................... 29, 41

*Bates v. United States,*
  522 U.S. 23 (1997) ................................................. 31

*Bennett v. Arkansas,*
  485 U.S. 395 (1988) ................................................ 70

*Biden v. Missouri,*
  595 U.S. 87 (2022) ................................................. 32

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ........................................... 58-59

*Bird v. Pioneers Hosp.,*
  121 F. Supp. 2d 1321 (D. Colo. 2000) .............................. 39

*Bond v. United States,*
  572 U.S. 844 (2014) ................................................ 75

*Bowsher v. Merck & Co.,*
  460 U.S. 824 (1983) ................................................ 31

*Bradley v. Sch. Bd. of Richmond,*
   416 U.S. 696 (1974) ...........................................................10

*Brooker v. Desert Hosp. Corp.,*
   947 F.2d 412 (9th Cir. 1991) ...........................................38

*Bryan v. Rectors & Visitors of the Univ. of Va.,*
   95 F.3d 349 (4th Cir. 1996) ......................................33, 41

*Bryant v. Adventist Health Sys./W.,*
   289 F.3d 1162 (9th Cir. 2002) ..................................28, 37

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
   29 F.4th 468 (9th Cir. 2022) ..............................................23

*Carlisle v. Frisbie Mem'l Hosp.,*
   888 A.2d 405 (N.H. 2005) ..................................................40

*Chamber of Com. of the U.S. v. Whiting,*
   563 U.S. 582 (2011) ...........................................................27

*Charles C. Steward Mach. Co. v. Davis,*
   301 U.S. 548 (1937) .....................................................69, 71

*Chicanos Por La Causa, Inc. v. Napolitano,*
   558 F.3d 856 (9th Cir. 2009) ...........................................52

*Cipollone v. Liggett Grp.,*
   505 U.S. 504 (1992) ................................... 27, 31-32, 57

*Cohens v. Virginia,*
   19 U.S. (6 Wheat.) 264 (1821) .......................................75

*Coventry Health Care of Mo., Inc. v. Nevils,*
   581 U.S. 87 (2017) .............................................................70

*CSX Transp., Inc. v. Easterwood,*
   507 U.S. 658 (1993) ...........................................................28

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
   596 U.S. 212 (2022) ................................... 65-66, 69, 71

v

*De Veau v. Braisted*,
  363 U.S. 144 (1960) .......................................................29, 56

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ............................... 1, 9, 57, 61, 76-77

*Does 1-5 v. Chandler*,
  83 F.3d 1150 (9th Cir. 1996) .........................................23

*Draper v. Chiapuzio*,
  9 F.3d 1391 (9th Cir. 1993) ...............27-30, 32, 42-43, 46-47, 49, 51

*Eberhardt v. City of Los Angeles*,
  62 F.3d 1253 (9th Cir. 1995) ...................................41, 61

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ......................................................46, 57

*Est. of Enck by Enck v. Beggs*,
  1995 WL 519148 (D. Kan. Aug. 30, 1995) ........................40

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ......................................................57

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ......................................................12

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ................................................. 76-77

*Goodman v. Sullivan*,
  891 F.2d 449 (2d Cir. 1989).........................................44

*Green v. Touro Infirmary*,
  992 F.2d 537 (5th Cir. 1993) ........................................38

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ......................................................75

*Hardy v. N.Y.C. Health & Hosps. Corp.*,
  164 F.3d 789 (2d Cir. 1999)...................................29, 33

*Harris v. McRae,*
448 U.S. 297 (1980) ...................................................................12, 55

*Harry v. Marchant,*
291 F.3d 767 (11th Cir. 2002) ...........................29, 34, 37, 41

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
599 U.S. 166 (2023) ...............................................................62

*Hodges v. Thompson,*
311 F.3d 316 (4th Cir. 2002) ...............................................71

*Idaho v. United States,*
144 S. Ct. 541 (2024) .............................................................21

*In re Baby "K,"*
16 F.3d 590 (4th Cir. 1994) ...................................................40

*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,*
799 F.2d 547 (9th Cir. 1986) .................................................48

*Jackson v. E. Bay Hosp.,*
246 F.3d 1248 (9th Cir. 2001) ..............................................34

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ...............................................................59

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1,*
469 U.S. 256 (1985) .........................................................70, 72

*Linder v. United States,*
268 U.S. 5 (1925) ...................................................................69

*Lopez v. Brewer,*
680 F.3d 1068 (9th Cir. 2012) ..............................................23

*Marshall v. E. Carroll Par. Hosp. Serv. Dist.,*
134 F.3d 319 (5th Cir. 1998) .................................................28

*Mass. Med. Soc'y v. Dukakis,*
815 F.2d 790 (1st Cir. 1987) .................................................31

*Massachusetts v. Mellon,*
262 U.S. 447 (1923) ................................................................68

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ................................................................32

*Memphis Ctr. for Reprod. Health v. Slatery,*
14 F.4th 409 (6th Cir. 2021) ...................................................76

*Moyle v. United States,*
144 S. Ct. 2015 (2024) ...........................2-3, 21-23, 51-52, 67-68, 70

*Moyle v. United States,*
144 S. Ct. 540 (2024) ..............................................................21

*Murphy v. NCAA,*
584 U.S. 453 (2018) ...............................................26, 63, 74, 77

*New York v. United States,*
505 U.S. 144 (1992) ...............................................65, 74, 77

*NFIB v. Sebelius,*
567 U.S. 519 (2012) ...............................................65, 67, 74

*Oklahoma v. U.S. Civ. Serv. Comm'n,*
330 U.S. 127 (1947) .....................................................62, 74

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) .................................................... 65-66, 71

*Pharm. Rsch. & Mfrs. of Am. v. Walsh,*
538 U.S. 644 (2003) ................................................................49

*Philpott v. Essex Cnty. Welfare Bd.,*
409 U.S. 413 (1973) ................................................................70

*Planned Parenthood Great Nw. v. Idaho,*
522 P.3d 1132 (Idaho 2023) ...................8-9, 11, 15, 19, 35, 45, 48-51

*Power v. Arlington Hosp. Ass'n,*
42 F.3d 851 (4th Cir. 1994) ......................................................39

*Pratt v. Rowland,*
    65 F.3d 802 (9th Cir. 1995) ............................................... 48

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ....................................................... 49

*Reid v. Colorado,*
    187 U.S. 137 (1902) ....................................................... 76

*Reid v. Indianapolis Osteopathic Med. Hosp., Inc.,*
    709 F. Supp. 853 (S.D. Ind. 1989) ................................. 40

*Rice v. Norman Williams Co.,*
    458 U.S. 654 (1982) ................................................... 48, 52

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ....................................................... 76

*Roe v. Wade,*
    410 U.S. 113 (1973) ......................................................... 8

*Sackett v. EPA,*
    598 U.S. 651 (2023) ....................................................... 75

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996) ......................................................... 62

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983) ......................................................... 30

*Sprietsma v. Mercury Marine,*
    537 U.S. 51 (2002) ......................................................... 29

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) ................................... 36, 52

*Summers v. Baptist Med. Ctr. Arkadelphia,*
    91 F.3d 1132 (8th Cir. 1996) ..................................... 38, 41

*Texas v. Becerra,*
    89 F.4th 529 (5th Cir. 2024) .............. 21, 29, 31, 34, 42, 45

*Townsend v. Swank,*
404 U.S. 282 (1971) ................................................................ 69-70, 72

*United States v. California,*
655 F.2d 914 (9th Cir. 1980) ...................................................61

*United States v. Idaho,*
82 F.4th 1296 (9th Cir. 2023) ........................................... 2-3, 21

*United States v. Idaho,*
83 F.4th 1130 (9th Cir. 2023) ............................ 2, 19-20, 45, 58, 61

*United States v. Mattson,*
600 F.2d 1295 (9th Cir. 1979) ................................................62

*United States v. Skinna,*
931 F.2d 530 (9th Cir. 1991) ..................................................46

*United States v. Solomon,*
563 F.2d 1121 (4th Cir. 1977) ................................................63

*United States v. Washington,*
596 U.S. 832 (2022) ........................................................62, 72

*Utility Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ........................................................ 59-60

*Vickers v. Nash Gen. Hosp., Inc.,*
78 F.3d 139 (4th Cir. 1995) ...................................................41

*W. Va. Univ. Hosps., Inc. v. Casey,*
499 U.S. 83 (1991) ..............................................................57

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ........................................................72, 78

*West Virginia v. EPA,*
597 U.S. 697 (2022) .............................................................59

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ..........................................................2, 46

*Williams v. County of Cook,*
  1997 WL 428534 (N.D. Ill. July 24, 1997)....................................40

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..........................................................................23

**Federal Statutes**

10 U.S.C. §1093 ...............................................................................55

18 U.S.C. §1461 ...............................................................................53

18 U.S.C. §1462 ...............................................................................53

18 U.S.C. §1531(a) ....................................................................12, 53

18 U.S.C. §248(d)(4) .......................................................................54

22 U.S.C. §2151b(f) .........................................................................55

25 U.S.C. §1676 ...............................................................................55

28 U.S.C. §1292(a)(1).........................................................................3

28 U.S.C. §1331 .................................................................................3

42 U.S.C. §1395 ...............................................8, 24, 31-32, 34, 43, 59, 66

42 U.S.C. §1395cc(a)(1)(I) ...............................................................4

42 U.S.C. §1395cc(b)(2)(A) .............................................................5

42 U.S.C. §1395dd(a) .........................................................4-5, 33, 36

42 U.S.C. §1395dd(b) .......................................................... 5, 33, 59

42 U.S.C. §1395dd(b)(1) ................................................................38

42 U.S.C. §1395dd(b)(1)(A) .............................. 5, 25, 37, 39, 42-43

42 U.S.C. §1395dd(c)..........................................................5, 33, 37

42 U.S.C. §1395dd(c)(1) ...................................................................7

42 U.S.C. §1395dd(c)(1)(A)(ii) .....................................................44

42 U.S.C. §1395dd(c)(2)(A) ...........................................................44

42 U.S.C. §1395dd(d)..............................................................33, 39

42 U.S.C. §1395dd(d)(1) ...............................................................5, 62

42 U.S.C. §1395dd(d)(2) ......................................................................5

42 U.S.C. §1395dd(e)(1)(A) ...............................................................36

42 U.S.C. §1395dd(e)(1)(A)(i) ............................................24-25, 44-45

42 U.S.C. §1395dd(e)(1)(B)(ii) ...........................................................44

42 U.S.C. §1395dd(e)(3)................................................5, 25, 33, 37, 45

42 U.S.C. §1395dd(e)(3)(A) ...........................................5, 34, 37-38, 42

42 U.S.C. §1395dd(e)(3)(B) ...........................................................7, 39

42 U.S.C. §1395dd(e)(4) .....................................................................33

42 U.S.C. §1395dd(f)....................................2, 4, 24-26, 29-30, 32-33, 39, 42, 58

42 U.S.C. §1395dd(h) .................................................................4, 43

42 U.S.C. §1395w-104(e)(5) ..........................................................30, 73

42 U.S.C. §1395w-112(g) ...................................................................73

42 U.S.C. §1395w-25(a)(2)(E)(iv) .................................................30, 73

42 U.S.C. §1395w-26(b)(3) ...........................................................30, 73

42 U.S.C. §1395x(e)(7) .................................................................44, 66

42 U.S.C. §1395x(r) .....................................................................44, 66

42 U.S.C. §1396u-2(e)(1)(B) ...............................................................53

42 U.S.C. §1397ee(c)(1) ......................................................................56

42 U.S.C. §1397jj(16) ..........................................................................56

42 U.S.C. §18023(a)(1) ........................................................................54

42 U.S.C. §18023(b)(2) ........................................................................54

42 U.S.C. §18023(b)(4) ........................................................................54

42 U.S.C. §18023(c)(1) ........................................................................54

42 U.S.C. §238n(a) ..............................................................................54

42 U.S.C. §280h-5(f)(1)(B) ..................................................................56

42 U.S.C. §289g-1(b)(2)(A) ...................................................53

42 U.S.C. §290bb-36(i) .......................................................56

42 U.S.C. §300a-6 ..............................................................56

42 U.S.C. §300a-7 ..............................................................12

42 U.S.C. §300a-7(b) ..........................................................54

42 U.S.C. §300a-7(c)(1) .......................................................54

42 U.S.C. §300a-7(d) ..........................................................54

42 U.S.C. §300a-8 ..........................................................12, 55

42 U.S.C. §300z-10(a) .........................................................56

Pub. L. 101-239, §6211(c), 103 Stat. 2246 (1989) ........................6

Pub. L. 101-239, §6211(c)(3)(B), (c)(5)(B), 103 Stat. 2246 (1989) .......7

Pub. L. 101-239, §6211(f), 103 Stat. 2247-48 (1989) .....................7

Pub. L. 101-239, §6211(h)(1)(A), 103 Stat. 2248 (1989) .................6

Pub. L. 101-239, §6211(h)(1)(C)(i), 103 Stat. 2248 (1989) ..............6

Pub. L. 102-585, 106 Stat. 4947 ............................................55

Pub. L. 118-47, §§506-507, 138 Stat. 703 (2024) ........................55

Pub. L. 118-47, §§613-614, 138 Stat. 568 (2024) ........................55

Pub. L. 118-47, §810, 138 Stat. 591 (2024) ...............................55

Pub. L. 99-178, §204, 99 Stat. 1119 (1985) ...............................55

Pub. L. 99-272, §9121(b), 100 Stat. 164-67 (1986) ........................4

**State Statutes**

1863-1864 Terr. of Idaho Laws 443 ..........................................8

1973 Idaho Sess. Laws 442-48 ...............................................9

2020 Idaho Sess. Laws 827 ...................................................9

2023 Idaho Sess. Laws 298 ..................................................10

Colo. Rev. Stat. §12-30-120(2)(a) ..........................................42

Idaho Code §18-604(1) ..................................................................11, 45, 48

