**Nos. 23-35440 & 23-35450**

IN THE

# United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE,

*v.*

THE STATE OF IDAHO,

DEFENDANT-APPELLANT.

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE,

*v.*

THE STATE OF IDAHO,

DEFENDANT,

*v.*

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF REPRESENTATIVES, ET AL.,

INTERVENORS-APPELLANTS.

*On Appeal from the United States District Court for the District of Idaho,*
No. 1:22-cv-00329-BLW

**BRIEF FOR THE AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS AS AMICUS CURIAE IN SUPPORT OF APPELLANTS**

JUDD E. STONE II
 *Counsel of Record*
CHRISTOPHER D. HILTON
ARI CUENIN
STONE HILTON PLLC
P.O. Box 150112
Austin, Texas 78715
judd@stonehilton.com
(737) 465-7248

*Counsel for Amicus Curiae*

## DISCLOSURE STATEMENT

Amicus is a nongovernmental corporation. Amicus has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

/s/ *Judd E. Stone II*
Judd E. Stone II

# TABLE OF CONTENTS

Disclosure Statement .................................................................i

Table of Contents .....................................................................ii

Table of Authorities................................................................ iii

Identity and Interest of Amicus Curiae.....................................1

Summary of Argument..............................................................2

Argument...................................................................................6

   I.   Induced Abortions Are Not Necessary Emergency Medical Care Required by EMTALA. .......................................................7

      A.   As commonly used, the term "abortion" refers to an induced abortion, not to a procedure designed to preserve life during an emergency.........................................................8

      B.   Induced abortions are not necessary medical care for the stabilization and transfer of patients. ..................................13

   II.   State Laws Regulating Induced Abortions Do Not Conflict with EMTALA. .........................................................................23

      A.   EMTALA is silent on abortion except to recognize that the pre-born child is also a patient. ..........................................24

      B.   EMTALA does not preempt the Idaho Defense of Life Act..26

      C.   At a minimum, statutory-interpretation principles militate against holding that EMTALA preempts all state abortion laws..................................................................................29

   III.   Maternal Mortality and Women's Health Provider Shortages Will Not Be Solved by Mandating Emergency Room Abortions. ........................................................................................33

Conclusion ............................................................................38

# TABLE OF AUTHORITIES

**Cases**

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................ passim

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) .................................................................... 16

*Marshall v. E. Carroll Parish Hosp. Serv. Dist.*,
  134 F.3d 319 (5th Cir. 1998) ................................................ 23, 29

*Moyle v. United States*,
  144 S. Ct. 2015 (2024) (Nos. 23-726 & 23-727),
  https://www.oyez.org/cases/2023/23-726 .......................... 17, 19, 21, 22

*Simmons v. Himmelreich*,
  578 U.S. 621 (2016) .................................................................... 30

*Texas v. Becerra*,
  623 F. Supp. 3d 696 (N.D. Tex. 2022), *aff'd*, *Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) .............................................. 31, 32, 33

*United States v. Idaho*,
  Nos. 23-35440, 23-35450 (9th Cir. filed Sept. 19, 2023) ...................... 10

*Util. Air Reg. Grp. v. EPA*,
  573 U.S. 302 (2014) .................................................................... 31

*West Virginia v. EPA*,
  597 U. S. 697 (2022) .............................................................. 30, 31

**Statutes**

42 U.S.C. § 1395dd(b) ...................................................................... 23

42 U.S.C. § 1395dd(b)(1) .................................................................. 24

42 U.S.C. § 1395dd(b)(1)(A) ................................................................ 6

42 U.S.C. § 1395dd(c)(1)(A)(ii) .......................................................... 25

42 U.S.C. § 1395dd(c)(2)(A) ............................................................... 25

42 U.S.C. § 1395dd(e)(1)(A) ............................................................... 28

42 U.S.C. § 1395dd(e)(1)(A)(i) ................................................25

42 U.S.C. § 1395dd(e)(1)(B)(ii) ..............................................25

42 U.S.C. § 1395dd(f)......................................................25, 30

**State Statutes**

Idaho Code § 18-604(1)........................................................27

Idaho Code § 18-604(1)(a)-(d) ..............................................27

Idaho Code § 18-622(1)(b) ...................................................27

Idaho Code § 18-622(2)(a)(i) ...........................................27, 28

Idaho Code § 18-622(2)(a)(ii) ...............................................27

Tex. Health & Safety Code § 170A.002(b) ...........................32

Tex. Health & Safety Code § 170A.002(b)(3)(A)-(B) ..............32

**Other Authorities**

"Abortion," Wex, Legal Information Inst., Cornell L. Sch., https://www.law.cornell.edu/wex/abortion............................10

Ariel Sklar et al., *Maternal Morbidity After Preterm Premature Rupture of Membranes at <24 Weeks' Gestation*, Am. J. Obstetrics & Gynecology, 226:558.e1-11 (Apr. 2022)................................14

Black's Law Dictionary (11th ed. 2019)................................10

CDCs Abortion Surveillance System FAQs, CDC.gov, https://www.cdc.gov/reproductivehealth/data_stats/abortion.htm .......9

Certification and Compliance for the Emergency Medical Treatment and Labor Act (EMTALA), CMS.gov, https://www.cms.gov/medicare/provider-enrollment-and-certification/certificationandcomplianc/downloads/emtala.pdf...........24

Clarification of Abortion Restrictions, AAPLOG.org (July 14, 2022), https://aaplog.org/aaplog-statement-clarification-of-abortion-restrictions/..........................................................11

iv

Cohen et al., *Septic Abortion with Renal Failure Treated by Hysterectomy*, 19 SOUTH AFRICAN MED. J. 319 (1978) https://pubmed.ncbi.nlm.nih.gov/568828/ ..................................... 18, 19

Daskalakis et al., *Emergency Obstetric Hysterectomy*, 86 ACTA OBSTETRICIA ET GYNECOLOGICA SCANDINAVICA 223 (2007) https://pubmed.ncbi.nlm.nih.gov/17364287/ ....................................... 18

