Nos. 23-35440, 23-95450

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellee,*

v.

THE STATE OF IDAHO,
*Defendant-Appellant,*

v.

MIKE MOYLE, SPEAKER OF THE IDAHO HOUE OF
REPRESENTATIVES, ET AL.,
*Movants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho, Southern Division
No. 1:22-cv-00329 | Hon. B. Lynn Winmill

BRIEF OF AMERICAN HOSPITAL ASSOCIATION, THE
ASSOCIATION OF AMERICAN MEDICAL COLLEGES, AND
AMERICA'S ESSENTIAL HOSPITALS AS
*AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

Chad Golder
American Hospital Association
2 City Center, Suite 400
800 10th Street, NW
Washington, DC 20001-4956
202-626-4624
cgolder@aha.org
Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* the American Hospital Association, the Association of American Medical Colleges, and America's Essential Hospitals are non-profit organizations. They have no parent corporations and do not issue stock.

October 11, 2024

/s/ *Chad Golder*
Chad Golder

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF INTEREST ................................................................. 1

INTRODUCTION/SUMMARY OF ARGUMENT ................................... 3

ARGUMENT ....................................................................................... 6

I. Criminal Statutes Can Chill Lawful Conduct, Especially in Emergency Medical Contexts. ......................................................... 6

II. Idaho's Criminal Statute Chills Medically Necessary Emergency Services. ............................................................................ 11

III. EMTALA and the ACA Preempt Idaho's Criminal Statute in the Narrow Domain of Emergency Care. ....................................... 18

    A. The ACA Eliminates Any Doubt That EMTALA Preempts Idaho's Criminal Statute ............................................. 18

    B. Even Apart From The ACA, EMTALA Preempts Idaho's Criminal Statute In Narrow Emergency Circumstances ............ 28

CONCLUSION ...................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. NLRB,*
466 F. Supp. 3d 68 (D.D.C. 2020) .......................................... 23

*AFL-CIO v. NLRB,*
57 F.4th 1023 (D.C. Cir. 2023) ............................................... 23

*Artuz v. Bennett,*
531 U.S. 4 (2000) ...................................................................... 28

*Ascendium Ed. Sols. v. Cardona,*
78 F.4th 470 (D.C. Cir. 2023) ................................................ 33

*Barnett Bank v. Nelson,*
517 U.S. 25 (1996) ................................................................... 34

*Battle ex rel. Battle v. Mem'l Hosp. at Gulfport,*
228 F.3d 544 (5th Cir. 2000) .................................................. 32

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) .................................... 22, 24, 26, 27

*Bryan v. Rectors & Visitors of Univ. of Va.,*
95 F.3d 349 (4th Cir. 1996) ............................................. 29, 30

*Cabell Huntington Hospital, Inc. v. Shalala,*
101 F.3d 984 (4th Cir. 1996) .................................................. 19

*Cantero v. Bank of Am.,*
602 U.S. ___ (2024) ................................................................. 34

*Cherukuri v. Shalala,*
175 F.3d 446 (6th Cir. 1999) .................................................. 31

*Conant v. Walters,*
309 F.3d 629 (9th Cir. 2002) .................................................... 8

*CPSC v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) ...................................................... 23

*del Carmen Guadalupe v. Agosto*,
  299 F.3d 15 (1st Cir. 2002) ................................... 31, 34

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) .......................................................7

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ...................................................... 34

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ...................................................... 34

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ...................................................... 27

*Graham v. Connor*,
  490 U.S. 386 (1989) ...................................................... 10

*Great N. Ry. Co. v. United States*,
  315 U.S. 262 (1942) ...................................................... 20

*Harry v. Marchant*,
  291 F.3d 767 (11th Cir. 2002) ................................... 29

*Holloway v. United States*,
  526 U.S. 1 (1999) ........................................................ 25

*June Med. Servs. L.L.C. v. Russo*,
  591 U.S. 299 (2020) .......................................................3

*King v. Burwell*,
  576 U.S. 473 (2015) ............................................... 20, 25

*King v. St. Vincent's Hosp.*,
  502 U.S. 215 (1991) ...................................................... 22

*Lawson v. FMR LLC*,
   571 U.S. 429 (2014) ..................................................................28

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ...........................................................33

*Moyle v. United States*,
   144 S. Ct. 2015 (2024) ..................................5, 18, 19, 24, 25, 28, 31, 33

*NLRB v. Federbush Co.*,
   121 F.2d 954 (2d Cir. 1941) ...................................................23

*POM Wonderful LLC v. Coca Cola Co.*,
   573 U.S. 102 (2014) ...............................................................34

*Pulsifer v. United States*,
   601 U.S. 124 (2024) ...............................................................25

*Ruan v. United States*,
   597 U.S. 450 (2022) ............................................................7, 14

*Ryburn v. Huff*,
   565 U.S. 469 (2012) ...............................................................10

*Smith v. Botsford Gen. Hosp.*,
   419 F.3d 513 (6th Cir. 2005) .................................................32

*Thornburgh v. American Col. of Obstetricians & Gynecologists*,
   476 U.S. 747 (1986) ...............................................................27

*Tiger v. Western Inv. Co.*,
   221 U.S. 286 (1911) ...............................................................20

*United States v. Calvert*,
   511 F.3d 1237 (9th Cir. 2008) ...............................................24

*United States v. Stewart*,
   311 U.S. 60 (1940) .................................................................23

*Vickers v. Nash Gen. Hosp., Inc.,*
  78 F.3d 139 (4th Cir. 1996) ............................................... 31

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ......................................................... 7

*Whole Woman's Health v. Hellerstedt,*
  136 S. Ct. 2292 (2016) ................................................... 27

*Yates v. United States,*
  574 U.S. 528 (2015) ....................................................... 24

**Statutes**

18 U.S.C. § 3553 ............................................................... 6

26 U.S.C. § 501 ................................................................ 25

42 U.S.C. § 300gg-19a ....................................................... 25

42 U.S.C. § 1395dd ......................................... 4, 28, 30, 35

42 U.S.C. § 18023 .............. 4, 21, 22, 23, 24, 25, 26, 27, 28

42 U.S.C. § 18083 ............................................................. 25

Idaho Code § 18-622 ............ 4, 5, 6, 11, 12, 15, 18, 28, 30, 34, 35, 36

Idaho Code § 31-2227 ....................................................... 15

Idaho Code § 54-1806A....................................................... 11

Idaho Code § 67-1401 ....................................................... 15

**Other Authorities**

131 Cong. Rec. 28,49169 (1985) ......................................... 29

Antonin Scalia & Bryan Garner,
  READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ........ 23, 33

