Nos. 23-35440, 23-35450 (consol.)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF IDAHO,

*Defendant-Appellant,*

*and*

MIKE MOYLE, *Speaker of the Idaho House of Representatives*; CHUCK
WINDER, *President Pro-Tempore of the Idaho Senate*; THE SIXTY-SEVENTH
IDAHO LEGISLATURE, Proposed Intervenor-Defendants,

*Movant-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:22-cv-00329-BLW
Hon. B. Lynn Winmill, District Court Judge

**BRIEF OF *AMICUS CURIAE* ST. LUKE'S HEALTH SYSTEM IN
SUPPORT OF APPELLEE SUPPORTING AFFIRMANCE**

Wendy Olson
STOEL RIVES LLP
101 S. Capitol Blvd.,
Suite 1900
Boise, ID 83702
(208) 387-4291

Lindsay C. Harrison
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amicus Curiae St. Luke's Health System, Ltd.*

**CORPORATE DISCLOSURE STATEMENT**

St. Luke's Health System, Ltd. is an Idaho nonprofit corporation.  St. Luke's Health System, Ltd. has no parent corporation.  No publicly held corporation, nor any other person or entity, owns any stock in St. Luke's Health System, Ltd.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................i

TABLE OF AUTHORITIES .................................................. iii

STATEMENT OF INTEREST ...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................4

ARGUMENT ..................................................................6

I.   IDAHO CODE § 18-622 IMPOSES CONFLICTING STATE AND FEDERAL OBLIGATIONS ON IDAHO'S HEALTH CARE PROVIDERS. ...............................................................6

II.  VACATING THE DISTRICT COURT'S INJUNCTION WOULD CAUSE IRREPARABLE HARM TO THE PEOPLE OF IDAHO..............12

     A.   Vacating the Injunction Will Again Irreparably Harm Patient Care and Increase Suffering. ..............................12

     B.   Vacating the Injunction Will Also Harm Medical Professionals in Idaho, Which in Turn Harms the Idaho Public. ....................................................17

     C.   The Legislature's Amendments Do Not Avoid These Harms. ...........22

III. THE DISTRICT COURT'S INJUNCTION SHOULD NOT BE NARROWED OR MODIFIED .....................................24

CONCLUSION ................................................................29

# TABLE OF AUTHORITIES

CASES

*Moyle v. United States*, 144 S. Ct. 2015 (2024) ...................... 4, 7, 9, 11, 12, 16, 25

*Planned Parenthood Great Northwest v. Idaho*, 522 P.3d 1132 (Idaho 2023) ...........................................................................................................23

*Small v. Avanti Health Systems, LLC*, 661 F.3d 1180 (9th Cir. 2011) ...................12

*State v. Summer*, 76 P.3d 963 (Idaho 2003)............................................................26

*United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022)................................8

STATUTES

1 U.S.C. § 8(a) ...........................................................................................................11

42 U.S.C. § 238n .......................................................................................................28

42 U.S.C. § 1395cc(a)(1)(I)(i) ............................................................................... 6-7

42 U.S.C. § 1395dd(b)(1) .........................................................................................10

42 U.S.C. § 1395dd(b)(2) ...........................................................................................9

42 U.S.C. § 1395dd(e)(1)(A) ........................................................................ 9, 11, 28-29

42 U.S.C. § 1395dd(e)(1)(A)(i) ...........................................................................7, 11

42 U.S.C. § 1395dd(e)(1)(A)(ii) .................................................................................7

42 U.S.C. § 1395dd(e)(1)(A)(iii) ................................................................................7

42 U.S.C. § 1395dd(e)(3).........................................................................................24

42 U.S.C. § 1395dd(e)(3)(A) .................................................................................7, 8

42 U.S.C. § 1395dd(f)................................................................................................2

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. V, § 507(d)(1), 136 Stat. 4459, 4908 (2022)................................................28

Idaho Code § 18-204...............................................................................................18

Idaho Code § 18-622(1) ................................................................18

Idaho Code § 18-622(2)(a)(i).................................................3, 10, 23

Idaho Code § 18-622(2)(a)(i) (2023) .........................................7

**O**THER **A**UTHORITIES

Ada County Medical Society, *Idaho Physician Retention Survey – May 2023*, https://bit.ly/4f0POkz................................................20

Am. Psychiatric Ass'n, *Position Statement on Abortion and Women's Reproductive Healthcare Rights* (Mar. 2023), https://bit.ly/3XVlq4m..............................................................27

Christopher L. Bennett et al., *United States 2020 Emergency Medicine Resident Workforce Analysis*, 80 Annals Emergency Med. 3 (July 1, 2022), https://bit.ly/3QM50pB .............................................19

Brief for Respondent United States, *Moyle v. United States*, 144 S. Ct. 2015 (2024), 2024 WL 1298046 ..............................................26, 27

Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System, *Natality on CDC WONDER Online Database: Natality Records 2016-2023*, https://bit.ly/3ZE4rEh (last visited Oct. 9, 2024) ................................1

Christopher Cheney, *Rural Areas Experiencing Emergency Medicine Workforce Shortage*, Rural Health Info. Hub (June 29, 2022), https://bit.ly/3QqHcIm......................................................19

Kelly Gooch & Marissa Plescia, *States Ranked by Active Physicians Per Capita*, Becker's Hosp. Rev. (Mar. 9, 2022), http://bit.ly/49VrkHM.............................................................18

Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan. 2023), https://bit.ly/3QEEcrp..............................18

Kathleen McLaughlin, *No OB-GYNs Left in Town: What Came After Idaho's Assault on Abortion*, The Guardian (Aug. 22, 2023), https://bit.ly/4gYBxH8 .........................................................21