Idaho Code §18-604(1) (2020)..................................................................9

Idaho Code §18-604(1)(c) ..................................................................15

Idaho Code §18-604(10) (2020)..................................................................9

Idaho Code §18-604(11) ..................................................................11, 45

Idaho Code §18-622(1) ..................................................................10

Idaho Code §18-622(1)(a) (2020) ..................................................................9

Idaho Code §18-622(2) (2020)..................................................................9

Idaho Code §18-622(2)(a)................................................. 45, 48-49, 51, 58

Idaho Code §18-622(2)(a)(i).......................................................11, 35, 51

Idaho Code §18-622(2)(a)(ii)..................................................................11

Idaho Code §18-622(2)(b) ..................................................................12

Idaho Code §18-622(3)(a)(ii) (2020) ..................................................................10

Idaho Code §18-622(3)(b) (2020)..................................................................10

Idaho Code §18-622(4) ..................................................10, 45, 48, 51, 58

Idaho Code §18-622(4) (2020)..................................................................9

Idaho Code §39-3404 ..................................................................42

Idaho Code §39-3407 ..................................................................42

Idaho Code §39-3408 ..................................................................42

Idaho Code §39-3409 ..................................................................42

Idaho Code §67-465(1) ..................................................................14

N.Y. Comp. Codes R. & Regs., tit. 10, §58-2.2(c) ..................................................................42

**Regulatory Authorities**

68 Fed. Reg. 53,222 (Sept. 9, 2003) ..................................................................38, 60

CMS, *QSO-19-15-EMTALA* (July 2, 2019),
   https://perma.cc/BD3P-G3ST ..................................................................44, 61, 66

CMS, *Quality Improvement Organization Manual*,
Ch. 9, at 91 (Rev. 24, Issued Feb. 12, 2016),
https:perma.cc/EYL8-MNHY ...................................................................37

Exec. Order No. 13952,
85 Fed. Reg. 62187 (Sept. 25, 2020) ...................................................7

Exec. Order No. 14076,
87 Fed. Reg. 42053 (July 8, 2022)......................................................13

HHS, CMS, *Guidance Document QSO-22-22-Hospitals*
(July 11, 2022), https://perma.cc/8CR6-5SA6 ...............................13

Letter from Secretary Becerra to Health Care Providers
(July 11, 2022), https://perma.cc/PA63-LC2F ...............................73

## Other Authorities

A. Barrett, *Substantive Canons and Faithful Agency*,
90 B.U. L. Rev. 109 (2010)..................................................................76

A. Hamilton, *Report on the Subject of Manufactures*
(1791) (Brown ed., 1827) .....................................................................69

A. Scalia & B. Garner, *Reading Law:*
*The Interpretation of Legal Texts* (2012)............................................57

Am. Psychiatric Ass'n, *Position Statement on Abortion*
*and Women's Reproductive Healthcare Rights* (Mar. 2023),
https://perma.cc/UC35-26M9 ...........................................................52

*An Overview of Medicare*, KFF (Feb. 13, 2019),
https://perma.cc/B4LD-CQUQ...............................................67, 74

Comment, *To Treat or Not to Treat: A Hospital's Duty*
*to Provide Emergency Care*, 15 U.C. Davis L. Rev. 1047 (1982)....................33

D. Engdahl, *The Spending Power*, 44 Duke L.J. 2 (1994) ...................72

*Medicare Monthly Enrollment*, CMS (May 2024),
https://perma.cc/VT38-F8V5 ...........................................................74

P. Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* (2021) ................................69

The Federalist No. 45 (Madison) (Jacob E. Cooke ed., 1961)........................75

**Rules**

Fed. R. App. P. 4(a)(1)(B)(i) ................................................3

Fed. R. App. P. 4(a)(4)(A)(iv)..............................................3

**INTRODUCTION**

Our federalist system leaves Americans free to address the "profound moral issue" of abortion in their respective States. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 223 (2022). Today, "Americans continue to hold passionate and widely divergent views on abortion, and state legislatures have acted accordingly." *Id.* at 230. Idaho's Defense of Life Act is one such law. The Act generally prohibits abortion—distinct from lawful medical treatment. Congress, for its part, has remained mostly neutral on abortion policy; it has restricted abortion-related federal spending, protected conscience objections, and otherwise deferred to state laws.

But following the U.S. Supreme Court's decision in *Dobbs*, the White House directed federal agencies to expand access to abortion. The Department of Health and Human Services responded days later with a novel legal theory—that abortions are a condition of Medicare. This unprecedented suit by the United States against Idaho followed. The government alleges that the Emergency Medical Treatment and Labor Act, or EMTALA, requires Medicare hospitals to provide abortions irrespective of state law.

The district court agreed and preliminarily enjoined Idaho's Defense of Life Act. That preliminary injunction has been stayed and un-stayed—twice—and the government's novel theory is now back before this Court. *See United States v. Idaho*, 83 F.4th 1130, *vacated*, 82 F.4th 1296 (9th Cir. 2023) (en banc); *Moyle v. United States*, 144 S. Ct. 2015 (2024). For the government to prevail, it must convince this Court that EMTALA could require hospitals to provide even *unlawful* medical treatments—that is, "Congress, in reliance on the Spending Clause, can obligate recipients of federal funds to violate state criminal law." *Moyle*, 144 S. Ct. at 2022 (Barrett, J., concurring).

It is hard to imagine a larger elephant for a tinier mousehole than what the government contrived. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). EMTALA does not command physicians to perform abortions in violation of state law. Its default rule is the opposite: it does "not preempt" state law. 42 U.S.C. §1395dd(f). Nor could Congress have so commanded in EMTALA, which is simply a spending condition. That Spending Clause legislation cannot be forced on Idaho without its knowing and voluntary

consent—both absent here. Because the government cannot establish likely success on the merits, the preliminary injunction must be vacated.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction over the government's preemption claim. 28 U.S.C. §1331. The district court issued a preliminary injunction, which this Court has jurisdiction to review. 1-LEG-ER-51-52; *see* 28 U.S.C. §1292(a)(1).[1] On July 3, 2023, the Legislature timely appealed the preliminary injunction after the district court denied motions for reconsideration on May 4, 2023. 4-LEG-ER-587; 1-LEG-ER-12; *see* Fed. R. App. P. 4(a)(1)(B)(i); Fed. R. App. P. 4(a)(4)(A)(iv). This Court granted a stay pending appeal, which it then vacated for the matter to be reheard *en banc*. 82 F.4th 1296. The U.S. Supreme Court granted certiorari before judgment, which it then dismissed as improvidently granted. 144 S. Ct. 2015.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether any EMTALA requirement directly conflicts with Idaho's Defense of Life Act.

---

[1] The Legislature and State filed the cited excerpts of the record on August 7, 2023.

2. If so, whether EMTALA, as Spending Clause legislation, can constitutionally require hospitals to violate state law without Idaho's knowing or voluntary acceptance of any such spending condition.

## STATEMENT OF THE CASE

I.   **Statutory History**

A.   **EMTALA**

**1.** In 1986, Congress amended the Medicare Act to add new requirements, known today as EMTALA. *See* Pub. L. 99-272, §9121(b), 100 Stat. 164-67 (codified as amended 42 U.S.C. §1395dd). Neither EMTALA, nor the lengthy legislation of which it was a part, mentioned the word "abortion." Congress said its "provisions … do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. §1395dd(f).

EMTALA applies only to Medicare-participating hospitals with emergency departments. §§1395cc(a)(1)(I), 1395dd(a). It ensures access to emergency services regardless of an individual's ability to pay. §1395dd(a), (h). Violations risk exclusion from Medicare, fines, and civil enforcement actions

governed by "the law of the State in which the hospital is located." §1395dd(d)(1)-(2); *see* §1395cc(b)(2)(A).

EMTALA requires that if "any individual" comes to the emergency department, "the hospital must provide for an appropriate medical screening examination within [its] capability" to identify "emergency medical condition[s]." §1395dd(a). A hospital generally cannot transfer or discharge that patient without first providing "such medical treatment" to "stabilize" his emergency medical condition for the transfer or discharge, unless an immediate transfer would be safer. §1395dd(b)-(c), (e)(3). Stabilizing treatment is treatment "within the staff and facilities available at the hospital," §1395dd(b)(1)(A), necessary to avoid "material deterioration of the condition" during transfer, §1395dd(e)(3)(A).

**2.** In 1989, Congress amended EMTALA to clarify how its requirements apply specifically to a pregnant woman and "her unborn child." The amendment clarified that EMTALA's definition of "emergency medical condition" protects an "unborn child" (amended text in bold):

(e)(1)  The term "emergency medical condition" means—

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

    (i) placing the ~~patient's~~ health **of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child)** in serious jeopardy,

    (ii) serious impairment to bodily functions, or

    (iii) serious dysfunction of any bodily organ or part~~.~~**; or**

**(B) with respect to a pregnant woman who is having contractions—**

    **(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or**

    **(ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.**

Pub. L. 101-239, §6211(h)(1)(A), 103 Stat. 2248 (42 U.S.C. §1395dd(e)(1)). With that amended definition, EMTALA is clear that its stabilization provisions apply also to an unborn child when an emergency medical condition puts the child's health "in serious jeopardy." *See* §6211(h)(1)(C)(i), 103 Stat. 2248 (adding cross-reference to §1395dd(e)(1)(A)).

For women in labor, the amendment also clarified how EMTALA's "transfer" rule applies. *See* §6211(c), 103 Stat. 2246. Generally, hospitals cannot transfer patients whose "emergency medical condition[s] … ha[ve] not

been stabilized" unless the benefits of a transfer outweigh the risks. 42 U.S.C. §1395dd(c)(1). By adding references to the "unborn child," the amendment requires physicians to weigh benefits and risks to *both* a pregnant woman and "the unborn child." §6211(c)(3)(B), (c)(5)(B), 103 Stat. 2246 (§1395dd(c)(1)(A)(ii), (c)(2)(A)).

Finally, the amendment added a nondiscrimination provision for specialized hospitals, which are often on the receiving end of transfers, including those with "neonatal intensive care units." §6211(f), 103 Stat. 2247-48 (adding §1395dd(g)). Such hospitals "shall not refuse to accept an appropriate transfer of an individual" who requires those "specialized capabilities," *id.*, such as an "extremely premature infant[] born alive before 24 weeks," Exec. Order No. 13952, 85 Fed. Reg. 62187, 62187 (Sept. 25, 2020).

**3.** EMTALA's provisions are generally worded. They refer to an "unborn child" but never "abortion." Even at its most specific, when defining when a woman in labor is sufficiently "stabilized" for "transfer," §1395dd(e)(3)(B), EMTALA does not prescribe particular treatments. EMTALA specifies that she is sufficiently "stabilized" once she "has delivered

(including the placenta)." *Id*. Even that language does not prescribe *how* exactly the hospital delivers her unborn child and placenta. EMTALA operates at a higher level of generality. That is consistent with the Medicare Act, which states its provisions should not be construed to allow federal officials "to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." §1395.

### B. Idaho's Defense of Life Act

**1.** For its first 100 years, Idaho outlawed abortion except when necessary to "save" or "preserve" the pregnant mother's life. Idaho's earliest territorial laws prohibited administering "any medicinal substance" or using "any instruments" for abortion, unless a physician "deems it necessary … to save her life." 1863-1864 Terr. of Idaho Laws 443. After statehood, Idaho reenacted similar prohibitions except when "*necessary to preserve her life.*" *Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1149-52 (Idaho 2023) (collecting statutes).

After *Roe v. Wade*, 410 U.S. 113 (1973), Idaho enacted revised abortion statutes with provisions stating Idaho would reinstate abortion restrictions

if *Roe* were overturned. *E.g.*, 1973 Idaho Sess. Laws 442-48. Idaho made that same promise again in 2020, enacting abortion restrictions to take effect 30 days after "any decision of the United States supreme court that restores to the states their authority to prohibit abortion." 2020 Idaho Sess. Laws 827 (codified as amended Idaho Code §18-622). That decision came in 2022 with *Dobbs*, "return[ing] the issue of abortion to the people's elected representatives." 597 U.S. at 232.

**2.** Idaho's abortion law was set to take effect on August 25, 2022. Idaho Code §18-622(1)(a) (2020). The law subjected physicians to criminal penalties and suspension or revocation of their licenses if they "intentionally terminate[d]" the life of "a developing fetus" after "fertilization" with some exceptions. §§18-604(1), (10), 18-622(2) (2020); *see also* §18-622(4) (2020) (excluding "[m]edical treatment" resulting in "accidental death of, or unintentional injury to, the unborn child"); *Planned Parenthood*, 522 P.3d at 1202-03 (excluding "ectopic and non-viable pregnancies").

Initially, the law allowed physicians to raise two affirmative defenses to justify an abortion. First, if "the abortion was necessary to prevent the

death of the pregnant woman," then the abortion was permissible. §18-622(3)(a)(ii) (2020). Second, if the pregnant woman (or her parent or guardian) reported a rape or incest to appropriate authorities, then the abortion was permissible. §18-622(3)(b) (2020).