David C. Reardon et al., *Short and Long Term Mortality Rates Associated with First Pregnancy Outcome: Population Register Based Study for Denmark 1980-2004*, Med. Sci. Monit. 18(9):PH71-76 (Sept. 1, 2012), http://www.medscimonit.com/fulltxt.php?ICID=883338 .............. 35, 36

de Jong & Venter, *Hysterectomy for Septic Abortion: Is Bilateral Salpingo Oophorectomy Necessary?*, 17 SOUTH AFRICAN MED. J. 291 (1988) https://pubmed.ncbi.nlm.nih.gov/3047888/ ............................. 19

Guide to Language and Abortion, ACOG.org, https://www.acog.org/contact/media-center/abortion-language-guide (last visited Feb. 27, 2024) ..................................................... 9

https://www.acog.org/-/media/project/acog/ acogorg/files/advocacy/amicus-briefs/2023/20230919-us-v-idaho.pdf ("ACOG Br.") ................................................................. passim

Letter from Sally K. Richardson, HHS.gov (Feb. 12, 1998), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/smd021298_213.pdf ......................................... 11

Mika Gissler et al., *Injury Deaths, Suicides and Homicides Associated with Pregnancy, Finland 1987-2000*, Eur. J. Pub. Health, 15(5):459-63 (2005) ........................................................................ 36, 37

National Vital Statistics System, Provisional Maternal Death Counts, CDC.gov, https://www.cdc.gov/nchs/nvss/vsrr/provisional-maternal-deaths.htm ........................................................................ 35

Practice Bulletin no. 217, Prelabor Rupture of Membranes, ACOG.org (Mar. 2020), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2020/03/prelabor-rupture-of-membranes .................. 14

Practice Guideline no. 10, Concluding Pregnancy Ethically, AAPLOG.org (Aug. 2022), https://aaplog.org/wp-content/uploads/2023/04/PG-10-Concluding-Pregnancy-Ethically-updated.pdf...........................................................................................15

*Prelabor Rupture of Membranes,* ACOG PRACTICE BULLETIN NO. 217 (2020) https://pubmed.ncbi.nlm.nih.gov/32080050/............................20

Sarka Lisonkova et al., *Incidence and Risk Factors for Severe Preeclampsia, Hemolysis, Elevated Liver Enzymes, and Low Platelet Count Syndrome, and Eclampsia at Preterm and Term Gestation: a Population-Based Study*, Am. J. Obstetrics & Gynecology 538.e1-19, 538.e7 fig. 1 (Nov. 2021)....................................................................16

Sheila, Desai et al., *Estimating Abortion Provision and Abortion Referrals Among United States Obstetrician-Gynecologists in Private Practice*, Contraception 97(4):297-302 (Apr. 2018)..............................38

## IDENTITY AND INTEREST OF AMICUS CURIAE

The American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG") exists to encourage and equip its more than 7000 members and other concerned medical practitioners to provide an evidence-based rationale for defending the lives of both a pregnant mother and her pre-born child. AAPLOG seeks to inform the medical community, policymakers, and the public on the importance of the Hippocratic Oath, which respects the dignity of all human life and which prohibits the taking of a life—even the life of a pre-born child—by any medical practitioner.

Practitioners across the nation provide effective, evidence-based emergency care to pregnant women on a daily basis without resorting to induced abortions. AAPLOG has a strong interest in providing the Court with the details of that care and how federal law does not mandate the provision of induced abortions. AAPLOG's members likewise have strong interests in their continued ability to provide this critically important care consistent with their medical judgments and deeply held ethical and moral beliefs. Accordingly, AAPLOG respectfully submits this brief as amicus curiae with the hope that it will assist the Court in resolving the

1

question presented in the manner that protects all patients, including the unborn, using evidence-based approaches to managing emergencies during pregnancy.

Amicus has authority to file this Brief because all parties have consented to Amicus's participation.[*]

## SUMMARY OF ARGUMENT

I.    The Supreme Court has returned the power to regulate abortion to the States. Efforts to displace state abortion regulations based on EMTALA rely on a linguistically faulty understanding of the term "abortion" and a factually erroneous description of the nature of emergency medical care. An induced abortion intends to end pre-born life; emergency care intends to save it. EMTALA requires the latter, not the former. By definition, measures taken to save the mother, the pre-born child, or both are not considered "abortions" in either common or medical parlance. The effort to blur this terminology is nothing more than a misguided attempt to both normalize induced abortions and to

---

[*] No counsel for any party authored this brief, in whole or in part, nor did counsel for any party or either party make a monetary contribution intended to fund this brief in whole or part. No person or entity other than amicus and counsel for amicus contributed monetarily to this brief's preparation or submission.

conscript EMTALA into requiring the provision of those abortions nationwide.

Moreover, the argument that induced abortions are required for the stabilization and transfer of patients is medically insupportable. Proponents of EMTALA-mandated abortions identify a handful of medical conditions supposedly requiring an induced abortion. But in each case, they misstate the range of treatment options for these conditions, the risks to the mother, the legal implications of the pregnancy complication, or all of the above. That alone is reason enough to reject the argument that EMTALA mandates induced abortions.

II.     In any event, this Court should reject atextual attempts to preempt the laws of Idaho and other States by using EMTALA. EMTALA itself repudiates the challengers' arguments in the abortion context because it is altogether silent on the subject. To the extent EMTALA contains anything indicating Congress's intent with respect to abortion, the statute recognizes that a pre-born child is a patient requiring emergency medical care. And Congress disclaimed any broad preemptive effect by limiting federal supremacy over only those state laws that *directly* conflict with EMTALA. Nothing in EMTALA requires that

hospitals with federally funded emergency rooms provide induced abortions on demand.