Antonin Scalia,
   A MATTER OF INTERPRETATION 37 (1997) ..............................................22

Andrea MacDonald et al.,
   *The Challenge of Emergency Abortion Care Following the Dobbs
   Ruling*, 328 JAMA 1691 (2022)............................................................10

Brandice Canes-Wrone & Michael C. Dorf,
   *Measuring the Chilling Effect*, 90 N.Y.U. L. REV. 1095
   (Oct. 2015) ...................................................................................... 13, 14

Brittni Frederiksen et al.,
   *A National Survey of OBGYNs' Experiences After* Dobbs, KAISER
   FAM. FOUND. (June 21, 2023)................................................................13

Ctrs. for Disease Control & Prevention,
   *National Hospital Ambulatory Medical Care Survey: 2021
   Emergency Department Summary Tables* ..........................................12

David M. Herszenhorn & Jackie Calmes,
   *Abortion Was at Heart of Wrangling*, N.Y. TIMES, Nov. 8, 2009 .........20

David M. Studdert et al.,
   *Defensive Medicine Among High-Risk Specialist Physicians in a
   Volatile Malpractice Environment*, JAMA (June 1, 2005) ....................8

David S. Cohen et al.,
   *The New Abortion Battleground*, 123 COLUM. L. REV. 1, 45 (2023) ..7, 8

George Kovacs, M.D., MHPE, & Pat Croskerry, M.D., Ph.D.,
   *Clinical Decision Making: An Emergency Medicine Perspective*,
   ACAD. EMERGENCY MED. 947 (Sept. 1999) ...........................................9

Jill Fairchild,
   *The Defensive Medicine Debate: Driven by Special Interests*,
   19 ANNALS HEALTH L. ADVANCE DIRECTIVE 297 (2010) .........................8

John Cannan,
 *A Legislative History of the Affordable Care Act*,
 105 L. Lib. J. 131 (Spring 2013) ......................................................... 20

Kavitha Surana,
 *Their States Banned Abortion. Doctors Now Say They Can't Give Women Potentially Lifesaving Care.*, ProPublica (Feb. 26, 2024) ..... 17

Kimberly Chernoby & Brian Acunto,
 *Pregnancy Complications After* Dobbs*: The Role of EMTALA*,
 25 W. J. of Emergency Med. 79 (Jan. 2024) ....................................... 12

Kyle Urban,
 *Patient Visits Higher at Rural Emergency Departments*,
 U. of Mich. Med. (Apr. 29, 2019) .......................................................... 9

Press Release, Bonner General Health,
 *Discontinuation of Labor & Delivery Services at Bonner General Hospital* (Mar. 17, 2023) .................................................................... 12

Sara Rosenbaum,
 *The Enduring Role of the Emergency Medical Treatment and Active Labor Act*, 12 Health Affs. 2075 (2013) ................................... 22

Sarah Varney,
 *After Idaho's Strict Abortion Ban, OB-GYNs Stage a Quick Exodus*, KFF Health News (May 2, 2023) ........................................... 17

Staff of the Washington Post,
 Landmark: The Inside Story of America's New Health-Care Law and What It Means for Us All (2010) ....................................... 20

## Regulations

42 C.F.R. § 489.24 ................................................................................ 32

## STATEMENT OF INTEREST[1]

The American Hospital Association represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations across the country. Its members are committed to improving the health of the communities they serve and to helping ensure that affordable care is available to all Americans. The AHA frequently participates as *amicus curiae* in cases with important consequences for AHA's members and their communities. Thirty-seven of AHA's member hospitals operate in Idaho, ranging from one of the nation's most remote healthcare facilities in Salmon to tertiary facilities in Pocatello and Idaho Falls.

The Association of American Medical Colleges is dedicated to improving the health of people everywhere through medical education, healthcare, medical research, and community collaborations. Its members include all 158 medical schools accredited by the Liaison Committee on Medical Education; nearly 500 academic health systems and teaching hospitals; and more than seventy academic societies.

---

[1] Pursuant to FRAP 29, counsel states that all parties consented to the filing of this brief. No party's counsel authored any part of this brief, and no person other than *Amici* funded its preparation or submission.

America's Essential Hospitals is dedicated to equitable, high-quality care for all people, including those who face social and financial barriers. Consistent with this safety-net mission, the association's more than 300 members provide a disproportionate share of the nation's uncompensated care, with three-quarters of their patients uninsured or covered by Medicare or Medicaid.

Virtually all of *Amici*'s member hospitals are subject to the Emergency Medical Treatment and Labor Act. On rare and tragic occasions, EMTALA requires the termination of a pregnancy to stabilize a patient's emergency condition—including in circumstances that Idaho law criminalizes. Absent judicial relief, healthcare providers at *Amici*'s member hospitals will face the intolerable threat of criminal liability for doing what federal law requires. *Amici* therefore have a direct interest in this case.

## INTRODUCTION/SUMMARY OF ARGUMENT

This case involves underlying issues of great consequence and controversy. But it is, at bottom, an ordinary statutory interpretation case. It can be decided by basic textualist principles. "The real question" concerns this Court's "willingness to follow the traditional constraints" of textualism "when a case touching on abortion enters the courtroom." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 410 (2020) (Gorsuch, J., dissenting).

*Amici*'s members understand the legal and practical stakes of this case all too well. Every day, pregnant women arrive at their emergency rooms in the midst of grave health emergencies. When that happens, doctors, nurses, and other medical personnel must make split-second decisions about what care to give to those patients, who are at risk not only of death or serious lifelong impairment but also of losing their pregnancies. In those tragic situations, healthcare professionals must rely on their expertise, experience, ethical training, and ultimately their best medical judgment to provide emergency care. In exceedingly rare circumstances, termination is the *only* way to stabilize a pregnant patient.