Angela Palermo, *Boise-area Hospital Will Close Labor, Delivery Units. What It's Saying – and Not Saying*, Idaho Statesman (Feb. 22, 2024), https://bit.ly/3XVeSTk ...............................................................20

Angela Palermo, *Idaho Needs Doctors. But Many Don't Want to Come Here. What That Means for Patients*, Idaho Statesman (May 15, 2024), https://bit.ly/401uwiB.......................................................20, 21

Transcript of Oral Argument, *Moyle v. United States*, 144 S. Ct. 2015 (2024), https://bit.ly/3zWSukt .........................................11, 27, 28, 29

U.S. Dep't of Health & Human Servs., *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh.............................................................19

# STATEMENT OF INTEREST[1]

St. Luke's Health System, Ltd. ("St. Luke's") is the largest Idaho-based, not-for-profit, community-owned and community-led health system. Its mission is to improve the health of people in the communities it serves. To fulfill that mission, St. Luke's operates hospitals, clinics, and other health facilities across Southwest and South-Central Idaho, including eight emergency departments. Nine trauma centers in Southwest and South-Central Idaho are designated Time Sensitive Emergency ("TSE") centers; St. Luke's operates six of them. St. Luke's employs more than 16,000 people and is the largest private employer in the State of Idaho. St. Luke's physicians and nurses treat patients millions of times each year, including over one million hospital visits, 232,000 emergency department visits, and 2.1 million clinic visits in 2023 alone. Many of those patients are pregnant women; in 2023, St. Luke's helped welcome more than 8,920 newborns, representing 40% of live births in the state of Idaho.[2]

---

[1] *Amicus* has obtained the consent of all parties to file this brief. No party or party's counsel authored the proposed brief in whole or in part, and no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief. No person other than St. Luke's or its counsel has made a monetary contribution to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

[2] Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System, Natality on CDC WONDER Online Database. Data are from the Natality Records 2016-2023, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at https://bit.ly/3ZE4rEh (last visited Oct. 9, 2024).

Hospitals in Idaho participate in Medicare pursuant to agreements with the United States Department of Health and Human Services and are required to comply with the Emergency Medical Treatment and Labor Act ("EMTALA"). Because Idaho Code § 18-622 creates a direct conflict with EMTALA, it places hospitals, including St. Luke's, in the precarious position of risking the criminal liability and medical licenses of their providers simply for complying with federal law. Alternatively, complying with § 18-622 risks violating EMTALA and St. Luke's ability to participate in Medicare. As a result, physicians in Idaho, and the institutions for which they work, are faced with an irreconcilable conflict. Foreseeing the potential for such conflict, Congress expressly stated that EMTALA preempts such conflicting state law requirements. 42 U.S.C. § 1395dd(f).

In this brief, St. Luke's offers first-hand insight into what transpires in Idaho's emergency departments[3] and how § 18-622 imperils patient care—including how it *in fact* imperiled patient care during the period when the Supreme Court temporarily stayed the district court's injunction in this case. Healthcare providers in Idaho's emergency departments treat all kinds of health conditions experienced by pregnant patients. In some critical cases, termination of a clinically diagnoseable pregnancy is the emergency standard of care necessary to stabilize a patient. In many such

---

[3] Patients with emergency pregnancy-related conditions are frequently triaged and treated in a hospital's labor & delivery department, which is considered a dedicated "emergency department" under EMTALA.

cases, absent termination, the patient may experience severe consequences short of death that are nonetheless irreparable. These include loss of reproductive organs and fertility, loss of other organs, permanent disability, and severe pain, among others. Idaho Code § 18-622 prohibits healthcare providers from providing the necessary care to stabilize their patients and prevent these harms. This conflict is not hypothetical, and its consequences were vividly seen when the law was temporarily permitted to go into effect. Vacating or narrowing the district court's injunction now would again have dire consequences for physicians, patients, and their families.

St. Luke's understands the Idaho Legislature's reasons for enacting this law and appreciates the Legislature's obligation to enact laws that reflect the needs and values of Idahoans. Unfortunately, the law's unintended consequences have harmed, and, if permitted to take full effect again, will harm, patients, medical professionals, the Idaho healthcare system, and Idaho residents more broadly. That remains true even after the Legislature amended the law to convert the law's affirmative defenses to exceptions. As it stands, the law includes an exception that permits termination of pregnancy where "necessary to prevent the [mother's] death," Idaho Code § 18-622(2)(a)(i), but does not permit termination of pregnancy when necessary to stabilize other serious and debilitating health conditions. Because St. Luke's is dedicated to improving the health and well-being of Idahoans and

supporting its physicians, and because § 18-622 undermines those goals, *Amicus* respectfully files this brief in support of the United States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court should affirm the district court's preliminary injunction preventing enforcement of Idaho Code § 18-622 because Idaho's prohibition on abortion conflicts with the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. *Amicus* previously cautioned this Court that permitting Idaho's law to take effect would have grave consequences. And it did: as Justice Kagan explained, when the Supreme Court stayed the district court's injunction, the "on-the-ground impact was immediate. To ensure appropriate medical care, the State's largest provider of emergency services had to airlift pregnant women out of Idaho roughly every other week, compared to once in all of the prior year (when the injunction was in effect)." *Moyle v. United States*, 144 S. Ct. 2015, 2016-17 (2024) (Kagan, J., concurring). That provider was St. Luke's, and its "physicians were forced to step back and watch as their patients suffered, or arrange for their patients to be airlifted out of Idaho." *Id.* at 2023 (Jackson, J., concurring). Preserving the district court's injunction is essential to avoid returning to that state of affairs.