**3.** In July 2023, Idaho enacted the Defense of Life Act, amending its abortion law to its current form. 2023 Idaho Sess. Laws 298; *see Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974) ("[A] court is to apply the law in effect at the time it renders its decision."). It remains a crime for physicians to perform or attempt abortions, §18-622(1), but the amendment replaced affirmative defenses with provisions allowing the following conduct:

*First*, physicians may provide "[m]edical treatment … to a pregnant woman" even if it "results in the accidental death of, or unintentional injury to, the unborn child." §18-622(4).

*Second*, physicians may treat women for miscarriages and ectopic or molar pregnancies. An "abortion" expressly is *not* "[t]he removal of a dead unborn child," "[t]he removal of an ectopic or molar pregnancy," "[t]he treatment of a woman who is no longer pregnant," or other circumstances

where there is no "developing fetus." §18-604(1), (11); *see Planned Parenthood*, 522 P.3d at 1203 (interpreting definitions to require "*some* chance of survival outside the womb").

*Third*, a physician may intentionally terminate a pregnancy if, "in his good faith medical judgment and based on the facts known to the physician at the time," "the abortion was necessary to prevent the death of the pregnant woman." §18-622(2)(a)(i). But "[n]o abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself." *Id.* The physician must "provide[] the best opportunity for the unborn child to survive" (*e.g.*, pre-term delivery), unless that would "have posed a greater risk of the death of the pregnant woman." §18-622(2)(a)(ii). These standards are "subjective," "focusing on the particular physician's judgment," and do "not require *objective* certainty." *Planned Parenthood*, 522 P.3d at 1203. Nor does the exception demand "a particular level of immediacy, before the abortion can be 'necessary' to save the woman's life." *Id.*

*Fourth*, a physician may intentionally terminate a pregnancy "during the first trimester" when a pregnant woman (or her parent or guardian) reports to authorities that "she is the victim of an act of rape or incest." §18-622(2)(b).

**4.** In these ways, Idaho law parallels federal laws that expressly regulate abortion or abortion funding. Congress has made express findings about physicians' "medical, legal, and ethical duties … to preserve and promote life." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). It bans "partial-birth abortion" except when "necessary to save the life of a mother." 18 U.S.C. §1531(a). It protects conscience objections to abortion. *See, e.g.*, 42 U.S.C. §§300a-7, 300a-8. And federal funds cannot pay for abortions except "where the life of the mother would be endangered" or in cases of rape or incest. *Harris v. McRae*, 448 U.S. 297, 302-03 (1980).

## II. Procedural History

### A. After *Dobbs*, the government rewrites EMTALA to require "abortion care."

**1.** Two weeks after *Dobbs*, President Biden issued an executive order targeting the decision and directing the HHS Secretary to find ways "to

protect and expand access to abortion care." Exec. Order No. 14076, 87 Fed. Reg. 42053, 42053 (July 8, 2022). Identifying EMTALA by name, the President instructed the Secretary to "consider[] updates to current guidance" regarding the statute's requirements. *Id.* at 42054.

Days later, the Secretary issued new EMTALA guidance. *See* HHS, CMS, *Guidance Document QSO-22-22-Hospitals* (July 11, 2022), https://perma.cc/8CR6-5SA6. The guidance requires "abortion" as "stabilizing treatment," "irrespective of any state laws or mandates that apply to specific procedures":

> If a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician **must** provide that treatment.

*Id.*

**2.** Weeks later, the government deployed that novel theory by filing this suit against the State of Idaho. 4-LEG-ER-570-86. The government's complaint contained one claim, "Preemption Under the Supremacy Clause and EMTALA," 4-LEG-ER-584, and alleged the government was not "receiving

the benefit of its bargain" for Medicare because Idaho law prohibits most abortions, 4-LEG-ER-582.

The Legislature and its leaders moved to intervene to defend state law. *See* Idaho Code §67-465(1). The district court "grant[ed] permissive intervention on a limited basis to allow the Legislature to present argument and evidence (including witnesses) in opposition to the United States' pending Motion for Preliminary Injunction." 4-LEG-ER-515. After the district court granted the preliminary injunction, the court "fully consider[ed] the Legislature's motion for reconsideration," 2-LEG-ER-127, and concluded that "the State and the Legislature may appeal," 1-LEG-ER-12.

**B.     The government obtains a preliminary injunction.**

**1.** The government moved for a preliminary injunction less than three weeks before Idaho's abortion law was to take effect. The government submitted declarations identifying possible pregnancy-related emergency medical conditions. The Legislature responded with its own declarations from highly qualified physicians. For every example the government offered, the Legislature's physicians responded that there was no conflict between

EMTALA and Idaho law, because procedures described were either "life-saving procedure[s]" or otherwise not "abortion[s]." *E.g.*, 4-LEG-ER-410. They reached those conclusions based on decades of combined experience in obstetrics and emergency care including thousands of live births, crafting emergency room protocols for obstetric patients, and teaching appointments. 4-LEG-ER-406-07, 436-37.

**Ectopic pregnancy and molar pregnancy:** The government said ectopic pregnancies and molar pregnancies were emergency medical conditions that could not be treated in Idaho. 3-ER-205-07, 325-26, 356-57. The Legislature's witnesses testified that "[a]ny effort to *redefine*" treatment for these conditions as "abortions" is "inexcusable" and "medically baseless." 4-LEG-ER-439-40; *see* 4-LEG-ER-410-12, 424-25. Treating such conditions is not "abortion." *Planned Parenthood*, 522 P.3d at 1203; Idaho Code §18-604(1)(c).

**Pre-eclampsia, eclampsia, and HELLP syndrome:** The government asserted pre-eclampsia, eclampsia, or HELLP syndrome could not be treated in Idaho. 3-ER-328-29, 344-45, 349-52. The Legislature's witnesses responded that these conditions present "life-threatening situation[s]" and can be

"highly lethal" and require "life-saving surgery" or "early delivery" in later stages of pregnancy, both of which Idaho law permits. 4-LEG-ER-418-22, 440; *see* 4-LEG-ER-413; *accord* 3-ER-250-51, 254-58.

**Sepsis:** Premature rupture of membranes (PROM) can cause sepsis, which the government said physicians could not treat in Idaho. 3-ER-329-30, 341-42, 356. The Legislature's witnesses responded that it would be "malpractice" not to treat preterm PROM as life-threatening or a reason for "early delivery" in later stages of pregnancy. 4-LEG-ER-438-40; *see* 4-LEG-ER-416-17; *accord* 3-ER-251-54.

**Severe heart failure:** One government declarant hypothesized that Idaho physicians cannot treat a pregnant woman with "severe heart failure" who requires "termination of the pregnancy." 3-ER-326-28. The Legislature's witnesses responded that life-saving treatment is allowed and clarified that "[m]aking terminating the pregnancy the primary objective could in fact be the worst first thing to do for the sake of the health of the mother," rather than immediately transferring her to a hospital with "highly specialized

equipment and capabilities." 4-LEG-ER-412-13; *see* 4-LEG-ER-439; *accord* 3-ER-250.

**Placental abruption:** The government identified placental abruption and disseminated intravascular coagulation (DIC), which "creates a high risk of death for the mother due to the rapid loss of large volumes of blood," as conditions that could not be treated. 3-ER-342-44; *see* 3-ER-330-31. The Legislature's witnesses responded that life-saving treatment is clearly permissible and that the baby is "doomed to die due to the ruptured placenta" unless "an immediate C-section is performed" after viability. 4-LEG-ER-414-15, 417-18; *see* 4-LEG-ER-440; *accord* 3-ER-252-54.

The Legislature moved for a hearing to resolve these material factual disputes. The court refused. 4-LEG-ER-397-400. The court concluded it was "impractical" given the "complex factual dispute" and the short time before Idaho's law took effect. 4-LEG-ER-399-400.

**2.** The district court preliminarily enjoined Idaho's law "as applied to medical care required by [EMTALA]" one day before the law was to take effect. 1-LEG-ER-51-52. The court held EMTALA required "abortion care" as

"stabilizing treatment" for pregnant women. 1-LEG-ER-32. It was "impossible to comply" with that requirement, the court ruled, because Idaho's exceptions in its abortion law were too narrow. 1-LEG-ER-32-35. The opinion relied entirely on the government's declarants, citing them nearly 40 times, while citing the Legislature's physician witnesses twice each to dismiss their testimony as "a difference of opinion." 1-LEG-ER-35-36, 43 n.4. The court said it was "immaterial" whether Idaho law allowed treatment for the identified pregnancy-related emergency conditions. 1-LEG-ER-34-35.

The court's preliminary injunction goes beyond EMTALA. The court preliminarily enjoined the State and its officials from initiating criminal or disciplinary proceedings for abortions performed "*to avoid*" emergency medical conditions for "a pregnant patient." 1-LEG-ER-51-52 (emphasis added). To define those emergency conditions, the order quoted EMTALA's definition but omitted that definition's reference to the "unborn child." 1-LEG-ER-51-52 ("'placing the health of' a pregnant patient 'in serious jeopardy,'" "serious impairment to bodily functions," or "serious dysfunction of any bodily organ or part" (quoting §1395dd(e)(1)(A))).

**3.** The Legislature asked for reconsideration. 2-LEG-ER-247-73. While reconsideration motions were pending, the Idaho Supreme Court affirmed the constitutionality of Idaho's abortion law, interpreted it to exclude ectopic and other non-viable pregnancies, and clarified its other parameters. *Planned Parenthood*, 522 P.3d at 1202-05. The district court denied the reconsideration motions without vacating or modifying the injunction based on the Idaho Supreme Court's decision. The district court concluded Idaho law was still too narrow to satisfy EMTALA. 1-LEG-ER-2-13.

## C.     The Legislature seeks a stay and appeals.

**1.** The Legislature and Attorney General appealed. 4-LEG-ER-587-89; 3-ER-386-89. The Legislature sought a stay of the preliminary injunction pending appeal, which a panel of this Court granted. 83 F.4th 1130.

The stay panel concluded that there was no direct conflict. EMTALA, it reasoned, stops hospitals from "dumping indigent patients by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Id.* at 1136. It does not "require that a hospital provide whatever treatment an individual medical professional

may desire." *Id.* The panel gave the example of a physician who thinks "an organ transplant is necessary to stabilize a patient's emergency medical condition." *Id.* "EMTALA would not then preempt a state's requirements governing organ transplants." *Id.* The court reasoned in the alternative that even if EMTALA contained procedure-specific requirements, there was no "*implicit* duty to perform abortions" causing "'a material deterioration of the condition' of the child" when EMTALA required physicians to care for both a pregnant woman and her unborn child. *Id.* And "all the hypotheticals presented by the district court" have "been shown to satisfy [Idaho's] 'life of the mother' standard," meaning no conflict. *Id.* at 1138. The stay panel concluded that the remaining factors favored a stay because the preliminary injunction undermined Idaho's "self-governance" and "strong interest in protecting unborn life," and the stay would not harm public health when "Idaho's law expressly contemplates necessary medical care for pregnant women in distress." *Id.* at 1139-40.

**2.** The government sought this Court's *en banc* review of the stay. The Court vacated the stay and reinstated the preliminary injunction. 82 F.4th

1296; Order 1, No. 23-35450 (Nov. 13, 2023), ECF No. 71. Judges Callahan, Miller, Bress, and VanDyke dissented. Order 2. Not long after, the Fifth Circuit affirmed that EMTALA does not mandate "abortion care" and rejected HHS's post-*Dobbs* guidance as an unlawful interpretation of EMTALA. *Texas v. Becerra*, 89 F.4th 529, 541-46 (5th Cir. 2024).

**3.** The Legislature and Attorney General sought the Supreme Court's review. The Supreme Court granted emergency stay applications and granted certiorari before judgment. *Moyle v. United States*, 144 S. Ct. 540 (2024); *Idaho v. United States*, 144 S. Ct. 541 (2024).

After argument, the Court dismissed the writ as improvidently granted. *Moyle*, 144 S. Ct. 2015. Justice Barrett's concurring opinion, joined by Chief Justice Roberts and Justice Kavanaugh, concluded the cases were "no longer appropriate for early resolution." *Id.* at 2019-20. That opinion observed that "EMTALA's reach is far more modest than it appeared" when the Court granted review, and "Idaho law has materially changed" since entry of the preliminary injunction. *Id.* at 2021-22. The opinion highlighted the federal government's concessions at argument—namely, disavowing "that

an abortion is ever required as stabilizing treatment for mental health conditions" and representing that "federal conscience protections, for both hospitals and individual physicians, apply in the EMTALA context." *Id.* at 2021. The opinion noted that the life-threatening medical conditions identified by the government could be treated in Idaho. *Id.* Finally, the opinion identified "a difficult and consequential argument" about whether EMTALA, as Spending Clause legislation, "can obligate recipients of federal funds to violate state criminal law." *Id.* at 2022. The opinion concluded that "[t]he lower courts should address the Spending Clause issue in the first instance." *Id.*

Justice Alito dissented, joined by Justices Thomas and Gorsuch. He observed that EMTALA "unambiguously demands" hospitals protect "both a pregnant woman *and* her 'unborn child.'" *Id.* at 2027. He added that Spending Clause conditions like EMTALA "must be unambiguous" and require "consent[]"—both absent here. *Id.* at 2028. He observed that the government's view of its spending power would allow Congress to "pay doctors to perform not only emergency abortions but also third-trimester elective abortions," or "offer[] assisted suicide," or "authorize the

practice of medicine by any doctor who accepts Medicare payments even if he or she does not meet the State's licensing requirements." *Id.* at 2034.