Nor does EMTALA preempt Idaho's law, which does not *directly* conflict with EMTALA. Idaho defines abortion consistent with that term's historical and medical usage and imposes prohibitions with certain exceptions. In situations where the life of the mother is genuinely imperiled, Idaho law permits abortions consistent with EMTALA. And permitting the exercise of medical judgment by practitioners in Idaho and other States that an induced abortion is unnecessary does not directly conflict with EMTALA. Only those physicians who induce abortions that are not medically necessary to prevent maternal death or that are justified in bad faith are subject to penalty under Idaho law.

At a minimum, sound principles of statutory interpretation counsel against holding that EMTALA preempts *all* state abortion laws. At least two statutory-interpretation principles suggest that this Court should resolve the question presented narrowly. First, permitting courts to analyze other state abortion laws comports with Congress's intentional choice to limit preemption only to instances of laws that *directly* conflict with EMTALA. Second, the major questions presented by abortion are

ill-suited to blanket rules. Rather, consistent with the Supreme Court's pronouncement that policy choices about abortion must be made by States, this Court should reject a one-size-fits-all approach to preemption.

III. Some organizations who support a federal abortion mandate argue for the categorical preemption of state abortion laws on pure policy grounds. Specifically, they argue that federally mandated emergency-room abortions are necessary to reduce maternal mortality rates and shortages of women's health providers. The Court should reject such policy arguments as grounds for preemption. Maternal mortality, although a serious concern in this country, is not driven by access to induced abortions—if anything, research indicates that induced abortions *increase* risks of maternal mortality. Nor are the complex reasons that a provider shortage could arise in a particular city or State amenable to nationwide resolution. Rather, as the Supreme Court has recognized, policy concerns such as these should be carefully studied and addressed by the States, not through a nationwide emergency-room abortion mandate.

## ARGUMENT

The Emergency Medical Treatment and Active Labor Act (EMTALA) requires hospital emergency rooms to provide an individual with an emergency medical condition with such "staff and facilities available at the hospital." 42 U.S.C. § 1395dd(b)(1)(A). It does not require emergency rooms to provide services that are not otherwise available at that hospital—even when those services are not available because of state law. Accordingly, EMTALA does not create a federal right to abortion in emergency rooms across the nation, as Idaho explains. And in any event, Idaho's Defense of Life Act permits abortion in life-threatening circumstances, so any purported conflict with EMTALA's emergency-services mandate on that basis is illusory. Beyond that narrow context, an abortion is never necessary emergency medical care—and contrary to the United States' suggestion below, there are other stabilizing treatments for a host of non-life-threatening conditions that pregnant women may face. There is neither a legal nor practical conflict between EMTALA and Idaho's Defense of Life Act, and therefore no basis for this Court to hold the latter preempted by the former.

I.   **Induced Abortions Are Not Necessary Emergency Medical Care Required by EMTALA.**

Supporters of the United States' novel abortion mandate blur medical terms together to group induced abortions (procedures or therapies that intend the death of the embryonic or fetal human being)— which are never medically necessary emergency care—with other, common medical occurrences, such as miscarriages. This blurred terminology is necessary to recast induced abortions as banal medical procedures that are commonly required in emergency situations. They are not.

The United States' effort to sweep aside state laws designed to limit induced abortions depends on this linguistic sleight of hand. That is because an "abortion" as contemplated by the common use of that term— more precisely referred to as an "induced abortion"—is designed to end a pre-born child's life. When a medical emergency arises, the procedures undertaken are designed to save mother, child, or both, and such procedures are not "abortions" or "induced abortions," in either popular parlance or medical terminology.

**A.   As commonly used, the term "abortion" refers to an induced abortion, not to a procedure designed to preserve life during an emergency.**

The Court should reject any definitions that falsely equate "abortion" with emergency interventions for women. An induced abortion—which historically would have been called an elective abortion—is properly understood as any treatment or intervention that is employed with the primary intent to end the life of the human being in the womb. These abortions are the target of the Hyde Amendment and state abortion restrictions. Importantly, an induced abortion is not the treatment of miscarriage or an ectopic pregnancy, nor is it the separation of the mother and the pre-born child at any gestational age to save a mother's life. There are no laws in any State in the United States— including Idaho—which criminalize the treatment of any of those conditions, nor would most medical practitioners generally refer to the treatment of these conditions or such a separation as an induced abortion.

The Centers for Disease Control and Prevention ("CDC") defines the standalone term "abortion" similarly. According to the CDC, an abortion is an intervention "that is intended to terminate a suspected or

known intrauterine pregnancy and that does not result in a live birth," excluding "intrauterine fetal death, early pregnancy failure/loss, ectopic pregnancy, or retained products of conception." CDCs Abortion Surveillance System FAQs, CDC.gov, https://www.cdc.gov/reproductivehealth/data_stats/abortion.htm (last visited Feb. 27, 2024). In other words, the CDC's definition of an abortion contains two components: (1) it must be intended to terminate an intrauterine pregnancy, and (2) it excludes various situations and procedures where baby and mother are separated to treat the mother's life-threatening conditions.

Others, however, have tried to distort the common meaning of "abortion" to transform EMTALA into a federal abortion mandate. For example, the American College of Obstetricians and Gynecologists ("ACOG") in its "Guide to Language and Abortion" now defines an "abortion" as "a medical intervention provided to individuals who need to end the medical condition of pregnancy." Guide to Language and Abortion, ACOG.org, https://www.acog.org/contact/media-center/abortion-language-guide (last visited Feb. 27, 2024). They have even gone so far as to claim that this is a "medical" definition. *See* Br. of

ACOG at 21, *United States v. Idaho*, Nos. 23-35440, 23-35450 (9th Cir. filed Sept. 19, 2023), https://www.acog.org/-/media/project/acog/acogorg/files/advocacy/amicus-briefs/2023/20230919-us-v-idaho.pdf ("ACOG Br."). But the term "abortion" has longstanding lay and medical meanings, and the Court should reject ACOG's legally convenient but medically and historically spurious definition.