When that happens, federal law, as reflected in EMTALA and reinforced by the Affordable Care Act, requires hospitals to perform that tragic emergency service. Specifically, EMTALA requires that providers assess "reasonable medical probability" and offer "necessary stabilizing treatment" to patients experiencing an "emergency medical condition," including in situations where the health or safety of "a pregnant woman" and her "unborn child" is in "serious jeopardy." 42 U.S.C. § 1395dd(b), (e). The ACA eliminated any doubt that Congress considered termination to be an "emergency service" under EMTALA. In a section dealing entirely with abortion and using that word *nineteen times*, the ACA provided: "Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA')." 42 U.S.C. § 18023(d).

Idaho Code § 18-622 conflicts with EMTALA and the ACA. Section 18-622 makes it a crime for providers to terminate a pregnancy. It includes an exception when termination is "necessary to prevent the death of the pregnant woman." But it does *not* include an exception for stabilizing services necessary to prevent "material deterioration" of

medical conditions that, absent immediate medical attention, would result in serious jeopardy to the patient's health, serious impairment to her bodily functions, or serious dysfunction of her bodily organs, as EMTALA requires. Providers who seek to comply with EMTALA but violate § 18-622 are subject to felony charges, a mandatory minimum of two years' imprisonment, and revocation of their professional licenses. And as Idaho represented to the Supreme Court, § 18-622 gives individual criminal prosecutors the "discretion" to second-guess medical judgments made by healthcare professionals in their efforts to stabilize patients in extreme duress. Tr. of Oral Arg. at 29, *Moyle v. United States*, No. 23-726 (S. Ct. Apr. 24, 2024); *see infra* at 17.

*Amici* respectfully submit this brief to explain why EMTALA and the ACA preempt Idaho's criminal statute. We begin, though, by explaining why Idaho's decision to criminalize medically necessary emergency care is so profoundly harmful to hospitals, physicians, and patients. The threat of criminal sanctions interferes with the exercise of expert medical judgment, and chills even the provision of care that would ultimately be adjudicated lawful. It intrudes upon the trustful relationship between a patient and her physician—precisely at the

moment when she is most dependent on that physician to promote her and her unborn child's health. And it is particularly troubling in the emergency-department context, where delay in providing necessary care could result in irreversible complications.

Allowing prosecutors, courts, and juries to armchair quarterback these kinds of medical judgments—and impose criminal liability—will make emergency healthcare more challenging for providers, with potentially disastrous consequences for patients. This Court should protect emergency providers who exercise reasonable professional judgment and hold that § 18-622 is preempted because it criminalizes stabilizing emergency services required under EMTALA and the ACA.

## ARGUMENT

### I. Criminal Statutes Can Chill Lawful Conduct, Especially in Emergency Medical Contexts.

Laws that criminalize medical care can have a severe chilling effect—even outside of the prohibited contexts. That chilling effect is frostiest in the emergency room, where providers must make on-the-spot medical decisions.

1. Criminal prohibitions deter bad conduct. *E.g.*, 18 U.S.C. § 3553(a)(2)(B) (criminal sentences should provide "adequate deterrence

to criminal conduct"). But criminal prohibitions can overdeter by chilling lawful conduct, particularly where the criminalized conduct involves standards that can be difficult to predictably apply. *See Ruan v. United States*, 597 U.S. 450, 459 (2022). Only "those hardy enough to risk criminal prosecution" will proceed where there is some question about whether conduct might be considered criminal. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965); *see Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (the risk that a law will "deter or 'chill'" conduct is heightened when the statute "imposes criminal sanctions").

2.     This chilling effect is particularly likely—and particularly problematic—in the medical context. The threat of criminal sanctions is an especially potent deterrent for healthcare providers who need professional licenses to earn a living. *See* David S. Cohen et al., *The New Abortion Battleground*, 123 COLUM. L. REV. 1, 45 (2023) ("These effects threaten providers' ability to practice medicine and support themselves and their families."). Even if a provider is eventually vindicated, the mere fact of a criminal prosecution "could be reported to the provider's licensing board, which typically has broad discretion in governing provider ethics and standards of conduct." *Id*. And "[b]eing named as a

defendant too many times or being subject to a disciplinary investigation, even if the provider ultimately prevails, could result in licensure suspension, high malpractice insurance costs, and reputational damage." *Id.* As a result, "[a] physician's career can be effectively destroyed merely by the fact that a governmental body has investigated his or her practice." *Conant v. Walters*, 309 F.3d 629, 640 n.2 (9th Cir. 2002) (Kozinski, J., concurring).

For those reasons, many providers are forced to avoid "procedures and patients that [a]re perceived to elevate the probability of litigation." David M. Studdert et al., *Defensive Medicine Among High-Risk Specialist Physicians in a Volatile Malpractice Environment*, JAMA (June 1, 2005); *see* Jill Fairchild, *The Defensive Medicine Debate: Driven by Special Interests*, 19 ANNALS HEALTH L. ADVANCE DIRECTIVE 297, 299 (2010) (doctors sometimes seek "to avoid legal liability by refusing to see high-risk patients or by refusing to perform high-risk operations"). The threat of criminal sanctions ratchets that deterrent effect even higher. *E.g.*, *Conant*, 309 F.3d at 640 n.2 (Kozinski, J., concurring) (quoting expert report for the proposition that "physicians are particularly easily deterred by the threat of governmental investigation and/or sanction

from engaging in conduct that is entirely lawful and medically appropriate"). And chilling lawful medical care can have disastrous consequences for patients who do not receive necessary treatment.

**3.** These consequences are even more likely in emergency situations. An ER "is a unique environment of uncontrolled patient volume and brief clinical encounters of variable acuity." George Kovacs, M.D., MHPE, & Pat Croskerry, M.D., Ph.D., *Clinical Decision Making: An Emergency Medicine Perspective*, ACAD. EMERGENCY MED. 947 (Sept. 1999). As a result, "emergency physician[s] … must often make complicated clinical decisions with limited information while faced with a multitude of competing demands and distractions." *Id.* That task can be even more daunting in rural areas, where emergency departments often serve as the only source of acute, unscheduled medical care. *E.g.*, Kyle Urban, *Patient Visits Higher at Rural Emergency Departments*, U. OF MICH. MED. (Apr. 29, 2019), https://www.michiganmedicine.org/health-lab/patient-visits-higher-rural-emergency-departments.