The purpose of this brief is to describe in practical terms the continuing conflict between federal and state law, and the real-world harms imposed on patients and healthcare providers as a result. The nature of the conflict is straightforward:

4

while § 18-622 prohibits termination except to prevent the *death* of the mother, EMTALA requires providers to offer stabilizing care even when an emergency medical condition poses severe health risks short of death. This can and does occur with some pregnant patients who suffer an emergency that threatens severe consequences and for which the standard of care includes termination of the pregnancy. When the district court's injunction was stayed, real patients suffered. Due to the uncertainty created by § 18-622, physicians' best option was often to transfer patients out of state—thereby delaying care and creating additional risks for the patients. Those delays can cause not only pain and suffering, but also more permanent effects such as organ failure, loss of reproductive organs, and other forms of disability.

While patients are most directly impacted by § 18-622's implementation, they are not alone: the law's unintended consequences also harm medical professionals, the Idaho healthcare system, and Idaho residents more broadly. Fearful that they will be compelled to violate federal or state law as a result of the conflict between EMTALA and § 18-622, physicians have fled from Idaho and/or refused to take jobs in the state. One study found that Idaho lost 22% of its practicing obstetricians in the months after § 18-622 was enacted. The consequences for patient care are significant.

Based on *Amicus*' experience, there is no need to narrow the scope of the injunction based on the United States' purported concessions before the Supreme Court. In seeking a stay before the Supreme Court, Idaho asserted irreparable harm based on various hypothetical scenarios that rely on fundamentally and factually incorrect premises, for instance involving the mental health of the patient or conscience objections from healthcare providers. Pregnancy termination is not the standard of care to stabilize a mental health emergency, and hospitals are already required to allow clinicians to opt out of care for which they have a conscience objection. There is no need to narrow the existing injunction to rule out hypotheticals that do not occur.

As the state's largest private employer and the entity responsible for treating more patients on the ground in Idaho than any other (more than 232,000 emergency department visits in 2023), *Amicus* respectfully submits this brief in support of the United States.

## ARGUMENT

### I. IDAHO CODE § 18-622 IMPOSES CONFLICTING STATE AND FEDERAL OBLIGATIONS ON IDAHO'S HEALTH CARE PROVIDERS.

From the perspective of Idaho's physicians and hospital systems, Idaho Code § 18-622 and EMTALA irreconcilably conflict. As a condition of participating in Medicare, hospitals must comply with EMTALA. *See* 42 U.S.C.

§ 1395cc(a)(1)(I)(i).  Under EMTALA, hospitals must offer stabilizing treatment where "the health" of a patient is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part."  *Id*. § 1395dd(e)(1)(A)(i)-(iii).  To "stabilize" a patient, the hospital must "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result" if the patient is discharged or transferred.  *Id*. § 1395dd(e)(3)(A).  By contrast, Idaho's Defense of Life Act prohibits abortion with limited exceptions, including (as amended) when a physician determines that the "abortion was necessary to prevent the *death* of the pregnant woman."  Idaho Code § 18-622(2)(a)(i) (2023) (emphasis added).

Thus, "[b]y their terms, the two laws differ" because "EMTALA requires a Medicare-funded hospital … to stabilize a medical condition that seriously threatens a pregnant woman's life or health," which may mean terminating a clinically diagnosable pregnancy, while "Idaho allows abortion only when 'necessary to prevent' a pregnant woman's 'death.'"  *Moyle*, 144 S. Ct. at 2017 (Kagan, J., concurring) (quoting Idaho Code Ann. § 18-622(2)(a)(i) (Supp. 2023)).  This gap between what the two laws require is meaningful in many cases.

For example, termination is sometimes necessary to prevent serious jeopardy to the health of a pregnant patient; in those cases, so long as the patient consents, a

provider under EMTALA must perform that procedure.[4]   St. Luke's physicians submitted declarations[5] in the district court describing several examples: two patients with preeclampsia with severe features, Cooper Decl. ¶ 6; Seyb Decl. ¶¶ 9-10; two patients with HELLP syndrome, Cooper Decl. ¶¶ 8, 10; a patient with septic abortion, Seyb Decl. ¶¶ 7-8; and a patient in hypovolemic shock due to blood loss, *id*. ¶¶ 11-12.   In each case, a fetal heartbeat was detected when the patient presented in the emergency department.   In each case, the health of the patient was in serious jeopardy.   In each case, physicians determined that termination of the clinically diagnoseable pregnancy was the standard of care "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result."  42 U.S.C. § 1395dd(e)(3)(A).   As a result, in each case, physicians were compelled by EMTALA to recommend termination of the pregnancy (with patient consent) knowing that the termination would result in fetal death.

And these cases are just a few examples: pregnant patients also present with early incomplete miscarriage as well as other conditions that can occur concurrent

---

[4] To be clear, EMTALA does not, under any circumstance, require "on-demand," elective abortion care.  For EMTALA to apply, patients must present with emergent conditions, for which stabilizing treatment (including, in some cases, abortion care) is necessary to prevent "material deterioration" of the patient's health. 42 U.S.C. § 1395dd(e)(3)(A).  Patients without an emergency medical condition are sent home following a medical screening exam.

[5] *See* Declaration of Kylie Cooper, M.D., Dkt. 17-7 (hereinafter "Cooper Decl."); Declaration of Stacy T. Seyb, M.D., Dkt. 17-8 (hereinafter "Seyb Decl."); *United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022).

with, or because of, the pregnancy, such as cancer, pulmonary hypertension, and heart failure. In some of these cases, physicians determine that termination is necessary to stabilize the patient's health and, with the patient's informed consent, is therefore required by EMTALA.