## STANDARD OF REVIEW

A preliminary injunction is a drastic remedy "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant, "*by a clear showing*," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), must establish likelihood of success, irreparable injury absent a preliminary injunction, that the balance of equities favor the movant, and that the injunction is in the public interest, *Winter*, 555 U.S. at 20. Likelihood of success "is the most important factor." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

Reversal of a preliminary injunction is warranted if the district court "incorrectly applied the law, relied on clearly erroneous factual findings, or otherwise abused its discretion." *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996). Questions of law, such as EMTALA's meaning, are reviewed de novo. *Id.* Reversal is warranted if "the court misapprehended the law with respect to the underlying issues in the litigation." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022).

## SUMMARY OF THE ARGUMENT

**I.A.** EMTALA does not preempt Idaho's Defense of Life Act. EM-TALA's default rule is no preemption: no state law is displaced unless it "directly conflicts" with an EMTALA "requirement." 42 U.S.C. §1395dd(f). EMTALA is best read to *supplement* state healthcare and criminal laws, not to supplant them. Any contrary interpretation is inconsistent with the Medicare Act's rule that it should not be "construed to authorize" federal officials to control "the manner in which medical services are provided." §1395.

**B.** EMTALA prohibits Medicare hospitals from turning away patients in the throes of a medical emergency. Its generally worded provisions require screening patients and then, if the hospital intends to transfer the patient, sufficiently stabilizing any emergency medical condition for the transfer. Those requirements apply to an "unborn child" too. §1395dd(e)(1)(A)(i). But EMTALA does not dictate *how* exactly to treat patients beyond its generally worded provisions to provide "such treatment," "within the staff and facilities available at the hospital," to avoid a "material deterioration" of the

patient's condition when she is transferred. §1395dd(b)(1)(A), (e)(3). There is no EMTALA requirement to provide "such treatment" if *unlawful*.

**C.** Even if EMTALA required specific procedures, there is no abortion requirement that "directly conflicts" with Idaho law. §1395dd(f). Idaho permits treatment for each pregnancy-related emergency identified by the government's witnesses. Reading EMTALA to require something more would put it at war with its own terms—requiring stabilizing treatment for an "unborn child" whose health is in "serious jeopardy," §1395dd(e)(1)(A)(i)—and other federal laws regulating abortion and abortion funding.

**D-E.** The government misreads EMTALA to give HHS officials a line-item veto over state healthcare and criminal laws. And the government ignores EMTALA's enforcement scheme in bringing this freestanding Supremacy Clause action against Idaho. Neither is consistent with the words Congress chose for EMTALA.

**II.A.** The government's rewrite of EMTALA has unconstitutional implications. EMTALA is Spending Clause legislation. Such legislation cannot be forced on States without their consent. When Congress spends, as it does

in the hundreds of billions for Medicare, it can put conditions on that spending, as it did with EMTALA. But those conditions must be knowingly and voluntarily accepted. Because Medicare is an agreement with hospitals, the State never had the chance to consent here, and still the preliminary injunction forces the government's read of EMTALA upon all state officials.

**B.** The Constitution leaves Idaho free to govern itself regarding abortion. To encroach on the State's historic police powers, Congress must do so with a clear voice and pursuant to its enumerated powers. It did no such thing in EMTALA. Idaho's Defense of Life Act is not preempted.

## ARGUMENT

### I.   EMTALA Does Not Preempt Idaho's Defense of Life Act.

There are different labels for preemption cases, "but all of them work in the same way." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). Courts ask whether there is a conflict between federal and state law sufficient to supplant state law. Here, EMTALA contains express language setting a high bar for any such conflict. *See* 42 U.S.C. §1395dd(f). That text—requiring "directly" conflicting requirements—is the north star for this Court's

preemption inquiry and limits EMTALA's preemptive reach. *See Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam) ("We therefore look only to this language and construe its preemptive effect as narrowly as possible."); *accord Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992). So while this Court has described the EMTALA preemption inquiry as asking "whether it is physically impossible to comply with both state and federal law" or "whether the state law is an obstacle" to Congress's "objectives," that inquiry is still one rooted in EMTALA's text. *Draper*, 9 F.3d at 1394. It is not a "freewheeling judicial inquiry" about "federal objectives" divorced from the text. *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality op.); *see Draper*, 9 F.3d at 1393-94.

Comparing EMTALA and Idaho's Defense of Life Act, there is no direct conflict between a hospital's EMTALA obligations and Idaho law. *Infra* I.B. There is no evidence that EMTALA requires abortions that Idaho prohibits. *Infra* I.C. There is no "impossibility." *Draper*, 9 F.3d at 1393. Nor is Idaho law an obstacle to Congress's "purposes and objectives." *Id.* Congress enacted EMTALA in response to concerns that hospitals were "patient

dumping." *Id.*; *accord Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (collecting cases). Its provisions tell hospitals how not to "dump" patients, with generally worded provisions about screening patients and sufficiently stabilizing them to be transferred. *See Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002). But EMTALA does not command hospitals to provide *unlawful* medical treatments generally. Nor does it command "abortion care" specifically, *contra* 1-LEG-ER-32, especially not abortions that Congress itself won't fund, *infra* I.C.2. Because there is no direct conflict, the preliminary injunction must be vacated.

## A. EMTALA's default rule is one of non-preemption.

Whether EMTALA preempts Idaho law begins and ends with EMTALA's "plain wording." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see Draper*, 9 F.3d at 1393. EMTALA's default rule is that it does *not* preempt state law:

> The provisions of this section *do not* preempt any State or local law requirement, except to the extent that the requirement *directly conflicts* with a requirement of this section.

42 U.S.C. §1395dd(f) (emphases added). That provision "necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002); *see Draper*, 9 F.3d at 1393.

Three features of §1395dd(f)'s text and the Medicare Act confirm EMTALA's "limited preemptive reach." *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999); *accord Draper*, 9 F.3d at 1393 (construing EMTALA's "preemptive effect as narrowly as possible"); *Texas*, 89 F.4th at 535 (noting EMTALA's "limited preemptive effect"). *First*, EMTALA's preemption provision is phrased in the negative: EMTALA does "*not* preempt … except" for directly conflicting federal and state requirements. §1395dd(f) (emphasis added); *see Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) (describing §1395dd(f) as a "non-preemption provision"); *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) (same). That syntax sets a default rule that EMTALA generally will *not* preempt state law. It "is an express *disclaimer* of pre-emption." *De Veau v. Braisted*, 363 U.S. 144, 157 (1960) (plurality op.) (emphasis added) (holding state law was not "impliedly preempted" by federal law that contained "an express disclaimer of pre-

emption … '[e]xcept as explicitly provided to the contrary'"). By its own terms, EMTALA anticipates its "provisions … do not preempt" and thus will operate alongside state law. §1395dd(f).

*Second*, to overcome EMTALA's non-preemption default rule, EMTALA requires "directly conflict[ing]" federal- and state-law requirements. *Id.* In *Draper*, this Court interpreted that "key phrase" to require a showing of "impossibility" or that state law is an "obstacle" to Congress's enacted "objectives." 9 F.3d at 1393. It is not enough for state laws to *relate* to EMTALA's generally worded screening, stabilization, or transfer provisions; there must be a *direct conflict* with an EMTALA requirement. *See id.* That "directly conflicts" language distinguishes EMTALA's preemption provision from broader provisions in other federal laws. *See, e.g., Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-98 (1983) (considering ERISA's preemption provision covering any state laws that "relate to" employee benefit plans). The "directly conflicts" language differs from other Medicare preemption provisions. *E.g.*, 42 U.S.C. §1395w-25(a)(2)(E)(iv) ("relate to"); §1395w-26(b)(3) ("with respect to"); §1395w-104(e)(5) ("contrary to … or restricts" and

"pertains to"). Courts "presume[] that Congress acts intentionally" when using that different language. *Bates v. United States*, 522 U.S. 23, 29-30 (1997). Its "limiting purpose" must be given its full effect, *Bowsher v. Merck & Co.*, 460 U.S. 824, 839 (1983), narrowing EMTALA's preemptive sweep, *see Cipollone*, 505 U.S. at 517.

*Third*, EMTALA is a condition of Medicare, and the Medicare Act sets a rule of construction that limits EMTALA's preemptive reach. EMTALA must be interpreted consistent with the Act's opening proviso:

**Prohibition against any Federal interference**

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided … .

42 U.S.C. §1395. Section 1395 confirms Congress's desire to "minimize federal intrusion" in state healthcare regulation. *Mass. Med. Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st Cir. 1987) (Breyer, J.); *see also Texas*, 89 F.4th at 542 (noting provision "underscores the 'congressional policy against the involvement of federal personnel in medical treatment decisions'"). Section 1395 belies the government's theory that EMTALA could impose federal requirements

directly conflicting with state laws regulating how medical services are provided. While Medicare regulations have of course proliferated, *see Biden v. Missouri*, 595 U.S. 87, 94-95 (2022) (per curiam), none purports to use EMTALA to displace state laws regarding lawful medical services, *see* §1395.

Together, those provisions leave no doubt that the presumption against preemption applies in full force here. This Court construes EMTALA's "preemptive effect as narrowly as possible." *Draper*, 9 F.3d at 1393. The government must overcome "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *see Cipollone*, 505 U.S. at 518, 523. EMTALA itself codifies the presumption that States have "primacy" over "matters of health and safety," *Medtronic*, 518 U.S. at 485, by setting a default rule that state laws are not preempted, §1395dd(f). The government can point to no "directly" conflicting federal and state requirements to overcome that presumption against preemption.

## B.    No EMTALA requirement directly conflicts with Idaho law.

No EMTALA requirement "directly conflicts" with Idaho's Defense of Life Act. §1395dd(f). EMTALA's focus is instead extending a Medicare hospital's duty of emergency care to the hospital's front door and offering a federal remedy for patient dumping. *See* §1395dd(d); *Hardy*, 164 F.3d at 792-93 (EMTALA "impose[s] on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all" (collecting cases)); *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) (discussing how EMTALA "gets patients into the system").[2] EMTALA's generally worded provisions prohibit Medicare hospitals from turning away patients in the throes of a medical emergency. Hospitals must screen patients and provide "such medical treatment" to allow patients to be safely transferred or discharged. §1395dd(a)-(c), (e)(3)-(4).

---

[2] Hospitals traditionally had no common-law duty to treat; in the years leading up to EMTALA, several States began recognizing a duty to provide emergency care. *See* Comment, *To Treat or Not to Treat: A Hospital's Duty to Provide Emergency Care*, 15 U.C. Davis L. Rev. 1047, 1048-60 (1982).

But as for *how* exactly hospitals treat patients, EMTALA contains no procedure-specific language that purports to override state healthcare or criminal laws regulating available treatments. *See Texas*, 89 F.4th at 542 (observing "EMTALA does not mandate any specific type of medical treatment"); *Harry*, 291 F.3d at 773 (describing EMTALA as "supplement[ing] state law" and rejecting that it "establish[ed] guidelines for patient care"); *see also Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) (discussing lack of specific screening requirements). EMTALA simply tells hospitals to provide "such medical treatment" without further specificity. §1395dd(e)(3)(A). That generally worded directive operates harmoniously alongside state laws. To say otherwise would turn EMTALA's presumption against preemption on its head and contravene the Medicare Act's rule that federal officials do not supervise or control "the manner in which medical services are provided." §1395.

1. **EMTALA's stabilization provisions are about patient dumping and do not override state laws regulating medical procedures.**

The district court zeroed in on EMTALA's references to "stabilize" or "stabilizing" as the basis for the preliminary injunction, reading those terms to require "abortion care" as "stabilizing treatment." 1-LEG-ER-32. The district court read EMTALA to require abortions even for non-life-threatening medical emergencies, such that Idaho's exception allowing intentional pregnancy termination "to prevent … death," Idaho Code §18-622(2)(a)(i), was too narrow, too "uncertain," and would result in "delayed care." 1-LEG-ER-33-34, 40, 45. Even after the Idaho Supreme Court clarified that the exception turns on a physician's subjective judgment, with no requirement to wait until death is "imminent," *Planned Parenthood*, 522 P.3d at 1203-04, the district court did not vacate the preliminary injunction, 1-LEG-ER-12. Still today, Idaho is enjoined from enforcing its law when abortions are necessary "*to avoid*" harm to a pregnant woman's bodily functions, organs, or parts. 1-LEG-ER-52 (emphasis added). But EMTALA contains no requirement "to avoid" adverse health events, let alone requirements to violate state

healthcare or criminal laws or to ignore an "unborn child," *contra* 42 U.S.C. §1395dd(e)(1)(A)(i). The district court's "overbroad injunction is an abuse of discretion." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

The district court plucked EMTALA's use of "stabilize" out of context. EMTALA's provisions about screening, stabilization, and transferring patients work together, operating at a higher level of generality than requiring "abortion care" specifically. EMTALA's screening rule requires Medicare hospitals to conduct an "appropriate medical screening" within their "capability" for individuals seeking emergency medical treatment. §1395dd(a). That screening determines whether an "emergency medical condition" exists. *Id.*; *see* §1395dd(e)(1)(A) (defining emergency medical condition as one that, without "immediate medical attention," will place "the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy" or risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part"). EMTALA's transfer rule generally prohibits hospitals from transferring or discharging patients before addressing any such emergency medical condition.