**1.** The term "abortion" is commonly used in lay language, including in legal contexts, to refer to the intentional killing of the pre-born child. For example, Black's Law Dictionary defines "abortion" as "[a]n artificially induced termination of a pregnancy for the purpose of destroying an embryo or fetus." Black's Law Dictionary (11th ed. 2019); *see also* "Abortion," Wex, Legal Information Inst., Cornell L. Sch., https://www.law.cornell.edu/wex/abortion (last visited Feb. 26, 2024) ("Abortion is the voluntary termination of a pregnancy."). Likewise, the Hyde Amendment and related guidance from U.S. Department of Health & Human Services note that federal funds cannot be expended on "abortion," with exceptions for rape, incest, and the life of the mother. *See, e.g.*, Letter from Sally K. Richardson, HHS.gov (Feb. 12, 1998),

https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-

documents/smd021298_213.pdf.

**2.** In medical parlance, there are uses of the term "abortion" that refer to situations other than the voluntary termination of a pregnancy, but these uses fall within well-understood situations that no medical practitioner would confuse for an induced abortion. For example, what most people would describe as a "miscarriage" is commonly medically identified as a "spontaneous abortion." An "incomplete abortion" can refer to a miscarriage that was not complete, that is, some embryonic or fetal tissue remains inside the uterus. A "threatened abortion" is a pregnancy that is at risk of not surviving. And so on. *See* Clarification of Abortion Restrictions, AAPLOG.org (July 14, 2022), https://aaplog.org/aaplog-statement-clarification-of-abortion-restrictions/.

Another indicator of the weakness of ACOG's proposed definition of an abortion is that it stretches the term beyond any sensible limit. According to ACOG, a scheduled cesarean delivery or medically induced labor of a full-term pregnancy is an "abortion." After all, a cesarean surgery or the administration of medication to induce labor are both

"intervention[s]" that "end the medical condition of pregnancy." ACOG also includes within its definition "the administration of medication to women already experiencing a miscarriage." ACOG Br. at 21. In other words, by caring for women whose pregnancies are in the process of ending *without* any external intervention by a medical professional, a doctor would be performing an "abortion."

That understanding is plainly wrong, in no small part because neither the mother nor the doctor in that scenario has done anything to intentionally bring about the death of the child. Such semantic contortions are nothing more than attempts to both normalize induced abortions and to conscript federal law into requiring the provision of those abortions nationwide. But adherence to the long-established understanding of the term "abortion" matters. The distinction of whether the termination of a pregnancy is the result of a procedure intended to end a preborn child's life, or instead that end comes about incidentally or because of some other medical circumstance, makes an immense difference to the significance of that procedure legally, medically, and ethically.

12

**B.    Induced abortions are not necessary medical care for the stabilization and transfer of patients.**

**1.** Doctors who treat pregnant women have two patients: the mother and the pre-born child. Any procedure that results in the death of one of these patients must therefore be justifiable on the basis of true necessity—that is to say, not an induced abortion. Proponents of the United States' abortion mandate have identified a number of pregnancy complications that they claim will require emergency abortions under EMTALA's mandates. *See, e.g.*, ACOG Br. at 15-16. But in each case, ACOG misstates the treatment options, the risks to the mother, the legal implications of the pregnancy complication, or all of the above. For example:

**a.** Preterm premature rupture of membranes (PPROM) is a condition that refers to a rupture of the amniotic sac that contains the fetus before the pregnancy has reached full term and before the onset of labor. Others have suggested that there are no alternatives to abortion for this condition, or that the risks to the pregnant woman are so extreme that an abortion is the only reasonable choice. *See, e.g.*, *id.* at 9, 15. But an abortion is not the only possible treatment in lieu of delivery. "Expectant management," which involves the close supervision of the

mother and child for signs of infection, placental abruption, fetal distress, and other complications, is well-recognized as a viable alternative to the immediate termination of pregnancy in a stable patient. A significant proportion of women can give birth without suffering any significant negative health impacts, even when the membranes rupture at very early stages of pregnancy. *See, e.g.*, Ariel Sklar et al., *Maternal Morbidity After Preterm Premature Rupture of Membranes at <24 Weeks' Gestation*, Am. J. Obstetrics & Gynecology, 226:558.e1-11 (Apr. 2022) (noting that 15.7% of women "avoided morbidity and had a neonate who survived to discharge"). Even ACOG, which has a long history of promoting abortion, recognizes expectant management as a viable approach to handling this condition. *See, e.g.*, Practice Bulletin no. 217, Prelabor Rupture of Membranes, ACOG.org (Mar. 2020), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2020/03/prelabor-rupture-of-membranes.

**b.** Miscarriage, as noted above, is another common pregnancy outcome that results in the loss of the pregnancy without any intentional actions by a medical professional. In no sense is an "abortion" being performed when a miscarriage is managed because the embryo or fetus

14

has already died. Accordingly, AAPLOG does not consider miscarriage treatment to constitute an "abortion" as a medical matter. *See* Practice Guideline no. 10, Concluding Pregnancy Ethically, AAPLOG.org (Aug. 2022), https://aaplog.org/wp-content/uploads/2023/04/PG-10-Concluding-Pregnancy-Ethically-updated.pdf.

**c.** Excessive bleeding does not necessarily require induced abortion either. This condition is not an uncommon occurrence in pregnancy that can have a variety of causes, some of which are life-threatening and some of which are not. Emergency interventions for life-threatening bleeding are allowed under Idaho law (consistent with existing EMTALA law) and do not require expansion of EMTALA to allow for elective induced abortions. So this condition has no bearing on the question presented.

**d.** Gestational hypertension and preeclampsia are potentially life-threatening conditions for the mother in severe cases and are often treated as emergencies and managed aggressively. For preeclampsia in particular, delivery is the most effective treatment. These conditions, however, rarely arise in the early stages of pregnancy prior to fetal viability. *See, e.g.*, Sarka Lisonkova et al., *Incidence and Risk Factors for Severe Preeclampsia, Hemolysis, Elevated Liver Enzymes, and Low*

15

*Platelet Count Syndrome, and Eclampsia at Preterm and Term Gestation: a Population-Based Study*, Am. J. Obstetrics & Gynecology 538.e1-19, 538.e7 fig. 1 (Nov. 2021) (graph showing less than a 0.05/1000 risk of preeclampsia even at 24 weeks, and risk clearly increases with increasing gestational age). Given that these conditions are life-threatening for the mother and nearly always present at later stages of fetal development, there is little risk of any conflict between any state law any federal requirement, much less a conflict sufficient to justify the heavy burden for facial relief against Idaho's Defense of Life Act. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007) (rejecting facial challenge to the federal Partial Birth Abortion Ban Act while preserving possibility for an as-applied challenge).