The stakes of emergency care are also very high. In the ER, even more than in other hospital settings, momentary hesitation can mean the

difference between life and death. "Every hour of delayed care substantially increases a patient's risk of adverse outcomes." Andrea MacDonald et al., *The Challenge of Emergency Abortion Care Following the Dobbs Ruling*, 328 JAMA 1691, 1691 (2022).

4.     In many respects, the challenges faced by ER providers are like those faced by officers responding to law enforcement emergencies. In those fast-moving, touch-and-go situations, the Supreme Court has emphasized the need for "breathing room" and warned against imposing retrospective liability based on uncertain standards. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (the law "must embody allowance for the fact that police officers are often forced to make split-second judgments," and do so "in circumstances that are tense, uncertain, and rapidly evolving"). Courts are not well equipped to "second-guess[]," with the "benefit of hindsight and calm deliberation," an "on the scene" professional assessment "of the danger presented by a … rapidly unfolding chain of events." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

So too in the ER. Doctors and nurses must make in-the-moment, high-stakes professional judgments. As in the law enforcement context, criminal penalties are ill-suited to that setting. This is particularly true

because providers have practiced under the EMTALA regime for decades, and so the threat of criminal penalties will disrupt the sensitive medical decisions they have successfully balanced.

## II. Idaho's Criminal Statute Chills Medically Necessary Emergency Services.

Section 18-622 criminalizes certain stabilizing emergency services that may be, in rare and tragic circumstances, medically necessary and required under EMTALA. But its effects will extend much further. By subjecting providers to criminal and professional sanctions, § 18-622 will chill the provision of lawful care.

1.     Section 18-622 imposes harsh criminal sanctions. Providers who violate it are subject to "a sentence of imprisonment of no less than two years and no more than five years in prison." § 18-622(1). They also face collateral consequences. The statute requires that any healthcare professional who performs or attempts to perform a prohibited procedure "be suspended by the appropriate licensing board for a minimum of six months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* And those professional consequences may ensue even if the criminal charges are ultimately dropped. *E.g.*, Idaho Code § 54-1806A.

**2.** The threat of these sanctions will chill the provision of emergency care to pregnant women. "Pregnancy complications are the fifth most common reason women between ages 15–64 visit emergency departments," Kimberly Chernoby & Brian Acunto, *Pregnancy Complications After* Dobbs*: The Role of EMTALA*, 25 W. J. OF EMERGENCY MED. 79 (Jan. 2024); *see* Ctrs. for Disease Control & Prevention, *National Hospital Ambulatory Medical Care Survey: 2021 Emergency Department Summary Tables*, at Table 9, https://www.cdc.gov/nchs/data/nhamcs/web_tables/2021-nhamcs-ed-web-tables-508.pdf. And that statistic does not capture the many *other* reasons—such as accidents or sudden cardiac arrest—why a pregnant woman might need emergency services that could impact her unborn child.

The situation is even more delicate in rural areas, where obstetric units are closing their doors at an alarming rate. As a result, "emergency physicians are [frequently] responsible for managing pregnancy complications … without the support of an in-house OB." Chernoby & Acunto, *supra*, at 79. Laws like § 18-622 only aggravate that problem. *E.g.*, Press Release, *Discontinuation of Labor & Delivery Services at Bonner General Hospital* (Mar. 17, 2023), https://bonnergeneral.org/wp-

content/uploads/2023/03/Bonner-General-Health-Press-Release-Closure-of-LD-3.17.2023.pdf (explaining decision to close obstetrical unit because of laws "that criminalize physicians for medical care nationally recognized as the standard of care").

Hospitals have responded to laws like Idaho's by closing their obstetric departments, but they *cannot* shutter their ERs. As hospitals continue to provide 24/7 emergency care to pregnant women, there is strong evidence that the threat of criminal sanctions has interfered with the provision of medically necessary treatment. *E.g.*, Brittni Frederiksen et al., *A National Survey of OBGYNs' Experiences After* Dobbs, KAISER FAM. FOUND. (June 21, 2023), https://www.kff.org/womens-health-policy/report/a-national-survey-of-obgyns-experiences-after-dobbs/ (68% of OBGYNs reported that their ability to manage pregnancy-related emergencies has worsened since 2022); *see* Brandice Canes-Wrone & Michael C. Dorf, *Measuring the Chilling Effect*, 90 N.Y.U. L. REV. 1095, 1114 (Oct. 2015) (laws governing pregnancy termination "discourage protected conduct outside of their direct ambit").

As the record in this case makes clear, even the hardiest, most devoted healthcare provider cannot help but hesitate to proceed with an

emergency service that "lies close to, but on the permissible side of, the criminal line." *Ruan*, 597 U.S. at 459. One declarant captured it well: "In the future, though I know what the appropriate medical treatment is for my patients, I would be hesitant to provide the necessary care due to the significant risk to my professional license, my livelihood, my personal security, and the well-being of my family." Cooper Decl. ¶ 12; *see* Seyb Decl. ¶ 13 (describing call from a physician who was forced to balance his "medical judgment or best practices for handling pregnancy complications" with the "ramifications of his actions if he proceeded with termination"); *id.* ¶ 14 ("In emergency situations, physicians may delay the medically necessary care because they fear a financially ruinous investigation or criminal liability.").

"The chilling effect," in other words, "is real." Canes-Wrone & Dorf, *supra*, at 1114.

**3.** This chilling effect is not cured by § 18-622(2)(a)'s reference to a physician's "good faith medical judgment… that the abortion was necessary to prevent the death of the pregnant woman." This language is *not* co-extensive with EMTALA, which mandates emergency care necessary not only to prevent death, but also to prevent further serious

jeopardy to a patient's health, serious impairment to her bodily functions, or serious dysfunction of her bodily organs.

Recent developments in this case do not fill this gap. For instance, the Idaho Attorney General (at 42-43) disclaims application of § 18-622 in certain circumstances such as PPROM. But as the Attorney General has admitted, other Idaho officials who (unlike the Attorney General) *actually* have the authority to enforce criminal laws, *compare* Idaho Code § 31-2227, *with* § 67-1401, may take a different view of the law or facts when exercising their "prosecutorial discretion," *infra* at 17. And tellingly, the Attorney General himself *nowhere* states that a doctor's "good faith" judgment that termination is necessary to prevent serious jeopardy to a patient's health (but not that patient's life) is outside the scope of § 18-622.