Appellants belatedly argued to the Supreme Court that terminating a pregnancy in various health-related scenarios (e.g., in response to preeclampsia, preterm premature rupture of the membranes (PPROM), sepsis, and placental abruption) would in fact be considered life-saving care permitted under Idaho law. *See, e.g.*, *Moyle*, 144 S. Ct. at 2025 (Jackson, J., concurring) (referring to this "convenient rhetorical maneuver"). They have advanced the same argument here, asserting that the "injunction cannot stand because the administration has not shown any circumstance where Idaho law prohibits an abortion that EMTALA allegedly requires." Idaho Replacement Opening Br. 5. But EMTALA requires stabilizing treatment for *any* "emergency medical condition," not just those treatments intended to prevent death.[6] 42 U.S.C. § 1395dd(e)(1)(A). The state-law exception for terminations that are "necessary to prevent the death of the pregnant woman" cannot plausibly cover all these scenarios, and there is no express exception to preserve the

---

[6] EMTALA does not require termination, or any other stabilizing treatment, where a patient refuses to consent to the treatment. *See* 42 U.S.C. § 1395dd(b)(2) (acknowledging that "the individual" with an emergency medical condition, after being informed "of the risks and benefits" of treatment, may "refuse[] to consent to the . . . treatment").

mother's underlying health, bodily organs, fertility, or the other irreparable harms women may experience. *See* Idaho Code § 18-622(2)(a)(i).

Furthermore, as both Dr. Seyb and Dr. Cooper explained, some of their patient examples may have survived without a termination but would have been at risk for severe health problems, including renal failure and clotting disorder, Seyb Decl. ¶¶ 7-8, stroke, seizure, pulmonary edema, and kidney failure, Cooper Decl. ¶¶ 6, 10. Thus, in many cases where termination is necessary to "stabilize" a patient under EMTALA because the life *or health* of the mother is in serious jeopardy, Idaho Code § 18-622 appears to prohibit it unless "necessary to prevent the death of the pregnant woman." The record thus contains ample evidence that, *from the perspective of Idaho physicians*, EMTALA and Idaho Code § 18-622 conflict. The assurances of the State's lawyers that termination would be life-saving care in every situation *they* can imagine is hardly adequate when the physician herself could not testify truthfully to that fact if faced with criminal prosecution under Idaho Code § 18-622.

Finally, Idaho cannot evade EMTALA's mandates by arguing that EMTALA imposes a duty to stabilize the "unborn child" when termination is necessary to stabilize the pregnant woman. *See* Idaho Replacement Opening Br. 29-32. EMTALA imposes a duty to stabilize the "individual" seeking care. *See* 42 U.S.C. § 1395dd(b)(1) (stating that a hospital's obligation to stabilize arises when it determines that "the individual has an emergency medical condition"). When a

pregnant woman presents with an emergency medical condition, she is the "individual" to whom that obligation runs; this is clear from the statute's distinction between "the individual" and "her unborn child," 42 U.S.C. § 1395dd(e)(1)(A)(i), and from the Dictionary Act's definition of "individual," which includes humans who are "born alive" but does not include an unborn fetus, 1 U.S.C. § 8(a). Idaho points to no provision in EMTALA imposing an obligation to *sacrifice* the health of the pregnant individual to stabilize her unborn child.[7] It is telling that Idaho's argument requires the Court to ignore the fact that pregnant women are the protected "individuals" under EMTALA. *See also* Tr. of Oral Arg. 104-111, *Moyle*, 144 S. Ct. 2015, https://bit.ly/3zWSukt (hereinafter "Tr. of Oral Arg."). Such an interpretation cannot be squared with EMTALA's text or its purpose.

In sum, given the plain differences in the language of the laws, as well as the actual and potential scenarios described above, "it is both legally and factually implausible to say that Idaho's current litigating position actually mitigates the conflict between that State's law and EMTALA." *Moyle*, 144 S. Ct. at 2025

---

[7] EMTALA also requires hospitals to offer stabilizing treatment to a pregnant woman, not in labor, who presents with an emergency medical condition that threatens her unborn child's health, but not her own. *See* 42 U.S.C. 1395dd(e)(1)(A). But that protection does not alter the statute's separate imposition of an obligation to stabilize a pregnant woman who presents with an emergency medical condition that *does* threaten her health; and when termination is the appropriate stabilizing treatment for such a condition, EMTALA requires the hospital to provide her with that treatment (which she may accept or refuse after being informed of the risks and benefits).

(Jackson, J., concurring in part). Because EMTALA sometimes requires physicians to perform a termination that would fit the definition of an abortion under Idaho law, the criminal ban on abortions in Idaho Code § 18-622 creates a conflict between the state and federal obligations of St. Luke's healthcare providers.

## II. VACATING THE DISTRICT COURT'S INJUNCTION WOULD CAUSE IRREPARABLE HARM TO THE PEOPLE OF IDAHO.

A showing of irreparable harm does not require proof "that irreparable harm is certain or even nearly certain[,]" only that it is "likely." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). That standard is certainly met here.

### A. Vacating the Injunction Will Again Irreparably Harm Patient Care and Increase Suffering.

If the district court's injunction is vacated, Idaho Code § 18-622 will again cause irreparable harm to the Idaho public by delaying and disrupting patient care. When Idaho Code § 18-622 took effect, it criminalized what previously had been mandated by physicians' training and federal law. When a pregnant patient presented to an emergency room with serious complications threatening her health, the treating physician's training and federal law indicated that a termination should be performed upon receiving the patient's consent. Idaho Code § 18-622 disrupts that care. By its terms, the law chills healthcare providers from administering care necessary to stabilize pregnant patients whose health is in jeopardy. *Cf. Moyle*, 144 S. Ct. at 2025 (Jackson, J., concurring) (noting that a doctor "would surely be cowed

into not providing abortion care that medical standards warrant and federal law requires" given the "different legal thresholds of action under state and federal law").