Medicare hospitals must first "stabilize" the emergency medical condition sufficiently to avoid "material deterioration" of the condition during the transfer, unless an immediate transfer would be safer or other conditions are met. §1395dd(b)(1)(A), (c), (e)(3).

EMTALA uses the term "stabilize" only in connection with those screening and transfer rules. *See Bryant*, 289 F.3d at 1167 (noting "'stabilize' … is defined only in connection with the transfer"); *Harry*, 291 F.3d at 775 ("There is no duty under EMTALA to provide stabilization treatment to a patient with an emergency medical condition who is not transferred."). As HHS guidance instructs, EMTALA's "[t]erms relating to 'stabilization' … DO NOT REFLECT the common usage in the medical profession." CMS, *Quality Improvement Organization Manual*, Ch. 9, at 91 (Rev. 24, Issued Feb. 12, 2016), https://perma.cc/EYL8-MNHY. Instead, EMTALA defines "to stabilize" as follows:

> The term "to stabilize" means, with respect to an emergency medical condition … , to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to *result from or occur during the transfer of the individual from a facility … .*

§1395dd(e)(3)(A) (emphasis added). So defined, EMTALA contains a stabilize-to-transfer requirement. It is not a freestanding requirement to cure a patient. *See, e.g.*, *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir. 1991); *Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir. 1993). But it still closes an important loophole: just as a Medicare hospital cannot turn away a patient at its front door, that hospital cannot throw out that patient once inside the emergency room if screening reveals an emergency medical condition. The hospital must first address the condition enough so that it will not materially deteriorate while the patient is transferred or discharged. *See* §1395dd(b)(1), (e)(3)(A).

EMTALA does not purport to go further, setting nationwide rules about *how* exactly patients must be stabilized before being transferred, irrespective of state law. *See Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996) (en banc) (noting "every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms"). HHS has agreed that "EMTALA does not … establish a national standard of care." 68 Fed. Reg.

53,222, 53,244 (Sept. 9, 2003). EMTALA itself acknowledges that care might be different at different hospitals: required stabilizing treatment is that "within the staff and facilities available at the hospital." §1395dd(b)(1)(A). Even at its most specific, when EMTALA defines when a woman in labor is "stabilized," EMTALA goes only as far as requiring "deliver[y] (including the placenta)." §1395dd(e)(3)(B). It does not prescribe particular procedures—for example, requiring delivery by cesarian section or prohibiting delivery by midwives. EMTALA leaves those particulars to hospitals, operating within the parameters of state law.

Because EMTALA does not set nationwide rules about the particulars of medical treatment, state laws regulating medical treatment do not "directly conflict[]" to trigger §1395dd(f). The potential for direct conflicts tends to be about something else entirely—state laws conflicting with EMTALA's private right of action, including its two-year statute of limitations, §1395dd(d). *See, e.g.*, *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 866 (4th Cir. 1994) (pre-suit notice requirement); *Bird v. Pioneers Hosp.*, 121 F. Supp. 2d 1321, 1323-26 (D. Colo. 2000) (same); *Est. of Enck by Enck v. Beggs*, 1995 WL

519148, at *3-4 (D. Kan. Aug. 30, 1995) (state savings statute extending statute of limitations); *Reid v. Indianapolis Osteopathic Med. Hosp., Inc.*, 709 F. Supp. 853, 855 (S.D. Ind. 1989) (statute requiring pre-suit review by medical review panel); *Williams v. County of Cook*, 1997 WL 428534, at *5 (N.D. Ill. July 24, 1997) (statute immunizing public medical facilities). The few cases finding a direct conflict with EMTALA's stabilization provision involve state laws permitting physicians to refuse to treat emergency medical conditions entirely. *See, e.g., Carlisle v. Frisbie Mem'l Hosp.*, 888 A.2d 405, 415 (N.H. 2005) (concluding state law allowing peace officers to remove intoxicated patients from emergency rooms directly conflicted with EMTALA's duty to care for emergency patients); *In re Baby "K,"* 16 F.3d 590, 596-98 (4th Cir. 1994) (concluding state conscience law conflicted insofar as it allowed physicians to refuse to treat respiratory distress for one patient while treating the same condition for others). But nothing about EMTALA's limited and generally worded stabilize-to-transfer rule suggests physicians must offer treatments that *violate* state law.

### 2. The district court's contrary interpretation would read EMTALA to command hospitals to violate state laws.

Never until this case has EMTALA been read to require hospitals to provide "such treatment" even if that treatment *violates* state law. EMTALA instead *supplements* state laws by extending Medicare hospitals' duty of emergency care to all patients. *See Harry*, 291 F.3d at 773; *Bryan*, 95 F.3d at 351; *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1995) (Wilkinson, J.) (describing EMTALA as "creat[ing] a new cause of action … for what amounts to failure to treat," not "duplicat[ing]" preexisting malpractice protections). It has never been understood to impose a national standard of care, let alone one that would override state law. *See Baker*, 260 F.3d at 993 (explaining EMTALA was "not intended to create a national standard of care for hospitals"); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995) (describing "Congress's refusal to impose a national standard of care"); *accord Summers*, 91 F.3d at 1137 ("EMTALA … does not set a national emergency health care standard"). But that is where the logic of the preliminary injunction leads: EMTALA requires whatever medical treatment federal officials command, even if it means violating state law. That turns

EMTALA's presumption against preemption on its head and contravenes the Medicare Act's other provisions.

EMTALA's codified presumption against preemption confirms that it does not purport to override state laws regulating medical treatments. *Supra* I.A.1. To overcome that presumption, there must be "directly" conflicting "requirement[s]." §1395dd(f). But here, state laws regulating medical treatments neither make it "impossible" to comply with EMTALA nor stand as an "obstacle" to its patient-dumping prohibition. *Draper*, 9 F.3d at 1393.

In particular, when EMTALA refers to "such treatment" or "such medical treatment," §1395dd(b)(1)(A), (e)(3)(A), those generally worded phrases leave room for specific state laws regulating medical treatments. Providers can "comply with both EMTALA and state law by offering stabilizing treatment in accordance with state law." *Texas*, 89 F.4th at 542. State laws regulating abortion no more directly conflict with EMTALA's stabilize-to-transfer requirement than other state laws limiting specific medical treatments or procedures. *See, e.g.*, Idaho Code §§39-3404, 39-3407, 39-3408, 39-3409 (regulating organ donation); N.Y. Comp. Codes R. & Regs., tit. 10, §58-2.2(c)

(imposing restrictions on blood donors); Colo. Rev. Stat. §12-30-120(2)(a) (prohibiting "medication abortion reversal"). Just as EMTALA does not obligate physicians to commit battery by taking blood from a nonconsenting patient for an emergency blood transfusion, EMTALA does not obligate physicians to violate other laws when providing "such treatment" to stabilize patients for transfer. §1395dd(b)(1)(A). Abiding by state law does not frustrate EMTALA's objective of stopping hospitals' "refusal to treat a patient who is unable to pay." *Draper*, 9 F.3d at 1393. In such circumstances, hospitals are not refusing to treat patients altogether, let alone refusing to treat patients based on their inability to pay, *contra* §1395dd(h); hospitals are simply treating patients within the parameters of state laws.

It is the government's contrary interpretation, adopted by the district court, that thwarts Congress's apparent purposes. The government reads EMTALA to allow HHS officials to insist on particular procedures or treatments, even if unlawful. *See* U.S. Br. 32-33, *Moyle*, 144 S. Ct. 2015. But the Medicare Act says federal officials *cannot* become the supervisors and controllers of "the manner in which medical services are provided." §1395; *cf.*

*Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989) (per curiam) (explaining reimbursement regulation was consistent with §1395 because it "does not actually direct or prohibit any kind of treatment"). The government's contrary reading also frustrates Medicare's requirement that participating hospitals and physicians comply with state law. HHS has said "hospitals are required to be in compliance with Federal *and State* laws." CMS, *QSO-19-15-EMTALA* 3 (July 2, 2019), https://perma.cc/BD3P-G3ST (emphasis added) (*QSO-19-15-EMTALA*). Federal law commands that Medicare-participating hospitals comply with state-law licensing requirements and that physicians are "legally authorized to practice medicine and surgery by the State." §1395x(e)(7), (r). Given those provisions, the only sensible reading of EMTALA is that hospitals will stabilize emergency medical conditions within the parameters of state law regulating allowable medical treatments.

### 3. EMTALA's stabilization provisions protect the "unborn child" too.

The district court also failed to reconcile EMTALA's references to the "unborn child" before concluding that EMTALA requires abortions specifically. *See* §1395dd(c)(1)(A)(ii), (c)(2)(A), (e)(1)(A)(i), (e)(1)(B)(ii). Most

relevant here, EMTALA's stabilization provisions apply not only to a pregnant woman but also to "her unborn child." §1395dd(e)(1)(A)(i). EMTALA's stabilization obligations run specifically to the "emergency medical condition," whether suffered by the "unborn child," the "pregnant woman," or both. §1395dd(e)(1)(A)(i), (e)(3). The district court never grappled with that text. But as the stay panel observed, EMTALA's references to the "unborn child" contemplate "dual stabilization requirements" for both a pregnant woman and her unborn child. 83 F.4th at 1136; *accord Texas*, 89 F.4th at 544-45 (discussing "equal stabilization obligations"). EMTALA leaves it to state legislatures to choose how to strike that balance, including maximizing health outcomes for both mother and child. *See Texas*, 89 F.4th at 544-45. So it is in Idaho, where pregnancy termination is permitted for rare and life-threatening emergencies, while giving a developing unborn child the best chance at survival. Idaho Code §§18-604(1), (11), 18-622(2)(a), (4); *Planned Parenthood*, 522 P.3d at 1203-05. Treating patients within those parameters neither makes it impossible to comply with EMTALA requirements nor

frustrates Congress's objectives, which expressly include protecting the "unborn child" too. *See Draper*, 9 F.3d at 1393.

Any contrary reading hides an elephant in the unlikeliest of mouseholes: a statute requiring care for an "unborn child" when an emergency places the child's health "in serious jeopardy." §1395dd(e)(1)(A)(i), (e)(3); *see Whitman*, 531 U.S. at 468. It would "too easily find[] irreconcilable conflicts in [Congress's] work," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018), to interpret EMTALA to simultaneously require that life-saving medical treatment and life-ending abortions.

### C. Even if EMTALA required abortions, Idaho's Defense of Life Act does not directly conflict.

Even if "abortion care" were an EMTALA requirement, there would be no direct conflict with Idaho's Defense of Life Act. The government bears the burden of showing a direct conflict. *United States v. Skinna*, 931 F.2d 530, 533 (9th Cir. 1991). That requires showing that "compliance is impossible," not merely that "noncompliance is possible." *Draper*, 9 F.3d at 1393. The government cannot shoulder that burden if forced to grapple with what Idaho law actually says and how it actually applies. There is no evidence of any

such impossibility. Idaho law "simply addresses a concern" that EMTALA—a law "to combat 'patient dumping'"—"does not." *Id.* And when Congress in other federal laws actually addresses abortion, Congress draws the same lines as Idaho.

### 1. There is no evidence that medical emergencies require abortions in circumstances that Idaho prohibits.

Even if EMTALA contained procedure-specific requirements, there is no evidence that Idaho law prohibits medical treatment, including intentional termination of pregnancy in rare cases, for any of the emergencies identified by the government's witnesses. And yet the district court found, without an evidentiary hearing, that EMTALA could require abortions for "serious health risks that may stop short of death." 1-LEG-ER-10. Explained below, that finding assumes something about state and federal law that is not in the text and not in the record. Rather than put the government to its burden of showing an actual conflict, *Draper*, 9 F.3d at 1393, the district court deemed it "immaterial" whether the pregnancy-related conditions identified by the government's witnesses could be treated in Idaho, *see* 1-LEG-ER-34-36, 43 n.4. The district court then granted the government a preliminary

injunction despite evidence that those conditions could be treated in Idaho and despite the Legislature's request for an evidentiary hearing about the same. *Supra* pp.14-17.[3] The court erred by preliminarily enjoining state law based on "sheer speculation." *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (reversing preliminary injunction); *see also Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982) ("a hypothetical or potential conflict is insufficient").

Idaho's Defense of Life Act targets elective abortions, not emergency medical care. *See Planned Parenthood*, 522 P.3d at 1202-04. Idaho law distinguishes "criminal abortions" from life-saving measures and other "[m]edical treatment," even if "result[ing] in the accidental death of, or unintentional injury to, the unborn child." Idaho Code §18-622(2)(a), (4). Nothing in Idaho law interferes with physicians' treatment of miscarriages, ectopic pregnancies, and molar pregnancies. §18-604(1). And in those rare circumstances when pregnancy termination is required, Idaho allows such terminations

---

[3] Other circuits would require an evidentiary hearing. *Compare Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt.*, 793 F.3d 313, 324 & n.11 (3d Cir. 2015) (collecting decisions from Second, Third, Fourth, Fifth, Sixth, Seventh, Eleventh, and D.C. Circuits), *with Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986).

when "necessary to prevent the death of the pregnant woman," while still aiming to give "the best opportunity for the unborn child to survive." §18-622(2)(a). Nothing in Idaho law requires "delayed care," *contra* 1-LEG-ER-45, or "guaranteed" death, *contra* 1-LEG-ER-42. The Idaho Supreme Court has spoken: there is no "immediacy" requirement, no "certainty" requirement, and no "medical consensus" requirement before a physician may terminate a pregnancy for life-threatening medical emergencies. *Planned Parenthood*, 522 P.3d at 1203-04. Idaho law "leaves wide room for the physician's 'good faith medical judgment'" to decide when that life-saving treatment is warranted. *Id.* at 1203. The district court was bound by that interpretation of Idaho law, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 (1992), but ignored it, *see* 1-LEG-ER-9-12 (refusing to reconsider preliminary injunction based on Idaho Supreme Court's decision).