**e.** Placental abruption is another condition that can present life-threatening risks to the mother, and depending on the stage of pregnancy, can result in miscarriage or stillbirth. Accordingly, as with other conditions, the pregnancy care at issue will not constitute an "abortion" or will fall within Idaho's life-of-the-mother exception.

**f.** Finally, one further category of conditions relates to the "mental and emotional well-being of patients and their families." ACOG Br. at 22.

16

The mental health of a pregnant woman can require careful monitoring and treatment, and pregnant women can and do have mental health emergencies. But the suggestion that a pregnant woman's "emotional well-being" can suffice to justify an "emergency" abortion that kills a pre-born child stretches medical ethics and EMTALA far beyond their outermost possible reach and is not an evidence-based claim.

**2.** A few other medical scenarios warrant discussion, but none militate for the United States's position that EMTALA requires the provision of abortions beyond what Idaho law allows. At oral argument before the Supreme Court, some of the Justices were concerned that an induced abortion might be the medically appropriate standard of care for a situation in which a woman's pregnancy complications might result in the loss of reproductive organs. *See, e.g.*, Oral Argument at 17:10, 34:37, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (Nos. 23-726 & 23-727), https://www.oyez.org/cases/2023/23-726.

Such a risk, although uncommon, most likely results from either massive hemorrhage or sepsis. Daskalakis et al., *Emergency Obstetric Hysterectomy*, 86 ACTA OBSTETRICIA ET GYNECOLOGICA SCANDINAVICA 223 (2007) https://pubmed.ncbi.nlm.nih.gov/17364287/. Either of these can

result not only from a complication of pregnancy, but from an abortion. Cohen et al., *Septic Abortion with Renal Failure Treated by Hysterectomy*, 19 SOUTH AFRICAN MED. J. 319 (1978) https://pubmed.ncbi.nlm.nih.gov/568828/. In some cases, the treatment may be a life-saving hysterectomy. If Cesarean extraction of the pre-born child, along with reproductive organs, is, in that circumstance, necessary to save the life of the mother, it would be permissible under Idaho law and should not be labeled an induced abortion. In the event of sepsis in the first or second trimester, for example from PPROM, the appropriate intervention might include evacuation of the uterus, either by inducing labor, performing a cesarean section, or other means. Such interventions, which may or may not include a hysterectomy, would be permissible under Idaho law because they are necessary to save the mother's life.

Indeed, any medical scenario that presents a risk that the mother might lose her reproductive organs is complex and inherently unpredictable. It is impossible to paint with a broad brush and say that terminating the pregnancy is the necessary and appropriate course in such a scenario, both because that generalization includes assumptions about the course of the medical issue and responses to treatments, and

because it assumes that there is no comparable risk from termination. Both are dangerous assumptions, and the latter disregards the fact that every case is unique and that induced abortions do sometimes result in the tragic loss of reproductive organs. *Id.*; de Jong & Venter, *Hysterectomy for Septic Abortion: Is Bilateral Salpingo Oophorectomy Necessary?*, 17 SOUTH AFRICAN MED. J. 291 (1988) https://pubmed.ncbi.nlm.nih.gov/3047888/. In certain cases, the appropriate course is to induce delivery, even knowing that a baby is very likely or certain to die. But such a course of treatment cannot be called an abortion and is allowed under Idaho law in any event. Moreover, abortion is not the appropriate treatment for any condition at any time after fetal viability; rather, the appropriate treatment is delivery.

Similarly, the Justices' concerns about the appropriate treatment for PPROM are overstated. Oral Argument at 20:30, *Moyle*, 144 S. Ct. 2015. Consider, for example, a hypothetical case in which a woman with PPROM is discharged from the hospital because physicians felt that they could not justify an abortion. In that hypothetical, assume that the woman bled and passed out the next day and had to be taken back to the hospital for an emergency operation. The physicians' error in such a case

is not the failure to terminate the pregnancy when the woman first presented—the error is discharging a woman who should have been admitted for observation and management. *Prelabor Rupture of Membranes,* ACOG PRACTICE BULLETIN NO. 217 (2020) https://pubmed.ncbi.nlm.nih.gov/32080050/. Had this hypothetical woman been admitted and properly cared for, she would never have come so close to tragedy.

Furthermore, with regard to EMTALA's use of the phrase "serious jeopardy," that phrase is best understood, medically, as a present risk. A risk of future serious jeopardy, of course, also requires medical intervention, and mothers facing such a risk should be evaluated, treated, and monitored, not subjected to an abortion. The options are not limited to either terminating the pregnancy or doing nothing—many other courses of treatment are available. When termination, cesarean delivery, or hysterectomy becomes necessary as part of a course of treatment, such treatment should not be considered an abortion and is allowed under Idaho law.

When it comes to EMTALA's use of the phrases "impairment to bodily functions" or "serious dysfunction of any bodily organ," the

Justices were interested to know whether these phrases refer to permanent or temporary impairments. Oral Argument at 01:09:34, *Moyle*, 144 S. Ct. 2015. Physicians cannot always know in advance the severity of any future prognosis or of any future complications and aftereffects. Thus, both EMTALA and Idaho's law permit physicians to use their medical judgment to determine what "could be reasonably expected to result" from the "absence of medical attention," including the absence of termination, and to again deploy that judgment to determine whether termination, cesarean delivery, hysterectomy, or some other course of treatment is appropriate.