To be clear: *Amici*'s members care for patients who arrive at the ER with medical conditions that seriously threaten their health (but not necessarily their lives) and for which termination is the only definitive emergency service. For example, pregnant women can present during their pre-viability/pre-deliverability period with *chorioamnionitis* or acute vaginal bleeding from *placenta previa*, *placenta accreta*, or *placenta*

*percreta*—all of which could seriously threaten not only a patient's health, but also her future fertility, bladder condition, and other bodily functions. All could require emergency termination to stabilize her.

More generally, the Idaho Attorney General appears to take the position (at 43) that doctors should attempt to manage emergency conditions *until* they become life-threatening, at which point it would be permissible to "end the pregnancy if necessary to save the mother's life." But nearly every condition that may pose serious jeopardy to a woman's health or bodily functions will ultimately lead to a risk of death if doctors are forced to wait long enough. Waiting, however, is not the standard of care. It can increase the risks of: 1) complications from eventual treatment; 2) other harms to the woman's bodily functions as *sequelae* of the original emergency condition; and 3) mortality. In the real world, moreover, the line between a serious risk to a pregnant patient's health and her life is vanishingly thin, and emergencies can spin out of control in an instant. Having to wait until that moment, as the Idaho AG would require, is neither safe nor realistic. The question is whether EMTALA

permits local prosecutors to second-guess *when* medical professionals can intervene in these rapidly-evolving scenarios.[2]

Astonishingly, Idaho does not disavow its representation to the Supreme Court that a lone prosecutor could dispute a provider's medical judgment and bring criminal charges against him:

> JUSTICE BARRETT: What if the prosecutor thought differently? What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert?
>
> MR. TURNER: And that, Your Honor, is the nature of prosecutorial discretion….

*See* Tr. of Oral Arg. at 28-29.

---

[2] *See* Sarah Varney, After Idaho's Strict Abortion Ban, OB-GYNs Stage a Quick Exodus, KFF HEALTH NEWS (May 2, 2023), https://kffhealthnews.org/news/article/after-idahos-strict-abortion-ban-ob-gyns-stage-a-quick-exodus/ ("The Idaho Supreme Court has since ruled that the law does not apply to ectopic or molar pregnancies…. But physicians say that limited change does not account for many common pregnancy complications that can escalate rapidly."); Kavitha Surana, Their States Banned Abortion. Doctors Now Say They Can't Give Women Potentially Lifesaving Care., PROPUBLICA (Feb. 26, 2024), https://www.propublica.org/article/abortion-doctor-decisions-hospital-committee ("Without clarification from legislators and prosecutors on how to handle the real-life nuances that have emerged in hospitals across America, doctors in abortion ban states say they are unable to provide care to high-risk pregnant patients that meets medical standards.").

This is precisely the conflict that causes *Amici*'s members such profound concern. So long as prosecutors can contest the judgments that doctors and nurses make in uncertain, fast-moving situations, medical professionals will be forced to provide care in fear of being indicted under § 18-622 for performing emergency services that federal law requires.

## III. EMTALA and the ACA Preempt Idaho's Criminal Statute in the Narrow Domain of Emergency Care.

EMTALA, as reinforced by the ACA, has long been a workable legal regime in the narrow context of emergency stabilizing care. It does not govern—and never mandates—"elective" abortions. Instead, it provides rules for hospitals confronted with medical emergencies. Idaho's criminal statute conflicts with the EMTALA/ACA regime. It is therefore preempted.

### A. The ACA Eliminates Any Doubt That EMTALA Preempts Idaho's Criminal Statute

The United States and Justice Kagan's concurring opinion in *Moyle* persuasively explain why EMTALA itself preempts § 18-622. *Amici* begin with the ACA, however, because it so directly defeats the principal textual arguments offered by Idaho and the *Moyle* dissenters. It is, as the saying goes, the shortest path from Point A to Point B.

**1.** Idaho and the *Moyle* dissenters contend that "EMTALA obligates Medicare-funded hospitals to *treat*, not abort, an 'unborn child.'" *Moyle v. United States*, 144 S. Ct. 2015, 2028 (2024) (Alito, J., dissenting). Their argument boils down to a simple proposition: Because the statute includes the term "unborn child" but "does not mention abortion," "EMTALA requires the hospital at every stage to protect an 'unborn child' from harm." *Id.* at 2029; *e.g.*, Appellant's Br. at 5, 29-30.[3]

*Amici*'s answer boils down to an equally simple proposition: If the ACA contemplates "abortion" as an EMTALA-mandated "emergency service," then EMTALA's use of "unborn child" cannot have the significance ascribed to it. As a matter of logic given the nature of emergency termination, the term "unborn child" must give way. Put differently, if EMTALA—as reinforced by the ACA—requires hospitals to perform abortions in rare and tragic circumstances, then EMTALA

---

[3] Justice Kagan dispositively addressed EMTALA's parenthetical reference to "unborn child." 144 S. Ct. at 2018-19. But for good measure, it is important to remember that relying on a parenthetical "to drive the interpretation of the whole provision … allow[s] the statutory tail to wag the dog. A parenthetical is, after all, a parenthetical…." *Cabell Huntington Hospital, Inc. v. Shalala*, 101 F.3d 984, 990 (4th Cir.1996) (Wilkinson, J.).

cannot require them to "protect an 'unborn child'" in the way Idaho and the dissenters insist.

The ACA does exactly that. If there were any doubt that "abortion" qualifies as an "emergency service" under EMTALA, the ACA puts it to rest. *See Great N. Ry. Co. v. United States*, 315 U.S. 262, 277 (1942) ("It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.'" (quoting *Tiger v. Western Inv. Co.*, 221 U.S. 286, 309 (1911))). "Abortion had proved a contentious issue throughout the health care debate." John Cannan, *A Legislative History of the Affordable Care Act*, 105 L. Lib. J. 131, 167 (Spring 2013). Unlike other provisions of the ACA that may "not reflect the type of care and deliberation that one might expect of such significant legislation," *King v. Burwell*, 576 U.S. 473, 492 (2015), the provisions addressing abortion were meticulously negotiated and given the closest attention, *see* Staff of the Washington Post, Landmark: The Inside Story of America's New Health-Care Law and What It Means for Us All 31–33 (2010); David M. Herszenhorn & Jackie Calmes, *Abortion Was at Heart of Wrangling*, N.Y. Times, Nov. 8, 2009, at A24.