This chilling effect has real consequences. In an emergency, time matters. Even if a patient ultimately receives the medically necessary care, Idaho Code § 18-622 will delay that care until a debate—likely had among physicians and non-physician attorneys—determines whether it is truly "necessary to prevent the death" of the patient, Idaho Code § 18-622(2)(a)(i), or whether it is "only" necessary to avert a serious but non-lethal threat to the patient's health—which is not permitted under Idaho law. Because a physician administering an emergency termination in Idaho would be risking their professional license, livelihood, personal security, and freedom, it is only natural that physicians may hesitate and seek assurance, to the extent possible, before proceeding. In the meantime, their patients may suffer, and their conditions may deteriorate, perhaps materially. These delays ultimately harm the critically ill pregnant patient, along with other patients in the Emergency Department whose providers must scramble to cover additional patients as other providers debate with lawyers as to whether the indicated care is permissible under Idaho law and when it may be administered.

These harms are not hypothetical. In all of 2023, before Idaho's law went into effect, only one pregnant patient presenting to St. Luke's with a medical emergency was airlifted out of state for care. Yet in the few months when Idaho's new abortion

law was in effect, *six* pregnant St. Luke's patients with medical emergencies were transferred out of state for termination of their pregnancy. One patient presented with hypertensive disorder—i.e., severe preeclampsia—and six patients presented with PPROM—i.e., spontaneous rupture of the membrane containing a fetus before 22 weeks of gestation. Preeclampsia occurs when a woman with previously normal blood pressure suddenly develops high blood pressure and protein in the urine or other problems such as impaired liver function or low platelet count after 20 weeks of gestation; if her blood pressure cannot be reduced, the patient can suffer severe liver failure, renal dysfunction, cerebral hemorrhage, and eventually, death. PPROM too can be a life-threatening condition with high risk of infection, sepsis, and bleeding from placental abruption, and for which the standard of care includes termination. Prior to 22 weeks of gestation, a neonatal intensive care unit (NICU) would not even attempt to resuscitate, as the fetus could not survive.

The St. Luke's physicians and nurses treating these patients when the law was in effect faced a terrible choice: they could either wait until the risks to the patient's health became life-threatening, or they could transfer the patient out of state. The first option was medically unsound and dangerous because the conditions that patients experienced could cause serious health complications if untreated, including systemic bleeding, liver hemorrhage and failure, kidney failure, stroke, seizure, and

pulmonary edema. Moreover, watching a patient suffer and deteriorate until death is imminent is intolerable to most medical professionals.

Accordingly, under the circumstances, these patients were transferred out of state. Of course, airlifting patients *also* put patients at risk due to significant delays in care while arranging medical transport out of state. And those delays could create a situation where the patient is no longer stable enough that the benefits of transfer outweigh the risks, again leaving Idaho physicians to wait until termination is necessary to prevent the patient's death—even while knowing that the wait could have severe health consequences, including damage to the patient's future reproductive health. As a result, St. Luke's physicians described a constant fear that patients would present in an emergency room who were not stable enough to transfer, yet the medically indicated stabilizing care—termination—could not be provided because it was not yet needed to prevent the patient's *death*. Fortunately, in the few months the injunction was stayed, that nightmare scenario did not occur. But for six different patients in just a few months, Idaho Code §18-622 forced St. Luke's to airlift critical pregnant patients out of state to receive stabilizing care they could not receive in their home state. These patients were forced to leave their homes, their families, their doctors, and their support systems—all because § 18-622 prohibited St. Luke's physicians from providing the stabilizing care required by EMTALA. As Justice Kagan explained, "[t]hose transfers measure the difference

between the life-threatening conditions Idaho will allow hospitals to treat and the health-threatening conditions it will not, despite EMTALA's command." *Moyle*, 144 S. Ct. at 2017 (Kagan, J., concurring).

Airlifting these patients was the medically appropriate course of action to avoid a conflict between the stabilizing treatment required by federal law and Idaho's law. Notwithstanding Idaho's limited exception to prevent the death of the patient, the law does not permit termination where necessary to otherwise stabilize the patient's health. In those situations, if a patient has no option but to continue their pregnancy, they will suffer—potentially gravely. The conditions that call for termination can be extremely painful. If untreated, they can cause serious health complications, including systemic bleeding, liver hemorrhage and failure, kidney failure, stroke, seizure, pulmonary edema, and more. *See, e.g.*, Cooper Decl. ¶¶ 8, 10. And often, it is patients with wanted pregnancies who must make the heart-wrenching decision to terminate to avoid these complications—including, in some cases, to preserve their future ability to have children.

When these situations arise, they are agonizing for the patient, as their joy in expecting a new baby turns to tragedy. This tragedy is compounded when they learn the care that is needed cannot be provided in their own state, making it likely they will suffer irreparable health consequences in addition to the loss of their expected

child. Moreover, the health consequences of delayed care can also be long term, making it difficult for them to care for any existing children they have at home.

In short, there is no need to speculate about the harms to patients if the district court's injunction is vacated. The events that transpired during the stay of that injunction showed the actual consequences in practice. The massive increase in airlifts in just the few months when the Idaho law was in effect was a dramatic change for a small state like Idaho, and it confirms the continued importance of maintaining the injunction the district court has entered in this case. Otherwise, more providers will find themselves unable to offer necessary care, more patients will be sent long distances for care, and more patients will be harmed.