The government cannot meet its burden to identify a direct conflict between those features of Idaho law and EMTALA to "overcom[e] th[e] presumption" that Idaho law "is valid." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 661-62 (2003); *see Draper*, 9 F.3d at 1393-94. The government's

declarants identified no medical emergencies, short of life-threatening emergencies, for which pregnancy termination is the only possible stabilizing treatment; they instead testified about "life-threatening" and "dire circumstances" where "death" was "imminent." 3-ER-340-43; *see also, e.g.*, 3-ER-349-52, 3-ER-356-58. The Legislature's witnesses, qualified physicians, testified that they would treat every condition as life-threatening without hesitation.[4] Those physicians' good-faith, subjective views control under Idaho law. *Planned Parenthood*, 522 P.3d at 1203. They explained how every identified condition could be treated with "lawful medical procedure[s]"—some of which were not even "abortions"—because each condition involved life-threatening circumstances where "no informed, competent professional would second-guess the legality of the procedure." 4-LEG-ER-438-40; *see* 3-ER-248-60, 4-LEG-ER-407-26; *see also* 4-LEG-ER-403 (testifying that "no Idaho prosecuting attorney would" "prosecute any health care professional

---

[4] *See* 4-LEG-ER-416-17, 438-40 (preterm PROM and related complications); 4-LEG-ER-414, 417-18, 440 (placental abruption and related complications); 4-LEG-ER-418-19, 421-22, 424-25, 440 (preeclampsia and HELLP syndrome); 4-LEG-ER-409-10, 413-14, 419-20, 423-24, 425-26 (other necessary "medical treatment").

based on facts like those set forth in those declarations"). Their testimony was consistent with Idaho's distinction between lawful medical treatment and prohibited abortions, Idaho Code §18-622(2)(a), (4), where treating severe heart failure, ectopic pregnancies, molar pregnancies, non-developing pregnancies, and myriad other medical emergencies is not "abortion[]." *Planned Parenthood*, 522 P.3d at 1202-04; *see, e.g.*, 4-LEG-ER-409-10 (no medical "literature" or "studies" provide that "abortion is the first line treatment for any medical emergency"). Against that evidence, the government cannot establish that "compliance" with federal and state requirements "is impossible." *Draper*, 9 F.3d at 1393.

The only conceivable conflict, if EMTALA's requirements were procedure-specific, would be Idaho's express prohibition on abortions for mental health emergencies. In Idaho, "[n]o abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself." Idaho Code §18-622(2)(a)(i). But the government "emphatically disavowed" that conflict at the Supreme Court, *Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring),

maintaining that "pregnancy termination" is "not the accepted standard of practice to treat any mental health emergency," Tr. of Oral Arg. 76:16-78:5, *Moyle*, 144 S. Ct. 2015.[5]

There is no evidence of a direct conflict. *See supra* pp.14-17. The "record contains no evidence to support it." *Stormans*, 586 F.3d at 1119. There is thus no basis for a preliminary injunction, which was premised on speculation, that EMTALA requires "abortion care" for some heretofore unidentified "health" emergency even though the government's own witnesses would not even go so far. *See Norman Williams*, 458 U.S. at 659; *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 866 (9th Cir. 2009) (rejecting mere "potential

---

[5] The concession is consistent with the Legislature's interpretation of EM-TALA, not the government's. If EMTALA's reference to "treatment" is *lawful* medical treatment, *supra* I.A.2, then the concession makes sense. But if, as the government claims, EMTALA requires *unlawful* medical treatment if federal health experts think it is required, some have said abortions are treatment for mental health conditions. Am. Psychiatric Ass'n, *Position Statement on Abortion and Women's Reproductive Healthcare Rights* (Mar. 2023), https://perma.cc/UC35-26M9 ("Freedom to act to interrupt pregnancy must be considered a mental health imperative … ."); *accord Moyle*, 144 S. Ct. at 2039-40 (Alito, J., dissenting).

for conflict" based on "a speculative, hypothetical possibility"), *aff'd sub nom.*, *Whiting*, 563 U.S. 582.

### 2. Idaho law draws the same lines Congress has drawn when restricting abortions or abortion funding.

It beggars belief that EMTALA contains an abortion requirement directly conflicting with Idaho law when Congress has drawn the same lines as Idaho. Explained below, federal abortion laws, like Idaho's, permit abortions or abortion-related funding when necessary to prevent death but not, more broadly, for health-related reasons short of life-threatening circumstances. *Contra* 1-LEG-ER-10. It makes little sense that EMTALA—Spending Clause legislation—could command those health-related abortions that Congress won't otherwise pay for.

Congress has remained mostly neutral on abortion. It has prohibited some abortions and otherwise deferred to state law. *See* 18 U.S.C. §1531(a) (banning partial-birth abortion except when "necessary to save the life of a mother whose life is endangered" by a "physical" condition); §§1461, 1462 (banning use of the mails for abortion instruments or medicine); 42 U.S.C. §289g-1(b)(2)(A) (permitting fetal tissue research only if "the abortion was

performed in accordance with applicable State law"); §1396u-2(e)(1)(B) (exempting "abortion services, except that a State may impose a sanction on any medicaid managed care organization that has a contract to provide abortion services"). The Affordable Care Act, for example, bars federal funds for abortion, disclaims preemption of state abortion laws, and allows States to "elect to prohibit abortion coverage in qualified health plans offered through an Exchange in such State if such State enacts a law to provide for such prohibition." 42 U.S.C. §18023(a)(1), (b)(2), (c)(1). Similarly, the Freedom of Access to Clinic Entrances Act prohibits obstructing abortion clinics but states that nothing in the Act "shall be construed … to interfere with the enforcement of State or local laws regulating the performance of abortions or other reproductive health services." 18 U.S.C. §248(d)(4).

Congress has also acknowledged and respected abortion-related conscience objections. Federal laws prohibit discrimination against healthcare providers who refuse to provide or facilitate abortions. *See* 42 U.S.C. §238n(a); §300a-7(b), (c)(1), (d); §18023(b)(4). And federal officials cannot require certain recipients of public health funds to perform abortions or

otherwise "coerce" a woman "to undergo an abortion … by threatening [her] with the loss of, or disqualification for the receipt of, … [f]ederal financial assistance." §300a-8.

Most telling, for as long as EMTALA has existed, Congress has generally prohibited the use of federal funds to pay for abortions that the government now insists EMTALA requires. *See Harris*, 448 U.S. at 302-03. When Congress enacted EMTALA, the Hyde Amendment allowed federal funds for abortions only "where the life of the mother would be endangered if the fetus were carried to term"—the same line that Idaho draws. *See* Pub. L. 99-178, §204, 99 Stat. 1119 (1985). Other funding restrictions bind HHS and other federal agencies still today; restrictions sometimes except abortions when a woman is "in danger of death" due to a "physical" condition but not abortions for non-life-threatening conditions. *See* Further Consolidated Appropriations Act, Pub. L. 118-47, §§613-614, 810, 506-507, 138 Stat. 568, 591, 703 (2024) (District of Columbia, Labor, HHS, Education, federal employee health benefits); 10 U.S.C. §1093 (Defense); 22 U.S.C. §2151b(f) (foreign assistance); 25 U.S.C. §1676 (Indian Health Service); Pub. L. 102-585, 106 Stat. 4947

(38 U.S.C. §1710 note) (Veterans Affairs). Other HHS programs preclude abortion funding altogether. Federal funding cannot be used for family planning programs "where abortion is a method of family planning." 42 U.S.C. §300a-6. School-based health centers are ineligible for funding if they "perform abortion services," and other funding programs for suicide prevention and child health assistance cannot be used for abortions. *See* 42 U.S.C. §§280h-5(f)(1)(B), 290bb-36(i), 300z-10(a), 1397ee(c)(1), 1397jj(16).

These longstanding congressional policies are irreconcilable with the conclusion that Idaho law frustrated Congress's objectives. *See* 1-LEG-ER-38-47. That Congress has "imposed the same type of restriction[s]" as Idaho "is surely evidence that Congress does not view such a restriction" under state law "as incompatible" with federal law. *De Veau*, 363 U.S. at 156 (plurality op.). EMTALA does not silently require abortions that Congress won't pay for. Nor does EMTALA command abortions over conscious objections.[6]

---

[6] At the Supreme Court, the government represented that "EMTALA does not override either set of conscience protections" for hospitals or individual physicians, Tr. of Oral Arg. 87:23-89:8, but was not clear whether hospitals had to be staffed to perform abortions or not, *compare id.* at 90:8-92:7, *with id.* at 92:13-25. The suggestion that Catholic hospital staff must perform

When Congress intends to regulate abortion, it says so. The Court need not read EMTALA to be "at war" with these federal laws. *Epic Sys.*, 584 U.S. at 502; *see* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 252-55 (2012). The statutes should be read "as a harmonious whole," *Epic Sys.*, 584 U.S. at 502, construing EMTALA consistent with congressional policy "specifically" addressing "the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991). Congress did not say so in EMTALA, leaving no basis to infer a nationwide rule "prevent[ing] the people's elected representatives from deciding how abortion should be regulated" within each State. *Dobbs*, 597 U.S. at 256; *see Cipollone*, 505 U.S. at 517.

---

abortions cannot be reconciled with federal conscience laws that cover both hospitals at the entity level, *see* 42 U.S.C. §238n(a); Pub. L. 118-47, §507(d)(1), 138 Stat. 703, and individual physicians, *see* 42 U.S.C. §300a-7(c)(1), (d). But conscience protections are easily reconciled if EMTALA does not contain procedure-specific requirements, as the Legislature argues.

**D. Reading the federal and state requirements to directly conflict offends the major questions doctrine.**

For the foregoing reasons, there is no direct conflict on the face of federal and state requirements. EMTALA contains "dual stabilization requirements" for a pregnant woman and her unborn child. *Idaho*, 83 F.4th at 1136; *supra* I.B.3. Likewise, Idaho distinguishes lawful medical treatment from criminal abortion, Idaho Code §18-622(4), and permits pregnancy termination in rare cases while giving the unborn child the best chance at survival, §18-622(2)(a). Neither law prescribes a one-size-fits-all "abortion care" requirement. *Contra* 1-LEG-ER-32. Case over? Not yet, the government says.

The government now contends that it overcomes §1395dd(f) because Idaho law "directly conflicts" with the wisdom of HHS officials. *See* U.S. Br. 32-34, *Moyle*, 144 S. Ct. 2015. That theory hands HHS officials a line-item veto over Idaho law with "political" and "economic" consequences that are "staggering by any measure." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

Congress decides major questions, not HHS officials. Any reasonable interpreter of EMTALA would think Congress would make those "big-time policy calls itself." *Id.* at 2380 (Barrett, J., concurring). No executive official

has any "power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). There must be "clear congressional authorization" to vest such enormous power in HHS officials—ultimately a power to command hospitals to violate state laws when treating patients lest they lose billions in federal funding. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("something more than a merely plausible textual basis … is necessary"). Congress said the opposite in the Medicare Act: federal officials do not exercise "supervision or control over … the manner in which medical services are provided." §1395. EMTALA did not impliedly repeal that directive with general references to "such treatment" or statutory headings like "[n]ecessary stabilizing treatment." §1395dd(b); *see West Virginia*, 597 U.S. at 732. Those terms must be read in context. *See Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring). And context—beginning with EMTALA's presumption against preemption—compels the conclusion that Congress did not hand HHS officials the power to make nationwide abortion rules irrespective of

state law. *Supra* I.A-C. Nor did HHS ever consider itself to have that power

until *Dobbs*. *See Utility Air*, 573 U.S. at 324 (expressing skepticism over agency

interpretation of "long-extant statute" resulting in a "transformative expan-

sion in [its] regulatory authority without clear congressional authoriza-

tion").[7] Before *Dobbs*, HHS said "EMTALA does not … establish a national

standard of care," 68 Fed. Reg. at 53,244, and "hospitals are required to be in

compliance with Federal and State laws," *QSO-19-15-EMTALA* 3.