Finally, Justice Barrett posed the following question to the United States:

> Let's imagine a situation in which a woman is 10 weeks and is told that "if you carry this pregnancy to term, it could have consequences for your health, but you would just need to abort before 15 weeks," for example. So there's not an immediacy, she's stable when she leaves the hospital. What is the federal government's position then?

*Id.* at 01:20:43. In that scenario, there is no emergency and no condition that requires stabilization as EMTALA requires. Such a mother would likely have, for example, a serious heart or renal condition, or sickle cell

21

disease. These conditions present considerable risks later in pregnancy and postpartum, and the care of both mother and baby would be coordinated by a team of specialists, working together to minimize risks, monitor both patients, and provide appropriate treatments.

If the team of specialists concludes that the continuation of the pregnancy poses a serious risk to the woman's life, then Idaho law permits abortion in this rare situation. However, if these risks usually arise after viability, the preferred course of treatment is delivery. Thus, if and when an emergency arises, intervention will usually involve cesarean delivery of the late-term, viable baby. In the unlikely event that termination or hysterectomy is necessary, such treatment would not be considered an abortion and would be permitted under Idaho law.

**3.** In the face of any of these potential pregnancy complications or others, EMTALA requires only the stabilization and transfer of the patient and her pre-born child, not necessarily a complete resolution of the underlying medical condition presented to the treating physician during the emergency. 42 U.S.C. § 1395dd(b). Each woman's regular physician who has been consulting with her throughout her pregnancy should be involved and consulted regarding the proper clinical

management of any condition that arises whenever possible. EMTALA does not create a national standard of care and "was not intended to be used as a federal malpractice statute, but instead was enacted to prevent 'patient dumping.'" *Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (citing cases). That statute does not abrogate the power that the Supreme Court has "return[ed]" to the States: the power to decide whether to allow induced abortions. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022). A nationwide mandate requiring all States to allow induced abortions does not merely frustrate the return of that power; it nullifies it. Fortunately, EMTALA requires no such thing.

## II. State Laws Regulating Induced Abortions Do Not Conflict with EMTALA.

The United States' attempt to preempt Idaho's laws using EMTALA is misguided and atextual. EMTALA does not speak to abortion at all; indeed, to the extent EMTALA contains anything informative on the topic of abortion, it recognizes that a pre-born child is a *patient* requiring care in Medicaid-funded emergency rooms. This broad silence on the topic of abortion does nothing to justify facial relief against Idaho's law, let alone the setting aside of *every* state law regulating induced abortions.

A. **EMTALA is silent on abortion except to recognize that the pre-born child is also a patient.**

EMTALA "requires hospitals with emergency departments to provide a medical screening examination to any individual who comes to the emergency department and requests such an examination, and prohibits hospitals with emergency departments from refusing to examine or treat individuals with and emergency medical condition." Certification and Compliance for the Emergency Medical Treatment and Labor Act (EMTALA), CMS.gov, https://www.cms.gov/medicare/provider-enrollment-and-certification/certificationandcomplianc/downloads/emtala.pdf (last visited Feb. 27, 2024). It also requires the provision of stabilizing treatment and/or transfer to another medical facility under appropriate circumstances. *Id.*; *see also* 42 U.S.C. § 1395dd(b)(1).

Importantly, EMTALA does not mention or discuss abortion. To the contrary, EMTALA makes clear that an emergency room physician is to treat both the pregnant woman and her unborn child. *See* 42 U.S.C. § 1395dd(c)(1)(A)(ii) (restricting a physician's ability to transfer patients after labor unless the benefits to both the mother and the child outweigh the risks); *id.* § 1395dd(c)(2)(A) (defining an appropriate transfer as one

that occurs after minimizing any risks to "the health of the unborn child"); *id.* § 1395dd(e)(1)(A)(i) (defining an "emergency medical condition" to include "with respect to a pregnant woman, the health of the woman or her unborn child"); *id.* § 1395dd(e)(1)(B)(ii) (noting the requirement to minimize "threat[s] to the health or safety of the woman or the unborn child" for a pregnant woman having contractions).

EMTALA also disclaims any kind of broad preemptive effect: it explicitly provides that it does not "preempt any State or local law requirement, except to the extent that the requirement *directly* conflicts with a requirement of this section." *Id.* § 1395dd(f) (emphasis added). Importantly, EMTALA does not impose any kind of treatment mandates for any particular condition, nor does it make broad pronouncements about the particular care that emergency room practitioners must administer. Instead, those standard-of-care requirements are left to the States.

EMTALA does not impose a requirement on hospitals with emergency rooms that they provide abortions on demand, as the United States contends. Indeed, that position is impossible to square with EMTALA's requirements that physicians go to lengths to minimize risks

25

to unborn children when treating pregnant women. As a matter of medical ethics and judgment, the text of EMTALA could not support an emergency physician's conclusion that providing stabilizing care to the unborn child meant intentionally ending his or her life. Accordingly, the United States is not enforcing and administering EMTALA, but rather is turning EMTALA on its head to mandate abortion procedures.

## B.  EMTALA does not preempt the Idaho Defense of Life Act.

Idaho physicians may provide a full range of evidence-based emergency care to pregnant women without running afoul of state law. Idaho defines an "abortion" consistent with the historical and medical understanding of that term: it is an "intentionally terminat[ing] the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." Idaho Code § 18-604(1). Excepted from this definition are the use of birth control, "removal of a dead unborn child," "removal of an ectopic or molar pregnancy," and "treatment of a woman who is no longer pregnant." *Id.* § 18-604(1)(a)-(d).

The statute also provides for additional exceptions. Physician-performed and -attempted abortions are permissible if the abortion is

"necessary to prevent the death of the pregnant woman" based on the physician's "good faith medical judgment and based on the facts know to the physician at the time." *Id.* § 18-622(2)(a)(i). In those cases, the physician need only "perform the abortion in the manner that . . . provided the best opportunity for the unborn child to survive," if that is possible without creating a greater risk to the woman. *Id.* § 18-622(2)(a)(ii). Idaho law also contains a rape and incest exception. *See id.* § 18-622(1)(b).