In a section entitled "Special rules," the ACA uses the word "abortion" *nineteen times*. *See* 42 U.S.C. § 18023. It is the primary ACA section addressing abortion. In fact, it is virtually the *only* ACA section addressing abortion in the Act's 900 pages. Section 18023 covers topics like "State opt-out of abortion coverage" and "Special rules relating to coverage of abortion services." The section also preserves federal conscience protections and prohibitions on the use of federal funds for "abortion services." 42 U.S.C. § 18023(c)(2).

Importantly, § 18023 contains a final subsection entitled "Application of emergency services laws." Having established in preceding subsections that insurance companies and the federal government cannot be required to *pay for* "abortions," subsection (d) makes certain that patients will still receive that "service" in *emergency* situations. It states: "Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1395dd of this title (popularly known as 'EMTALA')." 42 U.S.C. § 18023(d). Thus, in a section of the ACA that deals entirely with the topic of "abortion" and uses the term repeatedly, the Act expressly references "EMTALA" and ensures that its

"emergency services" requirements for "providers" remain undisturbed. *See* Sara Rosenbaum, *The Enduring Role of the Emergency Medical Treatment and Active Labor Act*, 12 HEALTH AFFS. 2075, 2075 (2013) ("The Affordable Care Act reaffirmed EMTALA's preeminent position in American health law through provisions that clarify hospitals' emergency care duties in abortion cases.").

Section 18023(d)'s text and context therefore make clear that Congress understood that "abortions" would sometimes occur during the provision of "emergency service[s]" under "EMTALA." *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("[T]he meaning of a word depends on the circumstances in which it is used. To strip a word from its context is to strip that word of its meaning.") (citation omitted); Antonin Scalia, A MATTER OF INTERPRETATION 37 (1997) ("In textual interpretation, context is everything."). Indeed, the only sensible way to read its text and context is that EMTALA recognized that "abortion" may be a stabilizing "emergency service." *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate

take their purport from the setting in which they are used." (quoting

*NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.))).[4]

Or, to use the exact words of § 18023(d): hospitals are not "relieve[d]" of

that legal duty under "EMTALA." At the very least, this "subsequent

*legislation*," which "declar[es] the intent of an earlier statute[,] is entitled

to great weight in statutory construction." *CPSC v. GTE Sylvania, Inc.*,

447 U.S. 102, 118, n.13 (1980); *see United States v. Stewart*, 311 U.S. 60,

64–65 (1940) ("That these two acts are *in pari materia* is plain. Both deal

with precisely the same subject matter…. The later act can therefore be

regarded as a legislative interpretation of the earlier act … in the sense

that it aids in ascertaining the meaning of the words as used in their

contemporary setting. It is therefore entitled to great weight in resolving

any ambiguities and doubts."); *see generally* Antonin Scalia & Bryan

Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 254–55

---

[4] *See also AFL-CIO v. NLRB*, 57 F.4th 1023, 1032-33 (D.C. Cir. 2023) ("[T]he subsections surrounding 10(f) make explicit their concern with unfair labor practices…. This context suggests that, like its sister provisions, 10(f) is concerned solely with unfair labor practices."); *AFL-CIO v. NLRB,* 466 F. Supp. 3d 68, 84 (D.D.C. 2020) ("[B]ecause the *entirety* of section 160 solely focuses on NLRB orders on unfair labor practice disputes, the only reasonable construction of subdivision (f) takes into account that it only concerns NLRB orders on unfair labor practice disputes as well.").

(2012) ("The meaning of an ambiguous provision may change in light of a subsequent enactment.").

   **2.** The *Moyle* dissenters rejected this reading of the ACA, but their analysis violates the basic interpretive principle that "context … includes commonsense." *Biden*, 143 S. Ct. at 2379 (Barrett, J., concurring). For starters, the dissent would have us believe that the placement of Section 18023(d) was somehow coincidental. It insists that it is "totally unwarranted" to infer that "[b]ecause this provision was placed in a section of the Act concerning abortion, … it reflects a congressional understanding that EMTALA sometimes requires abortions." *Moyle*, 144 S. Ct. at 2032. In essence, the dissent maintains that *of all the places* in "the entire massive Affordable Care Act" that Congress could have "reaffirm[ed] the duty of participating hospitals to comply with EMTALA," *it just happened* to choose a section that is devoted entirely to abortion and uses the word nineteen times. *Id.* at 11. But that is not how courts interpret statutes.[5] And even for a statute that

_____

[5] *E.g.*, *Yates v. United States*, 574 U.S. 528, 540-41 (2015) ("This placement accords with the view that Congress' conception of § 1519's coverage was considerably more limited than the Government's."); *United States v. Calvert*, 511 F.3d 1237, 1243 (9th Cir. 2008) ("The

is "far from a *chef d'oeuvre* of legislative draftsmanship," *Burwell*, 576 U.S. at 483 n.3 (citation omitted), the dissent's assertion defies commonsense.[6]

Next, the dissenters argue that "[t]he provision in question refers to the entire massive Affordable Care Act, not just the relatively few provisions concerning abortion." *Moyle*, 144 S. Ct. at 2032. To support this contention, the dissent compares 18023(d) with 18023(c), which it says "refer[s] more narrowly to 'this subsection.'" *Id.* But the dissent cherry-picks language from subsection 18023(c)(3), and in so doing fails to "consider[] the paragraph's text in its legal context." *Pulsifer v. United States*, 601 U.S. 124, 141 (2024). Critically, the dissent omits any discussion of subsections 18023(c)(1) and (c)(2), both of which: (1) refer to

_____

placement of certain prohibited acts in [Chapter 73] strongly indicates that the intent to commit such an act amounts to an intent to obstruct justice."); *see generally Holloway v. United States*, 526 U.S. 1, 6, (1999) ("In interpreting the statute at issue, we consider not only the bare meaning of the critical word or phrase but also *its placement* and purpose in the statutory scheme." (emphasis added)).