## B. Vacating the Injunction Will Also Harm Medical Professionals in Idaho, Which in Turn Harms the Idaho Public.

Though pregnant patients will bear the brunt of § 18-622's consequences, they will not bear them alone. Health care providers will be mired in legal debates and live with the fear of criminal proceedings should they need to terminate a pregnancy for the sake of their patient's health. Again, this harm is not theoretical: that is what occurred when the law was in effect.

The exception for abortions necessary to "prevent the death" of the mother does not avert these consequences. From a physician's perspective, it is not always easy to tell—even subjectively and in good faith—when a patient's life, as opposed to her health, is imperiled. Before § 18-622 took effect, Idaho physicians could

provide stabilizing care without trying to decipher the line between health and death. Now, they must waste precious minutes trying to parse where one obligation begins and another ends. Their patients suffer accordingly.

Making matters worse, Idaho law also exposes those who assist physicians in terminating a pregnancy to criminal and license-suspension risk. *See* Idaho Code § 18-204 (criminal accessory statute); *id.* § 18-622(1) (license suspension provision). As a result, there may be some cases where a physician may be comfortable proceeding but has no nurse or other staff to assist. This too means at best delayed care and at worst deficient or no care at all.

Thus, vacating or narrowing the injunction would again deter physicians and nurses from practicing in Idaho, thereby compounding existing provider shortages. Medical providers in Idaho are already stretched thin. Idaho has the lowest number of physicians per capita of all fifty states.[8] A January 2023 report by the Idaho Department of Health and Welfare shows that 98.2% of areas in Idaho have a primary care professional shortage.[9] Idaho also has a shortage of emergency

---

[8] Kelly Gooch & Marissa Plescia, *States Ranked by Active Physicians Per Capita*, Becker's Hosp. Rev. (Mar. 9, 2022), http://bit.ly/49VrkHM.

[9] Idaho Dep't Health & Welfare, *Bureau of Rural Health & Primary Care Brief* (Jan. 2023), https://bit.ly/3QEEcrp.

physicians.[10] And Idaho is one of the states most affected by the nationwide OB-GYN shortage.[11] This shortage is both caused and exacerbated by the lack of a single OB-GYN residency program in the State of Idaho. That gap means that every OB-GYN physician must be recruited to Idaho from out of state.

Unfortunately, permitting Idaho Code § 18-622 to take effect would inevitably worsen these provider shortages by deterring medical professionals from practicing in Idaho. *See* Seyb Decl. ¶ 14; Declaration of Dr. Emily Corrigan ¶ 32, Dkt. No. 17-6 (stating that "at least one of my colleagues has already decided to stop her part-time work at our hospital due to the stress of complying with this law"). Since the Legislature passed § 18-622, the shortages have become dire. In 2023, St. Luke's lost two Maternal Fetal Medicine ("MFM") specialists—Dr. Kylie Cooper and Dr. Lauren Miller, both declarants in the district court proceedings—due to § 18-622. Another declarant, Dr. Huntsberger, left Idaho due to the uncertainties surrounding § 18-622. At present, there are *no* MFM specialists in the northern or

---

[10] *See* Christopher L. Bennett et al., *United States 2020 Emergency Medicine Resident Workforce Analysis*, 80 Annals Emergency Med. 3 (July 1, 2022), https://bit.ly/3QM50pB; *see also* Christopher Cheney, *Rural Areas Experiencing Emergency Medicine Workforce Shortage*, Rural Health Info. Hub (June 29, 2022), https://bit.ly/3QqHcIm.

[11] U.S. Dep't of Health & Human Servs., *Projections of Supply and Demand for Women's Health Service Providers: 2018-2030* (Mar. 2021), https://bit.ly/3PhGagh (projecting demand of OB-GYNs to exceed supply in Idaho).

eastern portions of the state, and hospitals in eastern Idaho must use a telephone consult service with MFMs from outside of Idaho.

Moreover, ten of the OB-GYNs in the Panhandle region of Idaho alone have left the state or resigned; several OB-GYNs in Boise have transitioned to GYN-only practice, meaning they will no longer provide obstetric care; three midwives have resigned or relocated out of state; and many of St. Luke's remaining providers are seriously considering reducing their practice, moving, or retiring early. This mirrors the pattern statewide: in the fifteen months after § 18-622's enactment, 22% of Idaho obstetricians stopped practicing in the state.[12] As of May 2024, there is just one obstetrician per 8,510 Idahoans.[13] And the problem may worsen still: Over half of Idaho OB-GYNs surveyed in 2023 were considering leaving Idaho; of those, 96% said they would reconsider or very likely stay if a health exception was added to the state's abortion law.[14]

Recruitment for St. Luke's has likewise been fraught: Since § 18-622's enactment, St. Luke's has had markedly fewer applicants for open physician

---

[12] Angela Palermo, *Boise-area Hospital Will Close Labor, Delivery Units. What It's Saying – and Not Saying*, Idaho Statesman (Feb. 22, 2024), https://bit.ly/3XVeSTk.
[13] Angela Palermo, *Idaho Needs Doctors. But Many Don't Want to Come Here. What That Means for Patients*, Idaho Statesman (May 15, 2024), https://bit.ly/401uwiB.
[14] *See* Ada County Medical Society, *Idaho Physician Retention Survey – May 2023*, https://bit.ly/4f0POkz.

positions, particularly in obstetrics.[15] And several out-of-state candidates have withdrawn their applications upon learning of the challenges of practicing in Idaho, citing § 18-622's enactment and fear of criminal penalties. Program directors in other states have said they will no longer recommend to any of their fellows that they consider job opportunities in Idaho. Again, this mirrors the pattern statewide: As the president of the Idaho Hospital Association explained in an interview, physicians are refusing in droves to come to a state that criminalizes physicians' efforts to safeguard their patients' health.[16]

As a result of provider shortages, hospitals are simply shutting down their labor and delivery services. Dr. Huntsberger's hospital, Bonner General Health, no longer provides any obstetrical care.[17] Valor Health, the only hospital in Emmett, closed its obstetrics program as well.[18] And West Valley Medical Center has closed its labor and delivery and neonatal intensive care units effective April 1, 2024.[19] These sorts of closures can only be expected to proliferate as more doctors leave and few, if any, are willing to move to Idaho to take their places.