Reading EMTALA to hand HHS a line-item veto over state abortion

laws, contrary to Congress's longstanding neutrality on abortion, would

---

[7] So far in this case, the government has identified *no* instance when HHS officials commanded hospitals to provide abortions or medical treatments that violate state law. At the Supreme Court, the government relied for the first time on an HHS spreadsheet documenting more than 115,000 EMTALA "deficiencies." U.S. Br. 16 n.2, *Moyle*, 144 S. Ct. 2015 (citing CMS, *Hospital Surveys with 2567 Statement of Deficiencies – 2023Q4*, https://perma.cc/A3TN-8M67). It identified seven instances when HHS purportedly determined abortion was "necessary" stabilizing "care." *Id.* All but two involved ectopic pregnancies—not abortions. The remaining two involved failures to account for patients' symptoms before discharging them; neither required hospitals to perform abortions violating state law. Remarkably, one involved a Catholic hospital transferring a patient after refusing to abort her 17 to 23-week unborn child with fetal heart tones. HHS found the hospital's failure to "transfer[] via ambulance" compromised "the health of *the unborn baby* and the patient." Reply Br. of Pet'rs 13-14, No. 23-726, *Moyle*, 144 S. Ct. 2015.

deny "the people of the various States" freedom "to address a question of profound moral and social importance" and "evaluate those interests differently." *Dobbs*, 597 U.S. at 256, 269. EMTALA's text has not changed since *Dobbs*. EMTALA has nothing to say on the subject. As the stay panel observed, "[i]t is not the purpose of EMTALA to force hospitals to treat medical conditions using certain procedures" but instead "to prevent hospitals from neglecting poor and uninsured patients with the goal of protecting 'the health of the woman' and 'her unborn child.'" 83 F.4th at 1138 (quoting §1395dd(e)(1)(A)); *accord Eberhardt*, 62 F.3d at 1258. EMTALA does not preempt Idaho's Defense of Life Act.

**E.      Even if there were a direct conflict, the government has no cause of action for this pre-enforcement suit.**

The district court further erred by concluding that the government "has the unquestioned authority to sue." 1-LEG-ER-26. But "like any other plaintiff, the federal government must first have a cause of action against the state." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). It has none against Idaho with respect to EMTALA—a spending condition that Idaho itself has not accepted. *Infra* II.A.

The Supremacy Clause "certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-27 (2015). Nor could the government "proceed against Idaho in equity" given EMTALA's enforcement scheme. *See id*. at 327-29; *accord Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74-75 (1996). EMTALA authorizes the government to impose fines or terminate Medicare contracts after *actual* violations, not theoretical ones. §1395dd(d)(1). That is the "typical remedy" for violating spending conditions, *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023), and makes this case distinguishable from suits brought by the government regarding federal immigration power or federal workers, *cf. Arizona v. United States*, 567 U.S. 387 (2012); *United States v. Washington*, 596 U.S. 832 (2022). Allowing this suit ignores that the government's "only power" with respect to spending conditions is "the threat of withholding funds" from those who knowingly and voluntarily accepted them. *United States v. Mattson*, 600 F.2d 1295, 1299-1300 (9th Cir. 1979) (rejecting government's suit for injunctive relief against funding recipients); *see Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 143-44 (1947). Idaho is no such funding recipient and has not

accepted any "abortion care" requirement; even if it had, EMTALA's enforcement scheme would preclude this pre-enforcement "Supremacy Clause" action. *See, e.g.*, *United States v. Solomon*, 563 F.2d 1121, 1128-29 (4th Cir. 1977) (rejecting suit against federally funded state hospitals).

## II. EMTALA Could Not Constitutionally Preempt Idaho's Defense of Life Act.

Even if there were directly conflicting federal and state requirements, there is no constitutional basis for telling Medicare hospitals to *violate* state healthcare or criminal laws. From day one, the government has contended that "Idaho's law is invalid under the Supremacy Clause and is preempted by federal law." 4-LEG-ER-572. But "pointing to the Supremacy Clause" alone "will not do." *Murphy*, 584 U.S. at 477. The government must identify what substantive "power" it has to preempt, beyond the Supremacy Clause. *Id.* The Spending Clause confers no such power here. Congress cannot simply pay hospitals or other entities to violate state laws. That unprecedented expansion of federal power goes well beyond what the Tenth Amendment permits. The government's view of EMTALA, adopted by the

district court, trespasses on Idaho's sovereignty without congressional or constitutional authority.

## A. EMTALA is Spending Clause legislation that must abide by the Spending Clause's limits.

The government is unabashed about the constitutional implications of its preemption theory. It claims Spending Clause conditions have "full preemptive force." U.S. Br. 45, *Moyle*, 144 S. Ct. 2015. In its view, Congress can regulate the practice of medicine *via* EMTALA or other spending conditions; Congress could require or ban abortions or sex reassignment surgeries, for example, irrespective of state law. Tr. of Oral Arg. 96:15-98:12, *Moyle*, 144 S. Ct. 2015. And "what a state can't do," the government says, "is interpose its own law as a direct obstacle to being able to fulfill the federal funding conditions." *Id.* at 72:18-24.

That expansive view of government spending gets our federalist system backwards. The government cannot explain where Congress derives the power to override state law with ambiguous spending terms, or terms that the State has never accepted, or unduly coercive spending terms. That is because the Constitution confers no such power.

Spending Clause legislation is "[u]nlike ordinary legislation." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022). It functions "much in the nature of a contract." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). It "operates based on consent," only after the recipient of federal funds "knowingly accepts the terms of th[e] [spending] 'contract.'" *Cummings*, 596 U.S. at 219; *see Armstrong*, 575 U.S. at 323 (describing Medicaid as "offer[ing] the States a bargain," where "Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions"). Spending Clause conditions cannot be forced on parties "involuntarily," *Cummings*, 596 U.S. at 219, let alone on non-consenting States*, see NFIB v. Sebelius*, 567 U.S. 519, 577-78 (2012). While Congress may *influence* policy through spending, it cannot *coerce* policy through spending. *See id*. at 579-82; *New York v. United States*, 505 U.S. 144, 176 (1992).

**1.** The first rule of Spending Clause legislation is that Congress must "speak with a clear voice." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "[I]f Congress intends to impose a condition on the grant of

federal moneys, it must do so unambiguously," so that those who accept federal funds do so "knowingly." *Id.* Recipients must "clearly understand the obligations that would come along with doing so." *Cummings*, 596 U.S. at 219 (cleaned up). Recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent.*, 548 U.S. at 296.

EMTALA contains no unambiguous requirement to provide medical treatment in violation of state law generally, nor an unambiguous requirement to provide prohibited abortions specifically. *Supra* I.A-C. Medicare requires providers to comply with state law, *see* §1395x(e)(7), (r); *QSO-19-15-EMTALA* 3, and the Medicare Act says federal officials will not exercise "supervision or control" over how medical treatment is provided, §1395. EMTALA contains no "unambiguously" worded abortion exception to those rules. *Pennhurst*, 451 U.S. at 17. EMTALA instead compels hospitals to care for an "unborn child." *Supra* I.A.3. Nor would anyone expect a Medicare condition to include abortion requirements when most Medicare enrollees are beyond child-bearing age. *See An Overview of Medicare*, KFF (Feb. 13,

2019), https://perma.cc/B4LD-CQUQ. For the few who aren't, Congress *prohibits* paying for pregnancy terminations except in life-threatening circumstances or in cases of rape and incest. *Supra* I.C.2. Until *Dobbs*, no one understood EMTALA to depart from Congress's longstanding neutrality on abortion policy and silently override state abortion laws. *Supra* I.B.

At the very least, EMTALA is ambiguous, and the government cannot overcome the Spending Clause's clear-statement requirement. The government has said that abortion was "part of the United States' bargain" when it provided Medicare funding to Idaho hospitals, and Idaho's law "prevents the United States from receiving the benefit of its bargain." 4-LEG-ER-582-83. But nothing in EMTALA is "unambiguously clear" about that. *Moyle*, 144 S. Ct. at 2033 (Alito, J., dissenting). That alone is grounds for vacating the preliminary injunction.

**2.** Spending conditions also bind only those who voluntarily accept them. States must retain the right "to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own." *NFIB*, 567 U.S. at

579 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). Here, Idaho was never given that chance. The government's Medicare agreements in Idaho are with hospitals, not Idaho itself. 3-ER-361-62; *see* 3-ER-263-65 (explaining Idaho's only Medicare-participating state hospital is a psychiatric hospital with no emergency department). And still, the government obtained a preliminary injunction against Idaho that forces EMTALA's supposed abortion condition on the State. Six Supreme Court Justices wrote or joined opinions highlighting that "difficult and consequential" Spending Clause conundrum. *Moyle*, 144 S. Ct. at 2022 (Barrett, J., concurring); *id.* at 2034 (Alito, J., dissenting) (noting the government "ha[d] not identified any decision holding that a federal law enacted under the Spending Clause preempts a state criminal law or public health regulation").

The preliminary injunction is antithetical to the notion that EMTALA, as a spending condition, has no force unless accepted. *See Mellon*, 262 U.S. at 482; P. Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 129-33 (2021) (distinguishing spending conditions on those grounds for Supremacy Clause purposes). Allowing it to stand would transform Congress's

power to spend from a carrot to a stick, subjecting Idaho "involuntarily" to congressional policy attached to spending that the State did not accept. *Contra Cummings*, 596 U.S. at 219. The government cannot "force" its view of EMTALA on Idaho with a preliminary or permanent injunction. *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 595 (1937). The Spending Clause first requires the State's consent. *See*, *e.g.*, *Linder v. United States*, 268 U.S. 5, 18-23 (1925); A. Hamilton, *Report on the Subject of Manufactures* 54-55 (1791) (Brown ed., 1827) (observing spending power did not "imply a power to do whatever else should appear to Congress conducive to the general welfare").

But here, Idaho is preliminarily enjoined from enforcing its law even though Idaho is not a party to the Medicare contract. That unusual posture distinguishes this suit from others brought to enforce spending conditions against actual recipients of federal funding programs. *See, e.g., Townsend v. Swank*, 404 U.S. 282, 283-85 (1971) (preemption suit against Illinois officials as direct recipients of federal funds for Aid to Families with Dependent Children program). And it distinguishes this suit from others about the use of or control over the federal funds specifically. *See, e.g., Coventry Health Care of*

*Mo., Inc. v. Nevils*, 581 U.S. 87, 95-99 (2017) (involving subrogation and reimbursement related to Federal Employee Health Benefits Act); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 258-59 (1985) (involving local government's discretion to spend federal funds); *Philpott v. Essex Cnty. Welfare Bd.*, 409 U.S. 413, 413-15 (1973) (involving New Jersey's diversion of federal welfare funds); *Bennett v. Arkansas*, 485 U.S. 395, 396-98 (1988) (per curiam) (similar); *Townsend*, 404 U.S. at 283-85 (involving Illinois's changes to eligibility requirements for federal funds). As the government acknowledged before the Supreme Court, there is no other instance in which Spending Clause conditions are forced on a non-consenting State the way the preliminary injunction purports to override Idaho law here. *See* Tr. of Oral Arg. 67:8-70:12; *accord Moyle*, 144 S. Ct. at 2034 (Alito, J., dissenting).

As Chief Justice Burger observed in *Townsend*, spending conditions are not "mandatory upon the States under the Supremacy Clause" the way other federal laws are. 404 U.S. at 292 (Burger, C.J., concurring in judgment). When acting pursuant to the Spending Clause, Congress depends on the States' consent—like Illinois's consent in *Townsend* to accept federal funds. When

there is no consent of the States, the government cannot insist that policies embodied in spending conditions preempt state laws. *Cf. Pennhurst*, 451 U.S. at 17; *Steward Mach.*, 301 U.S. at 585-86. From the States' perspective, that would make spending conditions no less mandatory than laws enacted pursuant to Congress's enumerated powers. *See Cummings*, 596 U.S. at 219 (distinguishing "voluntarily" accepted spending conditions from "involuntarily" imposed federal laws); *Hodges v. Thompson*, 311 F.3d 316, 320 (4th Cir. 2002) (per curiam) (distinguishing incentives in spending legislation from preemptive Commerce Clause legislation).

The government's contrary rule would work an end-run around Congress's limited powers. To effectuate any policy, federal officials could take ambiguous language in one of myriad spending conditions, sue a State, claim the State's law is an obstacle to newfound federal policy, and obtain an injunction. Or for new spending legislation, Congress could simply pay private hospitals to violate state healthcare or criminal laws. Imagine, for example, federal spending conditioned on allowing assisted suicide; Congress could insist on hospitals violating state bans on assisted suicide

without regard to Congress's enumerated powers. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 732-36 (1997). If the Spending Clause gave such priority "to every federal policy about anything" attached to spending legislation, then there would be no limiting federal power. D. Engdahl, *The Spending Power*, 44 Duke L.J. 2, 42, 77-78 (1994).

Congress's spending power has never been so unbounded. At most, the Supremacy Clause empowers Congress to decide who is eligible for federal funds or how federal funds will be dispersed. *See, e.g., Townsend*, 404 U.S. at 283-85; *Lead-Deadwood Sch. Dist.*, 469 U.S. at 258-59; *see also, e.g., Washington*, 596 U.S. at 835 (holding state law targeting federal workers' compensation was unconstitutional under the Supremacy Clause). But here, the EMTALA condition has nothing to do with Medicare eligibility or Medicare dollars.[8] The district court cannot enjoin enforcement of state law when Idaho never knowingly or voluntarily accepted any "abortion care" requirement.

---

[8] By comparison, other preemption provisions in the Medicare Act relate directly to eligibility standards or operational requirements germane to the use of funds. *See* 42 U.S.C. §§1395w-25(a)(2)(E)(iv), 1395w-26(b)(3), 1395w-104(e)(5), 1395w-112(g).