For the reasons discussed above, the Idaho law does not conflict with the minimal requirements of EMTALA practically or legally. When a pregnant woman appears at a hospital with an emergency, EMTALA requires the treating physician to address and stabilize both the pregnant woman and her unborn child. *See, e.g.*, 42 U.S.C. § 1395dd(e)(1)(A). There are pregnancy complications where saving the life of the mother becomes paramount, in which case Idaho permits termination. And there are pregnancy complications that have already resulted in the death of the unborn child, or that will certainly result in the child's death no matter what the treating physician does, and those circumstances should not even be considered abortions under any law.

27

But the intentional termination of a pregnancy for the purpose of ending the life of a fetal human being is never an appropriate treatment for at least one of the treating physician's patients—that is, the child. And a termination done to save a pregnant woman's life does not have this purpose.

ACOG makes much of the Idaho requirement that an abortion be "necessary" to save the life of the mother. *See* ACOG Br. at 24-25. Of course, Idaho law defers to the physician's "good faith medical judgment [] based on the facts known to the physician at the time." Idaho Code § 18-622(2)(a)(i). Moreover, whether a particular treatment for a particular condition is medically necessary is a standard-of-practice issue that is reserved solely to the States to regulate. *See, e.g.*, *Marshall*, 134 F.3d at 322. Practitioners in Idaho or States with similar restrictions can rely on their education, experience, and training, and look to practice guidance from groups like AAPLOG (or even ACOG)—as they do for all of their patients—to form a medical judgment. And only those physicians who provide induced abortions that are not medically necessary to prevent the death of a mother, or those who offer bad-faith justifications for their decisions, are subject to penalty.

**C.  At a minimum, statutory-interpretation principles militate against holding that EMTALA preempts all state abortion laws.**

EMTALA does not mandate abortion in the Nation's emergency rooms, including those in Idaho. But the breadth of the question presented to the Court could result in a ruling that holds state abortion laws preempted across the nation. While the Court may resolve any question fairly subsumed by the question presented, at least two statutory-interpretation considerations weigh in favor of rejecting such a broad approach.

First, EMTALA's plain text strongly suggests that Congress did not intend for EMTALA to preempt all state abortion laws. Because of the narrowness of the only EMTALA language that could even arguably conflict with state abortion regulations, a sweeping invalidation of state abortion laws is unwarranted. Congress would not have drafted EMTALA to preempt *all* state law on the subject by so narrowly limiting preemption to scenarios in which state law "*directly* conflicts with a[n EMTALA] requirement." 42 U.S.C. § 1395dd(f) (emphasis added). Congress could have drafted EMTALA more broadly to cover any number of scenarios that could arguably pose a conflict between state and federal

29

law. But it did not. When interpreting statutes, this Court presumes that Congress "says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016). EMTALA's intentional requirement of a *direct* conflict to trigger any preemption reflects Congress's intent to permit state regulations that can in any way be harmonized with federal law. Courts are well-suited to conducting that analysis in appropriate cases.

Second, the principles underlying *West Virginia v. EPA*'s major-questions doctrine counsel against a one-size-fits-all preemption ruling. An interpretation that EMTALA preempts all state abortion laws is wholly novel and disregards EMTALA's express concern for pre-born children. Until now, "EMTALA ha[d] never been construed to preempt state abortion laws." *Texas v. Becerra*, 623 F. Supp. 3d 696, 735 (N.D. Tex. 2022), *aff'd*, *Texas v. Becerra*, 89 F.4th 529 (5th Cir. 2024). Given the "history and the breadth of the authority that [the Executive] has asserted, and the economic and political significance of that assertion," there is "reason to hesitate before concluding that Congress meant" such a result. *West Virginia v. EPA*, 597 U. S. 697, 721 (2022) (cleaned up). Moreover, "[w]hen [the Executive] claims to have found a previously

30

'unheralded power,' its assertion generally warrants 'a measure of skepticism.'" *Id.* at 748 (Gorsuch, J., concurring) (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Of course, an assertion of unbounded Executive power to preempt state law under EMTALA is no acceptable substitute for Congress's judgment. But in all events, the skepticism required by *West Virginia* favors testing state abortion laws in appropriate cases rather than a blanket ruling that EMTALA preempts state abortion laws.

This narrow approach likewise permits courts to evaluate whether state abortion laws are consistent with the authority Congress "meant to confer." *Id.* at 721. For example, in *Texas v. Becerra*, Texas recently defended its abortion laws against a preemption challenge under EMTALA, which the Fifth Circuit held did not require induced abortions. 89 F.4th at 543-45. The Texas Human Life Protection Act (HLPA) prohibits abortion unless the person performing the abortion is a licensed physician, the pregnant woman "has a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced,"

and the abortion is performed in a manner that is most likely to allow the child to survive. Tex. Health & Safety Code § 170A.002(b). The latter requirement does not apply when the manner would increase the risk of death for the mother or would cause "a serious risk of substantial impairment of a major bodily function of the pregnant female." *Id.* § 170A.002(b)(3)(A)-(B).

The Fifth Circuit held that "Texas's HLPA law does not directly conflict with EMTALA." *Texas*, 89 F.4th at 544. EMTALA ensures that patients who are unable to pay will still receive essential emergency medical treatment. *Id.* at 542. EMTALA "leaves the balancing of stabilization to doctors, who must comply with state law." *Id.* at 545. Texas law "does not undermine [EMTALA's] purpose," as "it does not compel the 'rejection of patients.'" *Id.* at 544 (citation omitted). But as the district court in *Texas v. Becerra* also noted, "EMTALA provides no instructions on what a physician is to do when there is a conflict between the health of the mother and the unborn child" and state law "fills this void." 623 F. Supp. 3d at 728. Given the importance of state law within the EMTALA context, this Court should decline to hold that Congress intended to preempt state abortion laws altogether.