[6] EMTALA is referenced elsewhere in the ACA. *See* 26 U.S.C. § 501(r)(4)(B); 42 U.S.C. § 300gg-19a(b)(2)(A), (B). The dissent does not explain why Congress did not reaffirm EMTALA's requirements in *those* sections or even in its *own* section. Thus, the ACA's broader context—and not just commonsense—undercuts the dissent's reading of § 18083(d).

"this Act"; (2) link those references to "abortion"; and (3) are included under the title "Application of State and Federal laws regarding abortion." What's more, the reference to "this subsection" in (c)(3) is textually significant, but for a reason the dissent overlooks. Functioning as a carveout from the preceding subsections, subsection (c)(3) ensures that the provisions of (c)(1) and (c)(2) do not disturb the requirements of a particular federal law: Title VII of the Civil Rights Act.[7]

Accordingly, the dissent's overemphasis on the word "Act" underscores the wise reminder that "[c]ase reporters and casebooks brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short." *Biden*, 143 S. Ct. at 2379 (Barrett, J., concurring). The interpretive question here is whether § 18023(d)'s reference to "emergency services" contemplates "abortion" as one of those services. Stressing "this Act" versus "this subsection"—while trivializing

---

[7]  The *Moyle* dissent argues in footnote 13 that § 18023(d) "demands compliance with state emergency care requirements," and Idaho's law is such a requirement.  But § 18-622 *bars* healthcare professionals from "providing" emergency services; there is no "emergency service"-provision-*requirement* to "relieve" them from.  *See* § 18023(d).

the abortion-related language throughout Section 18023—is orthogonal to that question and antithetical to "context-driven" textualism. *Id.* [8]

In the end, perhaps the most that can be said of the dissent's treatment of the ACA is that is an example of the "canon of construction" that some Justices once sarcastically decried—namely, the canon "under which in cases involving abortion, a permissible reading of a statute is to be avoided at all costs." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2353 (2016) (Alito, J., dissenting); *see Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) ("It is true this longstanding maxim of statutory interpretation has, in the past, fallen by the wayside when the Court confronted a statute regulating abortion."); *Thornburgh v. American Col. of Obstetricians & Gynecologists*, 476 U.S. 747, 814 (1986) (O'Connor, J., dissenting) ("[N]o legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case

---

[8] Idaho's *only* argument (at 40) in response to the ACA is that § 18023(c)(1) "contains an express savings clause stating that it is not to be construed to preempt state laws about abortion." But subsection (c)(1) expressly refers to "State laws regarding the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions." Idaho's law does not address these subjects. It is a prohibition on the *performance* of abortions. If Idaho's misreading of § 18023(c)(1) is its best response to § 18023(d), that is further proof that the ACA provides the easiest way to resolve this case.

involving state regulation of abortion."). Only here, the dissent was not just avoiding a "permissible" reading of the ACA, but rather the best and most logical one given the ACA's text, context, and history[9].

## B. Even Apart From The ACA, EMTALA Preempts Idaho's Criminal Statute In Narrow Emergency Circumstances

Turning to EMTALA itself, the statute contains two features that are critical to the preemption analysis. Bearing those features in mind, it is clear that EMTALA, on its own, preempts § 18-622.

1. *First*, EMTALA applies only in emergency situations. The Act's stabilization requirement is triggered when "an individual at a hospital has an emergency medical condition." 42 U.S.C. § 1395dd(c)(1).

---

[9] Idaho (at 30-31) and the *Moyle* dissenters cite statements by President Reagan as evidence that he would not have "happily signed EMTALA into law." *Moyle*, 144 S. Ct. at 2031. *Amici* doubt the interpretive value of presidential statements disconnected from EMTALA or the broader Consolidated Omnibus Budget Reconciliation Act of which it was a part. *See Artuz v. Bennett*, 531 U.S. 4, 10 (2000) (a statute's final wording "may, for all we know, have slighted policy concerns on one or the other side of the issue as part of the legislative compromise that enabled the law to be enacted"); *Lawson v. FMR LLC*, 571 U.S. 429 (2014) (Scalia, J, concurring) (rejecting reliance on enactment history because "we are a government of laws, not of men"). But if one believes it appropriate to consider a president's general views on the subject matter of a piece of legislation, nothing about *President Obama's* signing of § 18023(d) into law "beggars belief." *Moyle*, 144 S. Ct. at 2031.

Significantly, EMTALA does not set a national standard of care for all medical services. Instead, it "was meant to supplement state law solely with regard to the provision of limited medical services to patients in emergency situations." *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) (en banc); *see Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996) ("It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment."); 131 Cong. Rec. 28,491, 28,569 (1985) (statement of Sen. Dole) ("Under the provision of this amendment, a hospital is charged only with the responsibility of providing an adequate first response to a medical crisis. That means the patient must be evaluated and, at a minimum, provided with *whatever medical support services* and/or transfer arrangements that are consistent with the capability of the institution and the well-being of the patient. We should expect nothing less." (emphasis added)).

"Once EMTALA has met [its] purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, … the legal adequacy of that care is then governed

not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt." *Bryan*, 95 F.3d at 351; *see Harry*, 291 F.3d at 774. EMTALA "cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context." *Bryan*, 95 F.3d at 352. Put another way, EMTALA's preemptive force ends as soon as a patient receives stabilizing treatment. Here, the conflict between EMTALA and § 18-622 exists only in this narrow domain of emergency medical care.

*Second*, EMTALA focuses on "stabilizing" care. Crucially, EMTALA's stabilization requirement turns on the exercise of expert medical judgment. EMTALA's definition of "to stabilize" requires emergency providers "to provide such medical treatment of the condition as may be necessary to assure, *within reasonable medical probability*, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). The plain text of this statutory

definition relies on the "reasonable" medical judgments of emergency providers.[10]

EMTALA neither requires nor prohibits any *specific* form of care in a given case. But it does call for medical professionals to assess probabilities and determine the best course of stabilizing care consistent with their "reasonable" medical assessments. *See Moyle*, 144 S. Ct. at 2018 (Kagan, J., concurring) ("The statute does not list particular treatments…. What it instead requires is the treatment that is medically appropriate to stabilize the patient."); *Vickers*, 78 F.3d at 144 (EMTALA requires emergency "treatment based on diagnostic medical judgment."); *Cherukuri v. Shalala*, 175 F.3d 446, 454 (6th Cir. 1999) ("The statutory