---

[15] For 2024, St. Luke's received a record-low 57 applications for open obstetrics positions—a 39% and 47% decrease from 2022 and 2021, respectively.

[16] *See* Palermo, *supra* note 13.

[17] *See* Kathleen McLaughlin, *No OB-GYNs Left in Town: What Came After Idaho's Assault on Abortion*, The Guardian (Aug. 22, 2023), https://bit.ly/4gYBxH8.

[18] *See* Palermo, *supra* note 13.

[19] *Id.*

The consequences of provider shortages are serious. Without enough physicians and nurses to provide medical care to a community, the quality of care suffers, wait times for an appointment increase, and practitioners become overworked and stressed, causing burnout and—in a vicious cycle—deterring other people from entering the medical field or practicing in Idaho, which only compounds the shortages going forward. Again, these consequences will be felt by far more than just the pregnant patients most directly affected by § 18-622. By making it materially more difficult to attract and retain OB-GYNs, family practitioners, emergency physicians, maternity nurses, and other medical providers, Idaho Code § 18-622's enforcement will harm the public interest.

### C. The Legislature's Amendments Do Not Avoid These Harms.

The Legislature's amendments to Idaho Code § 18-622—which, *inter alia*, set forth an exemption for pregnancy terminations that physicians deem necessary to prevent the death of the mother—do not, and did not during the stay, forestall the harms to patients, physicians, or the people of Idaho.

*First*, the "prevent the death" exception does not mitigate the law's chilling effect on medical providers who could be criminally prosecuted if they are found to have violated the law. The exception is sufficiently narrow—covering threats to life, but not to other serious (though nonfatal) health complications—that providers cannot assume they will escape prosecution if their patients survive, yet suffer,

absent termination. That was true of St. Luke's physicians treating patients while the injunction was stayed: they could not say for certain that termination was necessary to prevent the death of their patients—at least not yet—but termination *was* necessary to prevent severe heath complications and other long-term consequences, according to their medical training and the standard of care. And physicians cannot be sure that prosecutors would not second guess physicians' "good faith medical judgments" that an abortion was necessary to prevent the death of a pregnant patient. Idaho Code § 18-622(2)(a)(i); *cf. Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1204 (Idaho 2023) ("Of course, a prosecutor may attempt to prove that the physician's subjective judgment … was not made in 'good faith'").

*Second*, and relatedly, the limited exception leads to, and led to, prolonged suffering. Because it allows termination of a clinically diagnosable pregnancy only where necessary to prevent death, it encourages providers to delay medically necessary treatment until the patient is close to death, even though the provider understands that the condition will inevitably worsen and even though the patient suffers in the meantime. Said differently, even if the health of the pregnant patient is in serious jeopardy—where she may suffer a lifetime of debilitating complications and excruciating pain if she does not receive an emergency termination—so long as

the suffering is short of death, even the amended § 18-622 provides no exception. EMTALA exists to prevent this deterioration. *See* 42 U.S.C. § 1395dd(e)(3).

*Third*, the amendments do not ameliorate the law's harmful effects in discouraging healthcare providers from practicing in Idaho. The exception does not change the fact that, by forcing physicians to allow their patients to suffer, § 18-622 will make Idaho an unwelcome home for OB-GYNs, family practitioners, emergency physicians, and other providers seeking to minimize patient suffering consistent with their professional assessments.

## III. THE DISTRICT COURT'S INJUNCTION SHOULD NOT BE NARROWED OR MODIFIED.

Finally, Idaho argues that the "United States has no irreparable harm from Idaho law," and that this Court should at minimum "narrow or modify the injunction to reflect the concessions the administration made to the Supreme Court about its position." Idaho Replacement Opening Br. 41, 43. *Amicus* disagrees on both points.

*First*, the United States has plainly suffered irreparable harm given the conflict between federal and state law extensively detailed above. In arguing to the contrary, Idaho primarily relies on the PPROM example, stating that there is no conflict between federal and state law in such cases because under § 18-622(2)(a)(i), a "doctor treating a patient with PPROM pre-viability will try to save the lives and preserve the health of both the mother *and* her child," and the doctor can often simply "monitor[] the mother's temperature and white-blood-cell count" and "watch for

infection and prescribe antibiotics if necessary." Idaho Replacement Opening Br. 42 (citing PPROM Foundation, *PPROM Facts* (June 21, 2024), https://www.aap prom.org/community/ppromfacts).

*Amicus*'s experience during the period when the Supreme Court stayed the district court's injunction disproves Idaho's contention. For some patients with PPROM pre-viability, termination is the necessary stabilizing care—and for other patients, waiting until the condition deteriorates to a near-fatal state risks horrific consequences, including organ failure. As a result, uncertainty about physicians' obligations under federal and state law led to five women being transported out of state—specifically in cases of PPROM. These patients' experiences demonstrate the conflict between EMTALA and § 18-622—something it appears a majority of the Supreme Court has already accepted. *See Moyle*, 144 S. Ct. at 2017 (Kagan, J., concurring) (noting that "when a woman comes to an emergency room with PPROM, the serious risk she faces may not be of death but of damage to her uterus, preventing her from having children in the future," and "Idaho has never suggested that its law would allow an abortion in those circumstances"); *id.* at 2037-38 (Alito, J., dissenting) (conceding that "in PPROM cases, there may be an important conflict

between what Idaho law permits and what EMTALA, as interpreted by the Government, demands").[20]

*Second*, in *Amicus*' view, the injunction need not be modified to permit enforcement of Idaho's law in the four scenarios that Idaho identifies, namely when (1) "abortions are sought for mental health reasons"; (2) "doctors or hospitals object as a matter of conscience" to the abortion; (3) the abortion would occur after 22 weeks; and (4) the abortion is "sought in a non-acute context." Idaho Replacement Opening Br. 44. But these are all hypothetical situations that would never arise under current practice and/or would not require any modification to the injunction.