**3.** Nor could there be knowing or voluntary consent to the government's coercive version of EMTALA: perform abortions in violation of state law or risk losing billions in Medicare funding. The threatened "termination" of Medicare agreements is an extreme sanction, wholly disproportionate to hospitals' duties under Medicare. *See* Letter from Secretary Becerra to Health Care Providers 2 (July 11, 2022), https://perma.cc/PA63-LC2F. Consider the financial and public-health stakes. Medicare spending approached $1 trillion in 2022, exceeding federal Medicaid spending. *An Overview of Medicare*, KFF (Feb. 13, 2019), https://perma.cc/B4LD-CQUQ. Between 2018 and 2020, Idaho hospitals received $3.4 billion in Medicare funding, with $74 million for emergency departments. 3-ER-367-68. Roughly 390,000 Idahoans are Medicare enrollees who depend on Idaho's Medicare-participating hospitals for treatment. *Medicare Monthly Enrollment*, CMS (May 2024), https://perma.cc/VT38-F8V5. Terminating Medicare agreements with hospitals would create a financial and public-health crisis in Idaho, with the State left holding the bag.

The government's abortion condition is an impermissible "gun to the head." *NFIB*, 567 U.S. at 581. It is not even about "the use of the funds." *Id.* at 580. Nor does it reflect Congress's view of the "general Welfare." *Id.* Congress would not even use Medicare dollars to pay for the abortions that the government now says EMTALA requires and Idaho prohibits. *Supra* I.C.2. The government has no power to "pressur[e] the States to accept policy changes," *NFIB*, 567 U.S. at 580, especially those Congress itself rejects.

While Congress's power to spend encompasses the power to take away, *Oklahoma*, 330 U.S. at 143-44, conditions must be knowingly and voluntarily accepted and not unduly coercive, *NFIB*, 567 U.S. at 580. There is no enumerated power to place "state legislatures … under the direct control of Congress." *Murphy*, 584 U.S. at 474. Congress can "encourage the States" but not "compel the States." *New York*, 505 U.S. at 149. The preliminary injunction subverts those well-established limits of federal power.

### B. Construing EMTALA to require abortion invades Idaho's sovereignty contrary to the Tenth Amendment.

The government's preemption theory trespasses on Idaho's retained powers under the Tenth Amendment. It exceeds the federal government's

"few and defined" powers, The Federalist No. 45, at 313 (Madison) (Jacob E. Cooke ed., 1961), to rewrite EMTALA to say something that it does not and to force that rewrite on a non-consenting State. It ignores that States retain "broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014).

To alter that balance of power, the government must overcome clear-statement rules that preserve the Constitution's "system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). It has always been "a very serious measure" for the federal government "[t]o interfere with the penal laws of a State," "which Congress cannot be supposed to adopt lightly, or inconsiderately." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 443 (1821). Any "intention" to do so must "be clearly and unequivocally expressed." *Id.*; A. Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 153-54 (2010) (collecting additional cases). There must be "exceedingly clear language if [Congress] wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023). That clear-statement rule is consistent with the

presumption against preemption—"that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see, e.g.*, *Reid v. Colorado*, 187 U.S. 137, 147-50 (1902).

There is no clear statement in EMTALA's text to take away the States' authority to regulate lawful medical treatment, *supra* I.A-B, or otherwise require abortions beyond what state law permits, *supra* I.C-D. Without a clear statement, the Court should reject the government's arguments for "expansive federal authority to regulate medicine" contrary to "background principles of our federal system." *Gonzales v. Oregon*, 546 U.S. 243, 273-74 (2006) (rejecting "the notion that Congress would use such an obscure grant of authority" to displace Oregon's assisted suicide law). Abortion had historically been subject to differing schemes of state regulation. *See Dobbs*, 597 U.S. at 245-50 (tracing history); *see also Memphis Ctr. for Reprod. Health v. Slatery*, 14 F.4th 409, 448-49 (6th Cir. 2021) (Thapar, J., concurring in part and dissenting in part) (noting States enacted 90 abortion-related laws in the first half of 2021). When Congress adds its voice to those state laws, it does so overtly

and unambiguously, not silently or indirectly, and it does so with deference to state law. *Supra* I.C.2. Finding a silent abortion requirement in EMTALA's text would be contrary to those federal laws and make for the most "obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Gonzales*, 546 U.S. at 274.

The government has no power to exceed the statutory and constitutional limits of its federal power with this unprecedented lawsuit. Idaho waited nearly 50 years to reclaim the sovereign authority to legislate on abortion. The State did so after *Dobbs* "return[ed] the issue of abortion to the people's elected representatives." 597 U.S. at 232. Within weeks, the Government hauled Idaho into federal court and demanded its compliance with a newfound HHS abortion mandate nowhere in EMTALA's text. The government has no power to place state legislatures under its control. *See Murphy*, 584 U.S. at 474; *New York*, 505 U.S. at 176. Its novel preemption theory denies States and the American people the freedom to chart their own course. The people are "engaged in an earnest and profound debate" about the "morality" and "legality" of abortion or other sensitive medical procedures.

*Glucksberg*, 521 U.S. at 735. EMTALA does not preempt that debate. Idaho

remains free to govern itself with respect to abortion.

## CONCLUSION

The Court should reverse and vacate the preliminary injunction.


Dated this 13th day
of September, 2024

Daniel W. Bower
HILTY, BOWER,
 HAWS & SEABLE PLLC
1305 12th Ave. Rd.
Nampa, ID 83686
(208) 345-3333
dbower@hbhslaw.com

Respectfully submitted,

/s/ Taylor A.R. Meehan

Taylor A.R. Meehan
Daniel M. Vitagliano*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Supervised by principals of the firm
 licensed to practice in Virginia


*Counsel for Idaho Legislative Appellants*

**CERTIFICATE OF COMPLIANCE**

In compliance with Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32-1, I certify that according to the word count feature of the word processing program used to prepare this brief, this brief contains 13,946 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure Rule 32(f) and Circuit Rule 32-1, and complies with the typeface requirements and length limits of Federal Rule of Appellate Procedure Rule 32(a) and Circuit Rule 32-1.

Dated: September 13, 2024    *_/s/ Taylor A.R. Meehan_____*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing brief on September 13, 2024, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

*_/s/ Taylor A.R. Meehan_____*

# ADDENDUM OF STATUTORY PROVISIONS

| Statutory Provisions | Page |
|---|---|
| 42 U.S.C. §1395dd (current) | ADD-2 |
| 42 U.S.C. §1395 (current) | ADD-11 |
| Idaho Code §18-604 (current) | ADD-12 |
| Idaho Code §18-622 (current) | ADD-15 |

# 42 U.S.C. §1395dd

## (current)

## §1395dd. Examination and treatment for emergency medical conditions and women in labor.

### (a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

### (b) Necessary stabilizing treatment for emergency medical conditions and labor

#### (1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

> **(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> **(B)** for transfer of the individual to another medical facility in accordance with subsection (c).

#### (2) Refusal to consent to treatment

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c) Restricting transfers until individual stabilized**

**(1) Rule**

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual unless—

> **(A)(i)** the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,
>
> **(ii)** a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the information

available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

    **(iii)** if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

  **(B)** the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

**(2) Appropriate transfer**

An appropriate transfer to a medical facility is a transfer—

  **(A)** in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

  **(B)** in which the receiving facility—

    **(i)** has available space and qualified personnel for the treatment of the individual, and

    **(ii)** has agreed to accept transfer of the individual and to provide appropriate medical treatment;

**(C)** in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C)) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(D)** in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(E)** which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

**(d) Enforcement**

**(1) Civil money penalties**

**(A)** A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply with respect to a penalty or proceeding under section 1320a-7a(a) of this title.

**(B)** Subject to subparagraph (C), any physician who is responsible for the examination, treatment, or transfer of an individual in a

participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who—

   **(i)** signs a certification under subsection (c)(1)(A) that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or

   **(ii)** misrepresents an individual's condition or other information, including a hospital's obligations under this section,

is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a-7a of this title (other than the first and second sentences of subsection (a) and subsection (b)) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a-7a(a) of this title.

**(C)** If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (B). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2) Civil enforcement**

**(A) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility**

Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions**

No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**(3) Consultation with quality improvement organizations**

In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate quality improvement organization (with a contract under part B of subchapter XI) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the

Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B.

**(4) Notice upon closing an investigation**

The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under this section is closed.

**(e) Definitions**

In this section:

**(1)** The term "emergency medical condition" means—

**(A)** a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

**(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

**(ii)** serious impairment to bodily functions, or

**(iii)** serious dysfunction of any bodily organ or part; or

**(B)** with respect to a pregnant woman who is having contractions—

**(i)** that there is inadequate time to effect a safe transfer to another hospital before delivery, or

**(ii)** that transfer may pose a threat to the health or safety of the woman or the unborn child.

**(2)** The term "participating hospital" means a hospital that has entered into a provider agreement under section 1395cc of this title.

**(3)(A)** The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), to deliver (including the placenta).

**(B)** The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(B), that the woman has delivered (including the placenta).

**(4)** The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

**(5)** The term "hospital" includes a critical access hospital (as defined in section 1395x(mm)(1) of this title) and a rural emergency hospital (as defined in section 1395x(kkk)(2) of this title).

**(f) Preemption**

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

**(g) Nondiscrimination**

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

**(h) No delay in examination or treatment**

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

**(i) Whistleblower protections**

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

# 42 U.S.C. §1395

## (current)

### §1395. Prohibition against any Federal interference.

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

# Idaho Code §18-604. Definitions.

## (current)

As used in this chapter:

**(1)** "Abortion" means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean:

    **(a)** The use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization, or the implantation of a fertilized ovum within the uterus;

    **(b)** The removal of a dead unborn child;

    **(c)** The removal of an ectopic or molar pregnancy; or

    **(d)** The treatment of a woman who is no longer pregnant.

**(2)** "Department" means the Idaho department of health and welfare.

**(3)** "Down syndrome" means a chromosomal disorder associated either with an extra chromosome 21, in whole or in part, or an effective trisomy for chromosome 21. Down syndrome is sometimes referred to as "trisomy 21."

**(4)** "Emancipated" means any minor who has been married or is in active military service.

**(5)** "Fetus" and "unborn child." Each term means an individual organism of the species Homo sapiens from fertilization until live birth.

**(6)** "First trimester of pregnancy" means the first thirteen (13) weeks of a pregnancy.

**(7)** "Hospital" means an acute care general hospital in this state, licensed as provided in chapter 13, title 39, Idaho Code.

**(8)** "Informed consent" means a voluntary and knowing decision to undergo a specific procedure or treatment. To be voluntary, the decision must be made freely after sufficient time for contemplation and without coercion by any person. To be knowing, the decision must be based on the physician's accurate and substantially complete explanation of:

    **(a)** A description of any proposed treatment or procedure;

    **(b)** Any reasonably foreseeable complications and risks to the patient from such procedure, including those related to reproductive health; and

    **(c)** The manner in which such procedure and its foreseeable complications and risks compare with those of each readily available alternative to such procedure, including childbirth and adoption.

The physician must provide the information in terms that can be understood by the person making the decision, with consideration of age, level of maturity and intellectual capability.

**(9)** "Medical emergency" means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

**(10)** "Minor" means a woman under eighteen (18) years of age.

**(11)** "Pregnant" and "pregnancy." Each term shall mean the reproductive condition of having a developing fetus in the body and commences with fertilization.

**(12)** "Physician" means a person licensed to practice medicine and surgery or osteopathic medicine and surgery in this state as provided in chapter 18, title 54, Idaho Code.

**(13)** "Second trimester of pregnancy" means that portion of a pregnancy following the thirteenth week and preceding the point in time when the fetus becomes viable, and there is hereby created a legal presumption that the second trimester does not end before the commencement of the twenty-fifth week of pregnancy, upon which presumption any licensed physician may proceed in lawfully aborting a patient pursuant to section 18-608, Idaho Code, in which case the same shall be conclusive and unrebuttable in all civil or criminal proceedings.

**(14)** "Third trimester of pregnancy" means that portion of a pregnancy from and after the point in time when the fetus becomes viable.

**(15)** Any reference to a viable fetus shall be construed to mean a fetus potentially able to live outside the mother's womb, albeit with artificial aid.

# Idaho Code §18-622. Defense of Life Act.

## (current)

**(1)** Except as provided in subsection (2) of this section, every person who performs or attempts to perform an abortion as defined in this chapter commits the crime of criminal abortion. Criminal abortion shall be a felony punishable by a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison. The professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense.

**(2)** The following shall not be considered criminal abortions for purposes of subsection (1) of this section:

    **(a)** The abortion was performed or attempted by a physician as defined in this chapter and:

        **(i)** The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman. No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and

        **(ii)** The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman. No such greater risk shall be deemed to

exist because the physician believes that the woman may or will take action to harm herself; or

(b) The abortion was performed or attempted by a physician as defined in this chapter during the first trimester of pregnancy and:

(i) If the woman is not a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman has reported to a law enforcement agency that she is the victim of an act of rape or incest and provided a copy of such report to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws; or

(ii) If the woman is a minor or subject to a guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has reported to a law enforcement agency or child protective services that she is the victim of an act of rape or incest and a copy of such report has been provided to the physician who is to perform the abortion. The copy of the report shall remain a confidential part of the woman's medical record subject to applicable privacy laws.

(3) If a report concerning an act of rape or incest is made to a law enforcement agency or child protective services pursuant to subsection (2)(b) of this section, then the person who made the report shall, upon request, be entitled to receive a copy of such report within seventy-two (72) hours of the report being made, provided that the report may be redacted as necessary to avoid interference with an investigation.

(4) Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section.

**(5)** Nothing in this section shall be construed to subject a pregnant woman on whom any abortion is performed or attempted to any criminal conviction and penalty.