To be sure, conflicts with federal law could still arise. But as the Supreme Court recently determined, the power to make policy choices on the issue of abortion must be exercised by the States. *Dobbs*, 597 U.S. at 232. The "Constitution does not confer a right to abortion" and the "authority to regulate abortion must be returned to the people and their elected representatives." *Id.* Disputes about any conflict between a state's law concerning abortion and EMTALA should be viewed through a similar lens. A narrow ruling limited to Idaho's laws would serve similar ends by permitting these important questions to be litigated in appropriate cases.

## III. Maternal Mortality and Women's Health Provider Shortages Will Not Be Solved by Mandating Emergency Room Abortions.

Finally, some organizations who support a federal abortion mandate argue for the categorical preemption of state abortion laws on pure policy grounds. Specifically, they argue that federally mandated emergency room abortions are needed to reduce maternal mortality rates and shortages of women's health providers. The suggestion that laws regulating abortion and unavailability of induced abortion in emergency rooms are causing or will exacerbate this problem, *cf.* ACOG Br. at 29-

32, is driven by speculation and ideology, not fact. But these policy concerns, even if better grounded, would not justify the relief that respondents seek—relief that they should seek from state legislatures.

First, consider maternal mortality. High maternal mortality rates are a serious problem in this country. Practitioners should care about finding out the true causes of this country's high maternal mortality rates. Fortunately, provisional data from the CDC demonstrates that maternal deaths have fallen from their recent highs at the beginning of 2022, with a marked decline following this Court's ruling in *Dobbs*. National Vital Statistics System, Provisional Maternal Death Counts, CDC.gov, https://www.cdc.gov/nchs/nvss/vsrr/provisional-maternal-deaths.htm (last visited Feb. 27, 2024). But maternal mortality rates remain far too high.

The causes of maternal mortality are multi-factorial and include deeply rooted socio-economic factors. Perhaps above all, improved quality prenatal care will reduce the troublingly high rate of maternal death. But there is no data—none—to support the notion that limiting abortion increases these rates. To the contrary, studies show that induced abortion is correlated with an *increased* risk of death for women.

One study examined robust demographic and medical records of 463,473 women in Denmark who had their first pregnancy over a 25-year period. David C. Reardon et al., *Short and Long Term Mortality Rates Associated with First Pregnancy Outcome: Population Register Based Study for Denmark 1980-2004*, Med. Sci. Monit. 18(9):PH71-76 (Sept. 1, 2012), http://www.medscimonit.com/fulltxt.php?ICID=883338. The authors found that "[c]ompared to women who delivered, women who had an early or late abortion had significantly higher mortality rates within 1 through 10 years. A lesser effect may also be present relative to miscarriage." *Id.* at PH71. "The greatest differences were observed within the first 180 days of the pregnancy outcome, but the higher rates of death persisted well beyond the first year." *Id.* at PH73. The authors noted that one possibly contributing theory to explain this data was the "physiological or psychological effects which increase risk of death" following a pregnancy loss. *Id.* at PH75. "For example, abortion is associated with an increased risk of suicide, substance abuse, post-traumatic stress disorder, and a lower assessment of general health." *Id.* (footnotes omitted).

Another study from Finland assessed the deaths of women of reproductive age spanning a period of 23 years, looking at multiple data sources for nearly 5300 deaths. Mika Gissler et al., *Injury Deaths, Suicides and Homicides Associated with Pregnancy, Finland 1987-2000*, Eur. J. Pub. Health, 15(5):459-63 (2005). The authors noted that "age-adjusted mortality rates for deaths due to unintentional injuries, suicide and homicide were significantly lower after giving birth than among non-pregnant woman." *Id.* at 462. But the authors also observed that "[i]n the year after undergoing an abortion, a woman's mortality rate for unintentional injuries, suicide and homicide was substantially higher than among non-pregnant women in all age groups." *Id.* In fact, they noted a sixfold increased risk of suicide and a tenfold increased risk of homicide after induced abortion when compared to a woman who gave birth, and these risks were approximately twice as high when compared to miscarriage or ectopic pregnancy. *Id.* at 461. The authors concluded that "[e]levated mortality risk after a terminated pregnancy has to be recognised in the provision of health care and social services." *Id.* at 462.

These statistics confirm what the Supreme Court already held in *Dobbs* regarding the complex policy choices that arise in the context of

abortion. But these questions must be resolved by "the people and their elected representatives." *Dobbs*, 597 U.S. at 232. Concerns about maternal mortality and provider shortages should be carefully studied and considered when making those decisions. But such policy concerns provide no basis to elevate EMTALA over state law.

Moreover, the suggestion of an EMTALA-driven provider shortage is inconsistent with available statistics. The overwhelming majority of obstetricians in the United States *do not perform abortions*. Sheila, Desai et al., *Estimating Abortion Provision and Abortion Referrals Among United States Obstetrician-Gynecologists in Private Practice*, Contraception 97(4):297-302 (Apr. 2018). Sky-is-falling news reports about obstetricians fleeing States that enforce pro-life laws have no connection to statistical reality.

Equally important, the particular reasons for outcomes regarding access to providers in any city or State are not amenable to nationwide resolution, as the Supreme Court has recognized. *Dobbs*, 597 U.S. at 231-32 ("[F]ar from bringing about a national settlement of the abortion issue, *Roe* and *Casey* have enflamed debate and deepened division."). Accordingly, while federal courts may play a role in the nation's abortion

policy going forward, it should not reassert primacy in that realm by countenancing the United States' efforts to mandate abortions in the nation's emergency rooms.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted.

September 20, 2024

/s/ *Judd E. Stone II*
Judd E. Stone II
Christopher D. Hilton
Ari Cuenin
STONE HILTON PLLC
P.O. Box 150112
Austin, Texas 78715
judd@stonehilton.com
ari@stonehilton.com
chris@stonehilton.com
(737) 465-7248

*Counsel for Amicus Curiae*

39

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35440 & 23-35450

I am the attorney or self-represented party.

**This brief contains** | 6,999 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Judd E. Stone II | **Date** | 9/20/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*