---

[10] Idaho's assertion (at 37) that preemption would make "doctors a law unto themselves" is wildly fanciful. Even within the narrow domain of emergency treatment, EMTALA only governs whether stabilizing treatment is provided. Unlike emergency termination in exceedingly rare circumstances, *none* of Idaho's hypotheticals (euthanasia, lobotomy, electroconvulsive therapy, organ transplantation, marijuana prescription) would satisfy a generally accepted medical standard of care for stabilizing an emergency condition. Likewise, EMTALA does not address *the quality* of any given stabilizing treatment, which is instead left to state malpractice law. *E.g.*, *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996); *del Carmen Guadalupe v. Agosto*, 299 F.3d 15, 21 (1st Cir. 2002). Consequently, no amount of deference to a doctor's "reasonable" medical judgments could justify what Idaho contends in its farfetched hypotheticals.

definition of 'stabilize' requires a flexible standard of reasonableness that depends on the circumstances."). And as the Fifth Circuit has correctly recognized, the "reasonable medical probability" standard calls for "'[t]reatment that *medical experts* agree would prevent the threatening and severe consequence of' the patient's emergency medical condition while in transit." *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 559 (5th Cir. 2000) (emphasis added) (alteration in original); *see Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 519 (6th Cir. 2005) ("[C]ompliance with EMTALA's stabilization requirements entails medical judgment[.]"); *accord* 42 C.F.R. § 489.24(h)(2)(v) (a peer review organization must provide CMS with an "expert medical opinion" to establish an EMTALA violation under the process set forth in 42 U.S.C. § 1395dd(d)(3)).

EMTALA's definition of "to stabilize" is both flexible and deferential, but for good reason. Congress recognized that untrained legislators never could have specified *every* form of care that might be needed for *every* type of medical emergency a hospital might confront. Instead, Congress accounted for the endless variability of care that may be needed in emergency situations while expressly respecting providers'

expertise about the particular form of care that any emergency situation may require. In so doing, EMTALA strikes a careful balance by mandating a goal—stabilization—but deferring to "reasonable" medical judgment for how to achieve it.

Appellants essentially ignore the statutory term "reasonable." Idaho's opening brief, for example, cites the word only twice. Appellant's Br. 8, 36. But it is central to any textual understanding of EMTALA. Congress's use of "reasonable" evinces an intention to defer to the expertise of medical professionals. Indeed, the Supreme Court recently explained that the term "reasonable" confers "a degree of discretion" and "flexibility." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024). At the same time, it provides *bounded* discretion such that, contrary to Idaho's earlier representations in this case, emergency rooms *do not* "function as 'federal abortion enclaves governed not by state law." *Moyle*, 144 S. Ct. at 2021 (Barrett, J., concurring); *see Ascendium Ed. Sols. v. Cardona*, 78 F.4th 470, 479, 482 (D.C. Cir. 2023) (discussing limits inherent in the term "reasonable"); *supra* at 26 n.8. Appellants' failure to grapple with a statutory term is, yet again, inconsistent with good textualism. *E.g.*, Antonin Scalia & Bryan Garner, READING LAW:

THE INTERPRETATION OF LEGAL TEXTS 26 ("Textualism, in its purest form, begins and ends with what the text says and fairly implies.").

2. Section 18-622 is preempted because it criminalizes an emergency service option that federal law flexibly leaves to the "reasonable" judgment of medical professionals. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 878, 881 (2000) (finding conflict preemption where federal "standard deliberately sought variety … and allowing manufacturers to choose among" ways of attaining safety goals); *Barnett Bank v. Nelson*, 517 U.S. 25, 32–33 (1996) (holding that when federal law affords regulated entities a choice of options, state law that would forbid particular options is conflict-preempted); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155–56 (1982) (same); *see also Cantero v. Bank of Am.*, 602 U.S. ___, slip. op. at 9 (2024) (explaining that *de la Cuesta* held a California law to be preempted because it "interfered with the flexibility given to the savings and loan by federal law"); *POM Wonderful LLC v. Coca Cola Co.*, 573 U.S. 102, 120 (2014) ("In *Geier*, the agency enacted a regulation deliberately allowing manufacturers to choose between different options.… The Court concluded that the [state

law] action was barred because it directly conflicted with the agency's policy choice to encourage flexibility.").

Specifically, § 18-622 criminalizes an EMTALA-mandated stabilizing treatment in the rare case when termination is necessary to prevent "material deterioration" of a medical condition that can be expected to result in "serious jeopardy" to a patient's health, "serious impairment to bodily functions," or "serious dysfunction of any bodily organ or part," 42 U.S.C. § 1395dd. Where withholding treatment will mean material deterioration of an *already*-severe emergency medical condition, and a physician accordingly determines that termination is medically necessary, EMTALA's provisions are clear: Clinicians must stabilize the patient even if that requires the tragic performance of an emergency termination. Idaho law, however, is equally clear: Emergency termination is a crime.

Medical professionals therefore face an impossible choice. On the one hand, they can provide emergency services that are medically necessary and federally mandated, but expose themselves to the discretion of Idaho prosecutors armed with § 18-622's criminal and professional sanctions. On the other hand, they can steer clear of

prosecutorial scrutiny, but only by withholding medically necessary and federally mandated emergency services that would prevent *further* serious jeopardy to a pregnant patient's health, serious impairment of her bodily functions, or serious dysfunction of her organs. In other words, Idaho law takes away from physicians an emergency service option that affords, in a provider's judgment, the best possible outcome in a tragic situation. That presents an irreconcilable conflict. EMTALA therefore preempts § 18-622 when narrowly applied to emergency medical services.

## CONCLUSION

This Court should affirm the preliminary injunction.


October 11, 2024                    Respectfully submitted,


                                   */s/ Chad Golder* _____
                                   Chad Golder
                                   American Hospital Association
                                   2 City Center, Suite 400
                                   800 10th Street, NW
                                   Washington, DC 20001-4956
                                   202-626-4624
                                   cgolder@aha.org
                                   Counsel for *Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** Nos. 23-35440, 23-95450 _____

I am the attorney or self-represented party.

**This brief contains** **7000**_____words,   including   **0**__words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Chad Golder*_____ **Date** 10/11/24_____

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit using the Appellate Case Management System ("ACMS"). I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ *Chad Golder*
Chad Golder