**Mental Health.** With respect to the first scenario, the injunction need not be modified to rule out the hypothetical possibility that EMTALA would permit pregnancy termination for mental health concerns. Idaho invented this scenario out of whole cloth before the Supreme Court; it has no basis in fact. As the United States correctly argued, an abortion is never required as stabilizing treatment under EMTALA for mental health emergencies. *See* Brief for Respondent United States

---

[20] Moreover, the fact that the Attorney General may believe doctors treating patients with PPROM have no prosecutorial risk does not make it so. Individual County Prosecuting Attorneys may feel differently, and they may exercise their prosecutorial authority independently. *See State v. Summer*, 76 P.3d 963, 968 (Idaho 2003) (explaining legislative amendments to eliminate the Attorney General's supervisory power over prosecuting attorneys and noting that "it is clear that the prosecuting attorney has primary responsibility for the enforcement of state penal laws," not the Attorney General).

at 26 n.5, *Moyle*, 144 S. Ct. 2015, 2024 WL 1298046; Tr. of Oral Arg. 76-78. *Amicus* has *never* seen a patient receive termination as stabilizing care for a mental health emergency. If a pregnant patient presents to an emergency room with an emergency mental health condition, the stabilizing treatment will address the mental health condition, not the pregnancy. And Idaho still has yet to identify a single instance in which this outcome occurred, or any clinical standard referencing termination as necessary stabilizing care in such circumstances.[21] Because the district court's injunction is limited to medical care required by EMTALA, it simply has no application to this scenario.

**Conscience Objections.** As for conscience objections, again no modification is required because conscience objections from physicians and hospitals have long been permitted. It can hardly be considered a concession for the government to state, as it did at oral argument, that EMTALA does not override other provisions of federal law, such as the conscience protections in the Weldon Amendment and the

---

[21] Appellants have briefly referenced an American Psychiatry Association Position Statement, *see* Tr. of Oral Arg. 46; Moyle Br. 52 n.5, but that half-page document does not set forth a clinical standard or reference abortion as a stabilizing treatment, and in any case appears to be focused on the entirely different question of subsequent mental health effects stemming from restrictive abortion measures. *See* Am. Psychiatric Ass'n, *Position Statement on Abortion and Women's Reproductive Healthcare Rights* (Mar. 2023), https://bit.ly/3XVlq4m (describing how "[r]estrictive abortion and contraception policies have been shown to be related to an increased risk for a variety of mental health problems").

Coats-Snowe Amendment. *See* Tr. of Oral Arg. 87-90; *see also* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, tit. V, § 507(d)(1), 136 Stat. 4459, 4908 (2022); 42 U.S.C. § 238n. And, once again, this issue does not actually arise in *Amicus*' experience. Doctors who choose to work in this field are aware that termination may be stabilizing care in certain situations, and they are prepared to provide that stabilizing treatment when required. If a doctor or other clinician does have a conscience objection, hospitals are required under federal law to allow them to opt out of providing that care.

**Delivery After Viability.** Third, the preliminary injunction need not be modified to provide that delivery rather than termination is required by EMTALA after viability. Initially, courts should not be in the business of dictating what is and is not stabilizing care—that is a question that should be left to medical professionals trained to apply the standard of care. And here, no modification to the injunction is needed because the standard of care under EMTALA generally would be to deliver the baby to end the pregnancy after viability to address severe health consequences for the mother. Thus, altering the injunction to require this outcome would have little practical effect.

**Acute Circumstances.** Finally, there is no need to modify the injunction to clarify that an abortion is stabilizing treatment only in acute circumstances. EMTALA already expressly provides that limitation. *See* 42 U.S.C.

§ 1395dd(e)(1)(A) (defining "emergency medical condition" as a condition "manifesting itself by acute symptoms" that must receive "immediate medical attention"). The scope of the injunction need not be altered to reflect what EMTALA already plainly commands: termination is required only in those acute emergency situations where a woman's health would be seriously jeopardized if her pregnancy is not terminated to address immediate risks to her health. Tr. of Oral Arg. 79-80.

## CONCLUSION

For the foregoing reasons, *Amicus* St. Luke's Health System, Ltd. respectfully requests that the Court affirm the District Court's preliminary injunction.

Date:  October 14, 2024

Respectfully submitted,

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison
Arjun R. Ramamurti
Jenner & Block LLP
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

Wendy Olson
Stoel Rives LLP
101 S. Capitol Blvd, Suite 1900
Boise, ID 83702
(208) 387-4291
Wendy.Olson@stoel.com

*Attorneys for Amicus Curiae St.
Luke's Health System, Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 23-35440, 23-35450**

I am the attorney or self-represented party.

**This brief contains 6,883 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** * /s/ Lindsay C. Harrison*      **Date** October 14, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed via the Court's electronic filing system on October 14, 2024, to be served by operation of the electronic filing system on all ECF-registered counsel of record.

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison
Jenner & Block LLP
1099 New York Ave. NW,
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Attorney for Amicus Curiae St. Luke's Health System, Ltd.*